**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Avon Products Inc. Securities Litigation | No. 19-cv-01420-CM |

# AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS


I. NATURE OF THE ACTION .......... 2

II. JURISDICTION AND VENUE .......... 12

III. PARTIES .......... 13

IV. SUBSTANTIVE ALLEGATIONS .......... 15

A. Company Background .......... 15

B. Avon's Recruitment of Representatives .......... 19

C. Avon Promoted the Training and Support Provided to its Representatives .......... 20

D. Sales of Avon Product by its Representatives .......... 22

E. Confidential Witnesses .......... 23

1. Defendants lowered the credit standards for new Representatives in Brazil. .......... 24

2. Predictably, a large percentage of the newly recruited sales Representatives with weaker credit could not pay for the Avon product sent to them, and thus, became delinquent. .......... 31

3. Defendants encouraged delinquent Representatives to order additional product with promises of discounts and reactivation. .......... 35

4. Defendants artificially inflated Avon's revenues in Brazil by sending Representatives product that had not been ordered. .......... 36

5. Defendants received reports and participated in meetings throughout the Class Period in which the increased Representative delinquencies and increasing bad debt were discussed. .......... 38

6. Defendants' scheme temporarily inflated the active representative base in Brazil, but when the credit criteria was tightened in 2017, Active Representative levels in Brazil came crashing down. .......... 41

7. Defendants overstated the number of Representatives in Brazil. .......... 41

8. Sales Representative training in Brazil was nonexistent throughout the Class Period. .......... 42

V. DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF CONDUCT .......... 45

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ..... 45

A. Annual Investor Conference – January 21, 2016 ..... 45

B. Fourth Quarter Fiscal 2015 Results – February 11, 2016 ..... 49

C. Form 10-K – February 23, 2016 ..... 51

D. First Quarter Fiscal 2016 Results – May 5, 2016 ..... 53

E. Second Quarter Fiscal 2016 Results – August 2, 2016 ..... 55

F. Barclays Global Consumer Staples Conference – September 6, 2016 ..... 58

G. Third Quarter Fiscal 2016 Results – November 3, 2016 ..... 60

H. Bank of America Merrill Lynch America Leveraged Finance Conference – November 29, 2016 ..... 65

I. ICR Conference - January 10, 2017 ..... 66

J. The Truth Begins to Emerge, but Defendants Continue to Mislead Investors ..... 67

1. Fourth Quarter Fiscal 2016 Results – February 16, 2017 *(First Partial Revelation of the Truth)* ..... 67

2. First Quarter Fiscal 2017 Results – May 4, 2017 *(Second Partial Revelation of the Truth)* ..... 74

3. Deutsche Bank Global Consumer Conference – June 14, 2017 ..... 78

4. Second Quarter Fiscal 2017 Results – August 3, 2017 *(Third Partial Revelation of the Truth)* ..... 79

VII. THE FULL TRUTH IS REVEALED ..... 83

VIII. POST-CLASS PERIOD EVENTS ..... 86

IX. DEFENDANTS' VIOLATIONS OF GAAP ..... 93

A. Avon's Bad Debt Expense and Allowance for Doubtful Accounts before the Start of the Class Period ..... 93

B. Avon's Bad Debt During the Class Period ..... 94

C. Overview of Relevant GAAP Provisions ..... 100

D. Avon's Improper Revenue Recognition ........ 101

X. ADDITIONAL EVIDENCE OF SCIENTER ........ 104

A. Avon's Brazilian Market Was Extremely Important to the Company's Revenues. ........ 105

B. Statements by Former Avon Employees, Independent Contractors, and Sales Managers Corroborate that Defendants Knew or Were Reckless in Not Knowing about the Burgeoning Bad Debt Problems Caused by the Company's Drastic Reduction in Credit Standards for New Representatives in Brazil. ........ 107

C. The Company's Late-in-the Class Period Admission that Increased Bad Debt Was Directly Attributable to "relaxing credit terms" for New Representatives in Brazil During the Class Period Provides Strong Evidence of Scienter. ........ 109

D. The Company's Post-Class Period Admissions Regarding the Total Lack of Training and Minimal Sales Support for its Representatives in Brazil and Other Top Markets Provides Strong Evidence of Scienter. ........ 111

E. McCoy's Ouster as CEO Provides Strong Evidence of Scienter. ........ 113

XI. LOSS CAUSATION/ECONOMIC LOSS ........ 114

XII. CLASS ACTION ALLEGATIONS ........ 117

XIII. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........ 119

XIV. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 121

XV. CONTROL PERSON ALLEGATIONS ........ 122

XVI. CAUSES OF ACTION ........ 124

COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 against All Defendants ........ 124

COUNT II For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder against All Defendants ........ 126

COUNT III For Violation of §20(a) of the Exchange Act against Individual Defendants ........ 127

XVII. PRAYER FOR RELIEF ........ 128

XVIII. JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS ........ 129

Lead Plaintiff Holly Ngo ("Lead Plaintiff") and additionally named plaintiff David Klungle ("Additionally Named Plaintiff"), individually and together on behalf of all others similarly situated, by their undersigned counsel, hereby bring this Amended Consolidated Class Action Complaint (the "Complaint") against Avon Products, Inc. ("Avon" or the "Company"), Avon's former Chairman and CEO Sherilyn S. McCoy ("McCoy"), Avon's former Executive Vice President and COO James S. Scully ("Scully"), Avon's former Executive Vice President and CFO James S. Wilson ("Wilson"), and the Executive Vice President and President of Avon South Latin America, David Legher ("Legher") (collectively, "Defendants"). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Avon; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees, independent contractors, and outside sales representatives ("Representatives") of Avon with knowledge of the matters alleged herein; and consultation with experts in the areas of: (1) accounting; and (2) loss causation and damages.[1] Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiff and Additionally Named Plaintiff believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable

[1] Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2, etc.). All CWs will be described in the masculine to protect their identities.

opportunity for discovery. On behalf of themselves and the class they seeks to represent, Lead Plaintiff and Additionally Named Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock of Avon during the period from January 21, 2016 to November 1, 2017, inclusive (the "Class Period"), and were damaged thereby. The action is brought against Avon and certain of its former officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Avon purports to be one of the world's largest direct sellers, distributing beauty and personal care products globally through a model whereby Representatives purchase product directly from Avon and then sell the product to the ultimate consumers. The growth and sustainability of Avon's business is wholly dependent upon the ability of its Representatives, predominantly women belonging to a lower socioeconomic class, to generate recurring sales. Under its direct-selling model, it is crucial for the Company to hire high-quality Representatives and provide them with ongoing sales support and training to ensure their success and longevity. Importantly, Avon provides thousands of dollars of product to its Representatives on credit, which exposes the Company to the risk of bad debt. The practice also exposes the Representatives to tarnished credit if they ultimately cannot pay Avon for the product. Traditionally, Avon has a high rate of churn, or turnover, on an annual basis among its Representatives.

3. Brazil is Avon's largest market, measured by revenue and number of Representatives. In 2016, revenue from Avon's Brazilian market was $1.2 billion, or

approximately 21% of Avon's 2016 consolidated revenue of $5.7 billion. No other country accounts for more than 10% of Avon's total revenues.

4. Avon establishes policies related to recruiting, training, and other functions to support the sales efforts of its Representatives in each of its geographical markets. During the initial recruitment stage, prospective Representatives register with the Company through an "appointment" process. To become an approved Representative, a candidate fills out an application and pays a nominal fee. Upon approval, Representatives are eligible to purchase product on credit extended by Avon. After approval, new Representatives go through an "onboarding process." During the onboarding process, Avon forwards informational materials and purportedly provides sales training and ongoing support to the new Representatives.

5. When training and other support functions are curtailed, or completely eliminated (especially during the onboarding process), Representatives' sales to the end users languish, causing those Representatives to stop placing orders with Avon. If the Representatives' accounts become past due or are deemed delinquent, the Company may not allow Representatives to order additional product or participate in subsequent sales campaigns. Therefore, the lack of Representative training and support negatively impacts Avon's recurring revenues. Indeed, during the Class Period, analysts following the Company noted that "[g]iven the importance of salespeople in a direct selling business, we place a high level of importance on a company's ability to retain talent." However, during the Class Period, despite representations to the contrary, Avon failed to provide any training for its Representatives, jeopardizing the sustainability of the Company's revenues and the retention and success of its Representative base.

6. It is crucial for Avon to recruit ***high-quality*** Representatives. If recruitment standards are significantly loosened, lower-quality Representatives are approved and issued instant merchandise credit by Avon. Therefore, looser recruitment policies increase Avon's exposure to credit risk. Historically, Avon did not allow the appointment of Representatives who carried debt or still owed the Company money from prior Avon sales campaigns. If a Representative's account was sent to collections, that Representative typically was not allowed to sell for Avon again even if they paid off their outstanding debt.

7. Between 2010 and 2014, Avon faced declining revenues and a dwindling Representative base due to: (i) increased competition; (ii) the rise of e-commerce; and (iii) an outdated marketing model. To combat declining revenues and add significantly more Representatives to its sales force, prior to the start of the Class Period, Avon loosened its credit standards for the recruitment of new Representatives in Brazil during a time when the country was experiencing a difficult economic environment and high unemployment. This loosening of credit expanded Avon's Representative ranks to include women who were already heavily in debt. Avon then provided debt burdened women with hundreds of dollars, and in some cases, thousands of dollars, of Avon product on credit without giving them the necessary training to succeed. Ultimately, this left these women burdened with even more debt than they had before and quite possibly permanently ruined their credit.

8. When Representatives predictably fell into arrears—helped in no small part by Avon's lack of training and support—Avon would entice them with partial loan forgiveness if they continued to purchase more product on credit, often driving them deeper into debt. Moreover, numerous Representatives fell further into debt through Avon's improper practice of delivering unordered merchandise. Avon's predatory lending policies fraudulently inflated the

Company's revenues and number of active Representatives at the expense of thousands of unsophisticated Brazilian women. As the Company misled investors, countless at-risk women were exploited, became hopelessly indebted with ruined credit, and were hounded by Latin American collection agencies. It was not until the spring of 2017 that Avon reversed course and began tightening its credit standards in Brazil - which Defendants claimed would not materially affect Avon's revenues and Representative retention. This, however, was untrue because during the Class Period both Avon revenues and Representative retention suffered.

9. It was well known within the Company, despite Defendants' successful efforts to withhold these facts from investors, that Avon had aggressively loosened its credit policies for incoming Brazilian Representatives at the start of the Class Period. Further, Avon offered minimal to no support or training to new Brazilian Representatives throughout the Class Period. Former Avon employees, independent contractors, and Representatives with knowledge of the Company's business confirm that:

(a) In 2015, there was a Company-wide decision to lower credit standards for new Representatives in Brazil to stimulate growth. The Company decided to offer credit to individuals already in debt and encouraged sales managers to recruit significantly more new Representatives during key recruiting campaigns to bolster dwindling Representative numbers in Brazil and combat increased competition from companies such as Natura and O Boticário;

(b) Thereafter, Avon encouraged and approved the appointment of new Representatives with lower credit marks/negative credit history and higher debt loads. These relaxed credit standards were prevalent in recruiting campaigns that occurred in Brazil from mid-2015 to mid-2016. For example, during an Avon recruiting campaign in July 2016 (Campaign

14), approximately 80% of prospective Representatives who applied were approved. By contrast, Avon Brazil typically approved only 20% of prospective Representatives;

(c) The loosening of credit standards for new Representatives in Brazil led to increased delinquencies and bad debt for the Company:

(i) By mid-2016, the delinquency rate was approximately 20-30% in the Northeast region of Brazil and approximately 12-15% in the Central-West region of Brazil (*i.e.*, Brasilia). By comparison, the standard delinquency rate at comparable Brazilian beauty companies averaged only 5-8%;

(ii) Avon urged its sales managers in Brazil to allow delinquent Representatives to pay in installments, enticing them with discounted product if they continued to order from the Company in subsequent sales campaigns. These enticements, however, caused approximately 50% of already delinquent Representatives to fall into further into debt; and

(iii) Sales managers were encouraged to utilize third-party collection agencies, and also to carry around handheld credit card machines to attempt to collect delinquent amounts directly from Representatives;

(d) The Company's bad debt situation was discussed in regional Company performance meetings held via video conference and attended by top Avon executives including Defendants McCoy, Scully, and Legher. Reports containing delinquency rates of new Representatives were provided to Defendant Legher and other top executives in Brazil;

(e) Sales Representative training in Brazil was nonexistent in 2016 and 2017;

(f) Avon failed to remove delinquent Representatives from its system; and

(g) Internal Avon documents confirm that there was a widespread problem of Representatives in Brazil receiving Avon products they had never ordered.

10. Rather than inform the investing public of the Company's increased exposure to bad debt, cessation of all Representative training worldwide, improper accounting practices (described below), and the unsustainability of its recurring revenues and Representative retention rates in Brazil and other top markets, Defendants continued to tout the Company's successful onboarding and support for its Representatives in Brazil and other top markets.

11. These statements were materially false and misleading when made in that they failed to disclose, among other things, that: (i) in late 2015, Avon had aggressively loosened its credit standards for incoming Representatives in Brazil, thereby exposing the Company to a much-increased risk of bad debt (and exposing the Representatives to long-term debt and tarnished credit); (ii) Avon had stopped providing important support functions, including all training, to its Representatives worldwide, including in Brazil, exposing the Company to a heightened risk of slowing sales and a languishing salesforce of Active Representatives[2]; (iii) Representative retention rates and revenues were being artificially inflated with purported "sales" to new Representatives who were not being trained and could not pay for product being shipped to them which they were not taught how to sell; (iv) delinquency rates among new sales Representatives in Brazil had increased; (v) the Company's revenues in Brazil (its largest market) were unsustainable; and (vi) the Company was exposed to bad debt for product shipped to Representatives who could not pay for it.

12. Throughout the Class Period, Defendants artificially inflated Avon's financial results. Specifically, a forensic accounting analysis reveals that Defendants failed to increase Avon's allowance for bad debt to account for changes it made to its credit terms in Brazil. Under Generally Accepted Accounting Principles ("GAAP"), Avon was required to maintain

[2] *See* ¶42 (definition of Active Representatives).

adequate reserves for bad debts where Avon faced a risk that it would not be paid for the products it sold on credit. When Avon relaxed its credit criteria in 2015, a spike in uncollectible revenue was inevitable. Yet Defendants improperly failed to account for the fact that it had loosened the Company's credit standards in assessing bad debt expense until the fourth quarter of 2016. Avon's exposure to bad debt in Brazil did not suddenly materialize in the fourth quarter of 2016. Rather, the losses caused by bad debts that were recognized by Avon from Q4 2016 into 2017 should have been recognized a year earlier—*i.e.*, beginning in Q4 2015.

13. As set forth in more detail herein, by Q4 2015, Defendants possessed information showing that the level of uncollectible receivables from new Representatives in Brazil had spiked higher and losses were highly probable. Yet Defendants failed to account for this information when estimating Avon's bad debt expense. If Avon had timely recorded bad debt expense commensurate with the increase in credit risk associated with its new Representatives in Brazil, Avon would have recorded substantially more bad debt expense from the fourth quarter of 2015 through the fourth quarter of 2016. Avon also would have experienced massive decreases in reported profitability during these periods had it timely record bad debt expense associated with the increased credit risk. Indeed, in three of the four quarters before Avon first disclosed the existence of the Brazilian credit risk (*i.e.*, the first three quarters of 2016), Avon's reported adjusted operating profit would have decreased by more than 5%. Instead, Defendants improperly failed to record any increased bad debt expense until well after the new Representatives in Brazil had defaulted on their payment obligations for product shipped to them by the Company. Given the Company's loosened credit standards, however, the collectibility of sales transactions with the new Representatives in Brazil was doubtful at the outset of the "sales" and revenue recognition should have been delayed until collectibility was reasonably assured.

Instead, Avon not only prematurely recognized this revenue, but failed to record adequate bad debt expense on a timely basis for this known risk.

14. Throughout the Class Period, Defendants also: (a) artificially inflated Avon's financial results by recording revenue on unordered product improperly shipped to Representatives in Brazil; and (b) inflated key metrics followed by the market including Avon's reported number of Active Representatives in Brazil by keeping delinquent Representatives in its system.

15. Defendants also failed to disclose Avon's predatory lending practices and highly aggressive collection tactics which took improper advantage of many of the women in its Representative base in Brazil—predominately unsophisticated women belonging to lower socioeconomic classes and living in a country facing extreme economic turmoil.

16. As a result of this deception, Avon caused its common stock to trade at artificially inflated prices during the Class Period, reaching a high of nearly $7.00 per share.

17. The truth about Avon's artificially inflated Representative base which was receiving no training, burgeoning bad debt, and unsustainable earnings was revealed to the market through a series of partial corrective disclosures beginning on February 16, 2017. That day, in connection with the announcement of Avon's disappointing results for its fourth quarter of fiscal 2016, the Company specifically attributed the weak results to stagnant Representative growth across its top markets and an "unexpected increase in bad debt of . . . $35 million, primarily within [Avon's] Brazilian business." According to the Company, its bad debt problem was caused by "adjusted credit terms" and "the inability of some [Representatives] to pay." On this news, Avon's stock price fell 18.6%. However, Defendants continued to mislead the market

by falsely reassuring investors that the bad debt problem was "fully cleared up and booked in the 2016 results," and that Avon "would not be expecting a flow over of that into 2017."

18. The negative effects of the Company's failure to support its Representatives through training and other sales support and loosening of its credit standards for Representatives in Brazil in 2016 was further revealed, in part, to the market on May 4, 2017, when Avon reported disappointing earnings for the first quarter of fiscal 2017, primarily due to weak Representative retention, service issues at the Representative level, and additional bad debt write-offs from lower collections in Brazil. On this news, Avon's stock declined 22.2%. Nevertheless, Defendants continued to mislead the market by falsely reassuring investors that they "expect[ed] the amount of bad debt to decline in the second half of [2017]" due to "enhanced collection processes and tighter recruiting terms."

19. Then, on August 3, 2017, the Company reported both new and lingering executional issues including additional material bad debt expenses due to the looser credit standards in Brazil. In addition, after mounting pressure from activist investors, Avon announced that Defendant McCoy would be leaving as CEO of the Company. On this news, Avon's stock price declined 10.7%, but Defendants made a concerted effort to soften the blow by falsely assuring investors that they "expect[ed] [Avon] to start to recover during the second half" of the year.

20. Finally, on November 2, 2017, before the market opened, the full extent of Defendants' fraud was revealed when the Company reported weak results for the third quarter of fiscal 2017 and disclosed that higher bad debt levels, which Defendant Wilson described as "self-inflicted," were driven by the Company's more relaxed credit policies for incoming Representatives in 2016. Defendant Wilson admitted that "[t]he consequence of these relaxed

policies were delinquencies associated with these new representative populations, resulting in large increases in bad debt." The Company also disclosed that Active Representative levels were down 3% in the quarter, primarily driven by declines in Brazil after the Company reverted to tighter credit standards for new Representatives, a trend the Company expected to continue to last through the end of 2017. On this news, the Company's stock price fell 18.1% over two trading days to close at $1.94 per share on November 3, 2017.

21. The Company's post-Class Period admissions are corroborated by the reports of the CWs (¶¶57-126). Following the Class Period, Avon's new CEO, Jan Zijderveld ("Zijderveld"), informed investors that Avon Brazil was on the "operating table" and that a brand-new leadership team would "fix [Avon's] service" to its Representatives in Brazil. When discussing its restructuring in Brazil, Avon executives revealed an astonishing fact. Avon's new CEO admitted on August 2, 2018 that there had been absolutely no training and minimal sales support for its Representatives in Brazil and certain other top markets for years, a material fact that was concealed from investors throughout the Class Period: "It is amazing that in Brazil, we basically stopped all training."

22. This came as a shock to securities industry professionals who followed the Company. For example, Lauren Lieberman, an analyst at Barclays, expressed surprise at the Company's disclosure, stating in an August 3, 2018 analyst report: "The company will resume training programs, which have largely (and shockingly) ground to a halt during recent years." Then, on September 21, 2018, during Avon Investor Day, Zijderveld repeated and further confirmed, in total contravention of what Defendants had previously said, that Avon had ceased all training and sales support for its Representatives. Zijderveld went even further, admitting that Avon "went to zero in terms of training and tools" and "didn't invest in [the Representatives']

business development, product knowledge and really how she builds her business." Miguel Fernandez, Avon's Global President at the time, also admitted that there had been no training in Brazil and other key markets for five years. Fernandez stated, in part: "About 5, 10 years ago, for some reason, we decided to cut training. . . . So a rep came, got the brochure and had no training."

23. The admissions continued. On November 1, 2018, when Avon reported its results for its third quarter of fiscal 2018, Fernandez further admitted that there had been no training in Brazil and other key markets for five years. On the same call, top Avon executives stressed that Representative training was the most important factor in Representative retention and success, which was key to sustaining and growing Avon's revenues, a metric which languished during the Class Period. Indeed, post-Class Period Avon executives noted that "[t]rained sales leaders earn 50% more money. Training with the intent to helping her increase her earning is one of the most critical elements to retaining our representatives."

24. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiff, Additionally Named Plaintiff, and other Class members have suffered significant economic damages.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

26. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as, upon information and belief, Avon shareholders reside in this District, the acts and transactions giving rise to the violations of law complained of occurred in part in this

District, the false and misleading statements were disseminated in this District, and the manipulative conduct was carried out in part in this District.

27. In connection with the acts, conduct, and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

28. As set forth in the Certification previously submitted to the Court (ECF No. 14-1) and subsequent certification filed with this Complaint, Lead Plaintiff Holly Ngo purchased Avon common stock at artificially inflated prices during the Class Period and suffered damages thereby. Additionally Named Plaintiff David Klungle purchased Avon common stock at artificially inflated prices during the Class Period and suffered damages thereby as evidenced by the certification annexed hereto.

29. Defendant Avon is a global manufacturer and marketer of beauty and personal care products. During the Class Period, shares of Avon common stock traded in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "AVP."

30. Defendant Sherilyn S. McCoy was the CEO and a director of Avon until she announced in August 2017, three months prior to the end of the Class Period, that she would be leaving the Company. CEO McCoy's total estimated compensation (including salary, stock and option awards, and Incentive Plan Compensation) was approximately $8 million in 2016 and $9.9 million in 2017. While CEO, McCoy signed Avon's annual reports and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Avon's internal control over financial reporting. While CEO, McCoy also participated in each of

the Company's quarterly earnings conference calls described herein. McCoy was a direct and substantial participant in the fraud.

31. Defendant James S. Scully was Avon's Executive Vice President and Chief Operating Officer ("COO") throughout the Class Period until October 1, 2017, and Chief Financial Officer ("CFO") from March 2015 until January 1, 2017. Scully's total estimated compensation (including salary, stock and option awards, and Incentive Plan Compensation) was approximately $3.2 million in both 2016 and 2017. While CFO, Scully signed Avon's annual reports and certifications pursuant to SOX stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Avon's internal control over financial reporting. While CFO, Scully also participated in each of the Company's quarterly earnings conference calls described herein. Scully was a direct and substantial participant in the fraud.

32. Defendant James S. Wilson was the Executive Vice President and Chief Financial Officer ("CFO") of Avon from January 2017 through the end of the Class Period. CFO Wilson's total estimated compensation (including salary, stock and option awards, and Incentive Plan Compensation) was approximately $2.4 million in 2017. While CFO, Wilson signed Avon's annual reports and certifications pursuant to SOX stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Avon's internal control over financial reporting. While CFO, Wilson also participated in each of the Company's quarterly earnings conference calls described herein. Wilson was a direct and substantial participant in the fraud.

33. Defendant David Legher was the President of Avon South Latin America and an Executive Member of Avon's Global Management Committee throughout the Class Period.

Legher occupied various other management roles at Avon Latin America during his 17-year career with the Company. Legher participated in Avon's Annual Investor Day on January 21, 2016. Legher was a direct and substantial participant in the fraud.

34. The defendants referenced above in ¶¶30-33 are collectively referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that caused the price of Avon common stock to be artificially inflated during the Class Period.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Company Background

35. Avon, a New York corporation now headquartered in London, is a global manufacturer and marketer of beauty products, personal care products, cosmetics, fragrances, fashion jewelry, apparel and footwear, and housewares. Avon was founded by David H. McConnel in 1886 as a direct-selling company specializing in personal beauty products. It is the second largest multi-level marketing ("MLM") company in the world (after Amway). The Company traditionally sold beauty products within the United States. Toward the end of the twentieth century, Avon expanded into several international markets. By 2010, Brazil surpassed the United States as Avon's largest market. On December 31, 2015, Avon had 28,300 employees.

