UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE AVON SECURITIES LITIGATION

No. 19-cv-01420-CM

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
CORRECTED CONSOLIDATED AMENDED COMPLAINT**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants Avon Products,
Inc., Sherilyn S. McCoy, James S. Wilson
and James S. Scully*

July 26, 2019

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................. iii

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ...............................................................................3

LEGAL STANDARD......................................................................................11

ARGUMENT ..................................................................................................11

**I.**     THE COMPLAINT FAILS TO STATE A CLAIM UNDER
SECTION 10(b). ................................................................................11

    A.     The Complaint Fails to Plead Facts Supporting a Strong Inference
of Scienter. ............................................................................11

        1.     Legal Standard to Plead Scienter. ..................................11

        2.     Plaintiffs Fail to Plead Scienter.......................................13

            (a)     The Confidential Witnesses Do Not Support
Scienter. ...................................................................13

            (b)     "Importance" of the Brazil Market Does Not
Support Scienter.......................................................16

            (c)     Hindsight Statements Do Not Support Scienter.................16

            (d)     Ms. McCoy's Departure from Avon Is Not
Indicative of Fraud. .............................................17

        3.     Plaintiffs Fail to Offer Any Cogent Theory of Fraud. ...................18

    B.     Plaintiffs Fail to Plead a Misstatement or Omission of Material
Fact...................................................................................19

        1.     Legal Standard to Plead Actionable Falsity....................................19

        2.     The Complaint Fails to Plead Any Actionable Misstatement
or Omission. ...................................................................20

            (a)     Avon's Finance and Accounting Public Statements
Not False or Misleading Based on
Contemporaneously Available Information......................21

i

(b)     Avon's Statements Regarding Its Representatives
        Are Not Well-Pled to Be False or Misleading or Are
        Taken Out of Context..........................................................22

(c)     Avon's Statements Regarding Its Projected
        Financial Health Are Forward-Looking Statements
        or Opinions..........................................................................24

(d)     The Remainder of Plaintiffs' Alleged Misstatements
        Are Non-Actionable Puffery..............................................25

II.    PLAINTIFFS' CONTROL PERSON CLAIMS UNDER § 20(a) MUST
       FAIL...............................................................................................25

CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87 (2d Cir. 2007) .................3, 11, 25

*Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 F.
     App'x 32 (2d Cir. 2012) .................................................................................................20, 25

*Campo v. Sears Holdings Corp.*, 371 F. App'x 212 (2d Cir. 2010) ...................................14

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan
     Chase Co.*, 553 F.3d 187 (2d Cir. 2009) .......................................................2, 12, 18, 19

*Gillis v. QRX Pharma Ltd.*, No. 15 Civ 4868, 2016 WL 3685095
     (S.D.N.Y. July 6, 2016) .................................................................................................12

*Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..................................... passim

*IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26 (2d Cir. 2014) ..............................12

*In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737
     (S.D.N.Y. 2018) .............................................................................................20, 24, 25

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ....................................11, 18

*In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461 (S.D.N.Y. 2008) ........................15

*In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*,
     604 F. App'x 62 (2d Cir. 2015) ............................................................................ passim

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) .........................................12

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*, No. 17-CV-2169 (LAK), 2019
     WL 1368787 (S.D.N.Y. Mar. 26, 2019) ................................................................19, 23

*Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144 (S.D.N.Y. 2015) ........................16

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express
     Co.*, 724 F. Supp. 2d 447 (S.D.N.Y. 2010) .......................................................14, 15, 18

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568
     (S.D.N.Y. 2016) ................................................................................................19, 22

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10
     (2d Cir. 2011) ................................................................................................16

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ........................................................17, 19

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ...............................................................20

*S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009)...........................19

*Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010) .................................................20

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)......................................................................................12, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .......................2, 12, 18

*Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323 (S.D.N.Y. 2011) ..................................15

*Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473 (S.D.N.Y. 2017) ............... passim

**Statutes & Rules**

15 U.S.C. § 78u-4(b)(2)(A).............................................................................................1, 11

Fed. R. Civ. P. 9(b) .........................................................................................................1, 11

Fed. R. Civ. P. 12(b)(6)...................................................................................................1, 11

Defendants Avon Products, Inc. ("Avon"), Sherilyn S. McCoy, James S. Scully and James S. Wilson (the "Individual Defendants") (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Corrected Consolidated Amended Complaint (the "Complaint") with prejudice pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiffs allege that Avon and certain of its executives, without any apparent benefit or motive, defrauded the investing public for 22 months by recruiting "thousands of unsophisticated Brazilian women" as Avon sales representatives at a time when Brazil "was experiencing a difficult economic environment and high unemployment." (¶¶ 7, 8.) According to the Complaint—already Plaintiffs' third attempt to plead their claims—Defendants "loosened" their recruitment standards in order to acquire these "lower-quality Representatives," and then failed to train them, causing these women to "predictably [fall] into arrears" on their Avon lines of credit to acquire and sell Avon products. (¶¶ 5, 6, 8.) Plaintiffs claim that Defendants misled investors by: (i) reporting that Avon increased its Representative pool in Brazil, but failing to disclose that expanding its "ranks to include women who were already heavily in debt" necessarily "increased [Avon's] exposure to bad debt" (¶¶ 7, 10); and (ii) failing to book the "unsophisticated Brazilian women" as "bad debt expense[s]" in Q4 2015 when they were engaged, rather than in Q4 2016 when Avon began realizing the debt expenses (¶¶ 8, 12, 181).

On its face, the Complaint fails to meet the exacting pleading standards required to plead scienter or falsity—each of which is independently fatal. *First*, the Complaint fails to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind" pursuant to Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 15 U.S.C. § 78u-4(b)(2)(A). As an initial matter, the Complaint does not

even attempt to plead specific facts sufficient to show a strong inference that any—much less

each—Individual Defendant intended to defraud investors.  And despite asserting that

Defendants had "access to information reflecting the true facts" (¶ 269), the Complaint fails to

identify a single report, statement or other piece of contrary information known to any Defendant

at the time the statements were made.  Nor are there any allegations of stock sales, job

promotions or other ill-gotten gains.  Instead, the Complaint relies on seven confidential

witnesses—one of whom has already changed its testimony—to attempt to plead scienter.  But

even taking those assertions as true, none of the confidential witnesses had any contact with any

Individual Defendant—a deficiency that is fatal in this Circuit.  In short, the Complaint offers no

cogent reason why Avon and its executives would embark on such a fraud in 2016, only to begin

disclosing the Company's bad debt expense one year later.  Instead, the far more plausible

inference to be drawn from Plaintiffs' allegations is that Avon management did not anticipate

how recruitment efforts in the midst of a severe economic downturn in Brazil would affect

Avon's business.  Because the allegations are not "cogent and at least as compelling as any

opposing inference of nonfraudulent intent," the Complaint must be dismissed.  *ECA, Local 134

IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir.

