**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Avon Products Inc. Securities Litigation | No. 19-cv-01420-CM |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'**
**CORRECTED CONSOLIDATED AMENDED COMPLAINT**

**LEVI & KORSINSKY, LLP**
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212-363-7500

**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: 212-907-0700

*Counsel for Lead Plaintiff, Additionally Named Plaintiff, and the Proposed Class*

*Additional Counsel for Lead Plaintiff, Additionally Named Plaintiff, and the Proposed Class*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

I. INTRODUCTION .......................................................................................................... 1

II. BACKGROUND ............................................................................................................ 3

    A. Defendants Materially Lowered Credit Terms in Brazil in 2015 .......................... 4

    B. Representatives Could Not Pay for Products Purchased on Credit ........................ 5

    C. Defendants Encouraged Delinquent Representatives to Order Additional Product with Promises of Discounts and Reactivation .......................................... 6

    D. Defendants Sent Representatives Product They Never Ordered ........................... 6

    E. The Individual Defendants Made the Decision to Lower Credit Standards ........... 7

    F. Defendants Received Reports and Participated in Meetings Discussing Both Increased Delinquencies and Bad Debt........................................................ 7

    G. Avon Failed to Train Its Representatives............................................................... 9

    H. Defendants' Accounting Violations During the Class Period ............................... 9

    I. The Truth Is Revealed........................................................................................... 10

    J. Admissions After the Class Period ...................................................................... 10

III. PLAINTIFFS HAVE ADEQUATELY STATED A § 10(b) CLAIM ........................... 11

    A. Plaintiffs Plead Facts Giving Rise to a Strong Inference of Scienter .................. 11

    B. Plaintiffs Plead Material Falsity.......................................................................... 20

        1. Defendants' Statements about Avon's Representatives Were False .............. 20

        2. False Statements Regarding the Increase in Bad Debt ................................. 22

        3. Statements Claiming Bad Debt Was "Cleared Up" Were False.................... 24

        4. The Actionable Statements Were Not Mere Puffery .................................... 25

    C. CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004)...................................................................................12

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).........................................................................................................21

*City of Pontiac Gen. Emples.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)...............................................................................17

*City of Providence v. Aeropostale, Inc.*,
    No. 11-cv-7132, 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)........................................14

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..............................................................................................22

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006).................................................................................15

*Emples.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)..............................................................................................12

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015)...............................................................................24

*Fresno Cnty. Emples.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)...............................................................................17

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)..........................................................................13, 25

*Gammel v. Hewlett-Packard Co.*,
    No. 11-cv-1404, 2013 WL 1947525 (C.D. Cal. May 8, 2013)..........................................20

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)..............................................................................................21

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................................................15

*Gross v. GFI Grp., Inc.*,
    162 F. Supp. 3d 263 (S.D.N.Y. 2016)...............................................................................25

*In re Hi-Crush Partners L.P. Sec. Litig.*,
No. 12-cv-08557, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...............................................16

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
Scotland Grp., PLC*,
783 F.3d 383 (2d Cir. 2015)...............................................................................................25

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019)........................................................................................................11

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y 2014)...............................................................................23, 24

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..............................................................................................................11

*Meyer v. JinkoSolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014)...............................................................................................21

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018)................................................................................15

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................................12, 14, 15

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019)..................................................................12, 17, 20, 23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
135 S. Ct. 1318 (2015)........................................................................................................24

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014)..............................................................................17, 18

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015).............................................................................13, 15

*In re QLT Inc. Sec. Litig.*,
312 F. Supp. 2d 526 (S.D.N.Y. 2004)................................................................................21

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)..................................................................................................18

*SEC v. SeeThruEquity, LLC*,
No. 18-cv-10374, 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) ..........................................11

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 16-cv-6728, 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)............................................22

*Strougo v. Barclays PLC*,
105 F. Supp. 3d 330 (S.D.N.Y. 2015)....................................................................................20

*In re Symbol Techs., Inc. Sec. Litig.*,
No. 05-cv-3923, 2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013)...............................................23

*Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................................11, 20

*Vining v. Oppenheimer Holdings Inc.*,
No. 08-cv-4435, 2010 WL 3825722 (S.D.N.Y. Sept. 29, 2010) ...........................................13

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).............................................................................................20, 25

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003)....................................................................................25

*Wilbush v. Ambac Financial Group, Inc.*,
271 F. Supp. 3d 473 (S.D.N.Y. 2017).....................................................................................15

**Statutes**

15 U.S.C. §78u-4(b)(1)(B).......................................................................................................20

Plaintiffs[1] respectfully submit this memorandum of law in opposition to Defendants'[2] Motion to Dismiss[3] the Corrected Amended Consolidated Class Action Complaint.[4]

## I.    INTRODUCTION

By 2015, Defendants were focused on reversing Avon's declining business in Brazil – by far, the Company's largest market.  To create the illusion that business in Brazil was still growing, Defendants dramatically lowered credit standards for their sales representatives in Brazil ("Representatives").  Avon's Representatives—predominately women of lower socioeconomic status—are critical to the Company's business model.  Instead of selling products in brick-and-mortar stores, Avon uses a direct sales model in which Avon product is first sold to Representatives *on credit*, then the Representatives sell Avon products to the ultimate consumers.  Because of the central relationship between Representative count and Company revenue, analysts and investors were critically focused on Representative growth as an indicator of Avon's economic health.

Between January 21, 2016 and November 1, 2017 (the "Class Period"), Defendants concealed that they dramatically loosened credit standards for Representatives in Brazil to mask declining performance.  Defendants also entirely stopped training Brazilian Representatives

---

[1]  Plaintiffs in this action are Lead Plaintiff Holly Ngo and additionally named plaintiff David Klungle (together, "Plaintiffs").

[2] Defendants are Avon, Inc. ("Avon" or the "Company"); Avon's former Chairman and CEO Sherilyn S. McCoy ("McCoy"); Avon's former Executive Vice President and COO James S. Scully ("Scully"); and Avon's former Executive Vice President and CFO James S. Wilson ("Wilson,") (collectively the "Individual Defendants").  David Legher ("Legher"), Avon's Executive Vice President and President of Avon South Latin America, is also named as a Defendant in this action.  Defendants recently agreed to accept service on his behalf.

