**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE AVON SECURITIES LITIGATION

No. 19 Civ. 01420 (CM)

**DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

McMahon, C.J.:

Lead Plaintiff Holly Ngo and additionally named plaintiff David Klungle (together, "Plaintiffs") brings this action on behalf of people who bought shares of Defendant Avon Products, Inc. ("Avon" or the "Company") between January 21, 2016 and November 1, 2017 (the "Class Period"). Plaintiffs allege that Avon, along with Avon's former Chairman and CEO Sherilyn S. McCoy, Avon's former Executive Vice President and COO James S. Scully, Avon's former Executive Vice President and CFO James S. Wilson, and the Executive Vice President and President of Avon South Latin America, David Legher (collectively, "Defendants") made materially false and misleading statements and omissions regarding Avon's operations in Brazil that concealed the Company's risk of bad debt, which induced Plaintiffs and others similarly situated to purchase Avon's shares. (*See generally* Amended Consolidated Class Action Complaint ("CAC" or "Complaint"), dated July 8, 2019, Dkt. No. 29.) Plaintiffs seek to recover losses from Defendants' purported violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the corresponding rule of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 ("Rule 10b–5").

1

According to the Complaint, Avon conducted a fraudulent scheme by Defendants to conceal the facts that Avon had loosened its credit criteria for hiring new Avon sales representatives ("Representatives") in Brazil, and had failed to train its new Representatives, "which led to increased delinquencies and high churn among Representatives in Brazil and materially increased bad debt for the Company." (CAC ¶ 57.) Relaxing the credit standards "expanded Avon's Representative ranks to include women who were already heavily in debt," thereby increasing the risk to the Company. (*Id.* ¶ 7.) Although hiring high risk Representatives boosted Avon's Brazilian revenue stream, the Company failed to disclose its increased potential for bad debt, which would result in a diminution of revenue, in its quarterly and annual financial statements. (*Id.* ¶ 12.) Finally, to make up for its uptick in Representative delinquencies, Avon advanced hundreds, and sometime thousands, of dollars-worth of product on credit to these debt-burdened Representatives "without giving them the necessary training to succeed." (*Id.* ¶ 7.)

All Defendants now move to dismiss the Complaint for failure to state a claim upon which relief can be granted. (Mot. to Dismiss, dated July 26, 2019, Dkt. No. 33.)[1] For the reasons discussed below, Defendants' motion is DENIED.

## BACKGROUND

### I.    Statement of Facts

The following facts are taken from the Complaint and certain Avon public filings, some of which are attached as exhibits to the Declaration of Karin A. DeMasi. (Dkt. No. 35,

---

[1] Plaintiffs did not seek a summons to serve Defendant Legher until August 19, 2019, one month after Defendants Avon, McCoy, Scully, and Wilson moved to dismiss the Complaint. (Dkt. No. 39.) On November 5, 2019, after waiving service, Legher joined the pending Motion. (Dkt. Nos. 44, 45.)

hereinafter "DeMasi Decl.")  As with all complaints, the well-pleaded facts are presumed true, and documents referenced in or relied on in drafting the complaint are considered alongside the allegations within the four corners of the Complaint.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  Nothing else is properly considered on a motion to dismiss.

Here, Plaintiffs derived the facts pleaded in the Complaint from the investigation conducted by their Lead Counsel; Avon's public filings, press releases and other public statements; reports and advice from securities analysts about the Company; media reports; and interviews with former employees, independent contractors, and Representatives of Avon with knowledge of the matters alleged therein.

Plaintiffs rely specifically on information provided by the following confidential witnesses ("CWs"), each of whom was alleged to be in a position to provide information on what was happening inside Avon and especially Avon Brazil, during the Class Period:

(1) CW-1 was Avon's former Executive Director of Global Financial Planning & Analysis ("FP&A") and Functional Business Support from 2015 through December 2017.  In that capacity he provided financial oversight for the Transformation Plan. Prior to 2015, CW-1 served as Executive Director of the FP&A department, overseeing the Company's profit and loss.  Throughout the Class Period, CW-1 reported directly to Avon's Vice President of Global Financial Planning.  (CAC ¶ 59.)

(2) CW-2 was a former Senior Sales Manager for Avon in Brazil, who oversaw thousands of sales executives and Representatives during the Class Period.  CW-2 reported to Vice President of Sales Eduardo Ribeiro, who in turn reported to Defendant Legher.  (*Id.* ¶ 61.)

(3) CW-3 was a former Avon Sales Manager who worked for Avon in Brazil from 2015 through 2017, "recruiting and managing approximately 1,500 sales Representatives and 15 sales executives." CW-3 reported directly to a Sector Manager in Sao Paolo, Brazil, who reported to Ribeiro. (*Id.* ¶ 63.)

(4) CW-4 was a former Avon Zone Sales Manager in Brazil, who was with the company until August 2018. CW-4 was responsible for hiring and managing a sales team of more than 2,000 Representatives and more than 20 sales executives in his sector of Brazil. (*Id.* ¶ 67.)

(5) CW-5 was a former Avon Sales Manager who worked for Avon in Rio Grande do Sul, Brazil, form October 2013 until February 2018, who was responsible for hiring and managing new Sales Representatives. CW-5 reported to a Divisional Sales Manager, who ultimately reported to Ribeiro. (*Id.* ¶ 74.)

(6) CW-6 was a former Avon Sales Manager who worked in Brazil throughout the Class period, who was responsible for hiring and managing new Sales Representatives in the Rio Grande do Sul area of Brazil. CW-6 reported to a Divisional Sales Manager, who ultimately reported to Ribeiro. (*Id.* ¶ 78.)

(7) CW-7 was a former Senior Manager in Operational Excellence and Supply Chain at Avon Brazil from March 2016 until May 2019. CW-7 reported to the Director of Supply Chain, who is not a Defendant to this action. (*Id.* ¶ 81.)

## A.       The History and Business Model of Avon

Avon, a New York corporation now headquartered in London, is a global manufacturer and marketer of cosmetics. (CAC ¶ 29.) Unlike most cosmetics companies, which rely upon traditional third-party retailers (such as drugstores and department stores) to distribute their

4

product, Avon uses the famous "Avon Ladies" ("ding-dong, Avon calling") – referred to internally and in the Complaint as Representatives – who visit potential customers in their homes or invite them to product parties, where they are exposed to Avon products.  As of December 31, 2016, Avon had more than 6 million Representatives in 57 countries. (*Id.* ¶ 37.)

Representatives have historically been recruited locally by district sales managers, zone managers, and individual Representatives.  (DeMasi Decl. Ex. 2, at 4.)  Some, but not all, of the recruiters are themselves independent contractors.  (*Id.*)  Representative recruiting cycles correspond with sales cycles, which occur every 3 weeks.  Although the amount of training prior to sending a Representative out into the market may seem negligible (as little as a week according to Avon's Chief Commercial Officer at the start of the Class Period (*see* DeMasi Decl. Ex. 4, at 26)), the Company recognizes a need to provide Representatives with "the support and training they need to navigate through their first few campaigns," (CAC ¶ 48 (quoting October 31, 2013 earnings call)).

There is, however, high turnover among representatives, which means that Avon must "continuously recruit and try to retain new Representatives . . . in order to maintain and grow [its] business."  (CAC ¶ 52.)  Nonetheless, there are minimum standards for representatives (which apparently vary from country to country).  And every country's standards include a credit check. (CAC ¶¶ 45-47.)

Representatives are not employees of the company. They are independent contractors.  Once approved, Representatives may purchase Avon products at a discount to sell at a markup to consumer, either with their own funds or "on credit extended by Avon" up to a pre-set credit limit. (CAC ¶¶ 4, 65; DeMasi Decl. Ex. 2, at 3.)  Generally, Representatives have "an unlimited right" to return unsold products to Avon for a refund.  (CAC ¶ 56.)  Recognizing that a 100%

sales rate is unlikely if not impossible, each of Avon's annual financial reports during the relevant time period disclosed an "Allowance for Doubtful Accounts," in order to account for returns, unsold products, and unpaid debt from credit extended to Representatives.

In its December 31, 2015 10-K, Avon disclosed it "Allowance for Doubtful Accounts" based on "an analysis of historical data and current circumstances, including seasonality and changing trends." (DeMasi Decl. Ex. 2, at 31.) At that time, Avon's management estimated that bad debt would be approximately 2% going forward, based on the fact that Avon had carried bad debt equivalent to 2% of the Company's total revenue in the three preceding years. (*Id.*)

If the Representative did not either sell or return all of the product sent to them on credit before a 20-day campaign period ended, she was not allowed to place another order for merchandise. (CAC ¶ 65.) That meant that Representatives indebted to the Company money at the end of a campaign could not participate in the next campaign. (*Id.* ¶ 6.)