36. In 2015, Avon sold 80% of its North American business to private equity firm Cerberus Capital Management, L.P. ("Cerberus") for $170 million. The sale of the North American business purportedly allowed the Company to focus on its growing international markets and "Transformation Plan," announced in January of 2016, which was based on three core pillars: (i) invest in growth; (ii) drive cost savings; and (iii) improve financial resilience.

Following closure of the deal, Avon North America (aka Avon LLC) was a privately held Company majority-owned by Cerberus.

37. Unlike most competitors that sell their products through third-party retail establishments (*e.g.*, drug stores and department stores), Avon's business is conducted primarily in one channel: direct selling to Avon Representatives. Avon Representatives then resell Avon products to end-user customers. As of December 31, 2016, Avon had more than six million Representatives in 57 countries.

38. After the sale of the North American business, Avon moved its corporate headquarters to the UK. Effective January 1, 2016, its reportable segments were reorganized into four geographic regions: (a) Europe, Middle East & Africa ("EMEA"); (b) South Latin America ("SOLA"); (c) North Latin America ("NOLA"); and (d) Asia Pacific. In 2016, more than 50% of Avon's business came from its Latin American segments (SOLA and NOLA) and 70% of Avon's revenues came from its top 10 markets. In 2016, Avon's top markets included Brazil, Mexico, Russia, the Philippines, and the UK.

39. Latin America contributes over 50% of Avon's total revenues and its share has remained relatively stable over the last several years.

(a) The SOLA segment includes operations in Brazil and Argentina and the NOLA segment includes Avon's operations in Mexico. The contributions by the two sub-segments, SOLA and NOLA, were approximately 40% and 15% in 2017, respectively. Overall, the Latin American region has witnessed a mid-single-digit reduction in Representatives over recent years, which has resulted in a similar revenue decline.[3]

---

[3] *A Closer Look At Avon's Global Operations, And What's In It For Natura*, Forbes, May 24, 2019, https://www.forbes.com/sites/greatspeculations/2019/05/24/a-closer-look-at-avons-global-operations-and-whats-in-it-for-natura/#5e3082b719dd.

(b) EMEA is Avon's second largest segment and contributes 38% of the Company's total revenues. Over the last two years, Active Representatives in EMEA declined by a low single-digit rate and resulted in a high single-digit reduction of units sold.[4]

(c) Asia Pacific contributes the least to Avon's top line at less than 10% of total annual revenues. Revenues for Asia Pacific declined sharply in 2016 because of a reduction in Active Representatives leading Avon to exit the Thailand market in 2017.[5]

40. Brazil is Avon's largest market, measured by revenue and number of Representatives. In 2016, Brazil revenue was $1.2 billion, or approximately 21% of Avon's total revenues. No other country accounts for more than 10% of Avon's total revenues. At the end of 2016, Avon had 1.5 million Representatives in Brazil, representing 25% of Avon's total Representative base of 6 million Active Representatives.

41. According to Avon's 2016 Investor Day Presentation, Avon's Representative base in Brazil is predominantly comprised of middle to lower class women in their 20s and 30s with a high school education. In 2015, over 25% of Brazilian Representatives were below the poverty line. Relatedly, as noted in the same presentation, "Brazil is experiencing one of its worst economic and political crises of the last 70 years," with unemployment of 9% or more.[6]

42. Avon utilizes and reports two metrics to investors to measure the strength of its Representative base: Active Representatives and Ending Representatives.

(a) Active Representatives are those who have submitted an order in the last sales campaign.[7]

---

[4] *Id.*

[5] *Id.*

[6] Powerpoint Presentation, Avon's 2016 Investor Day Presentation (Jan. 21, 2016).

[7] 2016 10-K, at 3. Avon has generally operated on a 3-week sales campaign cycle with approximately 17 sales campaigns per year. [Transcript 6/14/17, at 7]. The six million "Active

(b) Ending Representatives are those who, in Avon's determination, are eligible to place an order in the last sales campaign as a result of being on an active roster.[8]

(c) Avon measures changes in both Active and Ending Representatives by comparing the current number to that of the corresponding period during the prior year. Avon considers "Change in Representatives" (*i.e.*, representative growth) a key performance metric.[9]

43. During the Class Period, analysts covering the Company closely followed Representative retention trends and noted that Representative retention and Representative growth were the most significant indicators of Avon's business fundamentals. Unfortunately for shareholders, during the Class Period, Avon's Active Representatives were decreasing despite the lowered credit criteria for new Representative appointment in Brazil. For example, for fiscal 2016 ended December 31, 2016, Active Representatives were down 1%, with Ending

---

Representative" metric provided by the Company at its January 21, 2016 Investor Day represents the number of representatives who placed an order within the last six weeks." Transcript 1/21/16, at 25.

[8] Avon Form 10-K (Feb. 22, 2017) ("2016 10-K"), at 28. The Company's 2016 10-K defines "Change in Ending Representatives" as being "based on the total number of Representatives who were eligible to place an order in the last sales campaign in the related period as a result of being on an active roster. To determine the Change in Ending Representatives, this calculation is compared to the same calculation in the corresponding period of the prior year. Change in Ending Representatives may be impacted by a combination of factors such as our requirements to become and/or remain a Representative, our practices regarding minimum order requirements and our practices regarding reinstatement of Representatives. We believe this may be an indicator of future revenue performance." 2016 10-K at 28. If a Representative is removed for a delinquent account, they may have their account reinstated under certain circumstances including paying the past due amount in full and paying a reinstatement fee. Policies for Avon's Independent Sales Representatives, at 10. https://www2.youravon.com/REPSuite/static/pdf/leadership/avon_policy_book_isr.pdf?appRes=com.avon.gi.rep.core.resman.vprov.ObjProvApplicationResource%25406828d832

[9] The Company's 2016 10-K defines "Change in Active Representatives" as "a measure of Representative activity based on the number of unique Representatives submitting at least one order in a sales campaign, totaled for all campaigns in the related period. To determine the change in Active Representatives, this calculation is compared to the same calculation in the corresponding period of the prior year." 2016 10-K at 28. During the Class Period, Avon reported Change in Active Representatives on a Company-wide basis and by segment.

Representatives remaining relatively unchanged compared to fiscal 2015.[10] For fiscal 2017 ended December 31, 2017, Active Representatives fell even further, decreasing 3%.[11]

44. So important was the "Active Representatives" metric that growth in Active Representatives was added as a component of Avon's 2016 Annual Incentive compensation plan.[12]

**B. Avon's Recruitment of Representatives**

45. Avon sets policies related to recruiting, training, and other functions to support the sales efforts of its Representatives in each of its geographical markets, including Brazil. During the initial recruitment stage, prospective Representatives register with the Company through an "appointment" process. To become an approved Representative, the candidate fills out an application and pays a nominal fee. In order to be approved for appointment, candidates must meet Avon's country-specific credit standards and complete and sign an Avon Independent sales Representative Contract, which is subject to acceptance by Avon. Representatives who are approved are independent contractors and not Avon employees.[13] If the Representatives perform well at the lower level, they may qualify to become sales executives.

46. Avon's 2015 10-K describes its sales process and recruitment policies as follows:

> A Representative contacts their customers directly, selling primarily through our brochure, which highlights new products and special promotions for each sales campaign. In this sense, the Representative, together with the brochure, are the "store" through which our products are sold. A brochure introducing a new sales campaign is usually generated every three to four weeks for most markets. Generally, the Representative forwards an order for a campaign to us using the Internet, mail, telephone, or fax. This order is processed and the products are assembled at a distribution center and delivered to the Representative usually through a combination of local and national delivery companies. Generally, the

---

[10] Avon Form DEF 14A (Mar. 30, 2017) ("2016 Proxy"), at 33.

[11] Avon Form 10-K (Feb. 22, 2018) ("2017 10-K"), at 27.

[12] 2016 Proxy, at 35.

[13] 2015 10-K, at 3.

> Representative then delivers the merchandise and collects payment from the customer for her or his own account. A Representative generally receives a refund of the price the Representative paid for a product if the Representative chooses to return it.
>
> * * *
>
> The recruiting or appointing and training of Representatives are the primary responsibilities of district sales managers, zone managers and independent leaders. Depending on the market and the responsibilities of the role, some of these individuals are our employees and some are independent contractors. Those who are employees are paid a salary and an incentive based primarily on the achievement of a sales objective in their district. Those who are independent contractors are rewarded primarily based on total sales achieved in their zones or downline team of recruited, trained and managed Representatives. Personal contacts, including recommendations from current Representatives (including the sales Leadership program), and local market advertising constitute the primary means of obtaining new Representatives. The sales Leadership program is a multi-level compensation program which gives Representatives, known as independent leaders, the opportunity to earn discounts on their own sales of our products, as well as commissions based on the net sales made by Representatives they have recruited and trained. This program generally limits the number of levels on which commissions can be earned to three. The primary responsibilities of independent leaders are the prospecting, appointing, training and development of their downline Representatives while maintaining a certain level of their own sales. Development of the sales Leadership program throughout the world is one part of our long-term growth strategy.[14]

47. Upon approval, Representatives are eligible to purchase product on credit extended by Avon. If recruitment standards are significantly loosened, Avon is exposed to substantial credit risk due to its issuance of merchandise credit to newly approved Representatives with weak credit. Under GAAP, Avon is required to establish adequate reserves for potential bad debts related to these credit-based sales.

**C. Avon Promoted the Training and Support Provided to its Representatives**

48. After appointment, new Representatives go through an onboarding process. During this onboarding phase, new Representatives are forwarded informational materials and

[14] *Id.* at 3-4.

purportedly given corporate-sponsored sales training and ongoing support. As acknowledged by Defendant McCoy, training and support are crucial for Representative retention and recurring sales. For example, in October 2013, McCoy told investors that "effective recruiting is not simply bringing new Representatives into the system, but also giving them [the] support and training they need to navigate through their first few campaigns. . . . Frequent quality contact is critical to helping our Representatives—new Representatives [to] be successful, improving Representative retention and increasing productivity."[15]

49. Similarly, Avon's 2016 10-K noted that:

> • "The success of our business is highly dependent on recruiting, retaining and servicing our Representatives."[16]
>
> • "In order to reverse losses of Representatives and grow our business in the future, we need to recruit, retain and service Representatives on a continuing basis. Among other things, we need to create attractive Representative earning opportunities and transform the value chain, restore field health and sales force effectiveness, successfully implement other initiatives in the direct-selling channel, successfully execute our digital strategy, including ecommerce, improve our brochure and product offerings and improve our marketing and advertising."[17]

50. Indeed, the sustainability of the Company's earnings is dependent upon two factors: (1) Avon's ability to grow its Representative base with creditworthy individuals; and (2) Avon's commitment to train and provide ongoing sales support to its Representatives.

51. Thus, when training and other sales support initiatives languish, Representatives stop placing orders, thereby negatively impacting Avon's recurring revenues.[18]

---

[15] Transcript, Avon Management Discusses Q3 2013 Results Earnings Call (Oct. 31, 2013).

[16] 2016 10-K, at 26.

[17] *Id.* at 9.

[18] According to Avon's policies, if a Representative fails to submit an order for four consecutive Campaigns, they are considered "inactive" and are purportedly removed from Avon's "active" file. A Representative also may be removed from Avon's "active" file if they fail to submit payments to Avon in a timely manner. Policies for Avon's Independent Sales Representatives, at 11.

52. Traditionally, Avon has had a high rate of churn, or turnover. Thus, it is crucial to its business model and success that the Company continuously recruit and try to retain new Representatives. Avon disclosed in its 2015 10-K that:

> As described above, the Representative is the "store" through which we primarily sell our products and, given the high rate of turnover among Representatives (a common characteristic of direct selling), **it is critical that we recruit, retain and service Representatives on a continuing basis in order to maintain and grow our business**.
>
> * * *
>
> There is a high rate of turnover among Representatives, which is a common characteristic of the direct selling business. **In order to reverse losses of Representatives and grow our business in the future, we need to recruit, retain and service Representatives on a continuing basis**.
>
> * * *
>
> **The success of our business is highly dependent on recruiting, retaining and servicing our Representatives.**[19]

**D. Sales of Avon Product by its Representatives**

53. According to Avon's stated policies, if a Representative fails to remit payment for products purchased on credit, the Representative cannot participate in subsequent sales campaigns until her debt is settled with Avon. According to Avon's 2015 10-K:

> The Representative purchases products directly from us and may or may not sell them to an end user. In general, the Representative, an independent contractor, remits a payment to us during each sales campaign, which relates to the prior campaign cycle. The Representative is generally precluded from submitting an order for the current sales campaign until the accounts receivable balance for the prior campaign is paid; however, there are circumstances where the Representative fails to make the required payment. . . . If the financial condition of our Representatives were to deteriorate, resulting in their inability to make payments, additional allowances may be required.[20]

---

[19] 2015 10-K, at 2, 9-10, 27.

[20] *Id.* at 31.

54. Additionally, delinquent accounts are frequently sent to third-party collection agencies. Therefore, defaulted accounts have two adverse consequences for Avon: (1) a bad debt charge that lowers the Company's reported earnings; and (2) the loss of future sales and earnings from the delinquent Representative.

55. During the Class Period, Avon represented to investors that it recorded an estimate of an allowance for doubtful accounts on receivable balances based on an analysis of historical data and current circumstances. Avon purportedly reviews the allowance for doubtful accounts for adequacy, at a minimum, on a quarterly basis. In the years preceding the Class Period, Avon's annual bad debt expense remained constant at approximately 2% - 2.5% of total revenues.

56. Avon typically allows Representatives an unlimited right of return on its products. During the Class Period, Avon represented to investors that it recorded a provision for estimated sales returns based on historical experience with product returns. Over the past three years, annual sales returns were approximately 3% of total revenues.

**E. Confidential Witnesses**

57. Former Avon employees, independent contractors, Representatives, and sales managers from Brazil, with knowledge of the Company's business, confirm that credit standards for new Representatives in Brazil were substantially loosened by the start of the Class Period, and Representatives' training was minimal to nonexistent, which led to increased delinquencies and high churn among Representatives in Brazil and materially increased bad debt for the Company. The CWs discussed below provide factual support for a strong inference of scienter on Defendants' part regarding the false and misleading nature of their statements and omissions during the Class Period.

### 1. Defendants lowered the credit standards for new Representatives in Brazil.

58. In mid-2015, there was a Company-wide decision to lower credit standards for new Representatives in Brazil. Avon actively changed its credit standards and began offering credit to individuals already in debt. Moreover, Avon encouraged sales managers to recruit significantly more Representatives during key recruiting campaigns to bolster dwindling Representative numbers in Brazil and combat increasing competition from companies such as Natura and O Boticário. Then, throughout 2016, Avon continued to actively recruit and approve the appointment of new Representatives with lower credit history and higher debt loads. This, unsurprisingly, led to increased delinquencies among new Representatives in Brazil and increased bad debt for Avon.

59. CW-1 was the former Finance Executive Director, Global FP&A and Functional Business Support from 2015 through December 2017. In this position, CW-1's responsibilities included providing financial oversight for the Company's Transformation Plan and overseeing the Company's profit and loss. During CW-1's tenure, CW-1 reported directly to the Vice President of Global FP&A (Peter Haanschoten, and then Marcos Gabriel).

60. CW-1 confirmed that Defendants Legher, CEO McCoy, and CFO Scully were the three decision makers "in charge" of decisions regarding Avon's Brazilian business, including the decision to lower the credit standards in Brazil. According to CW-1, Defendant Legher initially reported to CEO McCoy, and then due to a restructuring in 2016, all market heads began reporting to Chief Commercial Officer, John Higson. CW-1 confirmed that at the end of 2015, Avon was focused on how to reverse its declining business and "lack of profitability."

61. CW-2 was a former Senior Sales Manager in Brazil. CW-2 was responsible for certain sectors in different Brazilian states and oversaw thousands of Sales Executives and sales Representatives in Avon Brazil. CW-2 reported to Vice President of Sales Eduardo Ribeiro, who reported to Defendant Legher.

62. CW-2 confirmed that Avon's "recruiting crusade" in the second half of 2015 was very aggressive and caused a spike in the number of new Representatives that was bound to decline later.

63. CW-3 was a former Sales Manager in Brazil from 2015 through 2017. During this time, CW-3 was responsible for recruiting and managing approximately 1,500 sales Representatives and 15 sales executives. CW-3 reported directly to a Sector Manager in São Paulo, Brazil, who reported to Eduardo Ribeiro, who reported directly to Defendant Legher.

64. According to CW-3, a prospective sales Representative would apply through the Avon website, and a Sales Manager or a Sales Executive would gather the candidate's information (including the social security number and ID of a potential new sales Representative) put it into a third-party credit check system (*i.e.*, Serasa, which is similar to Experian), and find out immediately whether the candidate was pre-approved. If they were pre-approved, the Sales Manager or Sales Executive would go to their house to physically confirm their address and verify the documents by obtaining a copy of their identification materials and bringing them to Avon. At that point, Avon would run their information and ultimately approve or deny them to become a sales Representative. If not approved, Avon would email the Sales Manager or Sales Executive and notify them of the denial.

65. According to CW-3, at the beginning of a sales campaign cycle (which happened every 15 days), CW-3 would approach people, even going to their homes with an Avon

magazine to see if they were interested in signing up to be a Representative. If they were, CW-3 would collect their information and sign them up through Avon's website. If they were approved, they would receive a minimum credit limit of R$100 [approximately $28 USD]. According to CW-3, the new Representatives would have to purchase an "initial kit" for approximately R$119 [approximately $33 USD], but they could also order Avon products up to the amount of their approved credit limit. According to CW-3, if a sales Representative sold R$100 worth of products, Avon would collect R$70 and the Representative would keep the remainder. CW-3 advised that there was a timeline of 20 days for how long a Representative was given to sell the products and repay Avon. CW-3 confirmed that until a Representative paid off the previous order or "box," the Representative could not receive another box but could still place an order but would have to wait.

66. CW-3 advised that a major change happened with recruitment standards before Campaign 14. CW-3 reported that, in 2016, Avon was accepting new sales Representatives with negative credit and recalled that in mid-2016 a Representative was R$20,000 in debt [approximately $5,640 USD] and was still approved. CW-3 recalled that "Campaign 14" was a turning point at the Company as Avon became far more flexible with onboarding new Representatives, a move CW-3 described as opening the gates for Representatives with high debt. According to CW-3, prior to Campaign 14, when CW-3 went to sign up prospective Representatives and put their information into Avon's system to determine their approval or denial, approximately 2 out of 10 people would be approved. According to CW-3, during Campaign 14, 8-10 people out of 10 would be approved. CW-3 stated that Campaign 14 "broke" the Company, and as far as CW-3 was concerned, Avon was still recovering from that change.

67. CW-4 was a former Avon Zone Sales Manager in Brazil until August 2018. During this time, CW-4 was responsible for hiring and managing a sales team of more than 2,000 Representatives and more than 20 sales executives in CW-4's sector in Brazil. CW-4 reported to a Regional Sales Director at Avon.

68. CW-4 advised that prior to the change in credit standards, a sales Representative could not have negative marks in their credit history or be more than R$250 in debt [or approximately $70 USD]. CW-4 confirmed that Avon's credit standards for Brazil recruitment changed in mid-2015 which, in CW-4's words, marked the "beginning of the end" for Avon. Indeed, CW-4 recalled a Representative being hired that had R$100,000 of debt, the equivalent of more than $28,000 USD, but that still only counted as one negative mark on their credit history. CW-4 confirmed that as long as a Representative did not have more than two "negative marks" on their credit history from a credit agency, she could be hired. CW-4 stated that Avon's relaxing of its credit standards caused delinquencies among sales Representatives to explode in 2016, which continued into 2017.

69. According to CW-4, Eduardo Ribeiro and Emerson Teixeira (Avon's Executive Director of Sales Development) were responsible for launching the internal policy change to allow the approval of Representatives with negative credit (up to two negative marks, and the amount of debt did not matter). CW-4 confirmed that Teixeira reported to Eduardo Ribeiro, who reported directly to Defendant Legher.

70. According to CW-4, the credit policy change was applied to all regions of Brazil uniformly, and the change was communicated to everyone through video conferences and e-mails. CW-4 confirmed that there were video conferences where CW-4's boss Eduardo Ribeiro communicated the change in credit policy to all sales managers of Avon Brazil. CW-4 reported

that David Legher was sometimes present for the video conferences. According to CW-4, along with the video conference meetings, there were e-mails sent from Ribeiro's assistant to all sales managers throughout Brazil addressing this policy change.

71. According to CW-4, it had been discussed among sales managers that they were "tainting our base" with the change in credit standards. CW-4 stated that there was a Manager in São Paulo who hired 900 Representatives in a single Campaign (either Campaign 14 or 17) in 2015, and that manager's sector was eventually "shut down" in 2016 because her delinquency rate reached "45%." CW-4 described this as "opening the gates of hell."

72. CW-4 stated that Avon Brazil was operating as an "amateur" or "backyard" company with very little structure. CW-4 stated that management knew the change in credit standards would not work well, but the Company wanted results to show shareholders. CW-4 reported that Avon management would embellish the Company's financial results to please shareholders. CW-4 provided an example of how the Company was embellishing its results: for example, if each campaign in 2015/2016 added 1,000 Representatives that would later become delinquent, the Company was showing the growth of a Representative base that did not really exist. CW-4 explained that Brazil is Avon's largest market, so the Company relies heavily on Brazil's numbers. According to CW-4, there was "massive pressure" in 2015 for results and the Company was looking for ways to show shareholders that they were growing. CW-4 added that everyone knew that changing the credit standards was a bad idea, and they discussed among themselves that the new Representatives with debt would not pay Avon back. CW-4 confirmed that the number of Active Representatives was one way that shareholders evaluated Avon, and the Company reported an increase in Active Representative numbers after the credit change in

Brazil. However, according to CW-4, the new Representatives with bad debt would not pay Avon back and would become delinquent.

73. According to CW-4, the relaxing of standards lasted at least six months and was most prevalent in Avon Campaign Nos. 9, 14, and 17 (May 2015, July 2015, and October 2015).

74. CW-5 was a former Avon Sales Manager from October 2013 until February 2018 in Rio Grande do Sul, Brazil. During that time, CW-5 was responsible for hiring and managing new sales Representatives. CW-5 reported to a Divisional Sales Manager in the Porto Alegre area in Brazil, who ultimately reported to Eduardo Ribeiro, Group Vice President of Sales in Brazil, who reported to Defendant Legher.

75. CW-5 advised that, before the change in credit standards, new sales Representatives in CW-5's territory could receive initial credit limits of up to R$500 [approximately $140 USD] in CW-5's region (Rio Grande do Sul, Brazil). According to CW-5, for a Representative to increase her credit limit, she had to be in good standing (pay on time) with Avon for six active campaigns (approximately three months) and then request an increase in her credit limit. According to CW-5, this request would lead to a performance analysis evaluation and the Representative would need an internal recommendation from her sales manager. CW-5 confirmed that a Representative in good standing could have her initial credit limit tripled in two years.

76. CW-5 stated that at the end of 2015, around the time of the Christmas campaigns, there was a change in Avon's onboarding criteria. According to CW-5, during that time, potential new Representatives could be in debt and still be approved by the Company. CW-5 confirmed that this was a Company-wide change that was communicated by Eduardo Ribeiro, Group Vice President of Sales in Brazil, in a quarterly video conference meeting. CW-5 stated

that the change in credit standards for new Representatives was motivated by the high rate of turnover among Avon's sales Representatives at the time. CW-5 believed that Avon hired individuals with negative marks on their credit to keep Representative numbers up and to keep pace with its competition. According to CW-5, at the end of 2015, there was increased competition in Brazil from Natura and O Boticário.

77. CW-5 advised that Avon had special campaigns four times a year called "Pontuais," during which Avon encouraged sales managers to onboard new Representatives to make up for delinquent Representatives and those who did not make new product purchases. According to CW-5, the Pontuais campaigns intensified over time (particularly campaigns around the holidays, *e.g.*, Christmas) as the number of delinquent Representatives increased. CW-5 advised that, in 2014, managers were encouraged to recruit 30-40 new Representatives for each Pontuais campaign, and that by 2016 and 2017, sales managers were encouraged to recruit 200 new Representatives for each Pontuais campaign. CW-5 also recalled that recruiting targets during normal campaigns increased from 20 new Representatives per campaign in 2014 to 50 new Representatives per campaign in 2016 and 2017.