2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007) (affirming

dismissal of amended complaint).  (*See infra* Section I.A.)

   *Second*, the Complaint fails to plead with particularity that each alleged

misstatement was false based on information available to Avon and its executives at the time the

statements were made.  To assert falsity, Plaintiffs rely on long, cherry-picked block quotes from

investor presentations and earnings calls, but then omit the full statement and ignore the context

in which the statements were made.  Plaintiffs likewise assert that Avon's financial information

was false, but point to no restatements or other well-pled accounting violations, much less any false statements by Avon's then-Chief Financial Officer, Mr. Wilson.  As if recognizing these problems, Plaintiffs finally rely on information from many months *after* the Class Period to imply that the statements were false when made many months *before*.  Because pleading by shortcut and hindsight does not satisfy the PSLRA and Rule 9(b), the Complaint should be dismissed.  (*See infra* Section I.B.)

*Finally*, Plaintiffs' claims for control person liability under Section 20(a) fail for the same reasons as their primary claims under Section 10(b).  (*See infra* Section II.)

## STATEMENT OF FACTS[1]

Avon is a global manufacturer and marketer of beauty-related products.  (¶ 35.) Avon sells its products primarily through direct sales to Avon Representatives, who are independent contractors, and who in turn sell Avon products to end-user customers.  (¶¶ 37, 45.) Representatives contact their customers directly, "selling primarily through [Avon's] brochure, which highlights new products and special promotions for each sales campaign.  In this sense, the Representative, together with the brochure, are the 'store' through which [Avon's] products are sold."  (Ex. 2, at 3.)[2]  Representatives fill customer orders by submitting them to Avon; after processing, the merchandise is either shipped to the Representative or delivered to a central distribution point for pickup.  (*Id.* at 3-4.)  Representatives are generally entitled to a full refund for returned products, including those they cannot sell.  (*Id.* at 3.)

Avon's business operates in two areas.  *First*, Avon competes in the highly competitive beauty industry against other consumer packaged goods and direct-selling

---

[1] These facts are from Plaintiffs' well-pled allegations, taken as true solely for purposes of this motion, and on documents the Complaint incorporates by reference, of which the Court may take judicial notice.  *See ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).
[2] Citations to "Ex. __" are to the corresponding exhibits to the Declaration of Karin A. DeMasi, which was executed on July 26, 2019, and filed with the instant Motion to Dismiss.

companies to create, manufacture and market beauty and non-beauty products.  (*Id*.)  *Second*,

Avon competes with other direct-sellers to recruit Representatives as its sales force, primarily by

offering attractive sales opportunities through incentives and quality products.  (*Id.* at 4-5.)  As a

result, Avon, like other direct-selling businesses, has a high rate of turnover among

Representatives, and is constantly seeking to recruit and retain new Representatives.  (¶ 52.)

Recruitment, appointment and training of Representatives is the responsibility of district sales

managers, zone managers and independent leaders (*i.e.*, Representatives who in turn recruit new

Representatives) within each market.  (Ex. 2, at 4.)

Geographically, Avon operates in several international markets, including Latin

America, Europe, the Middle East and Africa and Asia-Pacific.  (¶¶ 35, 38.)  From January 1,

2016, to November 1, 2017 (the alleged "Class Period"), Avon's largest markets by revenue

included Brazil, Mexico, Russia, the United Kingdom, Colombia, Argentina and the Philippines.

(¶ 38; Ex. 3, at 39.)  With respect to the Brazil market, Avon reported in securities filings before

and throughout the Class Period, that "Brazil continues to be impacted by a difficult economic

environment as well as high levels of competition" and that "a general economic downturn, a

recession globally or in one or more of our geographic regions or markets, such as Brazil" could

affect Avon's financial performance and management forecasts.  (*See, e.g.*, Ex. 1, at 36, 46;

Ex. 7, at 42, 48; Ex. 11, at 28, 35.)

On January 21, 2016, Avon held an Investor Day event, during which Avon noted

that "Brazil is experiencing one of its worst economic and political crises of the last 70 years."

(¶ 41.)  During the event, Avon announced a three-year "Transformation Plan" to improve

Representative engagement and address Avon's financial performance.  (¶ 131.)  John Higson,

then Avon's Chief Commercial Officer, stated that this plan included new smartphone tools "that

allow[ Representatives] to be an expert on anything . . . [m]aking those new sellers confident to sell [Avon's] product range quickly," "longer-term loyalty programs with the kind of alliances that are available to [Avon] today," and a new order management system.  (¶ 131; Ex. 3, at 26-29.)  Mr. Higson explained that this plan expanded on Avon's existing training, where "a new seller coming in gets rather less than a full week of training before she gets out in front of a customer.  That has been a weakness of the Avon business over 30 years."  (Ex. 3, at 26.)  Following the announcement, Mr. Acosta, then Avon's Chief Marketing and Social Selling Officer, said "[w]e will do everything for, with and about our representatives . . . [w]e equip her with the right tools to succeed and we want to make it very simple for her to earn money."  (¶ 133.)  David Legher, then-Head of Avon Brazil,[3] agreed that in the Transformation Plan, "we create a comprehensive 360 program of onboarding, so we're assisting [new representatives] and improving their opportunity in the first four months of their journey."  (¶¶ 81, 134.)  Mr. Legher further remarked that "we feel very comfortable that we can do a great job in direct selling in Brazil."  (¶ 134.)  And Sherilyn McCoy, Avon's then-Chief Executive Officer, stated that Avon's goals under the Transformation Plan "requir[e] us to continue to make sure that we are bringing women in and converting them to representatives."  (¶¶ 19, 132.)