[3] "MTD" refers to the Memorandum of Law In Support of Defendants' Motion to Dismiss Plaintiffs' Corrected Consolidated Amended Complaint (ECF No. 34), and "Def. Ex. __ " refers to the exhibits attached to the Declaration of Karin A. DeMasi in Support of Defendants' Motion to Dismiss Plaintiffs' Corrected Consolidated Amended Complaint. *See* ECF Nos. 35-1 to 35-15.

[4] Plaintiffs' pleading is referred to herein as the "Complaint," (cited as "¶__").  ECF No. 32.

during the Class Period, another critical fact which Defendants affirmatively misrepresented.

Instead of disclosing this material information, Defendants falsely assured the market that both sales and Representative growth were increasing because of robust recruitment. When Avon's new Brazilian Representatives predictably and sadly fell heavily into debt and could not pay for the merchandise they purchased on credit, Defendants continued to mislead investors and used aggressive debt collection tactics on their own Representatives to obscure the magnitude of the problem. Avon's securities ultimately plunged in value when the truth was revealed.

Defendants challenge only the Complaint's scienter and falsity allegations. Unable to counter Plaintiffs' well-pleaded scienter allegations, Defendants urge an analysis of each allegation in isolation. When viewed holistically, however, Plaintiffs' allegations give rise to a cogent and compelling inference of scienter as to each Defendant. Plaintiffs also plead facts, based on interviews with seven former employees, showing that in 2015 the Company made a uniform, undisclosed decision to loosen credit standards for Representatives in Brazil. These witness statements confirm that Defendants either knew or recklessly ignored information in their possession concerning the change in credit policy and its effects on the Company. For example, Defendant Legher—Avon's top Brazilian executive—communicated the credit policy change to managers in Brazil and was indisputably involved in the Company's aggressive debt collection practices in 2016 and 2017. Defendant Legher also met with the other Individual Defendants on a monthly basis to discuss the Brazilian market, and all the Individual Defendants had access to internal reports addressing the rising bad debt on the Company's books.

The core operations doctrine also supports an inference of scienter. Brazil was Avon's largest market – comprising 21% of the Company's consolidated revenue. Individual Defendants claimed on conference calls that they knew what was happening on the ground in

2

Brazil because they often went there.  Furthermore, Defendant McCoy was terminated as a result of Defendants' scheme, and Defendants first admitted that they were aware bad debt in Brazil reduced profitability a full eight months before the end of the Class Period.

Defendants ask the Court to completely ignore Plaintiffs' confidential witness ("CW") allegations by arguing the CWs must have had direct contact with the Individual Defendants for their statements to be considered.  This is simply not true under controlling authority, and the CW statements should be credited alongside Plaintiffs' other factual allegations.

Defendants' falsity arguments are similarly erroneous.  Defendants argue that Avon's loosening of its credit standards was immaterial to investors.  This argument fails because analysts were undeniably focused on Avon's Representative numbers in the Company's largest market as a measure of success.  Moreover, Defendants' claim that investors knew that Avon offered little to no training based upon one line uttered on a conference call is a truth on the market defense, inappropriate here.  Defendants' "puffery" argument should also be rejected because the false statements identified in the Complaint include hard facts—numbers, and information concerning actual business operations—not mere hype.  Accordingly, Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.

## II.    BACKGROUND

Avon is one of the world's largest direct sellers of beauty and personal care products. Avon uses a direct-selling model in which Representatives purchase products directly from Avon *on credit*, and then sell them to consumers.  ¶37.  Thus, the growth and sustainability of Avon's business is wholly dependent on the ability of its Representatives to generate recurring sales and the Company's ability to hire, train, and retain those Representatives.  ¶2.  Avon also provides thousands of dollars of merchandise to its Representatives on credit, which exposes the Company

to the risk of bad debt. ¶¶7, 11.[5]  To be hired, candidates must meet Avon's country-specific credit standards.  Upon approval, Representatives can purchase products on credit extended by Avon. ¶4.

Avon traditionally sold beauty products in the United States. ¶35.  By 2010, however, Brazil surpassed the United States as Avon's largest market, measured both by revenue and number of Representatives. ¶¶35, 40.  In 2016, revenue from Avon's Brazilian market was $1.2 billion, or approximately 21% of Avon's 2016 consolidated revenue. ¶40.  No other country accounted for more than 10% of Avon's total revenues at the end of 2016.[6]  *Id.*

Analysts covering the Company closely followed Representative growth and retention trends because these were the most significant indicators of Avon's business fundamentals. ¶43.  So important was the "Active Representatives" metric that growth in Active Representatives was added as a component of Avon's 2016 Annual Incentive compensation plan. ¶44.

### A.    Defendants Materially Lowered Credit Terms in Brazil in 2015

In mid-2015, there was a Company-wide decision to lower credit standards to attract new Representatives in Brazil.  *See* ¶79 ("the changes in credit standards for new Representatives in Brazil began towards the end of 2015, during Campaign 17 in September 2015, and lasted until Campaign 14 in mid-2016").  According to witnesses, there was "massive pressure" in 2015 for improved results and the Company was looking for ways to demonstrate growth to shareholders in the face of increased competition, especially in Latin America. ¶¶72, 75.  To create the illusion that Avon was growing its Representative base in Brazil, the Company materially lowered its credit standards and began extending credit to individuals already in debt. ¶58.

Before Avon changed its credit standards, Representatives could not have any negative

---

[5] The practice also tarnishes Representatives' credit if the product is not ultimately paid. ¶11.