Throughout the Class Period, Avon reported the total numbers of "Active Representatives" and "Ending Representatives" to investors as evidence of the strength of its Representative base. "Active Representatives" are those who have placed an order with Avon within the past 2 sales campaigns (3-6 weeks), while "Ending Representatives" are all those persons, excluding Active Representatives, who have an account with Avon and are eligible to place an order. (*Id.* ¶ 42.)

Because they are required to pay Avon for all the product they do not return, credit-worthiness has always been a critically important qualification for becoming an Avon Lady. (CAC ¶ 4.) The Company's growth depended upon enlarging Avon's Representative ranks through the hiring of credit-worthy individuals. (*Id.* ¶ 50.) Prior to the conduct described in the Complaint, Avon would only approve applicants with minimal or nonexistent debt loads; for

example, CW-6 recalls the maximum approvable debt load in 2015 and earlier was approximately $140 for Brazilian Representatives. (*Id.* ¶ 79.) Using those criteria, Avon would typically approve 2 in every 10 applicants (*id.* ¶ 66), and sales managers aimed to hire 30-40 Representatives during the Company's most active hiring campaigns (*id.* ¶ 77).

**B.    Recent Erosion of Avon's Business Model**

In recent years, Avon' direct-selling model has faltered in North America, due to increased competition, the rise of e-commerce, and an outdated sales model that relied upon finding cosmetics purchasers – mainly women – in their homes during working hours. As a result, in its 2015 annual report, Avon admitted that it had experienced a Company-wide, multi-year decline in revenue and margins, beginning as early as 2010. (*See* DeMasi Decl. Ex. 2, at 9; CAC ¶ 7.)

Hoping to refocus its efforts on its more profitable operations in foreign markets, Avon sold 80% of its North American business (a privately-held company now referred to as "Avon North America" or "Avon LLC") to private equity firm Cerberus Capital Management, L.P. ("Cerberus"). (CAC ¶ 36.)

The spinoff left Avon and its shareholders with the international business, which was the subject of the Company's "Transformation Plan," announced in January 2016. The Plan emphasized "investing in growth, reducing costs in an effort to continue to improve [Avon's] cost structure and improving [Avon's] financial resilience." (DeMasi Decl. Ex. 2, at 6.) The Transformation Plan was structured as a three-year initiative aimed at achieving "our long-term goals of double-digit operating margin and mid-single-digit constant-dollar revenue growth." (*Id.* at 7.) The plan called for, *inter alia*, certain restructuring, outsourcing, and social media

outreach strategies designed to optimize the Company's balance sheet.  (*Id.* at F-44.)  Under the Plan, Avon did not expect to begin realizing savings until 2018.  (*Id.* at F-45.)

Following the sale of Avon North America, Brazil was the single largest Avon market, both in terms of total revenue and number of Representatives.  In 2016, Representatives in Brazil accounted for $1.2 billion in revenue, which represented approximately 21% of post-spinoff Avon's total consolidated revenue for the year.  (CAC ¶ 3.)  Avon identified Brazil as a "key international market" where the direct-sales model remained an effective means of distribution.

Or so the Company reported.  Plaintiffs allege not so.

### C.      Avon's Operations in Brazil

Notwithstanding the appetite of its women for cosmetics, Brazil is probably not the strongest hook on which to hang a company's fortunes. The parlous state of the Brazilian economy immediately preceding and during the Class Period was no secret.  Like Avon, Brazil's gross domestic product underperformed expectations beginning in 2010, and by 2015 the economy was contracting, causing a downgrade in the national credit rating to junk status.  *See* "Brazil's Economy Shrank 3.8% in 2015,"  BBC News, March 3, 2016, *available at* https://www.bbc.com/news/business-35715317 (last visited October 31, 2019). By the end of 2016, unemployment had surged north of 12%, with an estimated 2.8 million jobs lost in the preceding two years.  *See* "Brazil's jobless rate ends 2016 at 12% with 12.3 million unemployed," Reuters, January 31, 2017, *available at* https://www.reuters.com/article/us-brazil-economy-employment-idUSKBN15F1LE (last visited October 31, 2019).  On top of that, the country was embroiled in a wide-ranging political corruption scandal that resulted in the impeachment of President Dilma Rousseff in August of 2016.

But, according to Plaintiffs – and their seven CWs from within Avon – the real threat to Avon's bottom line in Brazil was not the economic and political turmoil, but the Company's own dysfunctional operations.

Three of the individual defendants – CEO McCoy, CFO Scully, and President of Avon South Latin America Legher – were in charge of Avon's Brazilian operations. (CAC ¶ 60.) Laser-focused on reversing Avon's declining revenue trend and "lack of profitability," McCoy, Scully, and Legher allegedly put in motion a plan to recruit new Representatives more aggressively. (*Id.* ¶¶ 58-60.) Sometime during 2015 – perhaps as early as May (before the start of the Class Period on January 21, 2016) and certainly by the end of the year – a decision was made to lower the standards for new hires, in particular the credit standards. (*Id.* ¶¶ 60-62.) Avon understood that by pursuing applicants with worse credit histories, it could increase its Representative numbers more quickly.

Prior to this period, each Representative's personal indebtedness was limited to a few hundred dollars at most. (*See, e.g.*, *id.* ¶ 68.) At the end of 2015, Ribeiro, in a quarterly video conference with Sales Managers and Regional Sales Managers (who were in charge of hiring new Representatives), advised them of a new policy: they could now recruit, and approve, a much broader range of applicants. (*Id.* ¶ 76.)

Avon suddenly began taking on Representatives who had considerably more debt than those onboarded in earlier periods – up to three black marks and personal indebtedness in the five figures. Suddenly the Company was approving 8 of 10 applicants in Brazil, rather than 2 of 10. (CAC ¶ 66.) Where sales managers had been encouraged in 2014 to recruit 30-40 new Representatives for Avon's major sales campaigns, by 2016 thy were being told to recruit 200 new Representatives. (CAC ¶ 77.) One of the CWs, CW-6, onboarded 300 new sales reps in

July 2016, ten times what s/he had recruited for earlier campaigns. (*Id.* ¶ 79.) CW-4 stated that one manager in Sao Paolo hired 900 Representatives in a single campaign. (*Id.* ¶ 71.)

There were two immediate consequences of this change.

First, by the third quarter of 2016, Avon had realized a 14% increase in the Company's Brazilian revenue, "primarily due to an increase in Active Representatives and a higher average order from each Rep." (DeMasi Decl. Ex. 8, at 45.)

Second, as compared to the period preceding the credit criteria switch, a higher percentage of the new Representatives were delinquent in paying Avon for the product they had ordered on credit. In CW-6's region, Rio Grande do Sul, internal reports circulated which revealed that the number of delinquencies increased by 50%. (CAC ¶ 85.) Likewise, CW-4 reported an increase in the rate of delinquency in the Central-West region of Brazil from 9% in 2016 to 16% in 2017. (*Id.* ¶ 86.) In CW-3's division, one quarter of new Representatives "never repaid Avon for their first box order." (*Id.* ¶ 91.) Overall, CW-2 estimated that the delinquency rate "reached as high as 20%" in Brazil's most-affected regions. (*Id.* ¶ 92.)

CW-5 reported that 70% of the Representatives hired by Avon in 2016 left the Company by the end of the year, mostly due to delinquency. The departure rate had been 30% prior to the switch. (*Id.* ¶ 84.) And while half of this debt was eventually paid off, half was not. (*Id.* ¶ 94.)

Avon struggled to recover unsettled debts. When Representatives first fell behind in their payments, CW-4 was tasked with personally collecting the debts by visiting Representatives at their homes with a hand-held credit card machine. (*Id.*) That method resulted in just 3% recovery of the delinquent Representatives' debts; it also led to several labor lawsuits against the Company brought by Sales Managers claiming the collection duties were outside the scope of their job descriptions. (*Id.*)

Once a Representative had been delinquent for over 60 days, Avon employed collection agencies to obtain payment, but those efforts were only minimally effective; CW-4 reported that the company only recovered 5% of debts referred to collection agencies. (*Id.* ¶ 90.) Ribeiro, who reported to Defendant Legher, acknowledged during video conferences with Sales Managers and Regional Sales Managers that Avon's collection efforts were unsuccessful. (*Id.*) Avon's "bad debt 'spiked' or 'burst' at the end of 2016[,] and Avon Brazil spent the entirety of 2017 trying to recover from it." (*Id.* ¶ 88.)