78. CW-6 was a former Sales Manager in Brazil throughout the Class Period. During CW-6's time as a sales manager, CW-6 was responsible for the hiring and managing of new Representatives. CW-6 reported to a Divisional Sales Manager in the Rio Grande do Sul area of Brazil, who ultimately reported to Eduardo Ribeiro, Group Vice President of Sales in Brazil, who reported to Defendant Legher.

79. CW-6 confirmed that the changes in credit standards for new Representatives in Brazil began towards the end of 2015, during Campaign 17 in September 2015, and lasted until Campaign 14 in mid-2016. CW-6 pointed out that sales campaign dates in Brazil varied by

sector. According to CW-6, Avon's recruiting criteria began changing in late 2015 when, despite previously only approving Representatives with a maximum debt load of approximately R$500 [approximately $140 USD], the Company began approving new Representatives even if they carried more than that debt load. CW-6 explained that in Brazil, every time a borrower defaults on an amount owed, they receive a negative mark on their credit history. After Avon's credit loosening in late 2015, Avon allowed the approval of new Representatives in Brazil with up to three negative marks on their credit history. For example, in Campaign 14 (July 2016), Avon was accepting sales Representatives with negative credit. CW-6 specifically remembered Campaign 14 because during that campaign CW-6 onboarded 300 new sales Representatives, a much higher number than CW-6's typical 30-60 new Representatives during other campaigns, or CW-6's 100-120 new Representatives during the "Pontuais" campaigns in 2016.

80. CW-7 was a former Senior Manager in Operational Excellence and Supply Chain at Avon Brazil from March 2016 until May 2019. During this time, CW-7 reported to the Director of Supply Chain.

81. CW-7 confirmed that in the second semester of 2016, the Sales department of Avon Brazil began "opening" credit to increase the number of sales Representatives and was accepting new Representatives with increased debt. CW-7 confirmed that the decision to loosen the credit standards in Brazil was made by David Legher (President of Avon Brazil), Gustavo Barreto (CFO of Avon Brazil), and Eduardo Ribeiro (Vice President of Sales of Avon Brazil).

**2. Predictably, a large percentage of the newly recruited sales Representatives with weaker credit could not pay for the Avon product sent to them, and thus, became delinquent.**

82. A large percentage of the newly recruited sales Representatives in Brazil became delinquent. In fact, a substantial percentage of the new Representatives never even repaid Avon for their first order.

83. CW-1 discussed Avon's increasing bad debt in Brazil with CW-1's boss, the Company's Vice President of Global FP&A. According to CW-1, one of the factors contributing to the rising bad debt was that Avon had lowered its credit standards for new sales Representatives in Brazil at the end of 2015.

84. CW-5 confirmed that the change in onboarding standards increased both delinquencies and retention problems at Avon Brazil. CW-5 stated that 70% of the sales Representatives who joined Avon in 2016 also left during that year and the majority of the new Representatives became delinquent on their Avon credit purchases. CW-5 advised that if a sales Representative was delinquent after two campaigns, Avon could block them from ordering any more product until they paid Avon. CW-5 confirmed that the delinquencies in CW-5's region in 2016 were much worse than they had been in the past. When CW-5 began working at Avon in October 2013, only 30% of the onboarded sales Representatives during that year left, mostly due to delinquencies.

85. CW-6 also reported that the changes in recruiting criteria had a big impact on delinquencies among sales Representatives, recalling that the number of delinquencies "spiked" after Campaign 14, which set Company records. CW-6 recalled that initially the Company celebrated Campaign 14 because it produced record sales, but it also caused increased delinquencies. According to CW-6, due to this increase in bad debt after Campaign 14 in 2016, the Company tightened its credit standards for Representatives beginning in 2017 to mitigate the problem. CW-6 added that between Campaign 2 in 2016 to Campaign 3 in 2017, the number of delinquencies increased by 50% in CW-6's region, which was depicted in internal reports that CW-6 received.

86. CW-4 also was familiar with the increased delinquency among sales Representatives in Brazil in 2016. According to CW-4, the delinquency rate among Avon's sales Representatives doubled from 2016 to 2017. CW-4 reported that in the Central-West region of Brazil, where CW-4 was a Sales Manager, the delinquency rate was 12-15%, which was considered reasonable for Avon in comparison to other regions (*e.g.*, the Northeast region, where the rate was around 20-30%), before the delinquency in CW-4's region increased from 9% in 2016 to 16% in 2017.

87. CW-4 reported that all sales managers in each region were e-mailed spreadsheets daily with that region's delinquency rates. CW-4 reported that by comparison, the standard delinquency rate of competing Brazilian companies averaged 5-8%. According to CW-4, even though delinquencies at every Brazilian company were common and increasing due to the financial crisis in Brazil, Avon's rates were noticeably worse in 2016 and 2017. CW-4 advised that the delinquency rates of Avon compared to competitors was an issue discussed in the video conference meetings for sales and regional managers led by Eduardo Ribeiro and attended by, among others, Emerson Teixeira and Regional Sales Manager Leonardo D'Alcantara. CW-4 confirmed that everyone from directors to managers knew that Avon's delinquency rates were worse than those of their competitors as they mapped those numbers.

88. CW-7 stated that bad debt in Brazil "spiked" or "burst" at the end of 2016 and Avon Brazil spent the entirety of 2017 trying to recover from it.

89. CW-6 advised that the Company had a few methods to try to collect delinquent amounts owed. According to CW-6, one of these methods included Avon giving its sales managers credit card machines to personally collect debt from delinquent sales Representatives. CW-6 reported that sales managers were given the credit card machines depending on the

volume of delinquencies in their territory, and that CW-6 had been given four credit card machines at the beginning of 2016. According to CW-6, another method the Company used to try to collect delinquent amounts was using third-party collections agencies such as Malta to collect money owed to Avon by Representatives. CW-6 confirmed that Avon would give the delinquent Representatives' information to the third-party collectors for them to collect the debts.

90. CW-4 reported that Avon used at least five different collections agencies in Brazil depending on the region: in the Northeast region, they used Malta and, in CW-4's region, they used Verifique. CW-4 stated that once a Representative was 60 days delinquent, Avon would give their information to the collection agency in that region for the agency to try to recover the debt. CW-4 advised that out of all of the debts sent to the collections agency in CW-4's region, approximately 5% of the amount owed was collected. CW-4 added that beginning in 2017, CW-4 was given a credit card machine to personally go out and collect the debts from CW-4's Representatives with delinquencies less than 60 days. CW-4 was only able to collect approximately 3% of the delinquent amounts from CW-4's Representatives. CW-4 advised that the available collection methods and the success of the methods were discussed by Ribeiro in the video conference meetings. CW-4 added that Avon's collections methods led to a number of labor lawsuits against Avon for being outside the scope of the Sales Manager's job description.

91. CW-3 also had many delinquent Representatives in 2016. According to CW-3, colleagues in CW-3's Division at CW-3's level also were dealing with new Representatives who did not repay Avon. CW-3 estimated that out of 600-700 new Representatives, approximately 180 of them (or one quarter) never repaid Avon for their first box order.

92. According to CW-2, the biggest problems with delinquent Representatives were in the North and Northeast regions of Brazil, as well as in Rio de Janeiro and Minas Gerais. CW-

2 stated that in some regions delinquencies may have reached as high as 20%, including the North and Northeast region.

#### 3. Defendants encouraged delinquent Representatives to order additional product with promises of discounts and reactivation.

93. The Company also urged its sales managers in Brazil to allow delinquent Representatives to pay in installments, enticing them with discounted product if they continued to order from the Company in subsequent sales campaigns. These enticements, however, caused about half of delinquent Representatives to fall further into debt.

94. According to CW-5, Company video conferences encouraged sales managers to offer delinquent Representatives the option to pay their debt in installments in exchange for a discount in upcoming sales campaigns. CW-5 gave the example that if a delinquent Representative owed Avon R$500 [approximately $140 USD], she was asked to pay R$100 [approximately $28 USD] with the promise of a discounted rate on the order of additional product in the next campaigns (*e.g.*, she could receive $300 in product at a cost of $100). According to CW-5, by doing this, Avon would encourage Representatives to start ordering more product again, despite the risk of increasing that Representative's debt to Avon. According to CW-5, this caused a vicious cycle of debt among Representatives in Brazil. CW-5 estimated that 50% of Representatives would manage to pay off their debt through this process while 50% only added to their Avon debt.

95. CW-6 also confirmed that CW-6 was authorized to try to collect all or a portion of the money owed to Avon by offering installment payments and incentives such as product discounts on future campaigns to negotiate the debt.

96. CW-6 advised that in 2016 and 2017, a Representative could be 19 days late on the last installment or 1 or 2 campaigns behind and still be permitted to order additional product.

However, this changed in 2018 when a delinquent Representative had to be evaluated case-by-case to determine whether she could be allowed to participate in another sales campaign while holding debt to Avon.

97. CW-7 advised that there was a regular process at Avon Brazil where the call center would first try to call delinquent Representatives to collect money owed, and if the money was not recovered, Avon would send the Representatives' information to collections agencies to try to recover 20%-50% of the amounts owed.

98. Internal Avon documents confirm that the Company offered installment payments and other incentives to collect delinquent amounts. For example, in one case, the Company offered 5% off payment on "new debts that were up to 69 days late" and 20% off on payment of old debts that were "over 70 days late." In addition to the discounts, the Company offered to waive fees and penalties associated with the delinquent balances.

**4. Defendants artificially inflated Avon's revenues in Brazil by sending Representatives product that had not been ordered.**

99. During the Class Period, there was a widespread problem of Representatives receiving Avon product they had never ordered. CW-4 was told by Representatives that they would receive boxes of product from the Company without authorization and that this happened all of the time. According to CW-4, roughly 50 boxes were sent to Representatives without authorization per sales campaign in each of the 857 sectors in Brazil. According to CW-4, when the unauthorized boxes were returned to the Company, such returns were referred to internally as "Reason 8" ("Motivo 8") and "falsification of boxes."

100. CW-4 confirmed there were internal reports that measured the amount of returns reported under Reason 8. CW-4 advised that this was an out of control, big problem in Brazil which was discussed in Ribeiro's video presentations. CW-4 advised that Avon was losing

millions of dollars in each sales campaign because of returns under Reason 8, and that those numbers were documented in internal reports and presentations for Regional Managers' eyes only, but that CW-4's Regional Manager shared the reports with CW-4. According to CW-4, the return problem was not only discussed in video conferences, but in in-person meetings that were attended by Regional Sales Manager Leonardo D'Alcantara. CW-4 advised that millions of dollars were lost in every sales campaign due to the return of unauthorized boxes of product, as the costs of the boxes, shipping, and return shipping added up.

101. According to CW-4, the return rate problem hit its peak in 2017, and although it was still a problem during CW-4's time at Avon in 2018, it was better by comparison. CW-4 reported that returns under Reason 8 were the worst from 2015 – 2017 (the breaking point), until Avon hired a President of Field and Representative Experience specifically to address the Company's return rate.

102. CW-6 confirmed that the receipt by Representatives of unordered and unauthorized product also was an issue in CW-6's region. CW-6 confirmed that after each campaign, CW-6 would receive internal reports from Avon that included how many returns there were and the reasons for the returns, including Reason 8.

103. CW-3 corroborated that product was sent without Representatives' authorization, and that "fraud happened all the time." CW-3 explained that this was one of the reasons why CW-3 left the Company. CW-3 stated that this was happening within CW-3's division and believed it was happening elsewhere too.

104. CW-2 also confirmed that sending out product to Representatives without authorization happened a lot, particularly in the North and Northeast regions of Brazil. CW-2 also corroborated that when these products were returned, they would be categorized under

Reason 8, which was the internal label for returns of non-authorized inventory. CW-2 confirmed an inventory buildup in Brazil spiked at the end of 2015. CW-2 advised that both Ribeiro and Legher were aware of the inventory problems and the problem with the unauthorized shipment of product.

105. Internal Avon documents confirm that Reason 8 was the category for the return of product that had not been ordered by the Representative. In a given campaign, Reason 8 typically amounted to approximately 10% of total returns.

**5. Defendants received reports and participated in meetings throughout the Class Period in which the increased Representative delinquencies and increasing bad debt were discussed.**

106. The loosening of credit standards for new Representatives in Brazil led to increased delinquencies and bad debt for Avon. Reports containing the delinquency rates of new Representatives were provided to Defendant Legher and other top executives in Brazil. The stark rise in delinquencies also was discussed in video conference meetings in which Defendants participated.

107. According to CW-1, the bad debt situation was discussed at regional Company performance meetings held by video conference and attended by top Avon executives including Defendants McCoy, Scully, and Legher. CW-1 confirmed that there were regional monthly performance meetings held between the Company's executive management during which they would review each regional market. CW-1 confirmed that the topics discussed in those meetings – which included Brazil's bad debt and loosened credit standards – would be relayed to CW-1 by CW-1's boss, the Vice President of Global FP&A, who attended the meetings. CW-1 advised that the following senior executives attended regional monthly performance meetings: (i) former CEO Sherilyn McCoy; (ii) former CFO James Scully; (iii) Head of Latin America David Legher;

(iv) CFO of Latin America; (v) Heads of Sales; and (vi) Vice President of Global FP&A. CW-1 also viewed a document that detailed bad debt issues in Brazil.

108. CW-4 confirmed that Eduardo Ribeiro took part in the video conference meetings for Sales Managers and Regional Sales Managers. CW-4 specifically recalled that in one meeting in 2016, in the aftermath of the mess created by Avon with the relaxing of the credit standards, Defendant Legher was present to try to increase morale within the team.

109. CW-6 also participated in the quarterly video conference meetings where Ribeiro would discuss matters such as Representative delinquencies and incentives. According to CW-6, Ribeiro would discuss Representative delinquencies and encourage collections methods such as the use of credit card machines and third parties like Malta. CW-6 confirmed that Defendant Legher participated in some of the video conferences. CW-6 specifically recalled a convention that took place at the end of 2016 in São Paulo, Brazil to celebrate the Company's sales, where Defendant Legher was present.

110. CW-5 corroborated that Avon's executives were aware of the rising delinquency problems and that Eduardo Ribeiro acknowledged delinquencies in quarterly video conference meetings and encouraged sales managers to try to collect the debts.

111. CW-4 confirmed that everyone, including Ribeiro and Legher, knew about the delinquency and bad debt problems at Avon Brazil. According to CW-4, there were reports e-mailed to managers daily (called the "Daily") that summarized internal numbers, including delinquency rates in each region, and that Ribeiro and Legher received the "Daily" every day by email. CW-4 added that Ribeiro would talk about the numbers specific to each region in his video presentations. CW-4 only had access to his own region's numbers. CW-4 confirmed that

there also were internal reports circulated at the end of each sales campaign (every 15 or so days) and that Ribeiro and Legher also would receive those reports.

112. According to CW-7, there were internal reports showing the bad debt which David Legher "definitely" received, as did the financial team in Brazil, the sales teams, and possibly the Executive Committee. CW-7 confirmed that David Legher saw reports on bad debt "at least" once a month.

113. CW-3 advised that reports were available in the system documenting the delinquency problems. According to CW-3, Avon used an internal system that tracked employee sales and generated reports detailing who owed money to the Company. CW-3 believes Legher knew about the delinquency problems given his role and position at the Company. CW-3 confirmed that Ribiero, and pretty much everyone, knew about the problems caused by Campaign 14 and the problems with delinquent accounts. CW-3 recalled CW-3's boss commenting: "oh, Eduardo [Ribeiro] knows."

114. CW-7 advised that monthly forecasts of current and projected bad debt, sales and inventory were sent to Avon's headquarters. According to CW-7, these reports were posted on Avon's system, Hyperion, in the middle of each month, around the 15th or the 20th.

115. CW-2 advised that there is no way that both Ribeiro and Legher would not have known about the problems with delinquent representatives. According to CW-2, it was Ribeiro's job to know and to deal with these matters.

**6. Defendants' scheme temporarily inflated the active representative base in Brazil, but when the credit criteria was tightened in 2017, Active Representative levels in Brazil came crashing down.**

116. Internal Avon documents demonstrate that Defendants' scheme to increase the number of new Representatives in Brazil by reducing the credit criteria in mid-2015 and early 2016 was seemingly successful in temporarily increasing the Company's Representative base in Brazil. For example, in one sector of Avon Brazil new Representatives were added in every campaign in 2016, an increase ranging from approximately 2.4 - 8.4% when compared to the same period in the previous year. Unfortunately, a good percentage of the new Representatives were unable to pay for their Avon product credit and soon became delinquent.

117. When the Company readjusted the credit criteria in early 2017, recruitment was negatively affected. Indeed, in 2017, new Representatives in the same sector of Avon Brazil decreased 0.5 - 6.9% as compared to the same period in 2016.

118. According to CW-6, Eduardo Ribeiro and Defendant Legher received these internal reports. CW-6's supervisor would attend meetings where Ribeiro was present and the numbers from these reports would be presented and target goals established. CW-6 also confirmed that Eduardo Ribeiro participated in video conferences and presented these numbers throughout Brazil.

**7. Defendants overstated the number of Representatives in Brazil.**

119. Avon failed to remove delinquent Representatives from its system.

120. CW-4 reported that Avon was manipulating the numbers of Active Representatives during CW-4's time there by not disclosing that some of the Representatives counted as "Active Representatives" by the Company were, in fact, delinquent Representatives, thus inflating Avon's Active Representative numbers – a metric followed by the Company. According to CW-4, this was evident internally because the numbers included in internal reports

and the numbers shared with the public did not match up. CW-4 added that Avon would cite "internal studies" that it conducted to justify keeping delinquent Representatives around and try to make them active again.

121. CW-3 confirmed that even if a Representative did not repay Avon for a box, she was still kept in the system as a Representative and was not removed for delinquency.

**8. Sales Representative training in Brazil was nonexistent throughout the Class Period.**

122. The growth and sustainability of Avon's business is wholly dependent upon the Representative's ability to generate recurring sales. Under its sales model, it is crucial for the Company to hire quality Representatives and provide them with ongoing sales support and training to ensure their success and longevity. Throughout the Class Period, Avon offered new sales Representatives in Brazil little or no sales support or training and exposed them to predatory lending practices and aggressive collection practices.

123. CW-4 advised that there was never any formal training for Sales Representatives at Avon. According to CW-4, formal training for new sales Representatives did not begin until 2018 with some online training. CW-4 stated that before this change in 2018, after each sales campaign, there would be very short business meetings which new Representatives were asked to attend where Sales Managers would discuss upcoming campaigns. According to CW-4, this was very informal and most new Representatives did not attend these meetings.

124. CW-6 also confirmed that during CW-6's time as a Sales Manager there was never any formal training policy. CW-6 stated that in 2018, the Company announced a new project to implement formal training for Representatives, though when CW-6 left the Company at the end of November 2018, no formal training process had yet been launched in Brazil.

125. CW-3 advised that Avon only invested in the training of Sales Executives, not new sales Representatives. According to CW-3, there was never training for sales Representatives because there was nothing to train; CW-3 would just explain the basic process when the Representatives were approved. CW-3 confirmed that the only meetings held with CW-3's sales Representatives were informal meetings where they would discuss their teams. CW-3 attended meetings with other Sales Managers within CW-3's Division approximately monthly. CW-3's two direct bosses also attended those manager meetings and were aware of the problems with delinquencies and the problems that accompanied Campaign 14.

126. According to CW-7, during CW-7's tenure, there was no training for sales Representatives, who only received brochures at the beginning of each sales campaign showing the products and were not trained on how to sell the products. CW-7 stated that Avon's motto was "just bring in orders," but the Company did not show Representatives how to get orders and attract clients.

127. The Company's post-Class Period admissions corroborated and amplified the information reported by the CWs. For instance, following the Class Period, Avon's new CEO, Jan Zijderveld, informed investors that Avon Brazil was on the "operating table" and that a brand-new leadership team would "fix [Avon's] service" to its Representatives in Brazil. When discussing its restructuring in Brazil, Avon executives revealed an astonishing fact. Avon's new CEO admitted on August 2, 2018 that there had been absolutely no training and minimal sales support of its Representatives in Brazil and certain other top markets for years, a material fact that was concealed from investors throughout the Class Period: "It is amazing that in Brazil, we basically stopped all training."

128. Lauren Lieberman, an analyst at Barclays, expressed surprise in an August 3, 2018 report, stating: "The company will resume training programs, which have largely (and shockingly) ground to a halt during recent years." Then, on September 21, 2018, during the Avon Investor Day, Zijderveld repeated that Avon had ceased all training and sales support for its Representatives, admitting that Avon "went to zero in terms of training and tools" and "didn't invest in [the representatives'] business development, product knowledge, and really how she builds her business." Miguel Fernandez, Avon's Executive Vice President and Chief Commercial Officer, also admitted that there had been no training in Brazil and other key markets for five years. Fernandez stated, in part: "About 5, 10 years ago, for some reason, we decided to cut training. . . . So a rep came, got the brochure and had no training." Then, on November 1, 2018, when Avon reported its results for the third quarter of fiscal 2018, Fernandez again admitted that there had been no training in Brazil and other key markets for five years. On the same call, top Avon executives stressed that Representative training was the most important factor in Representative retention and success, which was key to sustaining and growing revenues, a metric that languished during the Class Period.

## V. DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF CONDUCT

129. In order to inflate its reported revenue and Representative growth metric during the Class Period, Avon engaged in an undisclosed scheme whereby it significantly loosened its credit terms in order to recruit new Representatives in Brazil, its largest market. Avon did not disclose the changes to its credit terms in Brazil. Avon also failed to increase its allowance for doubtful accounts to account for the changes to its credit terms in Brazil.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

130. Lead Plaintiff and Additionally Named Plaintiff allege that the statements highlighted in bold and italics within this section were materially false and misleading because, among other reasons, they omitted material information of which Defendants were aware, or were reckless in not knowing, was false and misleading. As alleged herein, such statements artificially inflated or artificially maintained the price of Avon's publicly traded common stock and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired that stock during the Class Period. Because Defendants chose to speak on the issues described below, it was important that they not mislead investors or withhold material information. As described below, Defendants created an impression of a state of affairs at Avon that differed in a material way from the one that actually existed.

### A. Annual Investor Conference – January 21, 2016

131. The Class Period begins with Avon's January 21, 2016 Investor Day conference when it announced its three-year Transformation Plan. The Transformation Plan was based upon three "pillars": (1) improving the Company's financial resilience through a sale of the Company's North American segment, with Avon retaining a 20% interest as an investment on its balance sheet; (2) driving down cost through a $350 million reduction in overhead; and (3)

investing into the Company's brand and beauty categories, as well as improving Representative engagement through better onboarding, training, and support.

132. During the Investor Day presentation, Defendant McCoy made the following statements regarding the Company's retention goals for its Representative base under the Transformation Plan (which were purportedly already bearing fruit) and the Company's Representative growth trends, stating in part:

> [A]nd as we look at it, the thing that's also important is, as we're measuring retention now, we're starting to see improvements in retention and ***retention is critically important.*** That will be another metric over time that, as we get aligned on how we're measuring retention globally, which we've just put in place in the last year, we can see that, and ***we're starting to see retention tick up, and that's critically important***.
>
> * * *
>
> I thought it would be helpful just to talk about the Avon International business. . . . ***Our representative trend is growing. You can see this has been a lot of work over the last couple years to get it moving in the right trajectory. We feel good about where it is***. . . . If you look at our field force you see we have a tremendous amount of women in Latin America, we have 8 million people that are registered with Avon; we have 6 million that are active on any given campaign. So we have a very large base. . . . The challenge for us is how do we keep more of them in so that we don't have that churn. ***If you look at our tenured base we have a about 60% of women with us for 18 months or more*** and of course there are some top sellers that have been with us for many years. ***. . . In the area of improving representative engagement, we will talk about making sure we are investing in her and understanding her needs and segmenting the representative population so that we are actually doing a better job of actually making sure she is getting what she needs from Avon. . . .The measures that we will continue to watch in the immediate term are representative growth, ensuring that we deliver on our commitments on cost, reinvesting that in growth and making sure that we continue to build a stronger balance sheet for the future***. Our long-term goals are mid-single-digit revenue growth. . . . ***This requires us to continue to make sure that we are bringing women in and converting them to representatives and that requires at least low-single-digit representative growth.***[21]

[21] Emphases added throughout, unless otherwise noted.