In response to an analyst's question at Investor Day, Ms. McCoy said that Avon planned to "get aligned on how we're measuring retention globally" and was "starting to see improvements in retention."  (¶ 135.)  In response to another analyst's question, regarding Avon's application of the Six Sigma business philosophy, Mr. Legher agreed that "[w]e have

---

[3] Mr. Legher was named as a defendant in the Consolidated Amended Complaint, filed on June 28, 2019 and in the Corrected Consolidated Amended Complaint, filed on July 24, 2019. Mr. Legher has not yet been served, or otherwise appeared, in this action.

today a common Latin American campaign planning process.  Bad debt, we have common knowledge on how to deal with bad debt at the full process."  (¶ 136; Ex. 4, at 57.)

On February 11, 2016, Avon announced its Q4 2015 results.  During the earnings call that day, Ms. McCoy reported that what "we see in Brazil is that active representatives are growing" and that "we expect our Brazilian team to maintain the underlying health of the business while keeping our representatives engaged."  (¶ 140.)  She further noted that although "we have been able to recruit and retain representatives," Brazil remained "a very challenging environment" even though it "is a very important market for us" and Avon "continue[s] to be very bullish for the . . . long term."  (¶ 142; Ex. 5, at 15.)  James Scully, then Avon's Chief Operating Officer, reported that Brazil's revenue declined due to lower average orders, and that "[t]hese negative average order impacts were partially offset by solid growth in active representatives, which benefited from a successful third quarter recruiting crusade."  (¶ 141.)

On February 23, 2016, Avon released its 2015 Form 10-K for the period ending on December 31, 2015.  In connection with its accounting policies, Avon noted that Representatives are "generally precluded from submitting an order for the current sales campaign until the accounts receivable balance for the prior campaign is paid; however, there are circumstances where the Representative fails to make the required payment."  (¶ 144.)  Further, the accounting policy expressly disclosed that "[i]f the financial condition of our Representatives were to deteriorate, resulting in their inability to make payments, additional allowances may be required."  (*Id*.)  There is no well-pled allegation that Avon's policy violates any applicable accounting standards, including Generally Accepted Accounting Principles ("GAAP").

On May 5, 2016, Avon issued its Q1 2016 financial results.  On the earnings call, Ms. McCoy and Mr. Scully stated that Brazil posed "challenging economic conditions," that

"Representatives were down 3%" for that quarter while "bad debt expense increased primarily due to the macroeconomic environment in Brazil and Argentina," and that Avon remained committed to "mak[ing] sure that we have women still coming in and staying with our business." (¶¶ 148-150; Ex. 6, at 9, 14.)

On August 2, 2016, Avon issued its Q2 2016 financial results.  On the earnings call, Ms. McCoy stated that she was "very encouraged by the progress the [team] is making" and that the "Brazil team is working hard to maintain the representative base." (¶ 154.)  She noted that "[w]e still have a lot of work ahead, however I'm pleased with our Q2 results and the progress the team is making on the transformation plan," which included "helping them build their business, making sure we are giving them the tools to reach out to consumers" and maintaining the representative base in line with the goals set out in January 2016.  (¶¶ 154, 156, 157.)  Mr. Scully echoed Ms. McCoy's goals for the Transformation Plan.  (¶ 155.)

On September 6, 2016, at Barclay's Global Consumer Staples Conference, Ms. McCoy noted Avon's "opportunity is to continue to make that experience [of younger Representatives] positive and retain those people over time," and acknowledged that "[w]e're not as far along in this initiative as we are on some of the others, but we are making good progress." (¶ 163.)  Mr. Scully reported that active Representative growth was "on track." (*Id.*)

On November 3, 2016, Avon announced its Q3 2016 results.  The 10-Q reported that Avon's operating expenses were higher due to "an increase of 30 basis points from higher bad debt expense, primarily in Brazil" (¶ 171), including a segment decline due to "a decline of .8 points from higher bad debt expense, primarily due to the macroeconomic environment in Brazil."  (Ex. 8, at 46.)  On the same day, Avon reported on an earnings call that Brazil missed quarterly projections, but performed above Avon's expectations in the midst of the economic

downturn.  (¶ 165.)  Ms. McCoy noted that Brazil had a "successful recruiting program" that grew the number of Representatives.  (*Id.*)  She noted that she "was in Brazil a month ago and continue[s] to be impressed with work the team is doing, especially given the backdrop of a tough economic, political and competitive environment" and that "we're pleased with the overall performance there."  (¶¶ 166, 168-169.)  Mr. Scully reported that "[r]evenue growth was driven by increases in active representatives and average order."  (¶ 167.)

On November 29, 2016, Mr. Scully participated in the Bank of America Merrill Lynch America Leveraged Finance Conference, in which he reiterated the Transformation Plan's goals for improving the Representative experience.  (¶ 177.)  On January 10, 2017, Ms. McCoy, Mr. Scully and James Wilson, Avon's then-Chief Financial Officer, participated in the ICR Conference, during which they reiterated the Transformation Plan's goal of improving Representative engagement and support through digital media, improved sales materials and better ordering platforms.  (¶ 179.)  They stated that "we've made good progress" and that Representative numbers were "on track."  (¶¶ 179, 180.)

On February 16, 2017, Avon announced its Q4 2016 financial results, including weak earnings and a decline in active Representatives.  (¶ 182.)  Avon disclosed that "given the deteriorating economic environment [in Brazil], we saw a higher-than-expected level of bad debt in the second half of the year," namely because of "the inability of some customers to pay" and "in order to assist new representative recruiting, the team adjusted credit terms."  (¶¶ 183, 184; Ex. 10, at 6.)  Mr. Wilson explained that the bad debt expense was revealed in the fourth quarter because it was an unexpected issue that was "not as obvious" in the third quarter due to a bank strike in Brazil:

> As we went through the year, there was some closing of the information there because of the bank strike in Brazil in September.   So as we came out of

quarter 3, some of that information was not as obvious because I think there was approximately around 1 month bank strike that meant it was difficult for the representatives to post cash.  So I think that, that came as the slightly unexpected issue in quarter 4, and we expect that to clean up as we go forward.