[6] In 2015, over 25% of Brazilian Representatives were below the poverty line. ¶41.

marks on their credit history or owe more than R$250 (approximately $70 USD) in debt.  ¶68.  Avon, however, modified its credit standards for Brazil recruitment in mid-2015.  *See* ¶¶116-18.  CW-4 confirmed that as long as a Representative did not have more than two "negative marks" on her credit history from a credit agency, she could be hired.  ¶68.  CW-4 recalled the hiring of a Representative who owed more than R$100,000 (the equivalent of more than $28,000 USD) because this sizeable debt counted as only one negative mark on her credit history.  *Id.*

CW-4 observed the relaxing of credit standards caused an explosion in delinquencies in 2016, continuing into 2017.  *Id*.  CW-3 similarly reported that in 2016, Avon was onboarding new Representatives with negative credit and recalled that in mid-2016 a candidate was R$20,000 (approximately $5,640 USD) in debt and was still approved.  ¶66.  The policy continued throughout 2016 and the result was predictable though hidden from the market.  The massive onboarding of uncreditworthy Representatives nominally increased the amount of product purchased (Avon's "sales"), but was accompanied by inevitable delinquencies and, ultimately, the need for bad debt write-offs.  According to CW-3, before Avon changed its credit standards, approximately 2 out of 10 people would be approved to be Representatives.  By July 2016, however, the rate of approval climbed to 80-100%.  *Id*.  Similarly, according to CW-4, a single manager in São Paulo hired 900 Representatives in a single Campaign in 2015.  ¶71.  That manager's sector was eventually "shut down" in 2016 because her delinquency rate reached "45%."  *Id*.

**B.      Representatives Could Not Pay for Products Purchased on Credit**

Numerous confidential witnesses confirmed that Avon's pivot to more lax credit standards caused an increase in delinquencies among newly recruited Brazilian Representatives.  ¶¶82-92.  CW-6 explained that between 2016 and 2017 the number of delinquencies increased by 50% in his region.  ¶85.  Similarly, according to CW-4, the delinquency rate among Brazilian

Representatives doubled from 2016 to 2017.  ¶86.

The enormity of the situation led Avon to give its sales managers credit card machines so they could personally collect unpaid debt from delinquent Representatives on the spot.  ¶89. Avon went so far as to use collection agencies to collect from its own Representatives, though this proved ineffective.  According to CW-4, for example, credit agencies collected a mere 5% of the amount owed in his region.  ¶90.  Despite efforts to collect from indebted Representatives, CW-3 estimated that out of 600-700 new Representatives, one quarter (*i.e.*, 180) never repaid Avon for their *first* box order.  ¶91.  Avon's drastic effort to recover money caused sales managers to commence several labor lawsuits.  ¶90.

### C.    Defendants Encouraged Delinquent Representatives to Order Additional Product with Promises of Discounts and Reactivation

Avon encouraged managers to offer delinquent Representatives the opportunity to pay their debt in installments in exchange for a discount in upcoming sales campaigns.  ¶94.  These enticements, however, caused about half of delinquent Representatives to fall further into debt. ¶¶93-98.  CW-5 estimated that 50% of Representatives managed to pay off their debt through this process while 50% only added to their outstanding debt to Avon.  ¶94.  In one case, the Company offered 5% off payment of "new debts that were up to 69 days late" and 20% off on payment of old debts that were "over 70 days late."  *Id*.  The Company also offered to waive fees and penalties associated with delinquent balances.  *Id*. Internal Avon documents have confirmed that the Company offered installment payments and other incentives to collect delinquent amounts.  ¶98.

### D.    Defendants Sent Representatives Product They Never Ordered

Witnesses confirmed that Avon artificially inflated sales by shipping unordered product to Representatives.  Representatives told CW-4 that the Company frequently sent them boxes of

6

product without authorization.  ¶99.  Approximately 50 boxes were sent without authorization per sales campaign in each of the 857 sectors in Brazil.  *Id*.  CW-4 related that returns of unauthorized boxes to the Company were internally designated as "Reason 8" ("Motivo 8").  *Id*. Multiple witnesses corroborated that this occurred in their regions.  ¶¶100-05.  CW-4 further confirmed the existence of internal reports measuring the number of returns reported under Reason 8.  ¶100.

> ### E.      The Individual Defendants Made the Decision to Lower Credit Standards

Multiple witnesses confirmed that the decision to lower credit standards was made at the highest levels.  Defendants Legher, CEO McCoy, and CFO Scully were "in charge" of decisions regarding Avon's Brazilian business, including the decision to lower the credit standards in Brazil, according to CW-1.  ¶60.  Eduardo Ribeiro (Vice President of Sales of Avon Brazil) and Emerson Teixeira (Avon's Executive Director of Sales Development) were responsible for launching the internal policy change to allow the approval of Representatives with negative credit (up to two negative marks, and the amount of debt did not matter).  CW-4 also confirmed that Teixeira reported to Ribeiro, who reported directly to Defendant Legher.  ¶69.

The credit policy change was communicated via video conferences and e-mails and applied uniformly throughout Brazil.  ¶70.  CW-4 confirmed that his manager, Ribeiro, communicated the credit onboarding changes to all managers in Brazil. Defendant Legher was present for some of these video conferences.  *Id*.  CW-5 similarly confirmed that Avon's decision to lower credit standards for Representatives in Brazil was a Company-wide change communicated by Ribeiro in a quarterly video conference.  ¶76.  In addition, Ribeiro's assistant sent emails to all sales managers throughout Brazil addressing this policy change.  ¶70.

> ### F.      Defendants Received Reports and Participated in Meetings Discussing Both

7

**Increased Delinquencies and Bad Debt**

Defendant Legher and other top executives in Brazil received reports detailing delinquency rates for new Representatives and discussed the issue in video conference meetings. ¶106.  Multiple confidential witnesses confirmed that Defendants discussed the decision to lower credit standards during video conference meetings:

- CW-4 confirmed that Eduardo Ribeiro took part in the video conference meetings for sales managers and regional sales managers.  CW-4 specifically recalled that in one meeting in 2016, in the aftermath of the mess created by relaxing credit standards, Defendant Legher was present to try to increase morale within the team.  ¶108.