As delinquencies rose, Avon engaged in predatory and coercive practices to artificially boosts sales numbers in Brazil. Under the previous policy, delinquent Representatives were excluded from placing orders subsequent campaigns; suddenly Avon encouraged delinquent Representatives' to order more product at a discounted rate, in exchange for the delinquent Representatives' entering into an installment plan for all repayments. (CAC ¶ 94.) Upon shipping more product to these delinquent Representatives, Avon recognized additional revenue, but it failed to accurately revise its "Allowance for Doubtful Accounts" disclosure to account for the increased likelihood that shipping product to delinquent Representatives would result in a greater proportion of uncollectible revenue. (*Id.* ¶ 261.)

Avon's revenues were further inflated by Representatives receiving product they had not even ordered. CW-4 said that millions of dollars were lost in every campaign when Avon had to pay shipping and return costs for product that had never been requested. (*Id.* ¶ 100.) CW-3 described the practice of shipping unrequested product and recognizing revenue on those shipments as "fraud." (*Id.* ¶ 103.) CW-2 explained that the unauthorized shipments correlated with an inventory buildup at the end of 2015; sending product that had not been requested simulated effective sales campaigns in the short term. (*Id.* ¶ 104.) Not only were Ribeiro and

Legher aware of the inventory buildup, they also had access to internal reports indicating that 10% of returns in Brazil were due to unauthorized shipments. (*Id.* ¶¶ 104-5.)

D.     **Senior Management's Awareness of the Bad Debt Problem**

During the Class Period, Avon's senior management, including each of the individual Defendants, received updates on the bad debt problem in Brazil.

Avon held monthly regional performance meetings, at which top-level executives reviewed issues in each regional market. CW-1's superior, the Vice President of Global FP&A, attended those meetings along with Defendants McCoy, Scully, and Legher. (CAC ¶ 107.) And CW-1 viewed a document that covered topics including "Brazil's bad debt and loosened credit standards" – although the Complaint does specifically allege that this document was reviewed at the regional performance meetings, or by that meetings attendees. (*Id.*)

Monthly forecasts of current and projected bad debt, sales, and inventory for Brazil, the market comprising more than 20% of Avon's revenue, were sent regularly to Avon's headquarters in New York, where McCoy, Scully, and later Wilson, all worked. The Company also maintained an internal system to track each Representative's sales and which "generated reports detailing who owed money to the Company." (*Id.* ¶ 113.)

Defendant Legher, whose focus was South Latin America and particularly Brazil, received more specific information about the Brazilian bad debt situation. Legher received daily reports summarizing delinquency rates in each region, as well as internal reports showing the delinquency rates for each completed campaign. (*Id.* ¶ 111.) Legher also attended at least one of the quarterly video conferences led by Ribeiro, during which the latter discussed delinquency issues and potential debt collection methods. (*Id.* ¶ 109.) CW-5 corroborated that Ribeiro acknowledged "the rising delinquency problems" during the video conferences. (*Id.* ¶ 110.)

12

According to CW-3, "Ribeiro, and pretty much everyone else, knew about . . . the problems with delinquent accounts" in mid-2016, and "Legher knew about the delinquency problems given his role and position in the company." (*Id.* ¶ 113.)

## II.   Avon's Disclosures During the Class Period

### A.  Disclosures Related to Recruitment, the Credit Crisis and Bad Debt

At some point in 2015, there was a decision to lower the credit standards for Representatives in Brazil, so that Avon could hire more Representatives more quickly than in the past. At no point in 2015 or 2016 did Avon disclose the adjustment to the credit criteria.

During the Class Period, Defendants made several statements touting Avon's recruitment of new Representatives and increased sales, as well as statements relaying the effects of those new Representatives on the Company's debt load.

On January 21, 2016, the first day of the Class Period, when questioned about the quality of Avon's new recruits in Brazil, McCoy extolled the Company's "improvements in retention" among its new Representatives, pointing out that "retention [is] tick[ing] up and that's critically important." (CAC ¶ 135.) Three weeks later, McCoy further assured investors that "despite the weak economy . . . the team [in Brazil] is doing a good job of maintaining the underlying health of the business" (*id.* ¶ 140), while Scully announced "solid growth in active representatives, which benefited from a successful third quarter recruiting crusade" (*id.* ¶ 141).

On February 11, 2016, during the 2015 fourth quarter earnings call Scully delivered the bad news that constant dollar revenues had declined by 2% in Brazil but said that the negative trend was "partially offset by solid growth in active representatives, which benefited from a successful third quarter recruiting crusade." (CAC ¶ 141.) There was no disclosure about the fact that the recruiting criteria had been modified, or how.

13

In fact, on February 23, 2016, Avon told its investors and the SEC that the old rule regarding delinquent Representatives was still in place: if a Representative received Avon products on credit but failed to remit payment to the Company, she was "generally precluded from submitting an order for the current sales campaign." (DeMasi Decl. Ex. 2, at 31; *see also* CAC ¶ 53.) The accounting disclosure went on: "If the financial condition of our Representatives were to deteriorate, resulting in their inability to make payments, additional allowances may be required." (*Id.*; CAC ¶ 144.) Avon did not disclose the fact that, in Brazil, this procedure was not being followed, and many delinquent Representatives were allowed to continue ordering Avon products.

During the May 5, 2016 earnings call, McCoy and Scully were forced to acknowledge the Company was underperforming in Brazil. But both blamed Brazilian economy as a whole; neither mentioned any increase in Representative delinquencies. As to the effects the downturn would have on retention, McCoy said:

> "[I]n light of the economic environment we are also taking a more balanced risk-based approach to bringing in and onboarding new representatives. For perspective, ending representatives Brazil were down fractionally this quarter versus prior year. As I said on our last quarterly call, we anticipate that Brazil will continue to be a challenging environment given the political and economic situation . . . . For the year, we continue to expect Brazil to be relatively flat with some ups and downs over the course of the year." (*Id.* ¶ 148; *see also id.* ¶ 154.)

Scully disclosed that Avon had experienced an increase in bad debt, but, echoing McCoy, he said it was "primarily due to that macroeconomic environment in Brazil and Argentina." (*Id.* ¶ 149.)

Avon continued to report increases in the hiring of new Representatives in August of 2016, crediting the Company's "strong and consistent recruiting programs and onboarding of new Representatives." (CAC ¶ 153.) But the Company was still on a downward trajectory. On November 3, 2016, Avon disclosed that its operating expenses were higher due to "an increase of

40 basis points from higher bad debt expense, primarily in Brazil." (DeMasi Decl. Ex. 7, at 37.) On that news, the price of Avon's stock declined nearly 3%. (CAC ¶ 172.)

Yet the Company maintained a sliver of optimism, again touting its recruitment results, as McCoy was "pleased" to report that Brazil had gained Representatives "through a combination of a very successful recruiting program and initiatives to build activity." (*Id.* ¶ 166.) She was not more specific about what had led to the "successful" recruiting (including specifically the relaxed credit standards) or what the "initiatives" were (*i.e.*, allowing delinquent Representatives or order new merchandise).

The increase in bad debt announced in November also caused Avon to revise its "Allowance for Doubtful Accounts." In the Company's December 31, 2016 10-K, Avon estimated its bad debt expense to be 3% of total revenue, a 50% increase over the 2% estimate provided in the 2015 10-K. (DeMasi Decl. Ex. 9, at 30-31.)

Then, on February 16, 2017, the Company acknowledged its Brazilian operations had suffered a "higher-than-expected level of bad debt" in part because of "the inability of some consumers to pay" during Brazil's economic crisis, and in part because the "adjusted credit terms" – referring to the relaxed credit criteria – that Avon had used to boost its Brazilian recruitment efforts. (DeMasi Decl. Ex. 10, at 6.) This appears to be the first public acknowledgement of the fact that less credit-worthy individuals were being accepted as Representatives in Brazil.

Avon's new CFO, Wilson, reiterated that Avon's woes were the product of forces both internal and external to the company, chalking up the higher bad debt "to the macroeconomic conditions, coupled with actions taken to recruit new representatives." (*Id.* at 11.) When asked if the bad debt issue was "all cleaned up," Defendant Wilson told investors that, "Our business

does have bad debt expense on an ongoing basis, but the specific thing, we believe, is fully cleared up and booked in the 2016 results." (*Id.* at 14.) Addressing the relaxed credit terms, Wilson further admitted that "there a was a little bit of that in Brazil in 2016, but it is not a general policy of ours." (CAC ¶ 187.)