133. Fernando J. Acosta ("Acosta"), Avon's Executive Vice President ("EVP") and Chief Marketing and Social Selling Officer throughout the Class Period until October 1, 2017, further elaborated on this point, stating in part: "When we give our representatives structure, we are giving Avon structure. ***We will do everything for, with and about our representatives***," "[***S***]***o we will nurture, I told you, the base*** and develop breakthrough innovation," and "***We believe it will increase the retention***. Why? We're targeting a complete new generation of beauty sellers. ***We equip her with the right tools to succeed*** and we want to make it very simple for her to earn and save money."

134. Defendant Legher also explained a Company initiative called "segmentation" designed to improve the experience and earning opportunity of Avon's sales Representatives in the first four months of their Avon journey. Legher stated, in relevant part:

> ***[W]e feel very comfortable that we can do a great job in direct selling in Brazil***.
>
> * * *
>
> ***So going to the representative side, basically what we're doing is that we have 1.5 million representatives in the country and we used to treat them all the same. So we went into a segmentation approach in order to improve the experience of the representative and also their earning opportunity***. . . .***So on the new representatives, we create a comprehensive 360 program of onboarding, so we're assisting them and improving their earning opportunity in the first four months of their journey. And what we have seen as a result is 2 points of retention and 3 points of increased productivity. So we copied with pride what we saw in Colombia and we're replicating this throughout Latin America and the world.***
>
> In terms of the seller side, we implemented as well the loyalty program. ***The loyalty program is not only helping us to have a better relationship with the representatives to retain them better***, but also is making -- it is helping us to have better profitability on the business. ***So we will train them and we will give them different benefits according to the relationship that they have with the Avon brand. . . . . [A]lso, in the top seller, we have been working in a program to increase productivity.***
>
> * * *

> ***[W]e have a complete three-year journey in front of us starting from the segmentation, order tracking, then moving to multiple order, flexible mail plan delivery and ending with an order management system, replacement and corporation. All this on the social selling model. So we have a complete detailed plan to implement these in Brazil, as well.***

135. During the question and answer ("Q&A") portion of the call, Defendant McCoy failed to directly answer an analyst's question about the quality of Representatives the Company was taking on:

> Steve Powers - UBS - Analyst
>
> And if I could, this is more tactical, but you opened with the ending rep count growth that you were citing and it's good. I guess the question is can you give us more detail on what you know about those reps? How much of that is actually a positive response to your initiatives versus just almost a negative response to the market conditions? Because I think in the financial crisis we also saw an uptick in recruitment. What's the quality of those reps that you are taking on?
>
> McCoy
>
> Yes, I would say that a lot of it has to do with our initiatives because it started happening. We were putting plans in place from 2013 and we've seen that and as we look at it, ***the thing that's also important is as we're measuring retention now, we're starting to see improvements in retention and retention is critically important. That will be another metric over time that, as we get aligned on how we're measuring retention globally, which we've just put in place in the last year, we can see that and we're starting to see retention tick up and that's critically important.***

136. On bad debt, Defendant Legher stated, in relevant part: ***"We have today a common Latin American campaign planning process. Bad debt, we have common knowledge on how to deal with bad debt at the full process."***

137. In the accompanying slideshow, Avon listed "***Longer Lasting Appointments***" as a goal for Brazil under the growth pillar of its Transformation Plan, and made the general statement that the Company "***Will Increase Retention***" of its Representatives.

138. Defendants' statements contained in ¶¶132-37, were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit);

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce; and

(c) failed to increase its allowance for bad debts to account for the changes it had made to its credit terms and the other available information set forth in ¶¶242-62.

139. On January 22, 2016, Chris Ferrara of Wells Fargo Securities issued an analyst report on Avon entitled "AVP Analyst Day Offers Only Limited Detail." In the report, Ferrara reported the following after the Company's Investor Day presentation:

> Long-term targets sound familiar. AVP's long-term goals include mid-single digit constant dollar revenue growth, **low-single digit Active Rep growth** and low double digit operating margin (all ex. North America). . . .The Three-Year Transformational Plan entails reinvesting $350MM of planned cost cuts (via operating model efficiencies and supply chain optimization) into brand/category investments (specifically in beauty), **driving greater rep engagement**. **Separately, management reaffirmed 2015 guidance (although now provided it ex. NA), including +2% constant dollar revenue growth and +1% Active Representative growth**.

**B. Fourth Quarter Fiscal 2015 Results – February 11, 2016**

140. On February 11, 2016, before the market opened, Avon issued a press release announcing its fourth quarter fiscal 2015 results and held a conference call for analysts, media representatives, and investors. During the earnings call, in which Defendants McCoy and Scully participated, Defendant McCoy assured investors that despite a challenging fourth quarter, especially in Brazil, in 2016 the Company would deliver on Active Representative growth and retention in Brazil while maintaining the health of the business, stating in pertinent part:

> Now turning to the full year 2015, I am pleased that our key local markets drove steady improvement in overall performance. One of our priorities for the year was to improve active representative growth in our top markets. We made significant progress in this area.
>
> * * *
>
> Specific to Brazil, despite weak economy, the challenging political environment, and reduced consumer consumption, ***the team is doing a good job of maintaining the underlying health of the business. . . . What we see in Brazil is that active representatives are growing*** . . . ***[W]e will deliver 1% to 2% active representative growth for the Company and continue to improve the ending representative trend***. Second, from a geographic perspective we will continue to drive improved over all performance in our top 10 markets. We anticipate that Brazil will continue to be a challenging environment; ***we expect our Brazilian team to maintain the underlying health of the business while keeping our representatives engaged.***

141. Defendant Scully also discussed Brazil's recruitment efforts, stating: "Turning to Brazil, . . . constant dollar revenue declined approximately 2% driven by lower average order. ***These negative average order impacts were partially offset by solid growth in active representatives, which benefited from a successful third quarter recruiting crusade.***"

142. During the question and answer ("Q&A") portion of the call, Defendant McCoy discussed the improving retention trend of sales Representatives at Avon:

> As it relates to Brazil one of the things that we're seeing is that ***we have been able to recruit and retain representatives. We're very pleased with our efforts there***. The results that we're seeing now are impacted -- the average order is impacted by, as you point out, the IPI and the VAT piece. . . . ***And we're continuing to stay very, very close to that to make sure that we are doing the right things to keep representatives engaged. Certainly Brazil is a very important market for us, we continue to be very bullish for the long term*** . . . .

143. On February 11, 2016, Stephanie Wissink of Piper Jaffray issued an analyst report on Avon entitled "Post Call Wrap-Up: Focus on LT View." In the report, Wissink reported the following:

> **Company Makes Commitment To Growth & Costs:** In addition to its report and as a follow-up to its investor event in mid-January, we are encouraged by sales performance in LatAm, and Europe and improvement in sales quality, net of

disc ops, local market tax adjustments, and divestitures. CC revenue growth of 3% was contrasted by a 23ppt impact from FX and reported sales declined 20%. . . . . Management noted that the top line is healthy and trending in the right direction. **Active rep count growth at 2% is at the upper end of management's 1-2% targeted annual range**. **Changeovers in process, systems, and efforts at the local level will be markers of 2016's progress,** alongside identified $350M of cost savings over the next three years. $200M in savings will come from supply chain improvements while $150M will come from other costs. . . .**We see a pathway over the next 12-24 months of improved sales and earnings quality through tactical initiatives.**

**C. Form 10-K – February 23, 2016**

144. On February 23, 2016, the Company filed its 2015 10-K for the period ended December 31, 2015 and disclosed, in pertinent part, Avon's accounting policies for doubtful accounts:

*Allowances for Doubtful Accounts Receivable*

Representatives contact their customers, selling primarily through the use of brochures for each sales campaign. Sales campaigns are generally for a three- to four-week duration. The Representative purchases products directly from us and may or may not sell them to an end user. In general, the Representative, an independent contractor, remits a payment to us during each sales campaign, which relates to the prior campaign cycle. ***The Representative is generally precluded from submitting an order for the current sales campaign until the accounts receivable balance for the prior campaign is paid; however, there are circumstances where the Representative fails to make the required payment.*** We record an estimate of an allowance for doubtful accounts on receivable balances based on an analysis of historical data and current circumstances, including seasonality and changing trends. Over the past three years, annual bad debt expense was $144 [million] in 2015, $171 [million] in 2014 and $209 [million] in 2013, or approximately 2% of total revenue in each year. ***The allowance for doubtful accounts is reviewed for adequacy, at a minimum, on a quarterly basis.*** We generally have no detailed information concerning, or any communication with, any end user of our products beyond the Representative. We have no legal recourse against the end user for the collection of any accounts receivable balances due from the Representative to us. ***If the financial condition of our Representatives were to deteriorate, resulting in their inability to make payments, additional allowances may be required.***

145. Defendants' statements about recruiting, retaining, and engaging Avon's Representatives and the growth of Active Representatives in Brazil, contained in ¶¶140-43, were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit);

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce; and

(c) failed to increase its allowance for bad debts to account for the changes it had made to its credit terms and the other available information set forth in ¶¶242-62.

146. Furthermore, Avon's statements about the calculation of the Company's Allowances for Doubtful Accounts Receivable, contained in ¶144, were materially false and/or misleading when made in that they failed to disclose that by Q4 2015, Defendants had at least the following information available indicating that the level of uncollectible receivables from Representatives in Brazil had spiked higher (*i.e.*, a loss was probable):[22]

(a) Competition in Brazil was increasing while the Brazilian economy was deteriorating;

(b) Credit standards for new Representatives in Brazil had been lowered and new Representatives, already saddled with debt loads, were being approved in large numbers;

[22] *See* Section IX (Violations of GAAP).

(c) Delinquencies were on the rise and Representatives were allowed to partially pay and/or pay in installments, instead of satisfying their entire outstanding balance, before being allowed to participate in subsequent sales campaigns;

(d) Delinquent Representatives were allowed to purchase additional product even while still delinquent on prior purchases; and

(e) Delinquent Representative accounts in Brazil were contracted out to third-party collection agencies at a higher rate.

147. As set forth in Section IX (Violations of GAAP), Avon failed to consider the above-referenced information in estimating its bad debt expense from Q4 2015 through Q3 2016. Instead, Avon improperly delayed recording such expense until well after the new Representatives in Brazil had defaulted on their purported payment obligations. Indeed, as described herein, the collectibility of sales transactions with the Representatives in Brazil was doubtful at the outset and revenue recognition should have been delayed until collectibility had been established.

**D. First Quarter Fiscal 2016 Results – May 5, 2016**

148. On May 5, 2016, before the market opened, Avon issued a press release announcing its first quarter fiscal 2016 results and held a conference call for analysts, media representatives, and investors. During the earnings call, in which defendants McCoy and Scully participated, the Company addressed, among other things, declining revenues and the decline in Active Representatives. Specifically, Defendant McCoy stated:

> Let's start with Brazil. . . . In Brazil average order grew based on pricing actions and mix. ***However, this was offset by a modest decline in active representatives.*** . . . . ***In light of the economic environment we also taking a more balanced risk-based approach to bringing in and onboarding new representatives. For perspective, ending representatives Brazil were down fractionally this quarter versus prior year.*** As I said on our last quarterly call, we anticipate that Brazil will continue to be a challenging environment given the political and economic

> situation. ***We have a strong team in place and I'm confident in their ability to maintain the underlying health of the business while keeping our representatives engaged to enhance activity drivers.*** For the year, we continue to expect Brazil to be relatively flat with some ups and downs over the course of the year.

149. Defendant Scully also addressed declining Representative trends in Brazil, stating: "***Active representatives were down*** 3%, primarily driven by declines in Brazil, Ecuador, and Argentina ***due to the challenging economic conditions in these markets***. Ending representatives decreased, primarily driven by Brazil." Scully also falsely attributed bad debt levels to the macroeconomic environment in Brazil, not the loosened credit standards for new Representatives, many of whom couldn't pay for the product sent to them by the Company: ***"In addition, bad debt expense increased primarily due to that macroeconomic environment in Brazil and Argentina.*** . . . As Sheri discussed earlier, this market continues to be impacted by a difficult macroeconomic environment. In addition, the tax environment in Brazil remains challenging."

150. During the Q&A portion of the call, Defendant McCoy discussed the reporting of Active Representatives at Avon:

> As it relates to ending reps and active reps, we actually will report both. Ending reps gives an indication of people in the business that are able to place an order. Active reps gives an indication of the number of orders placed and the activity level. ***It's really important to make sure that we have women still coming in and staying with our business, and that's why we want to look at ending representatives. And active, on the other hand, making sure that they continue to place orders. Both are important. But one of the things that we have been monitoring is ending representatives over time.*** And if we go back to ***late 2013, early 2014 we were seeing declines in that number of about 5% to 6%. We're now seeing positive trends of plus-2%. What that says is our base is healthy. We need to make sure that we're making it active and easy for them to place orders.*** But it's important for us to look at both of those. The point is, if we only look at active, many times you'll see a fluctuation because a campaign cycle moves, we have a holiday and things change. And therefore they're not able to place as many orders because the number of campaigns doesn't fall within that quarter. ***Ending is a more normalization to see the number of representatives we have.*** So it is

important for us to look at both. . . . ***So over time we want to make sure we measure ending [representatives] as well as activity.***

151. On that same day, the Company filed its Form 10-Q with the SEC for Avon's first quarter of fiscal 2016 ("Q1 2016 10-Q"), iterating Avon's accounting policies for doubtful accounts as set forth in the Company's 2015 10-K, *see supra*, ¶144.

152. Defendants' statements, contained in ¶¶148-50, were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit);

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce; and

(c) failed to increase its allowance for bad debts to account for the changes it had made to its credit terms and the other available information set forth in ¶¶242-62.

**E. Second Quarter Fiscal 2016 Results – August 2, 2016**

153. On August 2, 2016, before the market opened, Avon issued a press release and held an earnings conference call with analysts, media representatives, and investors. During the call Avon announced its second quarter 2016 results. Avon reported strength in its North and South Latin American markets and positive constant currency sales growth. Specifically, "Brazil[] Revenue was up 2% in local currency, slightly above our expectations." Avon also reported a slight decline in Active and Ending Representatives, but an increase in new Representatives in Brazil, citing "***strong and consistent recruiting programs and onboarding of new representatives***." As set forth herein, the growth in Representatives in Brazil was due to the

Company's lowering of credit standards for new Representatives in Brazil, many of whom became delinquent and/or inactive within the year.

154. During the earnings call, in which Defendants McCoy and Scully participated, Avon did not disclose that it had significantly loosened its credit terms in Brazil to recruit new Representatives. In fact, Avon told investors the exact opposite, with Defendant McCoy assuring investors that the Company had been cautious in adding new Representatives, and that the Company was helping support its Representatives during the difficult economic and political environment in Brazil. Specifically, Defendant McCoy stated, in part:

> ***I was in Brazil last month, and was very encouraged by the progress the [team] is making. All in all, even with the political and economic issues that continue and competition for both representatives and consumers, we are executing very well and have been gaining market share. We're growing average order based on pricing actions and mix with new innovative products and strong marketing . . . . The Brazil team is working hard to maintain the representative base, experiencing a slight decline in active representatives while growing ending representatives. This is the result of strong and consistent recruiting programs and onboarding of new representatives. The activity level of our representatives in Brazil continues to be a focus given the current depressed consumer spending*. . . . *And in light of the economic environment, we continue taking a balanced risk-based approach to bring in and on board new representatives. We have a strong team in Brazil, and I'm confident in their ability to build on the underlying strength of the business and keep representatives engaged.*** During my recent visit, we reviewed detailed plans behind reinforcing our brand and supporting our high-quality competitive products through our Beauty for Purpose positioning. And we reviewed programs that continue to enhance representative engagement and experience. ***Even with the negative impact of the taxes, we expect Brazil to grow in local currency in the second half and to be relatively flat for the year.***
>
> * * *
>
> The key areas targeted for investment remain, first, investing in the Avon brand. . . . ***Second, improving representative engagement through better onboarding, segmentation and execution of an improved service model. On all fronts, this work is progressing nicely***. . . . We still have a lot of work ahead, however, ***I'm pleased with our Q2 results and the progress the team is making on the transformation plan***. Based on where we are today, we expect to deliver improved year-on-year performance for the second half of 2016. ***Based on the***

> ***strength of our trends, particularly our tough markets, we remain on track to deliver 1% to 2% growth in active representatives***.

155. In addition, Defendant Scully noted, "***Above all, we remain committed to driving high quality, sustainable earnings growth which we expect to deliver through executing our Transformation Plan.***"

156. In response to an analyst question regarding Avon's competition, Defendant McCoy stated:

> As we look at it, we feel very good about what we are seeing. It's critically important. ***All of our teams are focused on that active representative growth piece,*** looking at average order growth through making sure we are pricing with inflation. . . . ***We think it is critically important in the environment that we are in to support our representatives. We have done very much investing behind them, helping them build their business, making sure we are giving them the tools to reach out to consumers. And we have a group of about 1.6 million representatives in Brazil that are very active. . . . But it is important to us to make sure that our representatives know that we are supporting them during this difficult economic and political environment.***

157. In response to an analyst question about pricing, Defendant Scully stated: "**[I]t** ***just isn't about pushing price, it's about making sure we get paid for the product . . . and making sure that we maintain Active Representatives***."

158. That same day, the Company filed its Form 10-Q with the SEC for Avon's second quarter of fiscal 2016 ("Q2 2016 10-Q"), iterating Avon's accounting policies for doubtful accounts as set forth in the Company's 2015 10-K, *see supra*, ¶144.

159. As a result of Defendants' materially false and misleading representations, **the price of Avon stock increased more than 14% to close at $4.76 per share on August 2, 2016**, on volume of over 21 million shares. On the following day, August 3, 2016, the price of Avon stock increased another 6.7% to close at $5.08 per share.

160. Defendants' statements, contained in ¶¶153-57, were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit);

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce; and

(c) failed to increase its allowance for bad debts to account for the changes it had made to its credit terms and other available information set forth in ¶¶242-62.

161. On August 2, 2016, Piper Jaffray issued an analyst report on Avon reporting on the Company's second quarter results. Stephanie Wissink reported the following:

> **Q2 Results Modestly Ahead of Expectations:** AVP posted Q2 revenues of $1.4B, in line with expectations, declining 8% y/y but +5% in [constant currency] excluding the sale of Liz Earle. Profitability improved, as adjusted GM was reported relatively in line at 60.6% (incl. a 290bps impact from FX), but adjusted OM expanded 100bps to 7.3% (vs. expectations for ~100-150bps decline) due to favorable price/mix and cost savings initiatives, partially offset by FX. This yielded EPS of $0.07, ahead of consensus at $0.02 and our $0.03 estimate. Q2 reported [constant currency] growth of 5% compared to general expectations around +3%, including growth in 9 of the top 10 regions and solid segment performance including North LatAm +6% and South LatAm +5% vs. collectively flattish expectations, EMEA +7% (slightly below consensus at 10%) and AsiaPac -5%, in line with estimates. Active rep counts increased 1%, and ending reps +2%, while average order +4%, implying improvement in rep productivity.

162. On August 3, 2016, following the earnings call, Jefferies: (i) raised its revenue estimates for Avon for 2016 and 2017 by +0.5% and +0.9%, respectively; (ii) increased its adjusted EBITDA estimates by +2.2% and +3.9%, respectively; and (iii) increased its fiscal 2016 adjusted EPS estimate by +$0.03.

## F. Barclays Global Consumer Staples Conference – September 6, 2016

163. On September 6, 2016, Avon presented at the Barclays Global Consumer Staples Conference. Defendant McCoy stressed the importance of Representative retention and the

Company's successful onboarding strategies to Avon's ability to grow its revenue, stating in part:

> We have the largest direct selling force in the world, 8 million people that are registered with us. Last year we added about 10 million people, in 2015. In our top 10 markets about half of the [appointments] were under the age of 35. So we are actually bringing young people in. ***Our opportunity is to continue to make that experience positive and retain those people over time.*** If you look at our sales, what you can see is that 60% of our sales come from people who have been with us 18 months or longer. ***So it's important to get people in, train them and have them stay with us because then they build a customer base and build the network***.
>
> * * *
>
> So besides investing in the brand and the product, it's also about the representative . . . . ***As we have seen, for the last six quarters we have actually had strong trends with number of people coming into the business. Importantly, we are always looking at an [ending] representative piece in around the 2% to 4%. That shows we have a healthy business[and] people are coming in. And our opportunity is to continue to make sure they are successful***. . . .
>
> ***And she needs to have a positive experience. Is she getting the training to be successful, either how to sell and go through the Avon system, or in a case of skincare, which is a much more complicated category, are we providing her with the tools so that she knows actually how to sell in that category. The areas of our focus for the top 10 markets is onboarding, segmentation support and service. These are the things that we think are critical to having more women earning more through beauty. Onboarding is really bringing someone in and having her be successful early.***
>
> ***What we've found is that if people stay with us through six campaigns, they are much more likely to stay with us and get to that point where I said 18 months' results and 60% of sales. So we want to get people to stay with us . . . .She can buy that Avon kit, learn how to sell it. And she is guaranteed to get money. So we actually train her by category for five campaigns. If she completes the five campaigns, she gets a significant price. And what we found is the people that actually do this, we see 5.5 point improvement in retention and we see a much higher average order***. . . . ***But the key message here is train her early, get her to stay and then make sure you reward her on consecutive orders. And that's really how we are looking to drive the business. And so we have opportunity to continue to roll this out globally. But we are very pleased with what we are seeing in some of our key markets***. . . . .
>
> ***In the middle is really where our focus is from an onboarding standpoint. It's to get more people to go up the curve and making sure we help them early to be***

> ***successful. And so, our resources, relative to how we segment, is against that. So we have, in some markets, special customer care and call centers for the top markets. We have different incentives and we have different training. We're not as far along on this initiative as we are on some of the others, but we are making good progress.***

In addition, Defendant Scully noted: "In terms of the focus in the top 10 markets, as I said in Q2, we announced nine out of the top 10 markets growing. . . [***A***]***ctive representatives is on track***."

164. Defendants' statements contained in ¶163 were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit); and

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce.

**G. Third Quarter Fiscal 2016 Results – November 3, 2016**

165. On November 3, 2016, before the market opened, Avon issued a press release announcing its third quarter fiscal 2016 results and held a conference call for analysts, media representatives, and investors. On the earnings call, in which Defendants McCoy and Scully participated, Defendant McCoy stated that despite missing its quarterly projections, Brazil was performing above expectations even amidst the macroeconomic environment due to successful Representative growth and activity drivers bringing consistent performance. As set forth herein, Defendants failed to disclose that the growth in Representatives in Brazil was due to Company's lowering of credit standards for new Representatives in Brazil, many of whom became delinquent and/or inactive within the year. Shockingly, Defendant McCoy referred to those unsustainable and risky practices as part of "***a very successful recruiting program and initiatives to build activity***."

166. On the issue of Representative retention and growth in Brazil, McCoy stated, in part:

> ***As noted, Avon's top 10 markets are performing well and outpaced the growth of the total company, with higher average order growth and higher growth in Active and Ending Representative.*** The good news is that our strategy of focusing on the top 10 is working, ***driving stronger and more consistent performance on our most important markets, which represents about 70% of our revenue.***
>
> * * *
>
> Brazil delivered a strong quarter, coming in above our expectations, with local currency revenue growth of 6%. This was driven by growth in both active representatives and average order and included an estimated three point negative impact from MVA taxes. ***We are pleased that Brazil grew both active representatives and ending representatives through a combination of a very successful recruiting program and initiatives to build activity. The increase in average order in Brazil was driven by both price mix and an increase in units sold per representative. . . . I was in Brazil a month ago and continue to be impressed with the work the team is doing, especially given the backdrop of a tough economic, political and competitive environment. . . . We are implementing advanced e-commerce technology to improve both representative experience and field management.*** This is a significant step forward in the IT agenda for Brazil. While we had previously said we expected Brazil to be flat for the year, given current performance trends, ***we now expect Brazil to post modest local currency revenue growth for the year.***

167. Defendant Scully also represented that "active and ending representatives . . . increased and the increase in ending representatives was primarily driven by Brazil. . . . ***Revenue growth [in Brazil] was driven by increases in active representatives and average order***."