(Ex. 10, at 16.)  Mr. Wilson stated that Avon "does have bad debt expense on an ongoing basis, but th[is] specific thing, we believe, is cleared up and booked in the 2016 results."  (¶ 186.)  He further explained that for the adjusted credit terms, "there was a little bit of that in Brazil in 2016, but it's not a general policy."  (¶ 187.)

On May 4, 2017, Avon reported its Q1 2017 earnings, with "revenue decline . . . primarily driven by declines in Russia, Asia Pacific and the United Kingdom and partially offset by growth in South Africa, Brazil and North Latin America."  (Ex. 11, at 24.)  Avon reported an "increase of 140 basis points from higher bad debt expense, driven by Brazil primarily due to the lower than anticipated collection of receivables which was partly as a result of the macroeconomic environment."  (*Id.* at 28.)  Ms. McCoy and Mr. Wilson stated that they "expect[ed] to see an improvement as [Avon gets] to the back end of the year in bad debt" and for the amount "to decline in the second half of [2017]" due to "enhanced collection processes and tighter recruiting terms."  (¶¶ 201-203.)

On June 14, 2017, Ms. McCoy and Mr. Wilson participated in Deutsche Bank's Global Consumer Conference, during which Mr. Wilson reiterated Avon's Representative engagement goals.  (¶ 211.)

On August 3, 2017, Avon reported its Q2 2017 earnings.  (¶ 213.)  On the earnings call, Mr. Wilson disclosed that the South Latin America segment margin declined due in part "to the continued high level of bad debt, particularly in Brazil, where we're still seeing the trailing impacts of last year's relaxation of credit terms along with the difficult macroeconomic environment."  (Ex. 12, at 6.)  Mr. Wilson expressed that "we do expect to see

improvement in the issues that impacted Brazil's performance this quarter, we expect the second half revenue to remain under pressure," but that Avon "expect[ed] to start to recover in the second half of the year."  (¶¶ 213, 214.)

On the same day, Avon announced that Ms. McCoy was departing the company. (¶ 217.)  *The Wall Street Journal* reported that Ms. McCoy was being "pushed out" from Avon following "a disappointing five-year tenure" in which Ms. McCoy "ultimately failed to stop its years long downward spiral."  (¶¶ 217, 293.)  There is no well-pled allegation that Ms. McCoy's departure was connected in any way with the performance of Avon Brazil, its Representative recruitment practices, or any realized bad debt expenses in 2016 and 2017.  (¶¶ 292-95.)

On November 2, 2017, the day following the close of the Class Period, Avon reported its Q3 2017 earnings.  Mr. Wilson disclosed that the bad debt expenses arising from the relaxed credit requirements for incoming Brazilian Representatives in 2016 were being addressed, but that additional work needed to be done to "reach normalized levels."  (¶¶ 223-225.)  Mr. Wilson acknowledged that the bad debt expenses were "to some extent, self-inflicted with the listing of credit policies there," but were also attributable to "other business processes that were further contributing to bad debt issues given the challenging macroeconomic environment."  (¶¶ 223-224.)  On that news, Avon's stock declined.  (¶ 226.)

Two months later, on February 5, 2018, Avon appointed Jan Zijderveld as Avon's new CEO, and announced that Ms. McCoy would step down as CEO but remain employed as an advisor to the Board and Mr. Zijderveld through March 31, 2018.  (¶ 229; Ex. 15.)  Over the next several months under new leadership, Avon continued to reflect on Avon Brazil's performance in hindsight, and assured investors that Avon was working to resolve the issues.  (¶¶ 229-241.)

**LEGAL STANDARD**

On a motion to dismiss under Rule 12(b)(6), the Court must accept well-pled allegations as true, but "it does not credit 'mere conclusory statements'." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 585 (S.D.N.Y. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A "complaint must allege enough facts to state a claim to relief that is plausible on its face." *Id.* (citation omitted). A "complaint alleging securities fraud must satisfy Rule 9(b) . . . , which requires that 'the circumstances constituting fraud . . . shall be stated with particularity.'" *ATSI Commc'ns*, 493 F.3d at 99 (quoting Fed. R. Civ. P. 9(b)) (citation omitted). The complaint must be dismissed if the allegations "permit no reasonable inference stronger than the 'mere possibility of misconduct.'" *Id*.

**ARGUMENT**

I.   **THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(b).**

To state a claim under Section 10(b), Plaintiffs must sufficiently allege (1) a misstatement or omission of material fact; (2) that each defendant acted with the requisite state of mind, *i.e.* scienter; (3) that investors relied on the misrepresentation in connection with the purchase or sale of securities; (4) that their losses were caused by the material misstatements or omissions; and (5) economic loss, *i.e.* damages. *See ATSI Commc'ns*, 493 F.3d at 105. Here, the Complaint fails for at least two reasons:  failure to adequately plead scienter and falsity.

A.   <u>The Complaint Fails to Plead Facts Supporting a Strong Inference of Scienter.</u>

1.   *Legal Standard to Plead Scienter.*

Under the PSLRA and Rule 9(b), Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b). Scienter must be pleaded with respect to *each defendant* individually. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005)

11

("In order to satisfy the PSLRA and Rule 9(b), plaintiffs must allege with particularity that each of the defendants acted with the requisite scienter.").  In addition, under the Supreme Court's decision in *Tellabs*, "a court must consider plausible, nonculpable explanations for the defendants' conduct" in addition to drawing inferences favoring the plaintiff in a Rule 12(b)(6) motion to dismiss.  *Tellabs*, 551 U.S. at 324.  Accordingly, "to qualify 'as a strong inference,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 309).

The strong inference of scienter must be supported by facts showing either an actual intent to deceive, or "conscious misbehavior or recklessness."  *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 28 (2d Cir. 2014) (citation omitted). "Where a plaintiff seeks to plead scienter by alleging conscious misbehavior or recklessness, the complaint must 'allege[ ] that defendants . . . had access to non-public information contradicting their public statements.'" *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001))  But "an inference of scienter does not follow from the mere fact of non-disclosure of relevant information"; instead, "plaintiffs must also provide sufficient factual allegations to indicate that defendants understood their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility."  *Gillis v. QRX Pharma Ltd.*, No. 15 Civ 4868, 2016 WL 3685095, at *13 (S.D.N.Y. July 6, 2016).  Accordingly, "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).