- CW-6 participated in the quarterly video conference meetings where Ribeiro would discuss matters such as Representative delinquencies and incentives.  Ribeiro would encourage collection methods such as the use of credit card machines.  CW-6 confirmed that Defendant Legher participated in some of the video conferences and specifically recalled a convention at the end of 2016 in São Paulo, Brazil, to celebrate the Company's sales, where Defendant Legher was present.  ¶109.

Another witness confirmed that Avon's executive management convened monthly performance meetings to review each market.  ¶107.  CW-1 confirmed that while he was Executive Director, Global FP&A, the following senior executives attended these regional monthly performance meetings: (i) former CEO Sherilyn McCoy; (ii) former CFO James Scully; (iii) Head of Latin America David Legher; (iv) CFO of Latin America; (v) Heads of Sales; and (vi) Vice President of Global FP&A.  *Id*.

During the Class Period, the Individual Defendants also received internal documents detailing bad debt numbers.  According to CW-4, reports were e-mailed to managers daily (called the "Daily") summarizing internal numbers, including delinquency rates in each region, and that Ribeiro and Legher received the "Daily" every day.  ¶111. CW-4 also confirmed that that Ribeiro and Legher received internal reports at the end of each sales campaign (approximately every 15 days).  *Id*.  CW-7 similarly explained that David Legher "definitely" received internal reports detailing the bad debt, as did the financial team in Brazil, the sales

teams, and possibly the Executive Committee. CW-7 confirmed that David Legher saw reports on bad debt "at least" once a month. ¶112. CW-7 also recalled that Avon's headquarters received monthly forecasts of current and projected bad debt, sales, and inventory which were posted on Avon's system, Hyperion, around the 15th or the 20th of each month. *Id.*

Other witnesses confirmed that internal reports were generated during the Class Period documenting the mounting bad debt. According to CW-3, Avon used an internal system to track employee sales and generate reports detailing who owed money to the Company. CW-3 confirmed that Ribeiro knew about the problems with delinquent accounts. CW-3 recalled his supervisor commenting: "oh, Eduardo [Ribeiro] knows." ¶113. Finally, CW-4 reported that all managers in each region emailed spreadsheets daily with that region's delinquency rates. ¶87.

### G.    Avon Failed to Train Its Representatives

Four confidential witnesses reported that Avon did not formally train its Brazilian Representatives throughout the Class Period and that a formal training program was not implemented until 2018. ¶¶123-26. Avon's new CEO admitted as much, stating on August 2, 2018, that "[i]t is amazing that in Brazil, we basically stopped all training." ¶127.

### H.    Defendants' Accounting Violations During the Class Period

A forensic accounting analysis reveals that Defendants hid their decision to lower Representatives' credit standards from Avon's balance sheet. This conduct increased the Company's risk of uncollectible receivables, for which it failed to account. ¶246.

Under GAAP, Avon was required to establish adequate reserves for potential bad debts related to these credit-based sales and consider whether such receivables were uncollectible. ¶47, 259. Avon failed to meet either requirement. When Avon significantly lowered its credit criteria in 2015, Defendants knew there would be an increase in uncollectible receivables. ¶251. Numerous facts thus put Defendants on notice that Avon's bad debt rate should have been

9

increased at that time. ¶261 (listing facts known to Defendants). A forensic accounting analysis shows that, had Avon increased its allowance for bad debt commensurate with the increased credit risk, profitability would have decreased substantially during these periods. ¶256.[7]

Avon recognized revenue when goods were provided to Representatives, not when they were sold to consumers. Under GAAP, however, revenue may only be recognized when it is earned and realizable. ¶264. Given that Avon had relaxed credit standards in Brazil, and that much of the merchandise provided to Representatives would almost certainly have to be written off, Avon's revenue recognition practices violated GAAP.

## I.     The Truth Is Revealed

The truth was revealed to the market through a series of partial corrective disclosures on February 16, 2017, May 4, 2017 and August 3, 2017. On each of these dates, the market learned progressively more about how: Avon's Brazilian business was struggling; Defendants had loosened credit terms in their most important market to hide these struggles; and the Company was dealing with uncollectable debt as a result. ¶¶182-205, 213-14.

## J.     Admissions After the Class Period

Lingering issues from Defendants' scheme to inflate sales and Representative count continued to plague Avon after the Class Period. On February 15, 2018, Avon's new CEO Jan Zijderveld announced another quarter of disappointing results driven by bad debt issues in Brazil. As Zijderveld explained, "Brazil's decrease in revenue was driven by declines in Active Representatives [and c]ontinued application of tighter credit policies impacted recruiting efforts as well as representative activity." ¶230. Zijderveld also admitted that Avon was not training

---

[7] Specifically, Avon's adjusted operating profit would have decreased by more than 5%. ¶258. Critically, these adjustments related to one of Avon's most important operating segments. *Id.*

10

Representatives: "[i]t is amazing that in Brazil, we basically stopped all training."  ¶232.[8]

### III.    PLAINTIFFS HAVE ADEQUATELY STATED A § 10(b) CLAIM

Plaintiffs' § 10(b) claim requires a material misrepresentation or omission ("falsity"), scienter, a connection between the falsity and sale of Avon securities, reliance, economic loss, and loss causation.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants only challenge Plaintiffs' § 10(b) claim on the basis of scienter and falsity. Moreover, Defendants nowhere address Count II of the Complaint in which Plaintiffs allege that Defendants perpetrated a scheme to defraud investors under Rule 10b-5(a) and (c) by drastically lowering Avon's credit standards and ceasing all training for new Representatives in Brazil while disseminating false information to the market about these issues.  Because Count II is uncontested, it must proceed to discovery.  *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1104 (2019) ("Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b–5(a) and (c)"); *SEC v. SeeThruEquity, LLC*, No. 18-cv-10374, 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019).

### A.    Plaintiffs Plead Facts Giving Rise to a Strong Inference of Scienter

In assessing scienter, the courts must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).  The inference of scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged" but "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences."  *Id.* at 323-24

---

[8] *See* ¶234 ("over the years cut and maybe in some places even went to zero in terms of training and tools").  An analyst at Barclays expressed surprise at these admissions, stating "the Company will resume training programs, which have largely (and shockingly) ground to a halt . . ." ¶128.