McCoy offered further assurances during the February 16 earnings call: she said Avon "had good success" in 2016, and that it had been "very focused this year on . . . making sure we continue to manage the recruitment of [Representatives]." (DeMasi Decl. Ex. 10, at 15.) She also announced two changes to address the debt issue: the company would be enhancing its collection process and "tightening [its] recruiting terms." (CAC ¶ 185.)

Avon's stock fell 19% by the end of the day. (CAC ¶ 191.)

Avon readjusted its credit criteria to address the bad debt situation "in early 2017." (CAC ¶ 117.) However, that correction did not immediately resolve the issue. At the next quarterly earnings call, on May 4, 2017, Wilson informed investors that the Company was still recovering from the "rise from our normal level of bad debt, which was typically between 2% to 3% of revenue," – the number disclosed in the Company's then-most-recent 10-K – "driven by relaxation of credit terms as part of our recruitment crusades." (*Id.* ¶ 199.) According to Wilson, while Avon was "seeing some improvement based on the actions [it] took to remediate the position, including tightening credit terms, it's taking longer than expected to return to normal levels." (*Id.* ¶ 199.)

Nonetheless, McCoy remained sanguine, telling investors that, although the issue "would take time to course correct," Avon was "continu[ing] to make progress on the actions we've put in place and expect to strengthen the business in the second half of the year." (CAC ¶ 201.)

On this news, Avon's stock tumbled 22.15% to close at $3.62 per share after a heavy day of trading.  (*Id.* ¶ 206.)

The bad debt burden had not improved by August 3, 2017, when Defendant Wilson revealed that the South Latin American segment margin was down 8.1%, "due to the continued high level of bad debt, particularly in Brazil, where we're still seeing the trailing impacts of last year's relaxation of credit terms along with the difficult macroeconomic environment."  (DeMasi Decl. Ex. 12, at 7.)  Although he expected to see improvement, Wilson noted that "second half revenue [would] remain under pressure."  (*Id.* at 8.)

That same day, Avon announced that McCoy would be stepping down as part of its "CEO Transition Plan" by March 2018.  (CAC ¶ 213.)  The market again reacted negatively; the stock price declined 1% on August 3, 2017 and 4% on August 4, 2017. (*Id.* ¶ 215.)

Months after McCoy's announcement, Avon was still struggling to reduce its debt load in Brazil.  On November 2, 2017, one day after the close of the Class Period, the Company reported that Brazil "continued to be impacted by a difficult macroeconomic environment combined with applying stricter credit terms to new Representatives" than had been applied in 2016.  (DeMasi Decl. Ex. 13, at 38.)  During the earnings call that same day, Defendant Wilson explicitly stated that the relaxed credit standards had increased "delinquencies associated with . . . new Representative populations resulting in large increases in bad debt."  (CAC ¶ 223.)

Plaintiffs allege that these statements were false and misleading because Defendants failed to disclose that Avon "had aggressively loosened its credit policies for incoming Representatives in Brazil, thereby exposing the Company to a significant risk of bad debt." (CAC ¶¶ 138, 145, 152, 160, 164, 178, 181, 192, 207, 216.)  Acknowledging that Avon disclosed a generalized risk that new Representatives might generate bad debt – both before and during the

Class Period – Plaintiffs argue that Defendants "made misleadingly positive statements to investors about Representative growth and the financial outlook in Brazil." (*See* Pl.'s Opp. to Def.'s Mot. to Dismiss ("Pl.'s Opp.") at 19, dated August 30, 2019, Dkt. No. 40).

*First*, Plaintiffs argue that statements touting the Company's recruiting initiatives "were misleading because Defendants failed to disclose that they had significantly reduced credit terms to achieve growth." (*Id.* at 20.)

*Second*, Plaintiffs argue that Defendants' attempts to place the blame for the bad debt issue on Brazil's ongoing economic crisis "were materially misleading because Defendants failed to disclose that Avon's bad debt problems directly resulted from the decision to lower credit standards." (*Id.* at 23.)

*Third*, Plaintiffs argue that statements indicating the bad debt problem was "cleared up" were materially misleading because Avon's "debt collection practices . . . were proving ineffective." (*Id.* at 24.)

*Fourth*, Plaintiffs argue that McCoy's representation that the Company was "taking a more risk-balanced approach to bringing in an onboarding new representatives" was false and misleading because the recruitment strategy was a one-way ratchet with respect to risk: it went up. (*Id.* at 25.)

**B.    Accounting Disclosures**

During the Class Period, Defendants made few statements describing how the Company estimated its levels of bad debt beyond the "Allowance for Doubtful Accounts" critical accounting estimate in the Company's annual report. (*See* CAC ¶ 144; DeMasi Decl. Ex. 2, at 31.)   Plaintiffs allege that this silence is proof of Avon's failure "to increase its allowance for bad debts to account for the changes it had made to its credit terms" – yet another fraudulent

scheme that worked to artificially inflate the share price of Avon's common stock. (CAC ¶¶ 138, 145, 152, 160, 164.)

Each of Avon's annual reports during the relevant time period disclosed an "Allowance for Doubtful Accounts" as a "critical accounting estimate" baked into the Company's reported financial results. (*See* DeMasi Decl. Ex. 2, at 31.) The SEC defines a "critical accounting estimate" as an estimate or assumption the nature of which "is material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change," the impact of which "is material" on the financial condition of the issuer. (SEC Release No. 33-8350.) The SEC requires publics companies to disclose all such estimate to "provide greater insight into the quality and variability of information regarding financial condition and operating performance." (*Id.*)

Plaintiffs allege that Avon's reported financial statements "hid [Defendants'] decision to lower Representative credit standards from Avon's balance sheet." (Pl.'s Opp. at 9.) The Complaint lists several factors that should have alerted the Defendants to the fact that that debt had "spiked" in Brazil "and losses were highly probable." (CAC ¶ 13.) In particular, Defendants either knew or should have known their critical accounting estimate concerning bad debt was inaccurate given that: (i) many more Representatives were being approved than had been approved in the best; (ii) delinquencies among new Representatives were on the rise; (iii) the new credit standards permitted delinquent representatives to continue ordering Avon products even when delinquent on prior orders; and (iv) delinquent accounts were contract out to collection agencies at a higher rate. (*Id.* ¶ 100.)

Furthermore, Plaintiffs allege that Avon violated Generally Accepted Accounting Practices (GAAP) by recognizing revenue when product shipped to the ordering Representative

(who had purchased it on credit) without properly accounting for the likelihood of loss. (*Id.* ¶ 264.) Plaintiffs argue that Avon should not have recognized revenue from products shipped to a group of Representatives with an increased likelihood of defaulting in payment; rather, that revenue should have been recognized only once the Company received payment in return for those shipments. (Pl.'s Opp. at 10.) Plaintiffs allege that, in recognizing revenue on product when shipped, Avon ignored: (i) the relaxed credit standards; (ii) Avon's increased competition in Brazil; (iii) Avon's increased Representative-approval rate; (iv) the increase in delinquencies among new Representatives; (v) additional purchases by delinquent Representatives that had not previously been permitted by the Company; and (vi) the increase in collection agency referrals to resolve delinquent accounts, which proved to be ineffective. (CAC ¶ 261.) Because collectability was not assured until the Representative had sold the product to a consumer, Plaintiffs allege that Avon improperly assumed its Representatives would be successful in moving Avon's product, even though the new Representatives had higher pre-existing debt loads than their historical counterparts. (*Id.* ¶ 266.)

### C. Disclosures Related to Training Representatives

Defendants frequently referenced the importance of training and support in developing new Representative relationships.

On the first day of the Class Period, January 21, 2016, Chief Commercial Officer John Higson identified the fact that "a new seller coming in gets rather less than a full week of training before she gets out in front of a customer" as "a weakness of the Avon business over 30 years" that "need[ed] to evolve." (DeMasi Decl. Ex. 4, at 26.) For that reason, the same day, Defendant Legher announced that Avon intended to remedy the paucity of training as part of the Transformation Plan. (*Id.* at 42.) Legher informed investors that Avon was implementing a "360

program of onboarding" for new Representatives. (DeMasi Decl. Ex. 4, at 41.) McCoy added that Avon was "making sure we are investing in [new Representatives] and understanding [their] needs" to ensure growth in the Representative base as well as Avon's revenue. (CAC ¶ 132.)