168. In response to an analyst question about the impact of price increases on the sales Representatives, Defendant McCoy stated:

> Your comment around how do we balance price with keeping representatives engaged is an important one. I think we've done a very good job in our top markets in doing that. . . . In some instances, I'll give Brazil as an example, where we're very thoughtful about taking pricing in personal care, so we will not take price in those categories. ***That allows us to ensure that we're bringing representatives in and engaging them in the business, but recognizing, ultimately, we need to make sure we're getting the price right to ensure that we have the economic value that we need for the Company overall. So, it is a***

> ***balance. I would say that it's a science, but there is an art to it, and so it's something that we stay very close with.***
>
> * * *
>
> ***The team in Brazil has done a fabulous job in bringing in new users, younger users. And we are seeing growth in our upper mass segments in both Mexico and in Brazil. And that's going to be critically important as we move toward into 2017***.
>
> * * *
>
> ***As it relates to reinvesting, we are reinvesting in Brazil.*** As I said, we are going to be reinvesting more heavily in some of our top markets. What's most important is that we want to make sure that the initiatives we put in place are competitive. ***And what we're seeing, Brazil is a good example, we have been growing our business relative to our number one competitor for eight quarters. We've been gaining share for four quarters. And we are reinvesting specifically in going head-to-head, but we're being thoughtful in terms of how we do that***.

169. In response to an analyst question about sales Representatives in Brazil, Defendant McCoy stated:

> ***Specifically, your question around Brazil, we are growing active representatives, average order and units. So, we're pleased with the overall performance there.*** We track our pricing with inflation on a quarterly basis. ***We do see a little bit of a decline in third quarter, but we continue to monitor that***. . . . But overall, we're pleased with the performance in Brazil.

170. On November 3, 2016, Avon also filed its Form 10-Q for the third quarter 2016 ("Q3 2016 10-Q"), iterating Avon's accounting policies for doubtful accounts as set forth in the Company's 2015 10-K, *see supra*, ¶144.

171. In its Q3 2016 10-Q, Avon disclosed that its operating expenses were higher due to "an increase of 30 basis points from higher bad debt expense, primarily in Brazil," and that margins in its South Latin America segment were negatively impacted by higher bad debt expense in Brazil. However, Avon falsely represented that the increase in bad debt was "***primarily due to the macroeconomic environment in Brazil,***" rather than the undisclosed

changes Avon had made to its credit criteria to recruit new Representatives and boost revenue in Brazil.

172. Following the release of its third quarter 2016 results, the price of Avon stock dropped $0.17 per share to close at $6.24 per share on November 3, 2016, a decline of almost 3%. However, Defendants' materially false and misleading statements and omissions kept the Company's stock price from falling even further, artificially maintaining the price of Avon's stock and/or cushioning the stock price from falling even further.

173. Defendants' statements concerning Representative retention, growth, and training in Brazil, contained in ¶¶165-71, were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit);

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce; and

(c) failed to increase its allowance for bad debts to account for the changes it had made to its credit terms and the other available information set forth in ¶¶242-62.

174. On November 2, 2016, Trefis issued a report on Avon entitled "Avon's Q3 2016 Performance Is Expected To Continue Showing Signs Of Recovery," in which Trefis noted that Avon "is investing significantly on the active representative training and retention in [Brazil] aiding the representatives in building their businesses, providing them with the required channels to reach out to customers."

175. On November 3, 2016, Bill Schmitz of Deutsche Bank issued an analyst report on Avon entitled "Haters gonna hate but players gonna play – maintain Buy." In his report, Schmitz reported the following:

> **The key takeaway**
>
> Company reported largely in-line organic growth of 4% and beat Street EBIT estimate by nearly 40% as f/x pressure continues to ease and productivity savings and pricing continue to flow through. Avon remains one of our top picks in the space as turnaround gains traction, currency headwinds ease, margins inflect and cash flow accelerates and is redeployed to pay down debt and derisk the story. Assuming current macro conditions endure, we see a compelling path to significant earnings and margin upside versus current expectations at a still reasonable multiple. Keeping Buy and $8 target.
>
> **Key positives in the quarter**
>
> Eight of the company's top 10 markets drove organic growth this quarter (Turkey fell short due to geopolitical events and Colombia is seeing category softness), with core Brazil and Mexican businesses strong. EBIT beat Street consensus by nearly 40% in a relatively clean quarter. Outlook for the December quarter was relatively upbeat and the company expects healthy gross margin expansion and cash flow acceleration next year assuming spot currency rates hold. China is exploring partnership options to leverage the strong Avon brand awareness there.
>
> * * *
>
> **Keeping Buy on earnings acceleration/multiple expansion**
>
> While there are still plenty of looming challenges for Avon and its direct selling model in the predominantly developing markets where it competes, results the last few quarters, despite forceful arguments to the contrary, are showing clear signs of improvement. Challenges with some of the company's mid-tier markets aside, growth across the company's business is healthy in a quarter where significant landmines emerged for other companies.

176. On November 4, 2016, Nik Modi of RBC Capital Markets issued a research report on Avon entitled "Avon Products – Making Progress. . .Remain Sector Perform." In his report, Modi reported the following:

> **Our view:** AVP reported a mixed quarter. Like most other [Consumer Product Group] names this quarter, Avon faced challenges delivering on consensus top line, but benefitted from moderating FX trends. Before getting more constructive

on the name, we would like to see a broader and more consistent acceleration in rep growth - a move that requires incremental reinvestments. Reiterate Sector Perform.

**Key points:**

**Slight misses, but not as bad as they seem**: AVP delivered +4% local currency growth, which was light of consensus +5% and adjusted EPS of $0.02, which missed RBCe/consensus expectations $0.03.

* * *

**Registered Reps:** Given the importance of salespeople in a direct selling business, we place a high level of importance on a company's ability to retain talent. Total AVP (reportable segments) registered reps were flat in the quarter, and unchanged at 0.5% over the past 3 quarters on a 2-year average basis. And while this is an improvement from deceleration we would expect trends would have to improve to see a sustainable turn-around in the business - which would require significant additional investment.

* * *

**Updates to Estimates:** We are raising our FY'16 EPS estimate to $1.12 from $1.10 previously given our expectation for significant EBIT margin expansion into year-end. We point out that 4Q [is] has historically been the highest margin quarter from a seasonality perspective.

### H. Bank of America Merrill Lynch America Leveraged Finance Conference – November 29, 2016

177. On November 29, 2016, during the Bank of America Merrill Lynch America Leveraged Finance Conference held during the trading day, Defendant Scully discussed ways in which the Company was improving the sales Representative experience: ***"If you look at improving the representative engagement in the middle, there is really three primary strategies that we have, first is to improve onboarding, the second is in segmentation is to make sure that we understand the best performing representatives, so we can focus investment on the highest return, whether that be the best recruiters and also eliminate some spend on customer representatives who just come once a year to buy with a discount for their family and friends***."

178. Defendant Scully's statements concerning Avon's onboarding process, contained in ¶177, were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit); and

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce.

**I. ICR Conference - January 10, 2017**

179. On January 10, 2017, during the ICR Conference in which Defendant McCoy, Scully and Wilson participated, Defendant McCoy acknowledged that Avon's sales Representatives needed training and support to be successful and that the Company had "***made very good progress on the onboarding side***." McCoy stated, in pertinent part:

> Importantly, if we look at the health of the business, we look at the revenue generation side. ***What you see is that 60% of our sales come from people who have been with us 18 months or more. So important to get them in, keep them, train them, and make the experience worthwhile for them.***
>
> * * *
>
> ***We need to bring her in, train her on how to sell, and then also support her.*** And if she's someone that's coming in and that's going to be her full-time job, what is it that she needs to be successful? ***If she's coming in on a part-time basis, what do we need to do to make sure that she's successful?***
>
> * * *
>
> ***[W]e've made very good progress on onboarding side. We know that if women come in and they're successful within the first six campaigns, they're more likely to stay with us because she's learned how to sell.*** She's built her confidence. So we've done that in markets like Russia, Mexico, et cetera. ***We've expanded that to our top 10 markets and it's really giving a benefit for consecutive selling. Learning how to sell personal care first, then color and then waiting till later to teach here how to sell skin care, which is a more***

***complex sell. That's something that we've made good progress on. We'll continue executing that in other markets and we'll be enforcing that on our top 10 moving into 2017.***

180. In the accompanying slideshow, Defendants again assured investors that "***1-2% Active Representative growth [was] on track***."

181. Defendant McCoy's statements concerning Avon's onboarding process contained in ¶¶179-80 were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit); and

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce.

### J. The Truth Begins to Emerge, but Defendants Continue to Mislead Investors

#### 1. Fourth Quarter Fiscal 2016 Results – February 16, 2017 *(First Partial Revelation of the Truth)*

182. On February 16, 2017, before the market opened, and less than six weeks after the Company touted the success of its sales Representative onboarding program, the truth about the Company's problems with its Representative base was partially revealed. On that date, Avon reported weak earnings for its fourth quarter of fiscal 2016 including a net loss of $0.03 per share and a 2% decline in Active Representatives. On the related earnings call, in which Defendants Wilson and McCoy participated, Avon specifically attributed the weak quarterly earnings to an "unexpected increase in bad debt of . . . $35 million, primarily within [Avon's] Brazilian business." According to the Company, this bad debt problem was caused by "**relaxing credit terms**" ***"a little bit . . . in Brazil***" and "**the inability of some [Representatives] to pay**."

Defendant McCoy also falsely reassured the market of the "***good succes***s" the Company had in Brazil "***manag[ing] the recruitment of Active Reps***."

183. On the issue of the bad debt, Defendant McCoy stated:

> **Revenue fell short of expectations**. . . **dampened by an unexpected increase in bad debt of roughly 210 basis points or approximately $35 million, primarily within our Brazilian business.**[23]

184. Defendants McCoy and Wilson both represented that the bad debt charge was the direct result of the "***deteriorating economic environment***" in Brazil and previously undisclosed changes to credit terms to recruit new Representatives in Brazil:

> Brazil's Representative recruitment efforts were solid throughout 2016, resulting in a modest increase in Ending Representatives for the year. However, ***given the deteriorating economic environment,*** **we saw a higher than expected level of bad debt in the second half of the year. There are two primary reasons for this. One, the inability of some consumers to pay, and two, in order to assist with new Representative recruiting, the team adjusted credit terms.** [McCoy]
>
> * * *
>
> **The South Latin America segment margin was 9.3%, down 100 basis points versus prior-year, driven by an estimated 320 basis point negative impact from foreign currency transactions costs and 200 basis points from higher bad debt, primarily in Brazil,** ***due to the macro economic conditions*** **coupled with actions taken to recruit new representatives,** partially offset by the favorable impact of price and mix and lower supply chain costs. [Wilson]

185. In addition to the bad debt charge, Avon warned that as credit standards for new Representatives in Brazil were tightened up back to prior standards, new Representative growth in Brazil could be moderated moving forward. Specifically, Defendant McCoy stated:

> **Moving forward, we are taking actions to adjust both of these factors by first enhancing our collection processes and second, tightening our recruiting terms. We expect that this may potentially result in a moderated new Representative growth**.

[23] **Information that reveals the truth is bold and underlined**.

186. However, Defendants' false representations that the Brazil bad debt had been fully accounted for in the fourth quarter kept Avon's stock price from falling even further. For example, in response to a question from Bill Schmitz of Deutsche Bank regarding whether the bad debt problem in Brazil was "all cleaned up, or do you think there's going to be more of a tail going into next year," Defendant Wilson falsely assured the market that the bad debt issues represented a one-time event, and that the Company was still on track to deliver the promised results from the Transformation Plan, stating:

> ***In the bad debt, obviously, our business does have bad debt expense on an ongoing basis, but [this] specific thing, we believe, is fully cleared up and booked in the 2016 result, so, we wouldn't be expecting a flow over of that into 2017.***

187. In response to a question from Ali Dibadj, a Bernstein Analyst, about Avon's decision to relax credit terms in Brazil, Defendant Wilson falsely represented that the decision to relax credit standards for new Representatives in Brazil ***during the second half of 2016*** *was* "***a very specific action for a limited period of time in one market***."

> Ali Dibadj - Bernstein Analyst
>
> I get worried a little about when I hear about relaxing credit terms and it backfired on you. How does that make me feel about your Representative base at this point?
>
> Wilson
>
> I think that the point we are making here is that we've obviously -- the success stories that we have seen, particularly in places like Brazil, show that we are on the right track and doing the right things. . . . I do think that we believe that we are on track. . . . ***The point on relaxing credit terms is, yes, there was a little bit of that in Brazil in 2016, but it is not a general policy of ours, and therefore I would not be reading across that to a sort of underlying trend in attracting representatives in by relaxing credit terms. That is not the case. It was a very specific action for a limited period of time in one market. So it is not a general read across the company***.

188. Defendant Wilson also falsely stated: "***Clearly, yes, the margin this year was depressed by the bad debt, so we wouldn't expect the 2017 margin to be depressed by that***" and

"***we should expect the course corrections from the issues we saw in the fourth quarter to start taking traction in quarter 2***."

189. Defendant McCoy also continued to tout the strides the Company made in 2016 in its onboarding and training of new Representatives, and how, in 2017, it intended to continue to invest in training its Representatives.

> [I]mproving Representative engagement is one of the most important drivers of growth. We know from our Active Representatives metric that we have not made the progress we would like in this area, particularly in some markets. ***During 2016, the areas of focus for the top 10 markets was to enhance our on-boarding process, begin implementing segmentation to offer more customized approaches for Representatives, and improve our service model to make it easier to do business with Avon***.
>
> For perspective, approximately 60% of sales are generated by people who have been with Avon for 18 months or more. ***This highlights the importance of investing in on-boarding, training, and retraining representatives. In 2017 we will continue to improve our on-boarding processes for representatives, including offering training to enable them to build confidence and be successful in building their earnings***.

190. Defendant McCoy also represented that the Company was having "***good success***" in Brazil "***driving market share, putting the investment, and making sure we continue to manage the recruitment of Active Reps***."

191. As a result of this surprising news, the price of Avon stock fell approximately 19%, to close at $4.77 per share on February 16, 2017. On the following day, February 17, 2017, the price of Avon stock dropped again, falling an additional 3% to close at $4.61 per share.

192. Defendants' statements about the limited temporal nature of the credit term relaxing, the Brazilian bad debt being fully accounted for in Q4 2016 ("***fully cleared up and booked in the 2016 result***"), and onboarding the Company provided to its Representatives in top markets, contained in ¶¶186-90, were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil in late 2015, not in the second half of 2016, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit); and

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce.

193. On February 16, 2017, Bill Schmitz of Deutsche Bank issued an analyst report on Avon entitled "Asleep at the wheel." In his report, Schmitz reported the following:

> **Key takeaways**
>
> Avon reported a terrible trifecta of bad results – organic growth was flat, operating profits missed on higher bad debt expense and cash flow came in well below seemingly conservative guidance. Company has plenty of excuses for the shortfall but the real answer is local managers aren't executing and senior management isn't holding people accountable. Despite deep frustration with how things are being handled here, stock was cheap and has gotten cheaper and latent potential remains significant. Keeping Buy, $7 target.
>
> * * *
>
> **Negatives to monitor**
>
> Where do we start? Russia, a key focus market, came in well below expectations, **bad debt expense in Brazil is a reflection of sloppy field execution and artificially inflated sales growth.** Moreover, free cash flow was much worse than expectations and guidance and will get people spooked again about the company's ability to sustainably generate enough cash flow to fulfill its obligations.
>
> * * *
>
> **Keeping Buy on valuation, latent potential despite few short-term catalysts**
>
> Avon is a tough stock to love. Each time you think the worst is over and the company is turning the corner an awful quarter like the one the company printed today comes through and you are reminded just how fragile this turnaround, and just how fickle direct selling is. Peeling back the onion and excluding hopefully one-time costs like bad debt expense in Brazil, the progress the company is making on the turnaround is palpable but that is little solace for the patient

investors and weary sellsiders seeing the stock bump from guardrail to guardrail. . . . [H]opefully this is a wakeup call for the Board and management that unless they execute over the quarter and show incremental progress on the turnaround, investors aren't going to sit around and wait for this one. So, while we cringed as we went through the release and didn't feel better after the call leaving with more questions than answers, if you liked the stock before today's move you should love it today because little has really changed with the story.

For instance, if organic growth was a point or two higher and the company didn't take the Brazil bad debt charge in the quarter, operating profits would have come in well above Street estimates and the stock would have been up 5% or more. Instead, by missing reported and organic sales growth, operating profit and importantly, cash flow investors are spooked again and will likely vote with their feet. Unfortunately, there are few catalysts to get the stock moving until management puts up a good print which is tough for many given the company's inherently opaque business model. . . . **Aforementioned higher bad debt expense impacted EPS by $0.08 vs. our model.**

194. On February 16, 2017, Trevor Young of Jefferies issued an analyst report on Avon entitled "Avon Products (AVP) 4Q16 First Take." In his report, Young reported the following:

**Key Takeaway**

Avon just reported 4Q results. Rev. fell short of cons. (-$42m, or -2.6%), although the miss was driven by CC declines in EMEA and slower growth in North/South LatAm rather than FX, **as active reps declined in 3 of 4 segments**. **GM improved +160bps, but this was offset by a -210bps bad debt headwind (Brazil),** resulting in adj. OM (7.3%, +130bps) well short of cons. Tax volatility returned once again, further contributing to a -$0.08 EPS miss ($0.01 vs. $0.09).

* * *

Full year cost savings from the ongoing transformation plan came in ahead of expectations ($120m vs. $90m guide and $80m 3Q16 YTD), **but this was somewhat offset by a +$33m (+210bps) increase in bad debt expense, which management attributed primarily to Brazil.**

195. Later that day, Trevor Young updated his Avon model and issued a follow-up report on Avon entitled "Avon Products (AVP) Post 4Q16 Model Update." In that report, Young reported the following after the Company's earnings call:

> **Long-term goals might be delayed, but still achievable.**..and valuation remains compelling. We're lowering our CC revenue growth assumptions for 2017-2018 given worsening trends in active representative growth, which may not reach the L-T goal of 1-2% growth until 2018 (or later). . . .We subsequently believe that AVP can achieve ~1% CC revenue growth in 2017 and ~3% in 2018. This is admittedly below AVP's L-T goal of MSD CC revenue growth, but we await positive growth trends in active representatives to drive higher revenue growth rates. Continued mix improvement should help further GM expansion into 2017 (absent FX), offset by pot. incremental SG&A spend to help drive representative engagement.

196. On February 16, 2017, Stephanie Wissink of Piper Jaffray issued an analyst report on Avon entitled "Reshaping Margin Improvement Curve; Sales Lag Will Test Savings Benefits; Neutral." In that report, Wissink parroted Defendants' false statements that the bad debt increase was due mostly to the economic conditions in Brazil (as opposed to the new Representatives in Brazil who were defaulting on their accounts in huge numbers): "Though Brazil delivered strong results throughout the year, **economic conditions resulted in higher than expected bad debt expense."**

197. On February 17, 2017, Lauren Lieberman of Barclays issued an analyst report on Barclays entitled "One Step Forward, Two Steps Back." In that report, Lieberman reported the following:

> In Brazil, the Company recognized a $35 MM increase in bad debt expense related to the inability of some representatives/consumers to pay in the current macro environment, and as local management adjusted credit terms to assist with new representative recruiting. **From our perspective, while we think greater focus could have allowed for this issue to have been resolved earlier**, we believe the new CFO is using this as an opportunity to look at management of accounts receivables across top markets and implement improved processes to better manage this risk. We know one quarter doesn't make a trend, but it's hard not to feel like 4Q16 was a major step in the wrong direction.

198. On February 22, 2017, Avon filed its 2016 10-K for the year ended December 31, 2016. In the 2016 10-K, the Company disclosed, among other things:

> • lower margins, due in part to "a decline of 2.0 points from higher bad debt expense, driven by Brazil primarily due to the macroeconomic environment,

**coupled with actions taken to recruit new Representatives, including the adjustment of credit terms;"**

• "an increase of 80 basis points from higher bad debt expense, driven by Brazil primarily due to the macroeconomic environment, **coupled with actions taken to recruit new Representatives**;"

### 2. First Quarter Fiscal 2017 Results – May 4, 2017 *(Second Partial Revelation of the Truth)*

199. On May 4, 2017, before the market opened, Avon reported disappointing earnings for the first quarter of fiscal 2017, primarily due to additional bad debt write-offs from lower collections in Brazil. The Company reported a net loss of $0.10 per share and a 3% decline in Active Representatives. On the related earnings call, in which Defendants Wilson and McCoy participated, Avon disclosed that despite its earlier assurances that the Brazil bad debt problem had been fully accounted for in 2016, the Company was recording another significant charge for bad debt in the first quarter of 2017. The bad debt charge was attributable to the "**relaxation of credit terms.**" Specifically, Defendant Wilson acknowledged:

> **In addition, at the end of last year, we saw a rise from our normal level of bad debt, which was typically between 2% to 3% of revenue, driven by relaxation of credit terms as part of our recruitment crusades, coupled with the general economic environment. On the quarter 4 call, we said that bad issues were behind us, however, while we are seeing some improvement based on the actions we took to remediate the position, including tightening credit terms, it's taking longer than expected to return to normal levels.**
>
> **During the first quarter, the level of collections we experienced was lower than we had estimated at the year end and inconsistent with our prior history. So we are again seeing a high level of bad debt provisioning in the quarter.**

200. In response to a question from an analyst about Avon's bad debt, Defendant Wilson stated, in relevant part:

> We believe that we are taking actions on the bad debt. **We did explain that last year that some of that was due to our relaxation of credit terms, which have now tightened again**, ***so that part of the equation has gone away.*** **But it will take time to work through**.

201. However, during the earnings call, Defendant McCoy falsely represented that the Company expected the past issues to be corrected by the second half of 2017:

> [I]n summary, quarter 1 delivered broadly in line with our expectations. We anticipated that the issues we identified during the fourth quarter would take time to course correct and would impact the first quarter. ***We continue to make progress on the actions we've put in place and expect to strengthen the business in the second half of the year. We have provided an outlook for the full year indicating our confidence in the year as a whole***.

202. Defendants also falsely assured investors about the limited impact the remedial actions (*i.e.*, stricter credit terms applied to recruiting new Representatives) in Brazil would have on the Company's future revenues. For example, Defendant Wilson represented the following on the conference call:

> We anticipate that an elevated level of bad debt may continue in quarter 2 and ***start to recover later in the year.*** Part of the remedial actions will result in a moderation of recruitment, ***but we do not expect to see this materially impacting on revenue generation.***

203. Defendants also falsely reassured investors that they "***expect[ed] to see an improvement as we get to the back end of the year in bad debt***" and "***expect[ed] the amount of bad debt to decline in the second half of [2017]***," due to "***enhanced collection processes and tighter recruiting terms***."

204. Despite increasing bad debt levels, Defendants McCoy and Wilson assured the market that the Company was improving Representative engagement and satisfaction:

> ***[I]mproving representative engagement is critical to our growth plans.*** We measure and track representative satisfaction in each of our top 10 markets. ***In first quarter, representative satisfaction scores increased significantly year-on-year, including improvements in likely to recommend being a representative.*** [McCoy]
>
> * * *
>
> ***It's about the work we're doing with Active Representatives. . . and the work we're doing with improving the representative experience.*** [Wilson]

205. In response to a question about reinvestment in the Company, Defendant Wilson iterated the importance of Representative onboarding and falsely represented that Avon was investing in this critical aspect of the Company's business:

> So really, the issue is more about how we actually make it easier for [the Representative] to build her business. A lot of that is not just throwing money at it. It's a lot about training, tools, the digital stuff we're doing, which is the capital expenditure we're doing, and we're not holding back on that piece of it at all. . . . And so it's really looking at the issues that we think are going to drive the business the way we want it to be driven. ***And we feel we're investing the right amount behind each element in that.*** . . . ***we think it's making sure that we're moving all aspects of the engagement of the representatives forward at the same pace. So that actually we continue to improve her engagement with Avon and actually the retention of those representatives within Avon.***

206. As a result of this news, the price of Avon stock fell 22.15% from $4.65 to $3.62 per share on a day of heavy trading.

207. Defendants' statements about bad debt declining in the second half of 2017, the limited impact the stricter credit terms applied to recruiting new Representatives in Brazil would have on the Company's future revenues, and the Company's continued investment it its Representatives, contained in ¶¶201-05, were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit); and

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce.