2.    *Plaintiffs Fail to Plead Scienter.*

The Complaint does not even attempt to plead facts sufficient to show that any defendant acted with an actual intent to deceive the investing public.  There are no allegations against Avon or any Individual Defendant that purport to establish such actual intent.

Rather, Plaintiffs seek to establish scienter through conscious misbehavior or recklessness through four bases:  (i) statements and allegations made by purported confidential witnesses ("CWs"); (ii) the importance of the Brazilian market to Avon; (iii) hindsight statements made by Avon; and (iv) Ms. McCoy's departure from Avon.  (¶¶ 271(b)-(e).)  None of these bases—taken individually or together—plead facts sufficient to raise a strong inference of scienter for any defendant, much less *each* defendant individually.

(a)    The Confidential Witnesses Do Not Support Scienter.

The Complaint relies on seven CWs to attempt to demonstrate that "Defendants knew or were reckless in not knowing about the burgeoning bad debt problems."  (¶ 271(b).)[4]  In this Circuit, a confidential witness may support Plaintiffs' scienter claims *only if* the CW alleges he/she had direct contact with the individual defendants to support the complaint's scienter allegations.  *See, e.g.*, *Wilbush*, 271 F. Supp. 3d at 497 (rejecting CW allegations when "the Amended Complaint does not allege that two of the four 'confidential witnesses' . . . had any contact with the Individual Defendants.  In such a case, the law is abundantly clear that [their] allegations are insufficient to support scienter" (citations omitted)); *Glaser*, 772 F. Supp. 2d at 594 ("[P]laintiffs make no allegation that these sources ever had any contact with anyone at [the defendant company], much less with the Individual Defendants").  Plaintiffs must also

---

[4] On July 19, 2019, counsel for Plaintiffs informed counsel for Defendants that CW-1 had changed his/her testimony.  At Plaintiffs' counsel's request, Defendants' counsel consented to Plaintiffs' motion for leave to amend their complaint (for a second time).  CW-1's revised testimony, contained in the "Corrected Consolidated Amended Complaint," makes even clearer that the allegations by CW-1 have no connection whatsoever to any Individual Defendant.

sufficiently allege that the CWs confirm that the Individual Defendants actually accessed or reviewed the data forming the basis of the allegation that the Defendants knew, or were reckless in not knowing, the underlying information at issue. *See, e.g.*, *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (affirming district court's finding of an insufficient allegation when a CW could not confirm "whether [any individual defendant] actually accessed or reviewed [the information]"). As a result, "Plaintiffs cannot rely on assertions that the information presented by the confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding of scienter." *Glaser*, 772 F. Supp. 2d at 594 (citation omitted).

Plaintiffs' CWs fail to meet these requirements. *First*, none of the CWs claim to have had any contact with the Individual Defendants. (¶¶ 59-81.) That is reason alone to find the CWs insufficient. *See Wilbush*, 271 F. Supp. 3d at 497 ("In such a case, the law is abundantly clear that [the CWs'] allegations are insufficient to support scienter.").

*Second*, although the CWs allege that there were internal documents that referred to Brazil's bad debt (¶¶ 83, 106-111), they make no attempt to identify the internal documents, much less demonstrate that they were known or available to the Individual Defendants. "[T]hese allegations do not establish what specific contradictory information the Individual Defendants received or when they received it." *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010), *aff'd sub nom. Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63 (2d Cir. 2011). Specifically, CW-1 (identified as a former Executive Director, Global FP&A and Functional Business Support (¶ 59)) alleges in his revised allegations (*see supra* note 4) that he learned about Avon's increasing bad debt through "monthly performance review documents." (¶ 83.)

14

But the Complaint nowhere alleges when such reports were prepared, what information was in them or who had access to them.  (*Id.*)  And although CW-1 also asserts that "there were regional monthly performance meetings" attended by Ms. McCoy, Mr. Scully and Mr. Legher (¶ 107), the Complaint fails to plead that CW-1 attended any of those monthly meetings, and further fails to plead when and at which meetings Brazil's bad debt expenses were allegedly discussed (*id.*). Such an allegation is "so vague as to be meaningless, because . . . it contains no time frame within which the meetings occurred . . . and no information regarding how extensively or in what manner the reports were discussed."  *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (refusing to credit allegations by CW).

Similarly insufficient are Plaintiffs' allegations that "everyone, including Ribeiro and Legher, knew about the delinquency and bad debt problems at Avon Brazil" (¶ 111); that a CW "believe[d] Legher knew about the delinquency problems given his role and position at the Company" (¶ 113) and that "David Legher traveled to Avon's headquarters in the United States, and then to its headquarters in London (starting in 2016) at least once a semester" (¶ 278).  Those allegations are not facts—they are insinuations.  Such "assertions are too vague to support a finding of scienter."  *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 340 (S.D.N.Y. 2011) (citation omitted); *see also Glaser*, 772 F. Supp. 2d at 594 (Plaintiffs "cannot rely on assertions that the information presented by the confidential witnesses was known or common knowledge within the company") (citation omitted).

Moreover, none of the confidential witness allegations support that any individual defendant had "access to non-public information contradicting their public statements" *at the time* the alleged misstatement was made—in fact they support the opposite.  *Wilbush*, 271 F. Supp. 3d at 485 (citation omitted).  For example, as the Complaint concedes, Defendants in fact

15

disclosed Brazil's bad debt expense issues on February 16, 2017, in the Q4 2016 earnings report.

(¶¶ 182-184.)  On the very same day, Mr. Wilson explained in an earnings call why the bad debt

expenses were revealed in the fourth quarter, rather than the third quarter:

> As we went through the year, there was some closing of the information there because of the bank strike in Brazil in September.  So as we came out of quarter 3, some of that information was not as obvious because I think there was approximately around 1 month bank strike that meant it was difficult for the representatives to post cash.  So I think that, that came as the slightly unexpected issue in quarter 4, and we expect that to clean up as we go forward.

(Ex. 10, at 16.)  Plaintiffs' CW-7 corroborates Mr. Wilson's explanation, alleging that the "bad

debt in Brazil 'spiked' or 'burst' *at the end of 2016*."  (¶ 88 (emphasis added).)  In other words,

far from supporting that Defendants acted with scienter, they in fact support that they did not.