(quotations and citations omitted).  If the inference is at least as compelling as any nonculpable explanation, "the tie . . . goes to the plaintiff."  *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 39 (S.D.N.Y. 2019) (omission in original).

Here, Plaintiffs plead scienter through evidence of conscious misbehavior or recklessness.  *Emples.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (finding scienter may be pleaded through "strong circumstantial evidence of conscious misbehavior or recklessness").  Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants "knew facts or had access to information suggesting that their public statements were not accurate."  *Blanford*, 794 F.3d at 306.  Here, Plaintiffs' allegations support a strong inference that the Individual Defendants either knew about the decision to lower credit standards and its damaging consequences or recklessly hid their heads in the sand while it took place.

### (a)    Meetings and Internal Reports

Allegations showing that defendants "knew facts or had access to information suggesting that their public statements were not accurate" give rise to a strong inference of scienter.  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).  Plaintiffs plead with particularity that senior executives, including Defendant Legher, participated in video conferences broadcast to managers in Brazil during which the decision to lower Avon's credit standards was communicated and bad debt issues were reviewed.  Moreover, CW-1 confirmed that Defendants McCoy, Scully, and Legher (i) convened monthly performance meetings during which they reviewed each regional market and (ii) were the decision-makers "in charge" of charting the direction of Avon's Brazilian business, including the decision to lower credit standards.  ¶¶60, 107.  These allegations collectively support a strong inference of scienter.  *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 221-22 (S.D.N.Y. 2004) (scienter pleaded through

12

defendant's attendance at meetings where issues were discussed); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 610-11 (S.D.N.Y. 2015) (scienter shown through defendants' attendance at a meeting and access to reports).  Further, witnesses confirmed that the decision to lower credit standards was uniformly communicated to employees throughout Brazil, showing that the decision was made at the top of the organization.  *Cf. Vining v. Oppenheimer Holdings Inc.*, No. 08-cv-4435, 2010 WL 3825722, at *13 (S.D.N.Y. Sept. 29, 2010) (explaining that "specific facts detailing the alleged uniform management directives" can "impute scienter to the corporate entity.").

CW-4 confirmed that his manager Eduardo Ribeiro (who reported to Legher) communicated credit policy change to all sales managers of Avon Brazil during video conferences, some of which were attended by Defendant Legher.  ¶70.  CW-4 recalled that in one such conference in 2016, in the aftermath of the relaxing of credit standards, Defendant Legher was present to try to increase team morale. ¶108.  CW-6 similarly participated in quarterly video conference meetings where Ribeiro discussed Representative delinquencies and incentives and encouraged collections methods, including the use of credit card machines.  CW-6 confirmed that Defendant Legher participated in these video conferences.  ¶109.

Plaintiffs have pleaded that Defendants had access to numerous reports circulated to senior executives detailing the rise in bad debt and delinquencies in Brazil, the Company's largest market.  *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018) (scienter sufficiently alleged where witnesses identified reports accessible to defendants and described defendants' attendance at meetings and on calls in which they were provided with information which contradicted their public statements).  CW-7 advised that monthly forecasts of current and projected bad debt, sales and inventory were sent to Avon's headquarters and posted

13

on Avon's system, Hyperion, in the middle of each month.  ¶114.

CW-3 explained that reports documenting delinquency problems were available through an internal system that tracked employee sales and generated reports detailing who owed money to Avon.  ¶113.  Witnesses also explained how Legher and Ribeiro were emailed the "Daily" report, summarizing internal numbers, including delinquency rates in each region.  ¶111.  And internal reports were circulated at the end of each sales campaign (every 15 or so days) received by Ribeiro and Legher.  ¶¶111-12 (confirming Legher saw reports on bad debt "at least" once a month); *see City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132 (McMahon, J.), 2013 WL 1197755, at *3 (S.D.N.Y. Mar. 25, 2013) ("Defendants also had access to daily 'flash' reports").

Defendants do not contest that these witnesses were in a position to know this information.  *See Novak*, 216 F.3d at 314.  The fact that the Individual Defendants had access to these reports shows that they were reckless, at a minimum, when speaking about rising Representative headcount, rising sales, and Representative training without disclosing that the increases were fueled by materially lowered credit standards and the elimination of any meaningful training in Brazil.

### (b)    Defendants' Attack on the CWs Is Wrong on the Law

Knowing the confidential witnesses' averments are fatal to their motion, Defendants effectively seek to strike these inconvenient facts, claiming that such statements support a finding of scienter "*only if* the CW alleges he/she had direct contact with the individual defendants to support the complaint's scienter allegations."  MTD at 13.  This is not the law.

In the Second Circuit, information attributed to confidential witnesses must be accepted as true when the sources "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314; *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469

14

F. Supp. 2d 88, 97 (S.D.N.Y. 2006) (holding that plaintiffs need only plead the "probability that [the confidential witnesses] know what they are talking about"). Contrary to Defendants' claim, "there is no baseline requirement of [direct] contact in order to allege 'sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Orthofix Int'l*, 89 F. Supp. 3d at 615-16; *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018) ("[A] plaintiff is not required to allege specific contact.").

Defendants' authority does not support their argument. *Wilbush v. Ambac Financial Group, Inc.*, 271 F. Supp. 3d 473 (S.D.N.Y. 2017) is distinguishable because the court found that nothing defendants said was actually false. There, plaintiffs claimed defendants concealed credit risk associated with Puerto Rican bonds, which the company was insuring, before Puerto Rico defaulted on the bonds. The court found that the allegations did not support a finding of scienter because, although there were meetings in which defendants discussed the viability of the bonds, there was no evidence defendants were really undervaluing the bonds. Conversely here, falsity and scienter are both adequately pleaded. Numerous confidential witnesses discussed the nationwide decision to lower credit standards and the resulting fallout, including Avon's unsuccessful efforts to collect from its heavily indebted Representatives through installments payments and the use of handheld credit card machines.[9]

### (c)    The Core Operations Doctrine Supports Scienter

"To fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge

---

[9] Defendants' reliance on the *Glaser* decision is also misplaced. There, the court determined that allegations from three confidential witnesses were not reliable because the witnesses did not work at the defendant company, but rather worked at a different company. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011). That is not the case here.

of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-cv-08557 (McMahon, J.), 2013 WL 6233561, at \*26 (S.D.N.Y. Dec. 2, 2013). The doctrine applies here because Brazil was Avon's largest market, measured by both revenue and number of Representatives.  When Defendants spoke about the market and referenced their travels to Brazil, the doctrine buttresses the inference that they either knew that credit standards were reduced or acted recklessly when speaking about Representative growth.