Over the remainder of the Class Period, Defendants McCoy and Wilson frequently emphasized that training and developing was crucial to Representative productivity. For example, on September 6, 2016, while discussing the profitability of Representatives that participated in multiple Avon campaigns over a long period of time, McCoy noted, "It's important to get people in, train them, and have them stay with us." (CAC ¶ 163.) She added that Avon was aiming to provide Representatives "the training to be successful," and was "continu[ing] to roll this [training program] out globally." (*Id.*) And, in January of 2017, McCoy said Avon had "made very good progress on the onboarding side" and reiterated that training and support were critical to creating successful Representatives. (*Id.* ¶ 179.) At an investor conference in June of 2017, the message was the same: Wilson said that every Representative need "pointers," including "training and sales tools" to "make sure she's understanding the opportunities that she should have." (*Id.* ¶ 211.)

After McCoy resigned in August of 2017, Avon conducted a diligent CEO search process, which led to Jan Zijderveld's being named as McCoy's replacement on February 5, 2018. (CAC ¶ 229.) He showed an immediate interest in increasing training for new Representatives while conveying his view, on February 15, 2018, that Avon had "under-invested" in training direct-sellers. (*Id.* ¶ 231.) On August 2, 2018, Zijderveld reemphasized that Representatives "need relevant training and support" in order to succeed (*Id.* ¶ 232), and revealed that "in Brazil, Avon basically stopped all training." (*Id.*)

On November 1, 2018, Miguel Fernandez, Avon's new Chief Commercial Officer, elaborated, disclosing that Avon had "cut Representative training out of many countries, including Brazil" five years earlier, or in 2013. (*Id.* ¶ 236.) All of the CWs confirm that Avon provided new sellers with "little or no sales support or training" throughout the Class Period. (*Id.* ¶ 122.)

In light of those post-Class Period disclosures, Plaintiffs contend that Defendants violated the law by failing to disclose that they had "entirely stopped training Brazilian Representatives" at any time during the Class Period. (Pl.'s Opp. At 2.) Plaintiffs argue that references to "a comprehensive 360 program of onboarding" and "the training [a Representative] needs to be successful" were false and misleading because "Avon offered no formal training whatsoever." (*Id.* at 21.) Likewise, Plaintiffs allege that Avon's claim that it was "mak[ing] sure that we are actually investing in her [and] giving her the skills to help her grow her business" were false and misleading because Avon provided no training to new Representatives. (*Id.* at 25.)

## DISCUSSION

### I. Standard on a Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir.2003); *see also Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir.2007).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," the complaint should be dismissed. *Twombly,* 550 U.S. at 558.

This liberal pleading standard is modified by Federal Rule of Civil Procedure 9(b) in cases where a claim "sounds in fraud," including actions for securities fraud. *See* Fed. R. Civ. P. 9(b); *Rombach v. Chang,* 355 F.3d 164, 170–71 (2d Cir.2004). Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 196 (2d Cir. 2009).

In addition, the Private Securities Litigation Reform Act ("PSLRA") requires application of a heightened pleading standard to claims brought under the Exchange Act. *See* 15 U.S.C. § 78u–4. Under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" – *viz.* with intent "to deceive, manipulate, or defraud" – with respect to each act or omission. *Id.* "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (alteration in original)).

**II.      The Motion to Dismiss the 1934 Securities Exchange Act Claims is Denied.**

Plaintiffs assert claims under Sections10(b) and 20(a) of the Exchange Act, and Rule

10b-5.  (CAC ¶¶ 320-339.)  Section 10(b) of the Exchange Act makes it unlawful to "use or

employ, in connection with the purchase or sale of any security . . . any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe." 15 U.S.C. § 78j(b).  To adequately allege a violation of Section

10(b), and the accompanying regulation Rule 10b-5, a plaintiff must plead six elements: "(1) a

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *City of Westland*

*Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 65 (S.D.N.Y.

2015) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)); 17

C.F.R. § 240.10b-5(b).

To state a claim under Section 20(a), "a plaintiff must show (1) a primary violation by the

controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant

was, in some meaningful sense, a culpable participant in the controlled person's

fraud." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir.

2014) (quoting *ATSI*, 493 F.3d at 108) (internal quotation marks omitted).  Plaintiffs must

demonstrate primary liability under Section 10(b) and Rule 10b-5 before it can make out a claim

for control-person liability.

The Defendants argue that the CAC fails to adequately allege two elements necessary to

plead a claim under Section 10(b) or Rule 10b-5:  First, the CAC fails to allege any actionable

misstatements because none of the statements at issue was false or misleading; and, second the

24

CAC fails to plead that any Defendant acted with scienter – the intent to deceive – when each of them made the statements at issues. And, because the CAC fails to state a claim under Section 10(b) or Rule 10b-5, Defendants argue, Plaintiffs' derivative Section 20(a) claim must also be dismissed.

### A. Plaintiffs Adequately Pleaded Materially False and Misleading Statements Under Section 10(b).

To plausibly allege a material misrepresentation or omission, a plaintiff must plead facts that, if true, would be sufficient to show that the defendant either made an untrue statement of a material fact or omitted to state a material fact necessary to make whatever statements it made not misleading. 17 C.F.R. § 240.10b-5(b).

An untrue statement of fact – as opposed to opinion or belief – "is one that was false at the time it was made." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd,* 604 Fed. Appx. 62 (2d Cir. 2015). A plaintiff "must do more than simply assert that a statement is false – [it] must demonstrate with specificity why that is so." *Id.* (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

The Complaint identifies three categories of fraudulent statement or omission: (1) Defendants' failure to disclose Avon's relaxed credit policies for new Representatives in Brazil, which exposed the Company to a greater risk of bad debt; (2) Defendants' misrepresentations and omissions in connection with Avon's estimated bad debt in light of the changes to the credit terms; and (3) Defendants' failure to disclose that Avon stopped training its Representatives in Brazil, which further exposed the Company to a greater risk of inefficient and/or disengaged Representatives. (*See, e.g.*, CAC ¶ 138.)

1.	The Recruiting Statements.

Defendants argue that their statements touting Avon's recruiting efforts and the

Company's resulting levels of bad debt – including that Avon's team in Brazil was "doing a

good job of maintaining the underlying health of the business" (CAC ¶ 140), that the Company

had enjoyed "a successful third quarter recruiting crusade" (*id.* ¶ 141), that Avon was "taking a

more risk-balanced approach to bringing in and onboarding new Representatives" (*id.* ¶ 148),

that Avon Brazil had gained Representatives "through a combination of a very successful

recruiting programs and initiatives to build activity" (*id.* ¶ 166) and, after disclosing the higher-

than-expected levels of bad debt arising from the change in Avon's recruiting policy, that the

relaxed credit criteria problem was "fully cleared up and booked in the 2016 results" (*id.* ¶ 186) –

do not give rise to a cause of action, because (i) Plaintiffs fail to allege that the statements were

false or misleading *when made*; (ii) Avon made "timely disclosures of the volatility and

weakness of Brazil's economy during the Class Period"; (iii) certain of the statements were

forward-looking; and (iv) certain of the statements were inactionable puffery (Def.'s Br. at 20-

25).

Defendants first argue that Plaintiff fails to allege that any of the challenged statements

were contemporaneously false.  But Defendants are responsible for their statements as well as

their omissions.  Plaintiffs' theory turns on the latter; they allege that the recruiting statements

misled investors because "Defendants *failed to disclose* that Avon's bad debt problems directly

resulted from the decision to lower credit standards" for new hires in Brazil.  (Pl.'s Opp. at 23

(emphasis added).)

A corporation has a duty to disclose a fact in order to avoid misleading investors if there

is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having *significantly altered* the 'total mix' of information available." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267–68 (2d Cir. 1993) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (emphasis added).  Furthermore, disclosure is required "when necessary to make statement contemporaneously or previously made not misleading." *Kocourek v. Shrader*, 391 F. Supp. 3d 308, 331-2 (S.D.N.Y. 2019).  Hence, misleading "half-truth[s]" can be actionable. *See In re GeoPharma, Inc. Sec. Litig.,* 411 F.Supp.2d 434, 446 (S.D.N.Y.2006).  Accordingly, when an issuer or its officers "make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (quoting *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987)).

For example, in *DoubleLine Capital LP v. Odebrecht Finance, Ltd.*, 323 F. Supp. 3d 393 (S.D.N.Y. 2018), plaintiffs pleaded a colorable claim of securities fraud when the defendant listed several reasons for its success in competitive bidding contests for government contracts, but failed to disclose an illegal bribery scheme that also contributed to its advantage. *Id.* at 444.