208. That same day, activist investment firm Barington Capital Group L.P. issued a press release entitled "Barington Capital Group Calls On The Avon Products Board To Begin A Search For A New CEO" stating:

> An investor group led by Barington Capital Group, L.P., including NuOrion Partners AG, announced today that it is calling on the Board of Directors of Avon Products, Inc. (NYSE: AVP) to immediately begin a search for a new Chief Executive Officer.
>
> During more than five years as CEO, Sheri McCoy has overseen a tremendous destruction of shareholder value. Avon's stock price has fallen by more than 80% since Avon announced that it had appointed Ms. McCoy as CEO – from $22.69 on April 9, 2012 to under $3.65 today. Under Ms. McCoy's leadership, earnings per share have fallen from $1.20 in 2011, the year prior to her appointment, to a current consensus estimate of $0.32 for 2017.
>
> As we stated in our December 3, 2015 letter to the Avon Board, we strongly believe that with the right leadership in place Avon can recover its position as a leading global beauty brand and create significant long-term value for shareholders. In that letter, we also questioned the ability of Ms. McCoy to manage the business effectively, including restoring sales growth and reducing the Company's bloated cost structure. While Avon has taken steps to improve its operations, we believe that efforts need to be dramatically intensified under new leadership. Based on today's substantial stock price decline, in spite of positive 2017 guidance, we believe that most shareholders would agree.

209. On May 3, 2017, Nik Modi of RBC Capital Markets issued an analyst report on Avon entitled "1Q'17 Preview & Cheat Sheet" before the Company released its first quarter results. In that report, Modi expressed concern that Avon had failed to sufficiently reinvest in its Representative base – including training its Representatives. Modi stated:

> Our view: We expect revenues of $1.25B (vs. cons. $1.33B) and EPS of $0.01 (vs. cons. $0.01). We remain cautious on Avon's prospects as we believe the **company still has to reinvest significantly behind its brands and rep training/incentives in order to stabilize results for the long run**.

210. On May 5, 2017, Stephen Powers of UBS issued an analyst report entitled "Avon Products - Q1 reaffirms concerns over the sufficiency of AVP's reinvestments." In that report, Powers reported the following:

> More misexecution/competitive struggles likely on the horizon
>
> AVP's Q1 results reinforced our longstanding concern that AVP has insufficiently reinvested in its business, making it more difficult for the company to consistently execute (as evidenced by its challenges in Russia in the quarter **and lingering Brazil bad debt expense headwinds)** and to win in an increasingly competitive landscape (as evidenced by softness in color cosmetics in the quarter) . . . . Underperformance in Q1 was driven by multiple markets—in Russia, AVP overpriced (to the detriment of volumes) to offset FX headwinds and encountered delivery service disruptions. In Brazil, it faced significant competition in color cosmetics, **while still contending with bad debt issues (expected to persist through at least Q2)**.

### 3. Deutsche Bank Global Consumer Conference – June 14, 2017

211. On June 14, 2017, during the Deutsche Bank Global Consumer Conference, in which Defendants Wilson and McCoy participated, Defendant Wilson acknowledged that training was crucial to the Company's success:

> ***But also, we have to make sure that we are actually investing in her, that we are giving her the skills to help her grow her business***. It is a competitive world out there. We need to make sure she fully understands our products. We need to recognize the fact that people, when they come to join Avon, are often starting out as mini entrepreneurs. I mean, it's their first step into trying to earn some money to build a business. ***We need to recognize that, help her and give her pointers and monitor how she's doing to allow her to build that and actually see whether she can make a success of that business and grow a credible opportunity for her to earn money. . . . So we also need to invest in her, which is more about training and sales tools, which are much more internal generation, actually getting that out and getting our associates to actually engage with our representatives to talk her through these and make sure that she's understanding the opportunities that she could have.*** And we need to simplify the process in terms of dealing with us, so whether it's ordering, returns, any of these things. ***We also need to invest in our associates. I talked about revenue growth management skills. I talked about merchandising skills. We need to lift the skills of our people and market so that they actually can drive the change that we're looking for***.

212. Defendant Wilson's statements about the importance of training contained in ¶211 were materially false and/or misleading when made in that they failed to disclose that, at that time, Avon offered minimal to no training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce.

### 4. Second Quarter Fiscal 2017 Results – August 3, 2017 *(Third Partial Revelation of the Truth)*

213. On August 3, 2017, before the market opened, and in connection with the issuance of the Company's second quarter fiscal 2017 results, Avon reported a net loss of $0.12 per share and a 3% decline in Active Representatives. The Company also reported that: (a) Brazil revenue was "down 2% in constant dollars, primarily driven by a decrease in Active Representatives"; (b) the "**elevated level of bad debt [had] continued in the second quarter [of 2017]**" in Brazil as the Company "**continue[d] to cycle through the impact of last year's relaxation of credit terms**"; and (c) Defendant McCoy would be leaving Avon as part of its CEO Transition Plan at the end of March 2018. On the related earnings call, Defendant Wilson admitted that, despite Avon's earlier representations, the remedial actions in Brazil (*i.e.*, stricter credit terms applied to recruiting new Representatives) were, in fact, negatively impacting Active Representatives and revenue in Brazil:

> **[T]he elevated level of bad debt continued in the second quarter. We continue to see improvements based on the actions we took to remediate the position, including tightening credit terms and improved collection procedures, and we expect to start to recover during the second half. However, the remedial actions resulted in moderation of recruitment that impacted Active Representative growth in the quarter. Although we do expect to see improvement in the issues that impacted Brazil's performance this quarter, we expect the second half revenue to remain under pressure**.

214. However, Defendants again falsely assured investors that they: (i) "***expect[ed] [Avon] to start to recover during the second half***" of the year; (ii) "***expect[ed] performance improvement throughout the balance of the year, with the second half being an improvement from the first half as growth initiatives gain traction***"; and (iii) expected bad debt to "***be much less of an impact in the last 2 quarters [of 2017].***"

215. As a result of this news, the price of Avon stock dropped $0.36 per share to close at $3.00 per share on August 3, 2017, a decline of nearly 1%. 1 On the following day, August 4, 2017, the price of Avon stock dropped again, falling over 4% to close at $2.87 per share.

216. Defendants' statements about Avon recovering in the second half of 2017 and the lessened impact of bad debt in Q3 2017 and Q4 2017, contained in ¶214, were materially false and/or misleading when made in that they failed to disclose that Avon:

(a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt (and exposing the Representatives to increased long-term debt and tarnished credit); and

(b) offered minimal to no support or training for its Representatives in Brazil, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce.

217. According to an August 3, 2017 article in the *Wall Street Journal* entitled "Avon CEO to Step Down Amid Investor Pressure - Shareholders frustrated with pace of turnaround plan," which was released after the market closed:

> **Avon Products Inc. pushed out Chief Executive Sheri McCoy after a disappointing five-year tenure** during which she oversaw an overhaul of the storied cosmetics seller but ultimately failed to stop its years long downward spiral.
>
> Avon announced Ms. McCoy's departure Thursday along with a third-straight quarter of particularly bleak results that sent the shares down another 11%. **She will technically be "terminated without cause," according to people familiar with the matter.**
>
> Avon said it has retained executive-search firm Heidrick & Struggles International Inc. to help find a successor to Ms. McCoy, who plans to stay on until March. That could be accelerated depending on when Avon finds a replacement, the people said.
>
> Ms. McCoy, 58, had been negotiating an exit from Avon, as The Wall Street Journal reported in June. The plan came together when the board, some members of which had continued to support Ms. McCoy, lost patience as a result of the continued weak performance of the business, people familiar with the matter said.

> **Ms. McCoy and the board reached an agreement at a July 13 board meeting at Avon's Rye, N.Y., facility, they said**.
>
> **The latest results—Avon reported a $45.5 million second-quarter loss and a 3% drop in revenue amid continued attrition in sales representatives—and the bungling of key overhaul initiatives led the board to demand an immediate exit plan and announcement, the people added.**

218. On August 2, 2017, Nik Modi of RBC Capital Markets issued an analyst report on Avon entitled "2Q'17 Preview & Cheat Sheet" before the Company's second quarter results were released, in which Modi again expressed skepticism about whether the Company was adequately investing in its sales Representatives. Specifically, Modi stated:

> Our view: We expect revenues of $1.43B (vs. cons. $1.44B) and EPS of $0.07 (vs. cons. $0.07). **We remain cautious on Avon's prospects as we believe the company still has to reinvest significantly behind its brands and rep training/incentives in order to stabilize results for the long run.**

219. On August 2, 2017, Trefis issued a report on Avon entitled "Avon Products' Focus On Top Markets And Brands Might Lead To A Stronger Q2 Performance." The report stated in part:

> Avon's performance in Brazil grew slightly (in local currency terms) in Q1 and is expected to follow the trend in Q2, as well. The higher average order led to this growth, **though the reduction in the Active Representative pool dampened it. This, in turn, increased the level of bad debt in Brazil. With a better collection process and more stringent terms of recruitment, the bad debts are expected to decline towards the second half of this year.**

220. On August 3, 2017, Faiza Alwy of Deutsche Bank issued an analyst report on Avon entitled "Downgrading to Hold." In the report, Alwy reported the following:

> **No confidence in a near-term turnaround**
>
> Avon reported yet another weak quarter that sent the stock down 10.7% today. Up until today, we believed risk/reward profile was favorable with significant latent potential but there are three key factors that led us to reevaluate our thesis:
>
> 1. Disappointing results accompanied by management lowering guidance to low end of ranges first provided just one quarter ago gives us little confidence that the back half innovation-driven acceleration baked into this guidance will actually

> materialize, particularly given the relatively volatile macro environment in Avon's top markets. The company is making investments in digital capabilities, advertising and innovation, which should theoretically drive sales growth but we have not seen any evidence of that so far. Instead, the company continues to face new execution challenges as we discuss below.
>
> 2. News that CEO Sheri McCoy is stepping down in March, indicates to us that a recovery, should there be one, is more than 12 months away. While this move was previewed in June, we believe a new leader for the company will need several months to learn this notoriously complex business, and likely have several setbacks, as we've learnt over the last decade, small changes can often backfire.
>
> * * *
>
> Reducing rating to Hold, lowering target to $3 (from $5) primarily due to lowered estimates.

221. On August 4, 2017, Stephen Powers of UBS issued an analyst report on Avon entitled "Avon Products - Still Too Many Blemishes to Conceal." In his report, Powers reported the following:

> Poor Q2 performance was attributable to both new and lingering executional issues: 1) **misguided credit standards in Brazil leading to material bad debt expenses;** 2) out-of-line pricing in Russia leading to volume losses; 3) transport/delivery disruptions in the UK; and 4) an inability to fill outsized demand from promotions in Mexico. All-in, Q2 reinforces our concern around AVP's ability to execute against its transformational plan.

222. On August 4, 2017, Nik Modi of RBC Capital Markets issued an analyst report on Avon entitled "Avon Products - Challenges continue." In his report, Modi reported the following:

> Brazil constant currency -2%, was one of Avon's stronger markets but we wonder if Brazil trends could further decelerate in 2H17 given **ongoing rep churn** and pull back in consumer spending.
>
> **Representative count trends negative**: It's clear from Avon among other CPG players that the global macro backdrop remains challenging – which typically would drive an acceleration in rep count. However, for Avon rep count (a leading indicator for sales growth) has now declined for six consecutive quarters. In 2Q17 reps were -3%, which encouragingly was a 50 bps acceleration sequentially on a 2-year average basis. We believe Avon rep count must first stabilize in order for the company to turnaround its top-line, and see risk to the company's 0-1% active

> reps guidance (which implies 3%+ rep growth in 2H17). Reinvestments in rep incentive structures may be required, limiting near-term earnings growth.

## VII. THE FULL TRUTH IS REVEALED

223. Finally, on November 2, 2017, before the market opened, the full extent of Avon's "self-inflicted" bad debt crisis was revealed to the investing public when the Company reported its results for the third quarter of fiscal 2017. Investors learned that there was "**higher bad debt and increases in field and selling expenses targeted to support our efforts to activate representatives.**" The higher bad debt levels were "**driven by more relaxed credit policies for incoming representatives [in 2016]. The consequence of these relaxed policies were delinquencies associated with these new representative populations, resulting in large increases in bad debt.**"

> **On active representatives, the decline in the quarter was largely driven by Brazil, as we continue to apply intentionally tighter credit policies. We are up against challenging comparisons from last year, when credit policies were less restrictive, which, while we continue -- which will continue to impact us through the remainder of 2017**.
>
> * * *
>
> Turning to [South Latin America], revenue was relatively flat, as growth in Argentina was offset by a decline in Brazil. **The segment margin declined due to the continued high level of bad debt, as well as higher field and selling expenses primarily to support field activation efforts, most notably in Brazil.** These items were partially offset by the favorable net impact of price and mix.
>
> * * *
>
> Given the importance of Brazil's performance on Avon's overall third quarter results, let me take a moment to explain the issues we faced in more detail. Brazil is one of our most competitive markets, which requires a keen focus on execution and insights into market demand.
>
> * * *
>
> **As a reminder, during this quarter last year, Brazil saw significant increase in Representative appointments, which were driven by more relaxed credit policies for incoming Representatives. The consequence of these relaxed policies where delinquencies associated with these new Representative**

> **populations resulting in large increases in bad debt. As a result, during the third -- this year's third quarter, Brazil planned a few representative appointments, as the business has reverted to tighter credit controls, resulting in a planned decline in active representatives. In addition, we adjusted other business processes that were further contributing to bad debt issues given the challenging macroeconomic environment. While we have again seen some improvement in bad debt in the quarter, the team still has work to do to reach normalized levels.**

224. In response to analyst questions regarding the status of Avon's bad debt Defendant Wilson stated:

> Yes, the bad debt risk comes—we've seen it in different forms in different markets. **I mean, we've talked a lot about the Brazil bad debt, and that was, to some extent, self-inflicted with the listing of the credit policies there, which have now come back to the normal levels that we had before that decision was taken.**
>
> * * *
>
> So I mean I do think a lot of the work we've been doing, particularly in Brazil, is beginning to bear fruit, and I don't see that as that we have to put more investment into that space. **It's more a case of getting it back to normalized levels as a result of the actions that we've taken**.

225. Avon executives assured investors that the Brazil team "underst[ood] the issues and [were] taking a balanced approach to address them" by "working to improve retention, build [their] Representative base and invest in programs to support [Representative] success while reduc[ing] bad debts." Finally, investors were reassured that "credit policies . . . [had] come back to the normal levels."

226. On this news, Avon's stock fell from $2.37 per share to $2.15 per share, **or 9.3%.** It dropped an additional 9.8 % the following day, closing at $1.94 per share on November 3, 2018, which was a new all-time low closing price for Avon stock.

227. On November 2, 2017, Stephanie Wissink of Jefferies issued an analyst report on Avon entitled "(AVP) Thesis Unchanged; Structurally Trapped in a Challenging Cost Model." In the report, Wissink reported the following:

**Key Takeaway**

Our thesis remains intact following a mixed Q3 report. The biz recovery has lagged expectations, and variability in key markets implies strain on the op model. Costs to retain active reps continue to increase, while sales are flattish. Balancing debt service with investments & outcomes is a point of tension. PT of $1.75 based on 4.7x FY19E EV/adj-EBITDA.

**Retaining Reps Remains a Costly Challenge:** While reported revenue was relatively unchanged, declines in Active Representatives have persisted. **Active reps were down 3% in the quarter, primarily driven by declines in Brazil. Brazil accounts for approx. 22% of sales, and can be a swing factor in the recovery. Last year, AVP relaxed credit policies for Active Reps in Brazil to stimulate rep growth. The relaxed credit policies resulted in a higher number of active reps, but a large number of payment delinquencies; substantially increasing bad debt expense. AVP has reverted credit controls in Brazil to reduce bad debt expense; tighter policies have resulted in a declining sales/active reps. This dynamicism reveals a core tension - reps require increasing rates of stimulus to engage.** On a relatively modest LSD decline in reps during 2017, op income is expected to be down near 20%.

228. On November 2, 2017, Faiza Alwy of Deutsche Bank issued an analyst report on Avon entitled "Another quarter of weak results." In the report, Alwy reported the following:

**The key takeaway**

Avon reported flat organic growth (in-line with DBe and Street) with EPS of $0.03 (DBe: $0.06). Operating profit of $89.2m was down almost 10% in the quarter and missed our estimate by 15% primarily due to weakness in the North LatAm division.

* * *

[A]side from a few bright spots, **performance this quarter continued to underwhelm as operating profit missed Street by more than 20% driven by higher SG&A pressure from their larger markets, and ending representatives declined by 2% driven by active rep tightening in Brazil due to increased bad debt resulting from prior lax credit policies.** In EMEA, Russia and the UK also underperformed, down 6% and 12% in constant currency, respectively, due to lower active reps.

## VIII. POST-CLASS PERIOD EVENTS

229. On February 5, 2018, the Company issued a press release announcing Zijderveld as the new Avon CEO effective immediately.

230. On February 15, 2018 on the Company's Fourth Quarter and Full Year 2017 Earnings Call, Zijderveld announced another quarter of disappointing results for Avon, primarily driven by lingering bad debt in Brazil, stating in part:

> The number of Active Representatives declined more than anticipated, largely due to a decrease in Brazil, which impacted volumes.
>
> * * *
>
> In [South Latin America], revenue continued to decline due to a decrease in Active Representatives, especially in Brazil, offsetting the benefits from the increase in average order. . . . **The bad debt situation continues to improve, however, it is not a rate consistent with economic conditions.**
>
> **Brazil's decrease in revenue was driven by declines in Active Representatives. Continued application of tighter credit policies impacted recruiting efforts as well as representative activity.** This was expected to a degree, given the strong comparison from last year.

231. On May 3, 2018 during the Company's First Quarter 2018 Earnings Call, Avon executives discussed the Company's "unacceptable" performance in Brazil, as well as training initiatives to quell the problems. Defendant Wilson stated, in part:

> **Turning to Brazil specifically, the performance has continued to decline as many of the same challenges seen in prior quarters persist.**
>
> * * *
>
> **Overall, Brazil's performance is unacceptable and while we work on our longer-term turnaround plans, we are taking some immediate actions to address critical pain points and to improve relationships with our Representatives.**
>
> * * *
>
> **[W]e are in the early stages of establishing ongoing training programs through our Representative University, that arm the Representative with**

> **knowledge about the products to become the expert**. While we have very broad representative coverage throughout Brazil, we need to align the compensation model with performance in a way that enhances productivity. We've taken our first steps towards fine-tuning the model and we will continue to make improvements to the commercial model over time.
>
> Finally, we have formed a task force in Brazil, leveraging expertise in key functional areas to address some of the key issues and needs specific to the market. This is a model we will pursue in other key markets as we address opportunities to accelerate and improve. These short-term changes are foundational and necessary now.

* * *

In the same call, Jan Zijderveld, said:

> **We need to reboot the total representative experience. We have an amazing resource of 6 million beauty entrepreneurs and we have under-invested in her. We will increase investment in her development. This starts with training and includes having the right tools, digital support and innovations, on-trend products, all designed to enable her success**.

232. On August 2, 2018, when Avon reported its results for its second quarter of fiscal 2018, Zijderveld discussed Brazil's disappointing performance, and attributed it to the undisclosed fact that all training initiatives had been abandoned in Brazil throughout the Class Period. He stated:

> We've launched a new segmentation model, which de-averages the 1.5 million Brazilian reps and stops treating them all the same. **We've introduced new skilled training programs to reignite training efforts that were stopped a few years ago.** In the second half, we will organize major sales events, energizing events, and introduce significant new sales growth incentives designed to reenergize and reengage our representative base.

* * *

> Let me start on Slide 16 and probably one of the more fundamental ones, to reignite and reenergize our representatives by investing in them again. We have 6 million beauty entrepreneurs, one of the greatest assets we have, and we are rebooting their experience. We are moving away from treating all representatives the same and recognizing that a full-time representative, a part-time representative, or just a beauty Avon fan are all different, have different needs and motivations. They need different tools. **They need relevant training and support. They need different compensation and incentives and they have**

> **different interests and motivation. Our new segmented approach is radically different from anything we've done before. It accommodates their different needs with different solutions and training designed to improve their productivity. . . .We are moving away from a place where we cut nearly all investment in representative training to step changing in training beginning now. We have set up a new global academy to help deliver training in each country, and we will deliver training to over half a million representatives in the second half. We are driving this new leader-led training effort to help our representatives sell more, earn more, and run a better business.**
>
> * * *
>
> **And I think the third thing that is really new is training. It is amazing that in Brazil, we basically stopped all training.** And the core of our whole business model is actually the development and investment in the Representative. That is our tool. So we're really rebooting and restarting the whole training initiative, and that is starting right now.
>
> * * *
>
> **Now that's a big task when you have 1.5 million Reps just in Brazil.** You start with the top and you start with a new methodology of sales leader-led training. And Miguel and the people that we're bringing in know this very, very well. But that is starting right now. So lots of things going on. It's fair to say it will take time, but it is a full makeover that we're doing in terms of the whole sales experience in Brazil.
>
> * * *
>
> And the one that I'm super excited about and is really also one of the powerful things of a direct social selling company is really creating regimes and bundles for assisted selling, And if you loop it all together, **if we start training and investing in our field again, and teaching them how to grow her business, sell more units at higher prices and start to teach her to do assisted selling, i.e. sell bundles, sell combination of products, maybe even personalizing products, then the whole thing comes together. You train the representative**.

233. Lauren Lieberman, an analyst at Barclays, expressed surprise in an August 3, 2018 report at the Company's disclosure, stating: "Similarly, the company will resume training programs, which have largely (and shockingly) ground to a halt during recent years."

234. On September 21, 2018, during the Avon Investor Day, Zijderveld revealed that during the Class Period Avon ceased all training and sales support for its Representatives in

Brazil. Specifically, Zijderveld admitted that Avon "went to zero in terms of training and tools" and "didn't invest in [the representatives'] business development, product knowledge, and really how she builds her business," stating in part:

> **The second thing is we, in fact, over the years cut and maybe in some places even went to zero in terms of training and tools. We didn't invest in her business development, product knowledge, and really how she builds her business,** so, in the end she became a bargain hunter. She was looking for the promotions in the brochure to just sell. We're going to reset that to build trained assistant sales consultants who are digital and motivated to drive this business and know how to make money and drive a successful business.
>
> * * *
>
> And we've got a number of businesses that are really needing to change, and Brazil is our biggest one. And many of the things that you'll hear today are all landing in Brazil, as well as a new leadership team **but it's fair to say Brazil is on the operating table. It is on the operating table, and the surgeons are right in there at the moment, fixing Brazil, but it will take some time.** And you see some other businesses that are on the operating table but you see some other businesses that are going out and already driving that forward. But this gives you also a sense of some will be ahead, some will be behind, but it's going to take some time.
>
> * * *
>
> **In the second half, we really stepped up training.** We said we're going to train 0.5 million people. I went through it the other day. It looks like we're going to train more than 1 million people in the second half, of which probably 0.5 million are going to be just digital as well.
>
> * * *
>
> Now, the only way to get them to do differently is to train with intent. It's to teach her how to on-sell, how to up-sell, how to sell wide, how to sell bundles. **That's why training and training with intent is so important, so she can run a better business and make more money. It seems so obvious, but to be honest, we've forgotten these things.** And we're going to build these muscles again and this capability back into the company to create value for her and value for us.
>
> * * *
>
> It starts with training. **We actually stopped all the training in Brazil and got totally -- to all the things we talked about, we've done in Brazil. So we stopped the training, started promoting more**. We even had the second brochure with promotions on top of the original brochures for the representative.

> We went close enough to the market to capture the trends. **We weren't thinking about service in the way we should have been thinking about service. . . . So we're starting with training, we're starting with simplifying the compensation, we're fixing the service. We're trying to get closer to the marketplace to get better service.**

235. Miguel Fernandez, Avon's Global President, also admitted that there had been no training in Brazil and other key markets for five years. Fernandez stated, in part:

> We're going to arm her with tools, selling tools and digital tools; and **we're going to train her accordingly** to what she wants to accomplish with us in the company.
>
> * * *
>
> Along the history of the company, we did, probably 10 years ago, a lot of training. And it was fine. **About 5, 10 years ago, for some reason, we decided to cut training. All -- the whole Americas didn't have any training for the last 5 years.** So a rep came, got the brochure and had no training. So the only thing that she did was like, "Okay, this is so easy. I'm going to send the brochure to my friends and see how much I sell, because I have absolutely no knowledge in how to up-sell, cross-sell, add value to any transaction."
>
> * * *
>
> So again, just to round it up. We're going to fix service. That's a right to compete. We're going to recruit more and better. We're going to segment people accordingly to what they want. We're going to train them. We're going to increase their earnings. We're going to give them the tools. With all this, the Avon proposition is going to again become the best proposition in direct selling in the world.