*See Wilbush*, 271 F. Supp. 3d at 497.  The CW allegations should be disregarded.[5]

(b) <u>"Importance" of the Brazil Market Does Not Support Scienter.</u>

Plaintiffs next allege that, because of "importance" of the Brazil market to Avon,

"it is unreasonable to think that the Individual Defendants would be unaware of the financial

implications of the loosened credit standards in its Brazilian market."  (¶¶ 272-280.)  Again, such

allegations are supposition—not facts.  In any event, the "importance" of a line of business or

geographic market is insufficient, without more, to establish scienter in the Second Circuit.  *See

Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("[T]he 'core

operations' theory at most constitutes 'supplemental support' for alleging scienter but does not

independently establish scienter" (citing *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F.

App'x 10, 14 n.3 (2d Cir. 2011))).  Accordingly, the "importance" of Brazil is insufficient.

(c) <u>Hindsight Statements Do Not Support Scienter.</u>

---

[5] The remaining CWs—two Senior Sales Managers (CW-2, CW-3), a Zone Sales Manager (CW-4), two Sales Managers (CW-5, CW-6) and a Senior Manager in Operational Excellence and Supply Chain (CW-7)—are former rank-and-file employees in Brazil not alleged to have had any contact with the Individual Defendants.

16

Plaintiffs next allege that certain late and post-Class Period statements by Ms. McCoy and Mr. Wilson are evidence of scienter in 2016 (¶¶ 282-285, 287-291). They are not. Later statements that reflect on earlier events with the benefit of additional information are not relevant to a defendant's state of mind *at the time an earlier statement was made.* "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citations omitted). For this reason, the Second Circuit has "refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.'" *Id.* There is no well-pled allegation that any defendant was aware of the extent of the bad debt expense prior to February 2017. These "fraud by hindsight" allegations of scienter should, therefore, be disregarded.

    (d) <u>Ms. McCoy's Departure from Avon Is Not Indicative of Fraud.</u>

Finally, Plaintiffs claim that Ms. McCoy's scienter is established by "[t]he abrupt nature of [Avon's] announcement of her impending departure, without a successor in place." (¶ 295.) This too fails. There is no allegation that Ms. McCoy's departure had anything to do with the "loosening" credit standards or bad debt issues in Brazil. (¶¶ 292-295.)[6] Nor was Ms. McCoy's departure "abrupt"; indeed, the very article cited in the Complaint states that Ms. McCoy had been negotiating her departure with Avon's board since at least June 2017, and that she would remain in her role until March 2018, or until a successor was named. (Ex. 14.) Ms. McCoy ultimately remained CEO until February 2018, when her successor was appointed, and stayed with Avon in an advisory role for another month thereafter. (¶ 229; Ex. 15.) Thus, the allegation that Ms. McCoy's departure was "highly unusual and suspicious" is unsupported insinuation that the Court need not credit. *Glaser*, 772 F. Supp. 2d at 598. Absent "alleged facts

---

[6] To the contrary, *The Wall Street Journal* article cited in the Complaint refers to a "disappointing five-year tenure during which she . . . ultimately failed to stop [the] years long downward spiral" that Avon suffered long before the Class Period began. (¶ 293; Ex. 14).

linking the . . . resignation[] and the alleged fraud," Ms. McCoy's departure "[can]not support an inference of conscious misbehavior or recklessness." *In re BISYS*, 397 F. Supp. 2d at 447.

        3.      *Plaintiffs Fail to Offer Any Cogent Theory of Fraud.*

The Complaint also fails for a more fundamental reason:  Plaintiffs have offered no cogent theory of fraud.  Under *Tellabs* and its progeny, the inference of scienter "must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 314).  The Complaint here fails that basic test.  Even read as a whole, Plaintiffs' allegations offer no explanation as to why Defendants would seek to mislead investors in 2016, only to disclose the fraud they allegedly concocted just months later in 2017.  There are no allegations that any individual benefited or profited from the fraud; to the contrary, all the alleged fraud accomplished was to expose defendants to securities fraud claims for no apparent motive or gain.  Such a theory makes no sense.  *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 459 (S.D.N.Y. 2010), *aff'd sub nom. Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63 (2d Cir. 2011) (citation omitted) (dismissing complaint where no defendant allegedly "benefited in a concrete and personal way from the purported fraud").

Instead, the far more plausible inference to be drawn from the Complaint is that Avon's management did not anticipate how recruitment efforts in Brazil in the midst of powerful macroeconomic forces would affect Avon Representatives or Avon's bottom line.  (*See, e.g.*, ¶ 7 ("To combat declining revenues and add significantly more Representatives to its sales force . . . Avon loosened its credit standards for the recruitment of new Representatives in Brazil during a time when the country was experiencing a difficult economic environment and high unemployment.").)  In other words, Plaintiffs fail to plead scienter because it is much more

plausible "that the statements either were not misleading or were the result of merely careless mistakes" based on information then available to management.  *Teamsters*, 531 F.3d at 197 (citation omitted); *see also S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 114 (2d Cir. 2009) (even a more plausible "inference of negligence" requires dismissal for failure to plead scienter); *ECA*, 553 F.3d at 198 (dismissing complaint) (citation omitted).

        B.      <u>Plaintiffs Fail to Plead a Misstatement or Omission of Material Fact.</u>

        *1.      Legal Standard to Plead Actionable Falsity.*

      The Complaint also fails for the independent reason that the alleged misstatements and omissions are not actionably false.  "Under Rule 9(b) and the PSLRA, a plaintiff must identify with particularity the statement or statements alleged to be false or misleading and the reason or reasons why that is so."  *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, No. 17-CV-2169 (LAK), 2019 WL 1368787, at *6 (S.D.N.Y. Mar. 26, 2019) (citing *Novak*, 216 F.3d at 306).  Importantly, a statement is only actionable if it "was false *at the time it was made*. A statement believed to be true when made, but later shown to be false, is insufficient.  In such a circumstance, there is a lack of actionable falsity."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citation omitted).

      Alleged "omissions are actionable under § 10(b) only when a corporation has a duty to disclose"—specifically, when "a statute or regulation requires disclosure" or "disclosure is necessary to avoid rendering existing statements misleading by failing to disclose material facts."  *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 579 (S.D.N.Y. 2016). "This requirement, however, does not mandate disclosure of all facts that 'would be interesting' in light of and in relation to a disclosed fact.  Nor does it automatically render statements of fact on a certain topic misleading due to the omission of another fact concerning the same topic."  *In re Tempur Sealy*, 2019 WL 1368787, at *11–12.