This Court's decision in *Hi-Crush Partners* is highly analogous.  There, the plaintiffs alleged defendants fraudulently concealed that Baker Hughes, one of the defendant company's four largest customers (representing 18% of revenue for the year), had repudiated its contract with the company.  *See id*. at \*2-3.  This Court found plaintiffs alleged scienter because (1) the individual defendants "were intimately involved in the day-to-day operations of [the company] and [were] presumed to have knowledge of the company's core operations," and (2) the Baker Hughes contract was within the core operations of the company because it represented 18% of projected revenue for the year and thus "[s]enior managers of High-Crush would naturally be apprised of important developments" regarding the contract.  *Id*. at \*23.  The Court considered statements specifically referencing the Baker Hughes contract in the company's Registration Statement which were attributable to the individual defendants.  *Id.*

Similarly, Brazil was Avon's largest market, representing approximately 21% of Avon's 2016 consolidated revenue, and no other country accounted for more than 10% of Avon's total revenues.  Avon had 1.5 million Representatives in Brazil, equal to 25% of Avon's total Representative base.  The significant lowering of credit standards for Representatives in Brazil, which allowed the onboarding of women with large debt loads and no training, is exactly the kind of decision that officers of the Company would have known about and approved.

16

Defendants acknowledged the centrality of the Brazilian market, ¶275, and Defendant McCoy represented to investors at least twice during the Class Period that she traveled to Brazil to check on operations. ¶276. It is thus reasonable to conclude that the Individual Defendants knew about Avon's loosened credit standards and the lack of training in Brazil during the Class Period. *See also Lexmark,* 367 F. Supp. 3d at 38 ("the importance of EMEA channel inventory to Lexmark's business moves the needle in Plaintiffs' favor."); *City of Pontiac Gen. Emples.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368-69 (S.D.N.Y. 2012) (one of several business units was a core operation of large contracting company). Defendants do not seriously contest that the core operations doctrine supports a finding of scienter. *See* MTD at 16 (not addressing Plaintiffs' allegations collectively but instead focusing only on the importance of Brazil).

### (d)    McCoy's Ouster as CEO Supports Scienter

Defendant McCoy's termination as Avon's CEO on August 2, 2017, three months *before* the final corrective disclosure, strongly supports an inference of scienter. It is well settled that "[t]he timing and circumstances surrounding [executive] resignations . . . contribute to the inference of scienter with respect to those defendants." *Fresno Cnty. Emples.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) (collecting cases) ("it [can] suggest[] a higher level of wrongdoing approaching recklessness or even conscious malfeasance."). Defendants' claim that McCoy's termination was not linked to the fraud is wrong. *The Wall Street Journal* article cited in the Complaint in connection with McCoy's ouster states that "Avon Products pushed out Chief Executive Sheri McCoy"; that "she will technically be terminated without cause"; and "a 3% drop in revenue amid continued attrition in sales representatives . . . led the board to demand an immediate exit plan." ¶293. Moreover, the termination occurred three months after it was revealed on May 4, 2017 that the Company was taking a significant charge in connection with

17

bad debt on the books, and three months before the full extent of Avon's "self-inflicted" bad debt crisis was revealed to the investing public.  Further, McCoy was fired without a new CEO in place, suggesting her ouster was in quick reaction to the news about Brazil.  Thus, the timing and circumstances surrounding McCoy's termination support scienter.

### (e)    Admissions Regarding the Lack of Training Support Scienter

Avon's new CEO admitted repeatedly that all training initiatives were abandoned in Brazil throughout the Class Period.  *See* ¶¶287-91.  On February 15, 2018, Zijderveld stated, for example, "[i]t's amazing that in Brazil, we basically stopped all training."  ¶232.  Given that the Individual Defendants made numerous claims throughout the Class Period stressing the importance of training in Brazil, there can be no dispute that Defendants were reckless, at a minimum with respect to these statements. [10]  *See  In re OSG*, 12 F. Supp. 3d at 633 (considering admissions in the scienter analysis).

### (f)    Defendants' February 16, 2017 Admissions Establish Scienter for the Remainder of the Class Period

Defendants McCoy and Wilson admitted on February 16, 2017—almost 8 months before the end of the Class Period—that a previously undisclosed loosening of credit standards had led to a spike in bad debt.  *See* ¶¶282 ("To assist with new Representative recruiting, the team adjusted credit terms.").  Yet Defendants did not fully disclose in February 2017 the extent to which Avon had relied on loosened credit standards to recruit new Representatives.  Thus, these admissions provide strong evidence of scienter with respect to all of Defendants' false and misleading statements between February 16, 2017 and the end of the Class Period, a point

---

[10] Defendants argue that "later statements that reflect on earlier events" are not relevant to the scienter analysis.  But that is not the law.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) ("post-class period data may be relevant to determining what a defendant knew or should have known during the class period").

Defendants do not meaningfully dispute.  *See* MTD at 13-17.