As in *DoubleLine*, the Avon Defendants also promoted recent success, in particular with respect to the Company's recruiting efforts, which triggered a duty to disclose the cause of that trend: the Defendants' decision to adjust credit terms in Brazil and allows sales managers to hire less creditworthy Representatives than Avon had hired in prior campaigns.  Drawing all inferences in Plaintiffs' favor, I cannot conclude that the decision to adjust the credit criteria – which eventually caused Avon's bad debt to "spike" by the end of 2016 – was either immaterial or so obviously unimportant to a reasonable investor that there remains no question as to the importance of the credit switch. Therefore, each time Defendants touted their recruitment efforts prior to February of 2017 without revealing their new, aggressive hiring strategy, they were

concealing material information from the market. Later in the Class Period, they were also concealing the rising rate of delinquencies created by that decision. Therefore, Defendants' failure to disclose their decision to hire less creditworthy individuals in Brazil until February 2017, even as the Company's bad debt began to balloon the previous year, was a material omission.

Nor did the Defendants' statements about the macroeconomic conditions in Brazil render their recruiting and delinquency statements complete and accurate. (*See* Def.'s Br. at 23.) Defendants argue that the "truth on the market" theory requires dismissal; *i.e.*, that Avon's investors already knew the truth about the Brazilian economic turmoil, so any omission Defendants made was immaterial. *See, e.g.*, *In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 757 F. Supp. 2d 260, 301-2 (S.D.N.Y. 2010). But "truth on a market" is not a proper ground for dismissal in this case.

Generally, "truth on the market" is "rarely an appropriate basis for dismissing a 10(b) complaint" at the pleadings stage. *Id.* (quoting *Ganino v. Citizen Utils.*, 228 F.3d 154, 161 (2d Cir. 2000)). That is because, to determine whether an alleged omission is immaterial – as the "truth on the market" defense presumes – a court must be able to determine whether the impact of macroeconomic conditions on Avon's debt load was actually conveyed to the market, and whether it was communicated "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information" disseminated by Defendants. *Ganino*, 228 F.3d at 167. Those inquiries present fact questions that cannot be resolved in Defendants' favor on a motion to dismiss.

Moreover, the macroeconomic conditions were not the only "truth" enlarging Avon's delinquency rate. Defendants do not claim that they ever disclosed the credit switch prior to

February of 2017. So they admit that a reasonable investor hearing Scully blame the swelling

bad debt "primarily" on the economies of Brazil and Argentina in May of 2016 would have had

no way of knowing that the company was extending credit to unqualified Representatives and

worsening the bad debt situation. Even if the "truth on the market" defense could dispose of

Plaintiffs' allegations at this stage (which it cannot), it does not absolve Defendants of the credit

criteria omissions.

Defendants then argue that certain statements made after the initial February 2017

disclosures partially attributing the rise in bad debt to the recruiting criteria switch are not

actionable under the PSLRA safe harbor for forward-looking statements. (Def.'s Br. at 24-25.)

Defendants are correct that they cannot be found liable for forward-looking statements that are

(1) "accompanied by meaningful cautionary language," (2) "immaterial," or (3) not accompanied

by adequate allegations that the Defendants had actual knowledge that the statement was

false. *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

However, the PSLRA's safe harbor provision does not protect optimistic statements

about future performance for which defendant have no basis, and where they already know "that

certain risks have become reality." *Hall v. Children Place Retail Stores, Inc.*, 580 F. Supp. 2d

212, 226 (S.D.N.Y. 2008).

The Complaint alleged that thousands of Representatives with poor credit histories were

increasing Avon's potential debt load with every new order. Only half of them ever paid off

their debts to the Company. Even after the February 2017 disclosures and Avon's decision to

stop hiring the Representatives that posed the highest risk to the Company's revenue stream, it

still had thousands of delinquent accounts on its books. Therefore, even though the company

tightened its hiring criteria in early 2017, Wilson had no basis to tell shareholders on May 4,

2017, that Avon did "not expect to see [the level of bad debt] materially impacting . . . revenue generation." (CAC ¶ 202.)

Contrast this with the decision denying a motion to dismiss in *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613 (S.D.N.Y. 2003). There, defendants allegedly issued rosy estimates of future performance, even as revenues declined and certain key customers reduced their orders. *Id.* at 619-620. Acknowledging that the defendants also offered general disclaimers about the potential for a downturn based on diminishing customer relationships, the court found that the *Nortel* plaintiffs had plausibly alleged that the forward-looking statements were misleading in light of risks that had already materialized. *Id.* at 629. *Nortel* could not be more apposite to the allegations presently before this Court. Accordingly, the safe harbor provision does not shield Defendants' forwards-looking statements.

Defendants' last argument regarding the recruitment statements is that certain of those statement (*see* Def.'s Br. at 25) are inactionable puffery, which the Second Circuit defines as any statement "too general to cause a reasonable investor to rely upon them." *ECA*, 553 F.3d at 206. For example, an affirmation of an issuer's "integrity," *id.*, or a prediction of its "continued prosperity," *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996), or an expression of belief in a product's "competitive advantage," *Oklahoma Firefighters Pens. & et. Sys v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018) (collecting cases), do not convey the type of information upon which investors base their investment decisions.

Applying that rule, Defendants argue that many of the challenged statements – such as McCoy's claim that Avon's Brazilian personnel was "doing a good job of maintaining the underlying health of the business" (CAC ¶ 140), that Avon was "doing the right things to keep

representatives engaged" (*id.* ¶ 142), and that Avon had conducted "a very successful recruiting program" (*id.* ¶ 165) – are inactionable as a matter of law.

But a court is neither required nor permitted to view such statements in isolation. Courts have found that when a company makes repeated representations on the same topic, even where those representation would otherwise be puffery, the repetition itself communicates to investors what "matters [are] particularly important," and "those statements may become material to investors." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017). For example, in *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368 (S.D.N.Y. 2015), my colleague, Judge Rakoff, found that repeated assurances about "the integrity of . . . management," might be material to an investor, even without any further detail, and thus denied a defense of puffery. *Id.* at 375, 381.

So too here: it is plausible that Avon's content-free, unverifiable statements that their Brazilian business was generally healthy or that a particular campaign was a success misled investors, who, having been assured by such general statements of optimism and encouragement for years, heard them "as reflective of the true state of affairs at the Company." *Id.* at 381. When Defendants described the Brazilian market as having "a strong team in place" (CAC ¶ 148), a reasonable investor would not have known, or had reason to ask, whether that team was currently presiding over the self-inflicted debt crisis that Avon ultimately disclosed in 2017.

I thus conclude that Plaintiffs' have adequately pleaded that the recruitment statements were false and misleading.

## 2. The Accounting Statements.

Plaintiffs also allege that Avon (i) materially underestimated its "Allowance for Doubtful Accounts;" (ii) misstated its bad debt exposure during the Class Period; and (iii) violated GAAP

31

by recognizing revenue when product shipped to Representatives as opposed to when it was sold. Defendants seek dismissal on the grounds that the Complaint lacks any allegation that the accounting statements were false or disbelieved when made, and that the allegations regarding Avon's accounting practices are "grounded in hindsight." (Def.'s Br. at 22.)

As a threshold matter, albeit one not addressed at much length in the parties' briefing of the pending Motion, I must determine whether critical accounting estimates like the "Allowance for Doubtful Accounts" are best analyzed as statements of fact or statements of opinion. Numerous courts in this Circuit have found that actuarial or accounting assumptions "depend[] on the particular methodology and assumptions used" and are not "objective factual matters." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015) (quoting *Fait v. Regions Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011)). For example, in the life insurance context, my colleague Judge Kaplan has ruled that "incurred but not reported" ("IBNR") claims estimates – which approximate "losses for which claims have not been reported but must be estimated so the company can pay future claims" – are statements of opinion, not fact. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 68 (S.D.N.Y. 2015). IBNR estimates are a helpful parallel: as MetLife did when approximating its future losses due to future life insurance claims, when Avon estimated its bad debt for the coming quarter, it was accounting for as-yet-unknown, but certain-to-exist future delinquencies and product returns that would cut into the Company's revenues.