236. On November 1, 2018, when Avon reported its results for its third quarter of fiscal 2018, Avon executives again admitted that there had been no training in Brazil and other key markets for five years. In that same call, they would stress representative training as the most important factor in representative retention, which was key to sustaining and growing the Company's revenues. Miguel Fernandez stated, in part:

> As I mentioned in [the September 21, 2018] Investor Day, **about five years ago, a decision was made to cut Representative training out of many countries, including Brazil**. Reinstating training programs is vital to driving retention and helping [Representatives] become a beauty advisor to [their] clients.

* * *

> [T]raining is the biggest priority for the market. This is a muscle that in some parts of the world we lost, and this is the key differentiator between a good direct seller and a not-good direct seller. We have to relearn in some parts of our markets and get much, much better in training. **So, we're prioritizing priorities, training is the one that has no downside**.
>
> * * *
>
> And this is a program that we're launching around the world in Q4 and this is just the first step of a very segmented approach on training and we're going to be continuously tracking what is better, what works better, and this is the whole concept of training with an intent. **We want people in the first 90 days to get to a certain level of income that becomes relevant to them, meaningful to them, so they stay with us. So the whole concept is identify who's actually really, really want to make money with us, train them, give them the tools and the services.** And that's how we're going to be tracking the progress of all of them.

237. CEO Zijderveld also elaborated on the importance of training, linking it to Representative retention, and therefore the Company's earnings, stating in part:

> I think in the end that internally, we're shifting really a lot of focus to productivity of our Representatives and increasing our earnings. And in the end, that is all about Rep retention. ***So, we are a pretty good recruitment machine, but what we really need to add to it is a retention machine. And the core of the retention is really about earnings, and earnings is really driven by training***, and it's as simple as that. And that's the essence of the rebooting of the direct selling that Miguel talked about.
>
> * * *
>
> [Y]our second question, what's the second-most important priority? **Well, that's really, really simple, it's training. It's training, it's training, it's training. We've got -- these 6 million ladies are the heart of our business and if she believes in our product, if she believes in our brand, if she gets told how to make more money, how to get to a meaningful earnings, if she feels that she's being recognized and rewarded for her efforts, if she feels that doing business with us is easier, then she will really go for that. And that is at the heart of any direct selling company and I must say that is what we've forgotten in Avon for the last whatever period of time you want to say. We forgot many of these things and we're putting all of that back. . . .you've got to invest in training**.
>
> * * *

> [M]ost importantly is about rebooting our direct selling, and that's really becoming a retention machine in improving her productivity. **And to do that, we've really got to drive up and step up training. And to be honest, it is as simple as that, really making sure that we improve her productivity through training and making it easier to do business with us. And that's the first and most important priority to stabilize our business.**

238. In a November 1, 2018 analyst report, Stephanie Wissink of Jefferies noted that:

> **Train, Train, Train:** The number of mentions of the word "Training" on the call was up 100%+ from prior calls, with a clear emphasis on rep education and awareness of new tools and techniques as a focus to improve retention and drive sales velocity. . . . The company had committed to training 500K reps in 2H; they have already trained nearly 1M in Q3 alone. It's plausible that at this pace, the company could train its entire rep base in 18 months.

239. On February 14, 2019, when Avon reported its results for the fourth quarter and year ended December 31, 2018, Avon executives again discussed the importance of training and reengaging Avon's reps in Brazil. CEO Zijderveld stated that he was "very encouraged to see the improving trends" in Brazil largely due to the "refocus on the basics, including improved service, the new incentive programs **and the enhanced training that resulted in an improved field activation** during the Christmas holidays." Zijderveld also stated:

> **Reversing the decision made over 5 years ago to cut training**, we reinstate training programs globally and locally that is vital to driving retention and helping become a beauty ambassador and adviser to the clients. . . . .**What we've learned is not enough to only have the tools, we must incorporate training to accelerate adoption and effectively drive sales.**

240. Defendant Wilson stated, in part:

> In quarter 4, we made material increased investment in representatives, recruitment and training, together with additional media spend over the prior year to create demand and rejuvenate our brand. We also invested in the representatives' incentives to help recover activity levels and reengage with our representatives. This resulted in an adjusted operating margin of 6%, a decline of 420 basis points from the prior year**. Restoring the relationship with our representatives, particularly in large markets like Brazil, is imperative.** These and other investments are key to resetting the foundation for future success to turn around this market and restore growth.

241. On May 2, 2019, when Avon reported its results for the first quarter ended March 31, 2019, Miguel Fernandez iterated that "[w]e know there is nothing more important than helping her earn more money. And we know that training drives productivity. Trained sales leaders earn 50% more money. Training with the intent to helping her increase her earning is one of the most critical elements to retaining our representatives." CEO Zijderveld echoed those sentiments stating: "we will improve the productivity of our representatives by a step change in training and equipping her with better tools and technology and make it more easy for her to run her business."

## IX. DEFENDANTS' VIOLATIONS OF GAAP

### A. Avon's Bad Debt Expense and Allowance for Doubtful Accounts before the Start of the Class Period

242. Avon's "Allowance for Doubtful Accounts" was described in the Company's 10-K filings as a "critical accounting estimate."[24] The SEC defines a critical accounting estimate as an:[25]

> [A]ccounting estimate[]. . .where [a] the ***nature of the estimate***[]. . . ***is material*** due to the levels of subjectivity and judgement necessary to account for highly uncertain matters or the susceptibility of such matters to change, and [b] the ***impact of the estimate***[]. . . on financial condition or operating performance ***is material***.

243. Avon claimed that its reported bad debt expense, which increased its allowance for doubtful accounts, was "based on an analysis of historical data and current circumstances, including seasonality and changing trends."[26]

---

[24] 2015 10-K, at 31.

[25] SEC Release No. 33-8350 (emphasis added).

[26] 2015 10-K, at 31.

244. From 2013 to 2015, Avon's reported bad debt expense was approximately 2% of total revenue.[27] The following chart summarizes Avon's reported bad debt expense from 2013 to 2015 (*$ in millions*) which declined only because Avon's revenue also declined over this period:[28]







245. Avon has admitted that the Company lowered credit standards for new Representatives in Brazil in calendar 2016. At the same time, the Company also ramped up Representative hiring in Brazil to combat increasing competition and its normal churn. This effort coincided with the Company's deteriorating performance in Brazil.

**B. Avon's Bad Debt During the Class Period**

246. As set forth herein, Avon's decision to approve Representatives in Brazil with lower credit worthiness and prior debt loads increased the Company's risk of uncollectible receivables. Avon's risk of uncollectible receivables also was negatively impacted by the fact that the Company ceased all training of new Representatives, allowed delinquent Representatives to pay in installments, and even allowed delinquent Representatives to order additional products, despite the deteriorating economic environment in Brazil.

[27] *Id.*

[28] *Id.*

247. Avon's bad debt expense experienced a sharp rise in late 2016 and early 2017 (dollars in millions):[29]




248. Avon's bad debt expense was not just increasing in magnitude. In fact, the Company's bad debt expense as a percent of total revenue nearly doubled from the historical level of approximately 2% of sales to a high of nearly 5% of total revenue in Q4 2016:[30]

[29] 2015 10-K, at F-6, Avon Form 10-Q (Nov. 4, 2015), at 8, Avon Form 10-Q (May 5, 2016), at 6, Avon Form 10-Q (Aug. 2, 2016), at 8, Avon Form 10-Q (Nov. 3, 2016), at 8, 2016 10-K, at F-6, Avon Form 10-Q (May 4, 2017), at 6, Avon Form 10-Q (Aug. 3, 2017), at 8, and Avon Form 10-Q (Nov. 2, 2017), at 8.

[30] Avon Form 10-Q (July 30, 2015), at 8, 2015 Form-10-K at, F-6 and F-53, Avon Form 10-Q (Nov. 4, 2015), at 3, 8, Avon Form 10-Q (May 5, 2016), at 6, Avon Form 10-Q (Aug. 2, 2016), at 8, Avon Form 10-Q (Nov. 3, 2016), at 8, 2016 10-K, at F-6, F-54, Avon Form 10-Q (May 4, 2017), at 3, 6, Avon Form 10-Q (Aug. 3, 2017), at 3, 8, and Avon Form 10-Q (Nov. 2, 2017), at 3, 8.




249. In 2017, Avon admitted that the increase in bad debt expense was directly attributable to a change in credit standards for Representatives in Brazil. As shown in the chart above, the largest single increase of bad debt expense occurred in Q4 2016, when quarterly bad debt expense jumped to nearly $80 million. During Avon's related earnings call, Defendant McCoy stated:

> Now turning to our fourth-quarter performance, which as I said was disappointing, considering the positive trend in the first three quarters of the year. Revenue fell short of expectations, and while we made significant progress taking out cost, this was dampened by an unexpected increase in bad debt of roughly 210 basis points or approximately $35 million, primarily within our Brazilian business.31

250. In fact, Defendant McCoy acknowledged that loosened credit terms precipitated the increase in the number of new Representatives in Brazil and that the Representatives' subsequent inability to pay Avon back led to "higher-than-expected" bad debt.[32] Defendant McCoy stated that:

> Brazil's representative recruitment efforts were solid throughout 2016, resulting in a modest increase in Ending Representatives for the year. However, given the

[31] Transcript, Q4 2016 Avon Products Inc. Earnings Call (Feb. 16, 2017) ("2/16/17 Transcript").

[32] *Id.*

> deteriorating economic environment, we saw a higher-than-expected level of bad debt in the second half of the year.
>
> There are 2 primary reasons for this. One, the inability of some consumers to pay; and two, in order to assist new Representative recruiting, the team adjusted credit terms.[33]

251. Despite Avon's admissions and delayed recognition in 2016 that there was an increased level of uncollectible receivables, it would have been evident to Defendants—at least a year earlier—that the Company would face increased bad debt levels as a result of its relaxed credit policies. Indeed, when Avon relaxed its credit criteria in 2015, a spike in uncollectible revenue was inevitable. Yet in assessing bad debt expense, Defendants improperly failed to account for the fact that it had loosened the Company's credit standards until the fourth quarter of 2016. In other words, the losses recognized by Avon beginning in Q4 2016 and continuing into 2017 should have instead been accounted for beginning in Q4 2015 and throughout 2016 because that is when Defendants implemented their relaxed credit policies.[34]

252. From the fourth quarter of 2015 through the third quarter of 2016, Avon's bad debt expense averaged 2.5% of total revenue reported in each period. For example, in the first quarter of 2016, Avon's bad debt expense was $37 million while total revenue was $1,307 million ($37 million ÷ $1,307 million = 2.8%).[35]

253. From the fourth quarter of 2016 through the third quarter of 2017, however, Avon's rate of bad debt expense jumped dramatically to an average rate of 4.3% of total revenue. For

---

[33] *Id.*

[34] Indeed, throughout 2017, Avon's senior management continued to cite the relaxation of credit terms as one of the causes of the higher bad debt.

[35] Avon Form 10-Q (May 5, 2016), at 6 and 3, respectively.

example, in the first quarter of 2017, Avon's bad debt expense was $61 million while total revenue was $1,333 million ($61 million ÷ $1,333 million = 4.6%).[36]

254. Over the entire period from the fourth quarter of 2015 to the third quarter of 2017, Avon's rate of bad debt expense averaged 3.4% of total revenue. This average provides a useful indication of the impact of Avon's delayed recognition of bad debt from its Brazilian Representatives, which steadily accumulated during the Class Period. That is, prior to the fourth quarter of 2016, Avon's reported financial results benefitted from the absence of increased bad debt expense (*i.e.*, revenue decreased by an average of 2.5%). Afterwards, however, Avon's reported financial results bore the brunt of the belated recognition of this expense (*i.e.*, revenue decreased by an average of 4.3%).

255. The following table compares bad debt reported by Avon during these quarters to the amount of bad debt that should have been recorded had Avon had used the 3.4% average bad debt rate the Company ultimately experienced:

| **Quarter** | **Actual bad debt expense; in millions** | **Bad debt expense based on average rate period; in millions** | **(Understatement)/ Overstatement bad debt expense; in millions** |
|---|---:|---:|---:|
| Q4 2015 | $30 | $55 | $(25) |
| Q1 2016 | $37 | $44 | $(7) |
| Q2 2016 | $37 | $49 | $(12) |
| Q3 2016 | $41 | $48 | $(7) |
| | | | |
| Q4 2016 | $76 | $53 | $23 |
| Q1 2017 | $61 | $45 | $16 |
| Q2 2017 | $52 | $47 | $5 |
| Q3 2017 | $56 | $49 | $7 |
| Total | $390 | $390 | $0 |

[36] Avon Form 10-Q (May 4, 2017), at 6 and 3, respectively.

256. As can be seen in the table above, if Avon had timely recorded bad debt expense commensurate with the increase in credit risk associated with its new Representatives in Brazil, ***Avon would have recorded substantially more bad debt expense from the fourth quarter of 2015 through the fourth quarter of 2016. If Avon had done so, Avon would have experienced massive decreases in reported profitability during these periods.***

257. Avon focused investors on adjusted operating profit margin as the most prominent measure of its profitability during the Class Period.[37] The impact on this earnings measure of properly matching this bad debt to the period in which it was incurred is reflected in the following table:[38]

| Quarter | Reported adjusted operating profit (non-GAAP); in millions | (Understatement)/ Overstatement bad debt expense; in millions | Revised adjusted operating profit; in millions | (Decrease) / Increase to Adjusted operating profit |
|---|---|---|---|---|
| Q4 2015 | $97 | $(25) | $72 | (25.4)% |
| Q1 2016 | $55 | $(7) | $48 | (13.4)% |
| Q2 2016 | $105 | $(12) | $93 | (11.3)% |
| Q3 2016 | $99 | $(7) | $92 | (6.9)% |
| | | | | |
| Q4 2016 | $114 | $23 | $137 | 19.9% |
| Q1 2017 | $39 | $16 | $55 | 40.3% |
| Q2 2017 | $70 | $5 | $75 | 6.0% |
| Q3 2017 | $89 | $7 | $96 | 8.3% |
| Total | $668 | $0 | $668 | 0.0% |

258. As seen in the table above, in each of the four quarters analyzed before Avon first disclosed the existence of the Brazilian credit risk, Avon's reported adjusted operating profit would have decreased by more than 5% (*i.e.*, the fourth quarter of 2015 and the first three

---

[37] *See* Q1 2016 Form 10-Q, at 28, and Q4 2016 Earnings Transcript, at 5.

[38] For simplicity, the actual reported results in this chart have been rounded to the nearest million.

quarters of 2016). Accounting standards recognize that this quantitative threshold is a *de facto* measure of a material adjustment. (*See* ASC 250-10-S99.). Moreover, these adjustments related to one of Avon's most critical operating segments – one of the most important segments of the company to succeed. This factor is a qualitative issue identified by GAAP to signal that a misstatement is material. *Id*.

### C. Overview of Relevant GAAP Provisions

259. GAAP required Avon to consider whether the receivables from new Representatives in Brazil were uncollectible. (ASC 310-10-35-7.). Indeed, GAAP required Avon to record bad debt expense to increase its allowance for doubtful accounts when it was probable that receivables were impaired and the amount of the loss could be reasonably estimated. (ASC 450-20-25-2.).

260. Avon should have considered historical information, as well as information regarding current trends and conditions (*e.g.*, geographic conditions).[39] GAAP further state that "whether the amount of loss can be reasonably estimated will normally depend on, among other things, the experience of the entity, information about the ability of the individual debtors to pay, and appraisal of the receivables in light of the current economic environment." (ASC 310-10-35-10.). Indeed, Avon represented to investors that its contemporaneous accounting had considered such factors. (¶144).

[39] *See*, *e.g.,* April 12, 1999 FASB Viewpoints article "[O]ther important factors to consider in establishing appropriate allowance levels include the following… all available information existing as of the measurement date (i.e., financial statement date), including credit quality, current trends, existing 'environmental' factors (e.g., industry, geographical, economic, and political factors), and the range of estimated losses on such loans."

261. Here, by Q4 2015, Avon management had at least the following information available indicating that the level of uncollectible receivables from Representatives in Brazil had spiked higher (*i.e.*, a loss was probable):[40]

- Credit standards for new Representatives in Brazil had been lowered and new Representatives, already saddled with debt loads, were being approved in large numbers;
- Competition in Brazil was increasing while the Brazilian economy was deteriorating;
- A significantly increased number of new Representatives in Brazil were being approved;
- Delinquencies were on the rise and Representatives were allowed to partially pay and/or pay in installments, instead of satisfying their entire outstanding balance before being allowed to participate in subsequent sales campaigns;
- Delinquent Representatives in Brazil were allowed to purchase more product even when delinquent on prior purchases; and
- Delinquent Representative accounts were contracted out to third-party collection agencies at a higher rate.

262. As observed in the charts above, Avon failed to account for the above-referenced information in estimating its bad debt expense from Q4 2015 through Q3 2016. Instead, Avon improperly delayed recording such expense until well after the new Representatives in Brazil had defaulted on their purported payment obligations. Indeed, as described below, the collectibility of sales transactions with the Representatives in Brazil was doubtful at the outset and revenue recognition should have been delayed until collectibility had been established.

**D. Avon's Improper Revenue Recognition**

263. GAAP require that "the inability to make a reasonable estimate of the amount of loss from uncollectible receivables precludes accrual and may, if there is significant uncertainty

[40] *See* ¶¶57-126.

as to collection, suggest that the installment method, the cost recovery method, or some other method of revenue recognition be used." (ASC 310-10-35-11).

264. Under GAAP, revenue may only be recognized when it is earned and realizable. This is typically achieved when all of the following four general criteria (the "Four General Criteria") are met: (ASC 605-10-S99-1).

1. Persuasive evidence of an arrangement exists;
2. Delivery has occurred or services have been rendered;
3. The seller's price to the buyer is fixed or determinable; and
4. Collectibility is reasonably assured.

265. For entities that sell products through resellers such as Avon through its independent contractor Representatives, there are two general methods of revenue recognition. The "Sell-In" method refers to Avon's historical recognition of revenue at the time product was delivered to Representatives. Under the "Sell-Through" model, Avon would have deferred revenue until the product was subsequently sold to an end customer or payment was made by the Representative.[41]

266. The Sell-Through model is appropriate when the Four General Criteria are not met at the time of Sell-In and was particularly appropriate here as collectibility was not reasonably assured at the time of product delivery to the Representative. GAAP identify the following factors to determine whether the collectibility requirement for revenue recognition has been met for transactions with resellers: (ASC 985-605-25-36).

[41] The Installment model of revenue recognition would also have been appropriate in these circumstances. The Installment model would result in a similar outcome to the Sell-Through model, which is deferral of the revenue until collectibility was reasonably assured. (ASC 605-10-25-4.)

| **GAAP Factors** | **Avon Situation** |
|---|---|
| Reseller's operating history | Prior to the Class Period, Avon was experiencing declining sales. For example, revenue had fallen from $8.5 billion in 2013 to $6.2 billion in 2015.[42] Brazil was Avon's largest market and problems there would have a drastic effect on the Company as a whole. |
| Competitive pressures | Avon acknowledged "Brazil continues to be impacted by a difficult economic environment as well as high levels of competition."[43] These pressures increased the likelihood that Brazilian Representatives would experience difficulty making payment to Avon. |
| Resellers that are new, undercapitalized, in financial difficulty, or otherwise unable to make payment until cash is collected from customers | The new Representatives in Brazil were new, retained based on relatively lower credit standards and with higher pre-existing debt loads than historical Representatives, and were untrained, which compounded the impact of the competitive pressures. |
| Indications that payment is contingent on the reseller's success in selling the product | Avon relaxed the credit standards applied to Representatives in Brazil such as allowing delayed payment and provision of higher levels of product inventory. |
| Extended payment terms (ASC 985-605-25-33) | The Representatives in Brazil were allowed additional time to make payment on products. |

267. For the reasons above, Avon should have, but failed to, delay the timing of revenue recognition on sales to new Representatives in Brazil until collectibility was reasonably assured. In other words, Avon should have recognized revenue from transactions with the new Representatives in Brazil on a Sell-Through basis.

268. Instead, Avon not only prematurely recognized this revenue, but failed to record adequate bad debt expense on a timely basis for this known risk. Ultimately, beginning in Q4 2016, Avon was forced to disclose these accounting errors.

---

[42] 2015 10-K, at 23.

[43] *Id.* at 50.

## X. ADDITIONAL EVIDENCE OF SCIENTER

269. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt or access to information reflecting the true facts regarding Avon, their control over, or receipt, or modification of Avon's materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

270. Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least, the reckless disregard, of Avon personnel at the highest levels of the Company.

271. The following allegations all support a strong inference of scienter:

(a) Avon's Brazilian market was extremely important to the Company's revenues;

(b) Statements by former Avon employees, independent contractors, and sales managers corroborate that Defendants knew or were reckless in not knowing about the burgeoning bad debt problems caused by the Company's drastic reduction in credit standards and lack of training for new Representatives in Brazil;

(c) The Company's late-in-the Class Period admissions that increased bad debt was directly attributable to "relaxing credit terms" for new Representatives in Brazil during the Class Period;

(d) The Company's post Class Period admissions that there had been absolutely no training and minimal sales support of its Representatives in Brazil and certain other markets for five years, a material fact that was concealed throughout the Class Period; and

(e) McCoy's ouster as CEO.

**A. Avon's Brazilian Market Was Extremely Important to the Company's Revenues.**

272. Avon traditionally sold beauty products within the United States. Toward the end of the twentieth century, Avon expanded into several international markets. By 2010, Brazil surpassed the United States as Avon's largest market.

273. In 2015, Avon sold 80% of its North American business to private equity firm Cerberus. After the sale of the North American business, Avon moved its corporate headquarters to the UK. Its reportable segments were based on geographic operations in four regions: (a) EMEA; (b) SOLA; (c) NOLA; and (d) Asia Pacific. In 2016, 50% of Avon's business came from its South Latin America segment and 70% of Avon's revenues came from its top 10 markets. In 2016, Avon's top markets included: Brazil, Mexico, Russia, the Philippines, and the UK. As of December 31, 2016, Avon had more than six million Representatives in 57 countries.

274. ***Brazil is Avon's largest market, measured by revenue and number of sales Representatives. In 2016, Brazil revenue was $1.2 billion, approximately 21% of Avon's total revenues.*** No other country accounts for more than 10% of Avon's total revenues. At the end of 2016, Avon had 1.5 million Representatives in Brazil, representing 25% of Avon's total Representative base.

275. Indeed, prior to and during the Class Period, Defendants boasted about the importance of Brazil to its revenues and success. For example, on January 21, 2016, Defendant Legher stated: "So Brazil is a very important market for us where . . . .we see a lot of opportunities there." On February 11, 2016, Defendant McCoy stated: "Certainly Brazil is a very important market for us, we continue to be very bullish for the long term."

276. Moreover, Defendant McCoy represented on at least two occasions during the Class Period that she traveled to Brazil to check on the Company's operations there. For example, on August 2, 2016, McCoy stated, in part:

> **I was in Brazil last month,** and was very encouraged by the progress the [team] is making. All in all, even with the political and economic issues that continue and competition for both representatives and consumers, we are executing very well and have been gaining market share. We're growing average order based on pricing actions and mix with new innovative products and strong marketing . . . The Brazil team is working hard to maintain the representative base, experiencing a slight decline in active representatives while growing ending representatives. This is the result of strong and consistent recruiting programs and onboarding of new representatives. The activity level of our representatives in Brazil continues to be a focus given the current depressed consumer spending.

277. Then on November 3, 2016, McCoy stated in part:

> **I was in Brazil a month ago** and continue to be impressed with the work the team is doing, especially given the backdrop of a tough economic, political and competitive environment.

278. CW-7 confirmed that CEO McCoy visited Avon Brazil at least once a year. CW-7 also confirmed that David Legher traveled to Avon's headquarters in the United States, and then to its headquarters in London (starting in 2016) at least once a semester.

279. Given the multitude of statements during the Class Period concerning Brazil's importance to the Company, as well as the revenue and number of Representatives in Brazil, and Defendant McCoy's travel to Brazil multiple times during the Class Period, and attention to Representative engagement and recruiting in Brazil, it is unreasonable to think that the Individual

Defendants would be unaware of the financial implications of the loosened credit standards in its Brazilian market.