Forward-looking statements or projections, including "plans and objectives of management for future operations," are not actionable if they are "'identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading.'" *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)).  By contrast, puffery—statements that are "too general to cause a reasonable investor to rely upon them"—are unqualifiedly not actionable.  *In re Aratana Therapeutics*, 315 F. Supp. 3d at 757 (citation omitted).

Finally, when plaintiffs allege "the falsity of a statement of belief or opinion, the plaintiff must plead that it was both objectively false and disbelieved by the defendant at the time it was expressed." *In re Lululemon*, 14 F. Supp. 3d at 571 (citation omitted).  "Such statements, often marked by phrases such as 'I believe,' are inactionable so long as the speaker actually held the belief professed, did not supply an untrue supporting fact, and did not omit information rendering the statement misleading." *In re Aratana Therapeutics*, 315 F. Supp. 3d at 758 (citation omitted).  That is because "companies must be permitted to operate with a hopeful outlook:  [p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (citation omitted).

2.    *The Complaint Fails to Plead Any Actionable Misstatement or Omission.*

Plaintiffs allege that 40 statements made by the Defendants are actionably false or omit material facts under Section 10(b).  (¶¶ 132-137, 140-144, 148-150, 153-157, 163-171, 177, 179-180, 186-190, 201-205, 211, 214.)  For the reasons that follow, none of these statements— many of which are comprised of long block quotes that often fail to identify what is false—is actionably false or pleaded with the particularity required by Rule 9(b).  *See Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 F. App'x 32, 37-38 (2d Cir. 2012) (a

complaint that "consists in large part of large block quotations with italicized text . . . does not comport with our exhortation that plaintiffs must demonstrate with specificity why and how each statement is materially false or misleading" (citation omitted)).  Here, the statements suffer from four flaws:  (i) they are not false based on the information then available to Avon's executives; (ii) they are not false or misleading when read in the context they were delivered; (iii) they are opinions or qualified forward-looking statements; or (iv) they are puffery.

(a)    <u>Avon's Finance and Accounting Public Statements Not False or Misleading Based on Contemporaneously Available Information.</u>

Plaintiffs challenge as false or misleading Defendants' public statements about Avon's bad debt expenses in 2016 and early 2017.  (¶¶ 149, 171, 187.)  Plaintiffs also allege that Avon's Allowances for Doubtful Accounts Receivable policy in its 2015 Form 10-K was misleading for failing to disclose Brazilian market-specific considerations.  (¶ 144.)

For the 2016 statements (¶¶ 149, 171), Plaintiffs allege that Avon should have disclosed that the bad debt expenses were attributable to Avon "loosen[ing] its credit policies," "offer[ing] minimal to no support or training for its Representatives in Brazil" or "fail[ing] to increase its allowance for bad debts," rather than citing the Brazilian economy.  (¶¶ 152, 173.)  But a "statement believed to be true when made, but later shown to be false, is insufficient" to sustain a Section 10(b) claim.  *In re Lululemon*, 14 F. Supp. 3d at 571.  Plaintiffs cite CWs in Brazil who alleged that practices known by Brazilian employees culminated in increased bad debt expenses, which were reported in internal systems.  (¶¶ 58-105.)  CW-1 claimed he "learned about Avon's increasing bad debt in Brazil through monthly performance review documents" (¶ 83) and separately alleged that there were "regional monthly performance meetings . . . during which [Avon executives] would review each regional market" (¶ 107).  He further alleges that Ms. McCoy, Mr. Scully and Mr. Legher "attended regional monthly performance meetings."

21

(¶ 107.)  But these allegations are not well-pled because they fail to specify *when* these meetings

occurred, or *when* documents showing increased delinquencies were prepared, or *if* the bad debt

issue was discussed in those meetings.  (¶¶ 106-115.)  Indeed, during the February 16, 2017

earnings call for Q4 2016, Mr. Wilson explained that the bad debt expenses were revealed in the

fourth quarter because they were not yet known in the third quarter:

> As we went through the year, there was some closing of the information there
> because of the bank strike in Brazil in September.  So as we came out of quarter
> 3, some of that information was not as obvious . . .

(Ex. 10, at 16.)  CW-7, who alleged that the "bad debt in Brazil 'spiked' or 'burst' *at the end of*

*2016*," corroborates this.  (¶ 88 (emphasis added).)  Thus, Plaintiffs fail to plead that the 2016

statements were false or disbelieved *when made*.  *See In re Lululemon*, 14 F. Supp. 3d at 571.

On the February 16, 2017 earnings call, Mr. Wilson stated that Avon's relaxed

credit policies were "a very specific action for a limited period of time in one market."  (¶ 187.)

Because the allegations do not contradict this statement (¶ 58), this claim should be dismissed.

With respect to Avon's accounting policy (¶ 144), there is no well-pled allegation

that this policy was not followed or did not comport with Generally Accepted Accounting

Principles.[7]  *Menaldi*, 164 F. Supp. 3d at 579.  Therefore, this claim should be dismissed.

(b)   Avon's Statements Regarding Its Representatives Are Not Well-
Pled to Be False or Misleading or Are Taken Out of Context.

Plaintiffs' allegations that Avon's statements regarding its Representatives are

false or misleading fall into three categories: (i) Representative engagement and retention;

(ii) Representative headcount trends; and (iii) Representative "onboarding" and "training."  (*See*

---

[7] Although the Complaint contains a lengthy section about accounting practices (¶¶ 144, 242-
268), Plaintiffs' accounting allegations also are grounded in hindsight.  Plaintiffs do not plead
with any particularity that Avon knew of any issues with bad debt expenses or revenue
recognition before Q4 2016; instead, Plaintiffs rely only on the same insufficient CW allegations
that cannot support a claim.  *See In re Lululemon*, 14 F. Supp. 3d at 571 (a "statement believed to
be true when made, but later shown to be false, is insufficient").

¶¶ 132, 134-135, 137, 141, 148, 150, 163, 167-169, 177, 180, 189-190, 204-205; ¶¶ 138, 145,[8]
152, 164, 173, 178, 181, 192, 207.)