        **(g)**      **Intent Is at Least as Compelling as Any Opposing Inference**

Defendants argue that the most plausible inference is that "Avon's management did not anticipate how recruitment efforts in Brazil in the midst of powerful macroeconomic forces would affect Avon's Representatives or Avon's bottom line." MTD at 18.  This claim finds no support in the Complaint.  Plaintiffs pleaded that analysts considered Avon's Representative growth a critical metric, and that Brazil was Avon's most important market.  ¶43.  Faced with declining Representative growth and poor performance, Avon decided to lower credit standards in Brazil in the middle of 2015.  Moreover, it is clear from the evidence provided by confidential witnesses that delinquencies skyrocketed in Brazil in 2016 and 2017.  *See*, *e.g.*, ¶85 (CW6 explained that the number of delinquencies increased by 50% in his region.)  And it was no secret within the Company that Legher and Eduardo Ribeiro were aware of collection problems during this time frame.  ¶¶99-115.  All the while, the Individual Defendants made misleadingly positive statements to investors about Representative growth and the financial outlook in Brazil.  Defendant McCoy, *Avon's then-CEO*, was *ousted* during the fallout from Defendants' decision to lower credit standards.  Moreover, a forensic accounting analysis shows that the Company would have been significantly less profitable during the Class Period had Defendants increased Avon's allowance for bad debt commensurate with the decision to loosen credit standards, which they failed to do.  ¶¶12-13.  The far more compelling inference to be drawn from Plaintiffs' factual allegations is that Defendants directed the scheme to lower credit standards in Brazil to mask poor performance.  *A fortiori*, that inference is "at least as compelling as any opposing inference" one could draw from the facts alleged. *Tellabs*, 551 U.S. at 324.[11]

---

[11] Defendants wrongfully claim that the absence of motive and opportunity allegations makes the Complaint deficient.  MTD at 18. The law is clear: Scienter can be pleaded through *either* "(a)

19

### B.      Plaintiffs Plead Material Falsity

The PSLRA requires that plaintiff "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1)(B).  "The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, taken together and in context, would have misled a reasonable investor."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (internal quotations omitted).  Misleading statements are actionable, even though "literally true," if they omit information which would be important to a reasonable investor making an investment decision.  *Lexmark*, 367 F. Supp. 3d at 30.

### 1.      Defendants' Statements about Avon's Representatives Were False

Defendants made numerous statements lauding the growth, retention, and training of Representatives in Brazil.  For example, Defendants claimed that *"[o]ur representative trend is growing,"* (McCoy, Jan. 21, 2016, ¶ 132) and *"[w]e are pleased that Brazil grew both active representatives and ending representatives through a combination of very successful recruiting program[s] and initiatives to build activity."* (McCoy, Nov. 3, 2016, ¶166).  *See also* ¶¶132, 135, 137, 139-43, 150, 153-57, 163, 165-69, 177, 180, 182, 189, 190, 204-05.  These and like statements were misleading because Defendants failed to disclose that they significantly reduced credit terms to achieve growth.  An omission is actionable when the defendant is subject to a duty to disclose the omitted facts, *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988), and

---

by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of . . . recklessness." *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 (S.D.N.Y. 2015).  Moreover, "[i]t is far from implausible that a corporate executive who had spent months building excitement and momentum . . . might recklessly misrepresent the inability to deliver on those promises. *Gammel v. Hewlett-Packard Co.*, No. 11-cv-1404, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013).

"once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).  When touting Avon's growth and retention, Defendants incurred a duty to disclose the whole truth.

Defendants' statements about Representative training were also false for the same reason – Defendants failed to disclose that, far from offering "*a comprehensive 360 program of onboarding*" (¶134) and *"the training to be successful"* (¶163), Avon offered no formal training whatsoever.  *See also* ¶¶133, 179, 211.

Unable to counter this outright falsity, Defendants bizarrely argue that the CWs were the ones responsible for training, and that there is no allegation that they notified Defendants of perceived training failures. This argument cuts against the Defendants' position in numerous ways.  First, Defendants' argument concedes the CWs were in a position to know what they assert.  Second, Defendants ignore other allegations that show Defendants were aware of the lack of training in Brazil.  ¶¶123-24.  Further, current-CEO Zijderveld admitted after the Class Period that "in Brazil, we basically stopped all training."  ¶127.  Defendants have, at most raised a factual question.  *See In re QLT Inc. Sec. Litig.,* 312 F. Supp. 2d 526, 535 (S.D.N.Y. 2004).

Moreover, Defendants' assertion that investors *knew* that Avon offered little to no training based upon one line uttered on a conference call (MTD at 16) is a truth on the market defense, inappropriate at this stage.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific.").  This argument is nevertheless weak.[12]

Though Plaintiffs allege false statements with specificity, Defendants attempt to recast

---

[12] The call transcript shows the statements were misleading at best and did not inform the market that the Company had abandoned training efforts in Brazil.  *See* Def. Ex. 4 at 26 (*"what she needs … is the right coaching and mentoring . . . . Technology today allows us to put an expert device in her hands and that allows her to be an expert on anything."*).

the pleading as mere quibbling over what else should have been said "about omitted details." *See* MTD at 23. They are wrong, especially in light of Court's holding in *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728 (McMahon, J.), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018). In *Signet,* qualitative statements touting the company's credit portfolio as "strong," "robust", and "very healthy" were held to be false and/or misleading because plaintiffs "alleged particularized and material[] facts giving rise to an inference that Defendants misrepresented their beliefs in the things they professed and . . . omitted supporting facts to support those beliefs." *Id*. Here, Representative growth and retention resulted directly from Defendants' decision to lower credit standards, and analysts were focused on Representative growth as a measure of the Company's financial health, *i.e.*, the very facts Defendants misrepresented. *See* ¶5, 43.[13] Plaintiffs do not quarrel over what might have been said, though much was omitted. Through witnesses, documents, admissions and forensic investigation, they plead that Defendants made false statements about the heart of their business in Brazil.