Allegations that Defendants made fraudulent opinion statements are subject to a more demanding pleading standard. For a statement of belief or opinion to be actionable under Section 10(b), a plaintiff must allege that (1) " 'the speaker did not hold the belief she professed,' " (2) " 'the supporting fact[s] she supplied were untrue,' " or (3) the stated opinion, "though

sincerely held and otherwise true as a matter of fact," "omit[ted] information whose omission ma[de] the [stated opinion] misleading to a reasonable investor." *Tongue v. Sanofi,* 816 F.3d 199, 209 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)). That Avon may have believed the accounting estimate to be accurate is irrelevant, even when read as an opinion statement. The core inquiry when determining whether an omission renders an opinion misleading is whether the omitted facts "conflict with what a reasonable investor would take from the statement itself." *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

Again, prior to their February 16, 2017 disclosure that the Brazilian credit criteria switch had contributed to the increase in Avon's bad debt, Defendants were aware of many facts in conflict not only with Avon's 2015 critical accounting estimate, but also Scully's May 5, 2016 statement that "bad debt expense increased primarily due to that macroeconomic environment in Brazil and Argentina" (CAC ¶ 149) and an identical statement in the Company's 2016 third quarter 10-Q (*id.* ¶ 171). At the end of 2015, Avon estimated its "Allowance for Doubtful Accounts" based on the Company's bad debt expense in 2013, 2014 and 2015, and assured investors that the allowance "is reviewed for adequacy, at a minimum, on a quarterly basis." (DeMasi Decl. Ex. 2, at 31.) Yet, all of Plaintiffs' CWs confirm that, at least in Brazil, Avon relaxed its credit standards for new Representatives in the second half of 2015, prior to Avon issuing its 2015 annual report on February 23, 2016. (*See* Section I.C., *supra*.) The CW allegations also explain how hiring less creditworthy Representatives caused an uptick in delinquencies and increased the bad debt on Avon's books. Avon then compounded the likelihood of an increase in bad debt by negotiating payment plans with delinquent Representatives so those Representatives could continue receiving shipments, and Avon could

continue recognizing revenue, a 180-degree turnaround from the Company's historic approach to doing business.

None of those facts was contemporaneously disclosed. Avon left the 2015 allowance estimate untouched and blamed the debt on Brazil's economic crisis until February of 2017, when it finally increased the allowance to 3% of total revenue. (DeMasi Decl. Ex. 9, at 30-31.) This makes Avon's accounting estimates and public statements regarding bad debt between the policy change and February 16, 2017 misleading opinion statements under Section 10(b).

By the same token, Avon's awareness of the credit criteria switch supports a conclusion that its GAAP calculations were false and misleading during the Class Period. Plaintiffs allege that Avon recognized revenue prematurely at the time of shipment to Representatives, because "collectability was not reasonably assured at the time of the product delivery to the Representatives." (CAC ¶¶ 264-66.) Without collectability assured, Avon's Sell-in method of recognizing revenue at the time of shipment was improper. (*Id.*) Where, as here, "Plaintiffs detail how defendants used *specific accounting practices* in violation of [GAAP] to prematurely recognize revenue," they have adequately alleged the issuer's reported financials contain false and misleading statements. *In re Comp. Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (emphasis added).

Accordingly, many courts have found revenue recognition practices substantially similar to those alleged in this case to be false and misleading. In *In re Ancor Communications, Inc.*, 22 F. Supp. 2d 999 (D. Minn. 1998), a district court determined that violations of GAAP actionable under Section 10(b) where the issuer, Ancor, recognized revenue on products sent to "liaisons who attempted to find end-users to buy Ancor's products," even though the liaisons "had no obligation to pay for the products unless they were ultimately sold to an end-user." *Id.* at 1001-4.

Like Avon's Representatives, Ancor's liaisons had an unlimited right of return and made no guarantees that all the product they received would ultimately be resold to end-users.

In *In re Miller Industries, Inc. Securities Litigation*, 12 F. Supp. 2d 1323 (N.D. Ga. 1998), another court found a plausible claim of accounting fraud based on allegations that defendants had recognized "loans to customers of questionable creditworthiness" as revenue. *Id.* at 1328-9. That is precisely what Avon allegedly did by recognizing the credit it extended to its already indebted Representatives as revenue.

Likewise, my colleague, Judge George B. Daniels, has previously found that allegations of accounting improprieties such as recognizing revenue "from the sale of undelivered equipment" and "the sale of goods and services to customers who were not creditworthy" were sufficient to survive a motion to dismiss. *In re Winstar Comms.*, No. 01-cv-3014, 2006 WL 473885, at *8 (S.D.N.Y. Feb. 27, 2006).

Here, Plaintiffs identified numerous accounting violations relating to the overstatement of revenues (due to the underestimation of bad debt) during the Class period. (CAC ¶¶ 242-268.) These allegations are set forth with sufficient particularity to support a claim of accounting fraud against the corporate Defendant, Avon. And since the bad debt disclosures and GAAP calculations were contained in quarterly and annual reports certified by McCoy, Wilson, and Scully, acting with "ultimate authority" over the disclosures in their CEO and CFO roles, all Defendants besides Legher are appropriately considered to have been "makers" of the accounting statements. *See In re Lehman Bros. Sec. & ERISA Litig.*, No. 11-cv-4278, 2013 WL 5730020, at *2 (quoting *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011)).

Therefore, Plaintiffs have made alleged false or misleading statements sufficient to plead a claim under Section 10(b) and Rule 10b-5 based on accounting fraud.

3.      The Training Statements.

Avon executives repeatedly emphasized the Company's focus on "onboarding" for Representatives as part of the Transformation Plan. (*See, e.g.*, CAC ¶ 163.) For instance, on September 6, 2016, McCoy told investors "we actually train [a new Representative] by category for five campaigns" (*id.*) and on February 16, 2017, she said that over the past year "enhanc[ing] our onboarding" had been an area of focus, (*id.* ¶ 189.) Yet, Avon's new CEO following McCoy's ouster would later concede that no training had occurred in Brazil during the Class Period – an admission confirmed by the CWs' contemporaneous observations on the ground. (*See* Background Section II.C., *supra*.)

Defendants argue that the training statements are not actionable, because: (i) "there are no well-pled allegations in the Complaint to suggest that any Defendant had information at the time of the alleged misstatements that Representatives were not being trained as expected" and (ii) the Company actually informed its shareholders that training was minimal on the first day of the Class period, when Higson disclosed that "a new seller coming in gets rather less than a full week of training." (Def.'s Br. at 24.)

I cannot say, as a matter of law, that the lack of contemporaneous allegations that Defendants knew Avon Brazil had no training program during the Class Period dooms Plaintiffs' claim that the training statements were false and misleading. It is undisputed that the Defendants repeatedly referenced the training program in public statements made during the Class Period. This means their disclosures on that topic were required to be complete and accurate. It is also undisputed that the CWs were in a position to know whether Avon was training its Brazilian

36

Representatives, and that they witnessed no such training. In other words, Defendants highlighted the "importance of investing in on-boarding, training, and retraining representatives" throughout the Class Period (CAC ¶ 189), even though no such training occurred. That the Defendants suddenly claim ignorance of the details does not negate the inference that their statements were false when made.

Nor can I infer that Higson's January 2016 statement neutralized all subsequent statements suggesting Avon was building up its training program as part of the Transformation Plan. (*See* Def. Br., at 24 (quoting DeMasi Decl. Ex. 4, at 26).) On the same day that Higson called training a "weakness" of the company, Legher announced a "360 program of onboarding" for new Representatives. (DeMasi Decl. Ex. 4, at 41.) Second Circuit precedent requires me to consider these representations "together and in context." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). Doing so, I conclude that a reasonable investor would have understood the Transformation to be a fix for, among other things, Avon's lackluster training program, and Defendants' subsequent statements would have led the same investor to believe that the situation had in some way changed since Higson bemoaned the weakness of the program. Yet Zijderveld's post-Class Period disclosures and the CW statements in the Complaint put the lie to those impressions.

Plaintiffs allege enough facts to sustain a plausible inference that the training statements were false or misleading.

### B. Plaintiffs Adequately Pleaded that Defendants Acted With Scienter as Required by Section 10(b).

Defendants also fail to persuade this Court with their second ground for dismissing the Complaint: Plaintiffs' purported lack of cognizable scienter allegations.

In addition to alleging facts showing actionable statements and omissions, in order to properly plead claims under Section 10(b) and Rule 10b-5, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 313. Under Section 10(b), scienter is the requisite mental state, meaning "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks and citation omitted). "Under the heightened pleading standard for scienter, a 'complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 324). A litigant may satisfy this pleading requirement by alleging facts showing either motive and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness. *ECA* 553 F.3d at 198–99.

Here, Plaintiffs proceed under a recklessness theory. (Pl.'s Opp. at 12.) To qualify as reckless, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). An alleged "refusal to see the obvious, or to investigate the doubtful," must be "egregious" to be actionable. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (citation omitted). Plaintiffs can establish recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308).