280. Given the critical importance of Brazil to Avon's overall business and projected growth, the problems detailed herein could not have occurred without the Individual Defendants' knowledge and approval.

**B. Statements by Former Avon Employees, Independent Contractors, and Sales Managers Corroborate that Defendants Knew or Were Reckless in Not Knowing about the Burgeoning Bad Debt Problems Caused by the Company's Drastic Reduction in Credit Standards for New Representatives in Brazil.**

281. The CWs make clear (¶¶57-126) that Defendants' false and misleading statements were not simply a mistake or mismanagement; rather, the Defendants knew or recklessly disregarded that the Company had aggressively loosened its credit policies for incoming Representatives in Brazil at the start of the Class Period and offered minimal to no support for those new Representatives throughout the Class Period. Former employees, independent contractors, and Representatives of Avon with knowledge of the Company's business confirm that:

(a) In 2015, there was a Company-wide decision to lower credit standards for new Representatives in Brazil in order to stimulate growth. The Company decided to offer credit to individuals already in debt and encouraged sales managers to recruit significantly more new Representatives during key recruiting campaigns to bolster dwindling Representative numbers in Brazil and combat increased competition from companies such as Natura and O Boticário. ¶58.

(b) Thereafter, Avon encouraged and approved the appointment of new Representatives with lower credit marks/negative credit history and higher debt loads. ¶58. These relaxed credit standards were prevalent in recruiting campaigns that occurred in Brazil from mid-2015 to mid-2016. ¶58. For example, during an Avon recruiting campaign in July 2016

(Campaign 14), approximately 80% of prospective Representatives who applied were approved. By contrast, Avon Brazil typically approved only 20% of prospective Representatives. ¶¶66.

(c) The loosening of credit standards for new Representatives in Brazil led to increased delinquencies and increased bad debt for the Company. ¶¶85, 86, 106.

(i) By mid-2016, the delinquency rate in the Northeast region of Brazil was approximately 20-30% and the delinquency rate in the Central-West region of Brazil (*i.e*. Brasilia) was approximately 12-15%. By comparison, the standard delinquency rate at comparable Brazilian beauty companies averaged only 5-8%. ¶¶86, 87.

(ii) Avon urged its sales managers in Brazil to allow delinquent Representatives to pay in installments, enticing them with discounted product if they continued to order from the Company in subsequent sales campaigns. These enticements, however, caused approximately 50% of delinquent Representatives to fall further into debt. ¶¶93.

(iii) Sales managers also were encouraged to utilize third-party collections agencies and also to carry around handheld credit card machines to attempt to collect delinquent amounts directly from the Representatives. ¶¶89, 90, 97.

(d) The Company's bad debt situation was discussed in regional Company performance meetings held via video conference and attended by top Avon executives including Defendants McCoy, Scully, and Legher. Reports containing delinquency rates of new Representatives were provided to Defendant Legher and other top executives in Brazil. ¶¶70, 76, 87, 90, 94, 100, 106-11.

(e) Representative training in Brazil was nonexistent in 2016 and 2017.¶¶122-27.

(f) Avon failed to remove delinquent Representatives from its system. ¶¶119-21.

(g) Internal Avon documents demonstrate there was a widespread problem of Representatives receiving Avon products they had never ordered. ¶¶99-105.

**C. The Company's Late-in-the Class Period Admission that Increased Bad Debt Was Directly Attributable to "relaxing credit terms" for New Representatives in Brazil During the Class Period Provides Strong Evidence of Scienter.**

282. On February 16, 2017, Avon attributed its weak quarterly earnings to an "unexpected increase in bad debt of . . . $35 million, primarily within [Avon's] Brazilian business." According to the Company, this bad debt problem was caused by "relaxing credit terms" in Brazil and "the inability of some [Representatives] to pay." Defendants McCoy and Wilson both acknowledged that the bad debt charge was the direct result of the "deteriorating economic environment" in Brazil and **previously undisclosed changes to credit terms to recruit new Representatives in Brazil**:

> Brazil's Representative recruitment efforts were solid throughout 2016, resulting in a modest increase in Ending Representatives for the year. However, given the deteriorating economic environment, we saw a higher than expected level of bad debt in the second half of the year. There are two primary reasons for this. One, the inability of some consumers to pay, and two, **in order to assist with new Representative recruiting, the team adjusted credit terms**. [McCoy]
>
> * * *
>
> The South Latin America segment margin was 9.3%, down 100 basis points versus prior-year, driven by an estimated 320 basis point negative impact from foreign currency transactions costs and 200 basis points from higher bad debt, primarily in Brazil, due to the macro economic conditions **coupled with actions taken to recruit new representatives**, partially offset by the favorable impact of price and mix and lower supply chain costs. [Wilson]

283. On May 4, 2017, Avon disclosed that despite its earlier assurances that the Brazil bad debt problem had been fully accounted for in 2016, the Company was recording another

significant charge for bad debt in the first quarter of 2017. The bad debt charge was attributed to the "relaxation of credit terms." Specifically, Defendant Wilson acknowledged:

> In addition, at the end of last year, we saw a rise from our normal level of bad debt, which was typically between 2% to 3% of revenue, **driven by relaxation of credit terms as part of our recruitment crusades**, coupled with the general economic environment. On the quarter 4 call, we said that bad issues were behind us, however, while we are seeing some improvement based on the actions we took to remediate the position, including tightening credit terms, it's taking longer than expected to return to normal levels.
>
> * * *
>
> We believe that we are taking actions on the bad debt. **We did explain that last year that some of that was due to our relaxation of credit terms**, which have now tightened again, so that part of the equation has gone away. But it will take time to work through.

284. On August 3, 2017, the Company also reported that Brazil revenue was "down 2% in constant dollars, primarily driven by a decrease in Active Representatives" and the "self-inflicted" "elevated level of bad debt [that had] continued in the second quarter [of 2017]" in Brazil as the Company "continue[d] to cycle through **the impact of last year's relaxation of credit term**s."

285. On November 2, 2017, investors learned that there was a "continued high level of bad debt as well as higher field and selling expenses to support field activation efforts most notably in Brazil." The higher bad debt levels were "**driven by more relaxed credit policies for incoming representatives [in 2016]. The consequence of these relaxed policies were delinquencies associated with these new representative populations, resulting in large increases in bad debt**." On the related earnings call, Defendant Wilson acknowledged that the bad debt problems in Brazil were self-inflicted:

> Yes, the bad debt risk comes -- we've seen it in different forms in different markets. I mean, we've talked a lot about the Brazil bad debt, and that was, to some extent, **self-inflicted with the lifting of the credit policies there, which**

> **have now come back to the normal levels that we had before that decision was taken**.

286. The Company's late in the Class Period admissions that increased bad debt was directly attributable to relaxing credit terms for new Representatives in Brazil during 2016 provides strong evidence of scienter.

**D. The Company's Post-Class Period Admissions Regarding the Total Lack of Training and Minimal Sales Support for its Representatives in Brazil and Other Top Markets Provides Strong Evidence of Scienter.**

287. As set forth herein, following the Class Period, Avon's new CEO admitted that there had been absolutely no training and minimal sales support of its Representatives in Brazil and certain other markets for five years, a material fact that was concealed from investors throughout the Class Period. For example, on August 2, 2018, in connection with the announcement of Avon's results for its second quarter of fiscal 2018, CEO Zijderveld, discussed Brazil's "unacceptable" performance, and attributed it to the undisclosed fact that all training initiatives had been abandoned in Brazil throughout the Class Period. He specifically stated:

> ***And I think the third thing that is really new is training. It is amazing that in Brazil, we basically stopped all training.*** And the core of our whole business model is actually the development and investment in the Representative. That is our tool. So we're really rebooting and restarting the whole training initiative, and that is starting right now.

* * *

> ***Now that's a big task when you have 1.5 million Reps just in Brazil.*** You start with the top and you start with a new methodology of sales leader-led training. And Miguel and the people that we're bringing in know this very, very well.

288. Then, on September 21, 2018, Zijderveld iterated that during the Class Period Avon ceased all training and sales support for its Representatives in Brazil. Specifically, Zijderveld admitted that Avon "went to zero in terms of training and tools" and "didn't invest in

[the representatives'] business development, product knowledge, and really how she builds her business," stating in part:

> ***The second thing is we in fact, over the years, cut and maybe in some places even went to zero in terms of training and tools. We didn't invest in her business development, product knowledge, and really how she builds her business,*** so, in the end she became a bargain hunter. She was looking for the promotions in the brochure to just sell. We're going to reset that to build trained assisted-sales consultants who are digital and motivated to drive this business and know how to make money and drive a successful business.
>
> * * *
>
> And we've got a number of businesses that are really needing to change, and Brazil is our biggest one. And many of the things that you hear today are all landing in Brazil, as well as a new leadership team. ***But it's fair to say, Brazil is on the operating table. It is on the operating table, and the surgeons are right in there at the moment fixing Brazil, but it will take some time.*** And you see some other businesses on the operating table, but you see some other businesses that are going out and already driving that forward. But this gives you also a sense of some will be ahead, some will be behind, but it's going to take some time.

289. Then, on November 1, 2018, in connection with the announcement of Avon's results for its third quarter of fiscal 2018, Avon executives admitted that there had been no training in Brazil and other key markets for five years. They would further stress that Representative training was the most important factor in Representative retention, which was key to sustaining and growing revenues. Miguel Fernandez, CCO, stated in part:

> As I mentioned in the [September 21, 2018] Investor Day, ***about five years ago, a decision was made to cut Representative training out of many countries, including Brazil***. Reinstating training programs is vital to driving retention and helping [Representatives] become a beauty advisor to [their] clients.
>
> * * *
>
> [T]raining is the biggest priority for the market. This is a muscle that in some parts of the world, we lost, and this is the key differentiator between a good direct seller and a not good direct seller. We have to relearn in some parts of our markets and get much, much better in training. ***So, we're prioritizing priorities, training is the one that has no downside***.

290. CEO Zijderveld also elaborated on the importance of training, linking it to Representative retention, and therefore the Company's earnings, stating in part:

> I think in the end, internally we're shifting really a lot of focus to productivity of our Representatives and increasing our earnings. And in the end, that is all about Rep retention. ***So, we've a pretty good recruitment side, but what we really need to add to it is a retention machine. And the core of the retention is really about earnings, and earnings is really driven by training***. And it's as simple as that, and that's the essence of the rebooting of the direct selling that Miguel talked about.

291. Thus, the Company's post-Class Period admissions regarding the total lack of training and sales support for its Representatives in Brazil provides strong evidence of scienter

**E. McCoy's Ouster as CEO Provides Strong Evidence of Scienter.**

292. On August 3, 2017, in connection with the announcement of a surprise loss of $45.5 million in the second quarter of fiscal 2017, *and without any succession plan in place,* Avon disclosed that Defendant McCoy would be leaving her role as Chairman and CEO effective March 2018. According to the announcement of the CEO Transition Plan, Avon hired an executive search firm to help find McCoy's successor.

293. According to an August 3, 2017 article in the *Wall Street Journal* entitled "Avon CEO to Step Down Amid Investor Pressure - Shareholders frustrated with pace of turnaround plan" which was released after the market closed on August 3rd:

> **Avon Products Inc. pushed out Chief Executive Sheri McCoy after a disappointing five-year tenure** during which she oversaw an overhaul of the storied cosmetics seller but ultimately failed to stop its years long downward spiral.
>
> Avon announced Ms. McCoy's departure Thursday along with a third-straight quarter of particularly bleak results that sent the shares down another 11%. **She will technically be "terminated without cause," according to people familiar with the matter.**
>
> Avon said it has retained executive-search firm Heidrick & Struggles International Inc. to help find a successor to Ms. McCoy, who plans to stay on

> until March. That could be accelerated depending on when Avon finds a replacement, the people said.
>
> Ms. McCoy, 58, had been negotiating an exit from Avon, as The Wall Street Journal reported in June. The plan came together when the board, some members of which had continued to support Ms. McCoy, lost patience as a result of the continued weak performance of the business, people familiar with the matter said. **Ms. McCoy and the board reached an agreement at a July 13 board meeting at Avon's Rye, N.Y., facility, they said**.
>
> **The latest results—Avon reported a $45.5 million second-quarter loss and a 3% drop in revenue amid continued attrition in sales representatives—and the bungling of key overhaul initiatives led the board to demand an immediate exit plan and announcement, the people added.**

294. In October 2017, Defendant Scully left the Company, and in November 2017, Fernando Acosta (Chief Marketing/Selling Officer) left the Company.

295. The abrupt nature of McCoy's announcement of her impending departure, without a successor in place, plus the departure of additional senior Avon personal at the end of the Class Period, provides additional evidence of scienter.

## XI. LOSS CAUSATION/ECONOMIC LOSS

296. During the Class Period, as detailed herein, Avon and the Individual Defendants engaged in a course of conduct that artificially inflated and/or artificially maintained the price of Avon common stock and operated as a fraud or deceit on the Class Period purchasers of Avon common stock by making the materially false and misleading statements and omissions recited above.

297. When the truth was disclosed and became known to the market, the price of Avon common stock declined precipitously as the prior artificial inflation was removed from the price of the stock. As a result of their purchases of Avon common stock at artificially inflated prices during the Class Period, Lead Plaintiff, Additionally Named Plaintiff, and other members of the Class suffered a substantial economic loss (*i.e.*, damages under the federal securities laws). The

price decline in Avon common stock was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff, Additionally Named Plaintiff, and the Class.

298. The truth about Avon's business was disclosed through a series of corrective disclosures beginning on February 16, 2017, when Avon attributed weak quarterly earnings for its fourth quarter of 2016 to an "unexpected increase in bad debt of . . . $35 million, primarily within [Avon's] Brazilian business" due to "adjusted credit terms" and "the inability of some [Representatives] to pay." Disclosure of the truth concluded on November 2, 2017, when Avon's "self-inflicted" bad debt crisis was revealed to the investing public when the Company reported its results for the third quarter ended September 31, 2017 and investors learned that there was a "continued high level of bad debt as well as higher field and selling expenses to support field activation efforts most notably in Brazil."

(a) ***February 16, 2017 - First Partial Revelation of the Truth***

(i) The truth about the Company's problems in Brazil was partially revealed on February 16, 2017, before the market opened, when Avon reported disappointing results for its fourth quarter of 2016. Avon specifically attributed weak quarterly earnings to an "unexpected increase in bad debt of . . . $35 million, primarily within [Avon's] Brazilian business." According to the Company, this bad debt problem was caused by "adjusted credit terms" and "the inability of some [Representatives] to pay." ¶¶182-90.

(ii) In reaction to these disclosures, ***Avon's stock price fell 18.6%.*** However, the Company's stock price remained artificially inflated after this partial disclosure as

Defendants led the market to believe that the problem was "fully cleared up and booked in the 2016 results," and that Avon "would not be expecting a flow over of that into 2017." ¶191.

(b) ***May 4, 2017 – Second Partial Revelation of the Truth***

(i) The truth about the Company's problems in Brazil was partially revealed on May 4, 2017, before the market opened, when Avon again reported disappointing earnings for its first quarter in 2017, primarily due to additional bad debt write-offs from lower collections in Brazil. ¶¶199-205.

(ii) In reaction to these disclosures, ***Avon's stock price dropped 22.2%***. However, the Company's stock price remained artificially inflated after this partial disclosure as Defendants led the market to believe that they "expect[ed] the amount of bad debt to decline in the second half of [2017]," due to "enhanced collection processes and heightened recruiting terms." ¶206.

(c) ***August 3, 2017 – Third Partial Revelation of the Truth***

(i) The truth about the Company's problems in Brazil was partially revealed on August 3, 2017, before the market opened, when the Company reported, despite prior assertions to the contrary, that the "bad debt [had] continued in the second quarter [of 2017]." ¶¶213-14.

(ii) In reaction to these disclosures, ***Avon's stock price dropped 10.7%***. However, the Company's stock price remained artificially inflated after this partial disclosure as Defendants yet again assured investors that they "expect[ed] [Avon] to start to recover in the second half" of the year. ¶215. In addition, Avon announced that Defendant McCoy would be resigning as CEO of the Company. *Id.*

(d) ***November 2, 2017 – Final Revelation of the Truth***

(i) On November 2, 2017, before the market opened, the full extent of Defendants' fraud was revealed when the Company reported weak results for the third quarter of fiscal 2017 and disclosed that higher bad debt levels, which Defendant Wilson described as "self-inflicted," were driven by the Company's more relaxed credit policies for incoming Representatives in 2016. Defendant Wilson admitted that: "The consequence of these relaxed policies were delinquencies associated with these new Representative populations, resulting in large increases in bad debt." The Company also disclosed that Active Representative levels were down 3% in the quarter, primarily driven by declines in Brazil after the Company reverted to tighter credit standards for new Representatives, a trend the Company expected to continue to last through the end of 2017. ¶¶223-25.

(ii) In reaction to these disclosures, ***Avon's stock price fell 18.1%*** over the following two trading days to close at $1.94 per share, a new all-time low. ¶226.

## XII. CLASS ACTION ALLEGATIONS

299. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock of Avon during the period from January 21, 2016 to November 1, 2017, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Avon during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Avon's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

300. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Avon's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Avon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

301. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether the Exchange Act was violated by Defendants;

(b) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(d) whether the price of the Company's common stock was artificially inflated; and

(e) the extent of damage sustained by Class members and the appropriate measure of damages.

302. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

303. Lead Plaintiff and the Additionally Named Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff and the Additionally Named Plaintiff have no interests that conflict with those of the Class.

304. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

305. Plaintiffs allege that throughout the Class Period, Defendants omitted material information of which Defendants were aware or reckless in not knowing. Such statements artificially inflated or artificially maintained the price of Avon publicly traded common stock and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired that common stock during the Class Period. Because Defendants chose to speak on the issues described in section VI, it was important that Defendants not mislead investors or withhold material information. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Avon and its business in Brazil, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

306. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Lead Plaintiff, Additionally Named Plaintiff, and other members of the Class purchased Avon's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

307. At all relevant times, the market for Avon common stock was an efficient market for the following reasons, among others:

(a) Avon stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) According to the Company's Form 10-Q filed on November 2, 2018, the Company had approximately 442 million shares outstanding as of the date of the filing, demonstrating a very active and broad market for Avon common stock;

(c) Avon filed periodic public reports with the SEC;

(d) Avon regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e) Avon was followed by several securities analysts employed by major brokerage firm(s) including Deutsche Bank, UBS, RBC Capital Markets, Piper Jaffray, Wells Fargo Securities, and Jefferies, which wrote reports which were distributed to the sales force and

certain customers of their respective brokerage firm(s), were publicly available, and entered the public marketplace; and

(f) Unexpected material news about Avon was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

308. As a result of the foregoing, the market for Avon's common stock promptly digested current information regarding Avon from publicly available sources and reflected such information in Avon's common stock price. Under these circumstances, all persons and entities who purchased or otherwise acquired Avon's common stock during the Class Period suffered similar injury through their purchase of Avon at artificially inflated prices and the presumption of reliance applies.

## XIV. INAPPLICABILITY OF STATUTORY SAFE HARBOR

309. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

310. To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

311. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Avon who knew that the statement was false when made.

## XV. CONTROL PERSON ALLEGATIONS

312. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

313. During the Class Period, Defendants' statements were materially false and misleading when made in that Defendants failed to disclose that Avon (a) had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debts (and exposing the Representatives to increased long-term debt and tarnished credit); and (b) offered minimal to no support for its Representatives in Brazil, including corporate-sponsored training, thereby exposing the Company to a heightened risk of slowing sales and a dwindling salesforce. Moreover, Defendants also misled investors by: (a) failing to increase Avon's allowance for bad debts to account for changes it had made to its credit terms, (b) artificially inflating its reported number of sales Representatives in Brazil by

keeping delinquent Representatives in its system, and (c) artificially inflating its revenues by improperly shipping product that had never been ordered.

314. The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

315. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Avon's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

316. As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful

and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

317. Both of the Individual Defendants are liable as primary participants in a wrongful scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Avon's common stock during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) regarding the Company's training and support of sales Representatives in Brazil and its burgeoning bad debt due to relaxed credit standards for new Representatives in Brazil.

318. The scheme: (i) deceived the investing public regarding Avon's operations and the true value of Avon's common stock, and (ii) caused Lead Plaintiff, Additionally Named Plaintiff, and other members of the Class to purchase or otherwise acquire Avon's common stock at artificially inflated prices, which fell as the true condition of Avon's business in Brazil and its increasing bad debt ultimately became known to the market.

319. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Avon, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## XVI. CAUSES OF ACTION

### COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 against All Defendants

320. Lead Plaintiff and Additionally Named Plaintiff repeat and reallege the above paragraphs as though fully set forth herein.

321. During the Class Period, Defendants carried out a plan that was intended to, and did: (a) deceive the investing public, including Lead Plaintiff, Additionally Named Plaintiff, and the Class; and (b) artificially manipulate the price of Avon common stock.

322. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of Avon common stock in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

323. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

324. Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Avon common stock and were aware of the dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

325. Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth. Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially manipulate the market price of Avon common stock.

326. By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

327. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff, Additionally Named Plaintiff, and members of the Class suffered damages in connection with their respective purchases and sales of Avon common stock during the Class Period.

## COUNT II

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder against All Defendants

328. Lead Plaintiff and Additionally Named Plaintiff repeat, incorporate, and reallege every allegation set forth above as though fully set forth herein.

329. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Lead Plaintiff and Additionally Named Plaintiff need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

330. During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiff, Additionally Named Plaintiff, and the Class; (ii) artificially inflate the market price of Avon common stock; and (iii) cause Lead Plaintiff, Additionally Named Plaintiff, and other Class members to purchase Avon common stock at artificially inflated prices. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiff, Additionally Named Plaintiff, and the Class in connection with their purchases of Avon common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

331. Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included drastically lowering the credit standards and ceasing all training for new Representatives in Avon's largest market (Brazil), while simultaneously disseminating false and misleading information to the market that the Company was investing in training and onboarding for its new Representatives in its top markets.

332. Lead Plaintiff, Additionally Named Plaintiff, and the Class reasonably relied upon the integrity of the market in which Avon common stock traded.

333. During the Class Period, Lead Plaintiff, Additionally Named Plaintiff, and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Lead Plaintiff, Additionally Named Plaintiff, and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Avon common stock, or if they had, would not have done so at the artificially inflated prices paid for such stock.

334. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiff, Additionally Named Plaintiff, and the Class suffered damages in connection with their purchases of Avon common stock during the Class Period.

335. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Lead Plaintiff, Additionally Named Plaintiff, and the Class for damages suffered in connection with their purchases of Avon common stock during the Class Period.

## COUNT III

### For Violation of §20(a) of the Exchange Act against Individual Defendants

336. Lead Plaintiff and Additionally Named Plaintiff repeat and reallege the above paragraphs as though fully set forth herein.

337. The Individual Defendants had control over Avon and made the materially false and misleading statements and omissions on behalf of Avon within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff and Additionally Named Plaintiff contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff Additionally Named Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

338. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Avon, in turn, controlled the Individual Defendants and all of its employees.

339. By reason of such wrongful conduct, defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff, Additionally Named Plaintiff, and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action, designating Lead Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff, Additionally Named Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff, Additionally Named Plaintiff, and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## XVIII. JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS

Lead Plaintiff and Additionally Named Plaintiff demand a trial by jury.

Dated: July 8, 2019[44]

**LEVI & KORSINSKY, LLP**

/s/ *Gregory Mark Nespole*
Eduard Korsinsky (EK-8989)
Gregory Mark Nespole (GN-6820)
Christopher J. Kupka (CK-9010)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212-363-7500
Facsimile: 212-363-7171
Email: ek@zlk.com
gnespole@zlk.com
ckupka@zlk.com

***Counsel for Lead Plaintiff, Additionally Named Plaintiff, and the Proposed Class***

[additional counsel on following page]

[44] Originally filed June 28, 2019. This version has been modified to reflect the caption change approved by the Court on July 3, 2019.

**LABATON SUCHAROW LLP**
Carol Villegas
Christine M. Fox
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
Email: cvillegas@labaton.com
cfox@labaton.com

***Additional Counsel for Lead Plaintiff, Additionally Named Plaintiff, and the Proposed Class***

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2019, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties whose counsel have appeared in this action, by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

By: /s/ *Gregory Mark Nespole*
**Gregory Mark Nespole**