            Plaintiffs offer no well-pled allegations that Defendants' statements about Avon's
Representative engagement and retention efforts (specifically, deploying the Transformation
Plan) (¶¶ 132, 135, 137, 157, 177, 190, 204, 205) or headcount trends (¶¶ 132, 141, 148, 150,
163, 167, 168, 169, 188) are actually false.  Instead, Plaintiffs complain about omitted details,
which do not "automatically render statements of fact on a certain topic misleading due to the
omission of another fact concerning the same topic."  *In re Tempur Sealy*, 2019 WL 1368787, at
*11–12.  Avon reported updated metrics that were cabined by timely disclosures of the volatility
and weakness of Brazil's economy during the Class Period.  (*See, e.g.*, ¶ 140 ("We anticipate
Brazil will continue to be a very challenging environment.").)  Accordingly, the claims regarding
these statements should be dismissed.

            Defendants' statements about Representative "onboarding" (¶¶ 134, 153, 163,
189) and "training" (¶¶ 163, 189) are likewise not false or misleading.  Plaintiffs cite to four
former Avon Brazil staffers as CWs—two sales managers (CW-3, CW-4), a zone manager (CW-
6) and a supply chain manager (CW-7)—who allege that no formal training occurred for new
Representatives.  (¶¶ 123-126.)  But "[t]he recruiting . . . and training of Representatives are the
primary responsibilities of district sales managers, zone mangers and independent leaders"—
ironically, the roles held by three of the CWs.  (Ex. 2, at 4.)  Notably, there is no allegation that
any of the CWs ever notified any Defendant of their own alleged training failure.  Furthermore,
CW-4's description of the training that has occurred—"very short business meetings which new

---

[8] Plaintiffs allege that a Piper Jaffray analyst report noting Avon's increase in Representative
headcount contained "materially false and/or misleading" statements.  (*See* ¶¶ 143, 145.)  To the
extent Plaintiffs are imputing Section 10(b) liability on Defendants for an analyst report, for the
reasons discussed in this section, the statements are not actionably false.

Representatives were asked to attend where Sales Managers would discuss upcoming campaigns" (¶ 123)—is exactly what Mr. Higson's told investors in January 2016:

> [A] new seller coming in gets rather less than a full week of training before she gets out in front of a customer.  That has been a weakness of the Avon business over 30 years.

(Ex. 4, at 26.)  Investors already knew about this training issue at the start of the Class Period.

In short, there are no well-pled allegations in the Complaint to suggest that any Defendant had information at the time of the alleged misstatements that Representatives were not being trained as expected.  (¶¶ 123-126.)  Because a "statement believed to be true when made, but later shown to be false, is insufficient" to sustain a claim for falsity, the claims should be dismissed.  *In re Lululemon*, 14 F. Supp. 3d at 571 (citations omitted).

> (c)   Avon's Statements Regarding Its Projected Financial Health Are Forward-Looking Statements or Opinions.

Plaintiffs further challenge opinion and forward-looking statements by Ms. McCoy and Mr. Wilson as actionable false or misleading statements.  (*See* ¶¶ 186, 188, 201-203, 214.)  In these statements, both Ms. McCoy and Mr. Wilson express their expectation that Avon's bad debt would be cleared up either in 2016 or by the first half of 2017.  (*Id.*)  *First,* because these statements were properly conveyed as "we believe" or "we expect," they "are inactionable so long as the speaker actually held the belief professed, did not supply an untrue supporting fact, and did not omit information rendering the statement misleading."  *In re Aratana Therapeutics*, 315 F. Supp. 3d at 758 (citation omitted).  The Complaint fails to plead that either Ms. McCoy or Mr. Wilson disbelieved their statements.  (*See* ¶¶ 192, 207.)

*Second*, these statements are also inactionable as forward-looking statements. Each of these statements was on earnings calls that were accompanied by Avon 10-Qs and 10-Ks and cautionary language, which "satisfactorily armed investors with all the information

necessary to evaluate the risks associated" with Defendants' statements.  *In re Aratana Therapeutics*, 315 F. Supp. 3d at 760 (citation omitted).  Paired with the three earnings calls at issue—for Q4 2016, Q1 2017 and Q2 2017—these accompanying public filings disclosed that Avon's expectations could be affected by "a recession . . . [in] Brazil" and Avon's "ability to . . . effectively manage doubtful accounts".  (Ex. 9, at 1; Ex. 11, 35; Ex. 13, at 43.)  And again, there is no allegation Ms. McCoy or Mr. Wilson disbelieved their statements when made.

> (d)   The Remainder of Plaintiffs' Alleged Misstatements Are Non-Actionable Puffery.

The remaining statements challenged by Plaintiffs are non-actionble puffery. (*See* ¶¶ 136, 140, 142, 148, 154-156, 165-166, 179, 211.)  They are "too general to cause a reasonable investor to rely upon them", *In re Aratana Therapeutics*, 315 F. Supp. 3d at 757, and have similar, non-specific themes, such as "we have common knowledge" (¶ 136), "we have a strong team in place" (¶ 148), "we're very pleased with our efforts there" (¶ 142) and "we need to invest in her" (¶ 211).  The "generic, indefinite nature of the statements at issue" are nonactionable; therefore, these claims should be dismissed.  *Bahash*, 506 F. App'x at 37.

## II.   PLAINTIFFS' CONTROL PERSON CLAIMS UNDER § 20(a) MUST FAIL.

To establish control person liability, Plaintiffs must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns*, 493 F.3d at 108.  Because Plaintiffs' Complaint fails to allege any primary violation of Section 10(b), it likewise cannot establish control person liability.  *See id.*

## CONCLUSION

For the foregoing reasons, Defendants respectfully move for this Court to dismiss the Complaint in its entirety and with prejudice.

Date:  July 26, 2019

Respectfully submitted,


CRAVATH, SWAINE & MOORE LLP,

by

*/s/Karin A. DeMasi*

Karin A. DeMasi
Andrew D. Huynh

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
kdemasi@cravath.com
ahuynh@cravath.com


*Attorneys for Defendants Avon Products, Inc.,*
*Sherilyn S. McCoy, James S. Wilson and*
*James S. Scully*