### 2. False Statements Regarding the Increase in Bad Debt

Defendants made false statements claiming that: (i) their bad debt was under control; (ii) their accounting policies were being followed; and (iii) any increase in bad debt or decline in Active Representatives could be attributed to the "macroeconomic environment." *See* ¶¶136, 144, 148-49, 171, 184. Defendants, however, claim that several of their statements attributing the rise in bad debt to the *"macroeconomic environment"* in Brazil and downplaying the credit policy changes were not false because confidential witnesses did not give Defendants contemporaneous notice that the statements were false. *See* Br. at 22; ¶¶149, 171, 187. This

---

[13] To the extent Defendants are arguing materiality, it is a mixed question of law and fact, inappropriate for resolution at the motion to dismiss phase. *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

argument misrepresents both the law and the facts. "[N]either FRCP 9(b) nor the PSLRA require allegations that the defendants in fact knew the alleged statements were false when made in order to establish *falsity,* but, rather, require allegations as to the circumstances or reasons why the statements were fraudulent or misleading, and separate allegations as to the speaker's state of mind." *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-cv-3923, 2013 WL 6330665, at *7 (E.D.N.Y. Dec. 5, 2013) (emphasis in original). Here, for example, Defendants' statements blaming Avon's bad debt problems on the "macroeconomic environment" were materially misleading because Defendants failed to disclose that Avon's bad debt problems directly resulted from the decision to lower credit standards, Defendants were using aggressive debt collection practices to collect from their own representatives in 2016 and 2017, and Defendants actively encouraged indebted women to buy more products with discounts. That is enough to allege falsity. *Lexmark*, 367 F. Supp. 3d at 30-31 (to allege a material misrepresentation at the pleading stage, the plaintiff need only offer sufficient evidence of "a statement or omission that a reasonable investor would have considered significant in making investment decisions."). Defendants' reliance on *In re Lululemon Securities Litigation*, 14 F. Supp. 3d 553 (S.D.N.Y 2014) is misplaced because no witnesses in that case provided meaningful evidence of knowledge or recklessness. In *Lululemon*, plaintiffs alleged defendants made false statements touting the high quality of their yoga pants without disclosing that the pants would become see-through when worn. *Id.* at 563-64. However, no CW attested that the defendants knew about this issue before it was disclosed. For example, one witness merely said the issue had been "acknowledged internally" while another said the "sheerness issue had definitely been percolating for a while." *Id*. at 566. Conversely, there are many facts here showing knowledge or recklessness confirmed with specificity by numerous CWs. *See supra* p.11-17.

23

### 3.    Statements Claiming Bad Debt Was "Cleared Up" Were False

Defendants argue that several of their statements concerning Avon's bad debt problems are not actionable because they were statements of opinion, or else forward-looking. *See* MTD at 24; ¶¶ 186-88, 192, 200-02, 214. Defendants are wrong. *First,* none of the statements that Defendants point to were in fact statements of opinion because they were capable of objective verification at the time they were made. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 565 (S.D.N.Y. 2015) ("[T]he use of the word 'believed' does not transform defendants' representation . . . into a statement of opinion"). *Second*, it is well settled that opinion statements starting with phrases such as "we believe" or "we think" are "perfectly capable of misleading investors" when they either: (i) contain embedded statements of fact that are untrue; or (ii) omit material facts about the basis for the opinion which render the statement misleading in context. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327-32 (2015). Here, the statements Defendants point to were materially misleading under Omnicare's second prong. For example, Defendants' statement in February 2017 that "*we believe, [Avon's bad debt] is fully cleared up and booked in the 2016 result*" was materially misleading because Defendants failed to disclose that loose credit terms had been in effect since the middle of 2015; delinquencies were on the rise throughout 2016; and Defendants were using installment plans and other aggressive debt collection practices to collect from Avon's Representatives, which were also proving ineffective. ¶¶93-98. Omission of this material information rendered Defendants' purported "opinion" statements false or misleading and actionable. *See Galestan*, 348 F. Supp. 3d at 303 (finding opinion statements actionable where defendants omitted information making statement misleading). Nor should these statements be case aside as forward-looking. *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.

Supp. 2d 158, 183 (S.D.N.Y. 2003) (holding that the safe harbor provision does not apply to statement that link "future success to present and past performance").

### 4.    The Actionable Statements Were Not Mere Puffery

Statements rightly denoted as "puffery" are those that are so vague or "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389-90 (2d Cir. 2015).  None of the statements identified by Defendants fit the bill.  Defendants told investors, for example, that *"[i]n light of the economic environment we [are] also taking a more balanced risk-based approach to bringing in and onboarding new representatives"* (¶148) and "we have to make sure that we are actually investing in her, that we are giving her the skills to help her grow her business" (¶211).  These were factual representations about Defendants' business, not puffing.  Indeed, they were false because Avon did not nothing to "invest in her" and nothing was balanced when it came to "onboarding new representatives."  *See Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 268 (S.D.N.Y. 2016) ("Statements are not puffery if shareholders could reasonably interpret them as material misstatements."); *Novak*, 216 F.3d at 315 (statements that inventory situation was "in good shape" or "under control" held not puffery).

### C.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety.[14]

---

[14] Because Plaintiffs state a § 10(b) claim, the Court should also sustain the § 20(a) claim.  In addition, if the Court finds Plaintiffs' scienter or falsity allegations wanting in any way, Plaintiffs respectfully request the opportunity to amend the Complaint to cure any deficiency.

Dated:  August 30, 2019

**LEVI & KORSINSKY, LLP**

 /s/ *Gregory Mark Nespole*
Eduard Korsinsky (EK-8989)
Gregory Mark Nespole (GN-6820)
Christopher J. Kupka (CK-9010)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: 212-363-7500
Facsimile: 212-363-7171
Email: ek@zlk.com
        gnespole@zlk.com
        ckupka@zlk.com

***Counsel for Lead Plaintiff, Additionally Named Plaintiff, and the Proposed Class***

**LABATON SUCHAROW LLP**
Carol C. Villegas
Christine M. Fox
Theodore J. Hawkins
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
Email:  cvillegas@labaton.com
        cfox@labaton.com
        thawkins@labaton.com

***Additional Counsel for Lead Plaintiff, Additionally Named Plaintiff, and the Proposed Class***

26

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2019, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties whose attorneys have appeared in this action, by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

By:     /s/ *Gregory Mark Nespole*
**Gregory Mark Nespole**