The allegations offered by the CWs suggest that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak,* 216 F.3d at 312. Plaintiffs allege that McCoy, Scully and Legher were "in charge" of the decision to lower the credit standards for hiring new Representatives in Brazil, (CAC ¶ 60), and that all Defendants were frequently updated about the consequences of that decision. For instance, Legher received daily updates on delinquency rates in each region of Brazil, as well as internal reports summarizing the delinquencies accrued during each 3-wek campaign. (*Id.* ¶ 111.) He also attended at least one of the meetings in 2016 when Ribeiro discussed the delinquency and debt collection issues. (*Id.* ¶¶ 109-10.) As for the Defendants stationed back at Avon headquarters, they received "monthly forecasts of current and projected bad debt" throughout the Class Period and attended regional sales meetings during which they reviewed issues in each regional market. (*Id.* ¶¶ 107, 113.) And, of course, management, included McCoy, Scully, and Wilson, represented in Avon's 10-K that it reviewed the allowance for delinquent accounts "at a minimum, on a quarterly basis." (DeMasi Decl. Ex. 2, at 31.)

Having represented that they would actively monitor the effect of delinquencies on the Company's debt load, and having received information demonstrating that the credit criteria switch caused an increase in delinquencies, Defendants had a duty to update their public disclosures so as to not render their earlier representations misleading. Either Defendants received reports detailing the rising delinquency rate long before acknowledging it publicly on February 16, 2017, or they deliberately ignored those reports while telling shareholders that Avon was "taking a more balanced risk-based approach" that had proved "very successful." (CAC ¶¶ 148, 166.) In either case, such behavior is sufficiently egregious to raise a strong inference of recklessness.

Similarly, once they had touted the new training program, Defendants had a duty to disclose the ongoing lack of training for Brazilian Representatives both during the Class Period. Defendants argue that the Complaint fails to allege "that any Individual Defendant was aware that training of new Representatives had ceased in Brazil." (Def.'s Reply at 4.) But Defendants made numerous public comments about the quality of the training program – *see, e.g.*, CAC ¶¶ 134, 153, 163, 189. Drawing all inferences in Plaintiffs' favor, this Court can reasonably conclude either that Defendants access to information regarding that program, or that defendants were recklessly indifferent to the truth or falsity of their training statements and never bothered to investigate whether Avon Brazil was actually training new Representatives. *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 395 (S.D.N.Y. 2007).

Defendants also argue that Zijderveld's statements regarding the lack of training cannot establish scienter since he never "profess[ed] to be knowledgeable about the state of mind of any Individual Defendant." (Def.'s Reply, at 7.) The Second Circuit has repeatedly held that district courts may draw inferences favorable to the Plaintiff in a PSLRA case from post-Class Period events and statements. *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *Scholastic*, 252 F.3d at 73 ("[P]ost-class period data may be relevant to determining what a defendant knew or should have known during the class period."). But the Court's conclusion that Plaintiffs have adequately alleged scienter as to the training statements does not hang solely on Zijderveld's comments alone. There are also the contemporaneous observations of the CWs, which confirm that Avon provided no training to new Representatives in Brazil.

That Brazil made up 21% of Avon's revenues at the start of the Class Period lends additional support a strong inference of scienter. The "core operations doctrine" permits an inference that a company and its senior executives have knowledge of information concerning

40

the "core operations" of a business, even without specific allegations that senior management had actual knowledge of such information. *See Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989); *Medis Inv. Grp. v. Medis Techs., Ltd.*, 586 F.Supp.2d 136, 145 (S.D.N.Y. 2008). "Core operations" include matters "critical to the long term viability" of the company and events affecting a "significant source of income." *Cosmas,* 886 F.2d at 13; *Medis,* 586 F.Supp.2d at 46. For example, in In *re Hi-Crush Partners L.P. Securities Litigation*, 12-cv-8557, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013), this Court relied upon management's awareness of a threat to 18% of the issuer's revenue to find that the "core operations" inference supported a strong inference of scienter. *Id.* at *3.

True, some courts have suggested that the "core operations" inference did not survive Congress's passage of the PSLRA, noting the tension between a presumption of knowledge and the statutory requirement that facts supporting scienter be "state[d] with particularity." *See In re Wachovia Equity Securities Litigation*, 753 F. Supp. 3d 326, 353 (S.D.N.Y. 2011). But the Second Circuit has yet to abrogate the rule. Accordingly, following the Supreme Court's instruction to "assess all the allegations holistically," *Tellabs*, 551 U.S. at 326, most district courts in this jurisdiction addressing the inference following the passage of the PSLRA have concluded that "allegations of a company's core operations . . . can provide supplemental support for allegations of scienter." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (quoting *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. Appx. 10, 14 n.3 (2d Cir. 2011) (summary order)). In any event, it would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market, especially in light of McCoy's multiple trips to check on operations in Brazil during the Class Period. (CAC ¶ 276.)

Avon's alleged GAAP violations reinforce the conclusion that Plaintiffs have adequately alleged scienter. Although insufficient standing alone, "allegations of GAAP violations or accounting irregularities . . . [when] coupled with evidence of 'corresponding fraudulent intent' . . . [are] sufficient" to establish scienter. *Novak,* 216 F.3d at 309. In particular, "accounting manipulations involving premature revenue recognition," – such as those alleged here (*see* CAC ¶¶ 263-268) – "are especially indicative of conscious misbehavior since such schemes do not commonly occur inadvertently." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (internal quotation marks and citations omitted). Plaintiffs' allegations regarding Avon's premature revenue recognition are substantially similar to those considered by Judge Koeltl in *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602 (S.D.N.Y. 2015), where plaintiffs alleged that a medical device manufacturer loosened its credit terms for sales to "higher risk distributors," even though "collection was not reasonably assured," but continued to recognize revenue prior to receiving full payment for those sales, *Id.* at 618. There, as here, Defendants continued to recognize revenue and make SOX certifications even after receiving reports showing higher rates of default on the questionable line items. The facts alleged by Plaintiffs as to Avon show a similarly cavalier attitude towards revenue recognition, thereby providing supplemental support for a strong inference of scienter with respect to McCoy, Scully, and Wilson, each of whom certified Avon's GAAP calculations during the Class Period.

In spite of all this, Defendants argue that neither Plaintiffs nor the CWs allege that "any defendant acted with an actual intent to deceive the investing public," or that "any individual defendant had 'access to non-public information contradicting their public statements.'" (Def.'s Br. at 14-15 (quoting *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 485 (S.D.N.Y.

2017).) These claims hang on the Defendants view that CWs must either have direct contact with individual defendants or "identify the internal documents . . . known or available to . . . Defendants" in order for their statements to establish the Defendants' states of mind during the relevant time period. (Def.'s Br. at 14.)

But that is not the standard in this Circuit: rather, for their statements to be credited on a motion to dismiss, confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314.

Applying the *Novak* standard is fatal to Defendants' argument. The notion that the CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law. For example, in *Orthofix*, the Court found that "there is no baseline requirement of such contact [between CWs and defendants]," where the CW was a regional sales manager whose statement supported allegations that individual defendants' were involved in certain sales practices in his region. *Orthofix*, at 89 F. Supp. 3d at 615-16. The relationship between the source and the defendant in *Orthofix* is highly analogous to facts alleged as to CWs 2, 3, 4, 5, 6, and 7: each was in position to possess information about hiring and sales practices in Brazil during the Class Period, and was aware of the extent to which the individual Defendants were involved in those same practices.

As for CW-1, it is highly probable that an executive director providing financial oversight for the Transformation Plan would have "learned about Avon's increasing bad debt in Brazil through monthly performance review documents." (CAC ¶ 83.)

Defendants' other ground for discounting the CW statements – a failure to identify specific documents that establish scienter – is simply counterfactual: the CWs do identify

particular reports containing non-public information reviewed by the Defendants. (*See, e.g., id.* ¶¶ 106-115.)

Applying those principles to conclude that the CWs were in a position to possess the information alleged, this Court finds that the allegations support an inference of scienter that is both "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324.

**C.     The Motion to Dismiss the Section 20(a) Control Person Claim is Denied.**

Section 20(a) holds liable any persons who "control" those found primarily liable under the Exchange Act. 15 U.S.C. § 78t(a)); *accord ATSI*, 493 F.3d at 108 (elements of control person liability). Defendants do not dispute that the executives named as Defendants qualify as control persons under Section 20(a). Because Plaintiffs have properly pleaded a primary violation of Section 10(b), Plaintiffs' control person liability claim survives as well.

## CONCLUSION

Accordingly, the Defendants' motion to dismiss is denied. The Clerk of Court is respectfully directed to terminate the open motion at Dkt. No. 33.

The constitutes the "written" decision and order of the Court.

Dated: November 18, 2019
         New York, New York

                                        Chief Judge

BY ECF TO ALL PARTIES