UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Avon Products Inc. Securities Litigation | No. 19-cv-01420-MKV CLASS ACTION |
|---|---|

**DECLARATION OF GREGORY M. NESPOLE IN SUPPORT OF
(i) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND PLAN OF ALLOCATION, AND (ii) LEAD COUNSEL'S MOTION
FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARDS
PURSUANT TO 15 U.S.C. §78u-4(a)(4)**

I, Gregory M. Nespole, hereby declare as follows:

1.      I am a partner of the law firm of Levi & Korsinsky, LLP ("**Levi & Korsinsky**" or "**Lead Counsel**"), attorneys for Lead Plaintiff Holly Ngo ("**Lead Plaintiff**") in the above-captioned securities class action (the "**Action**"). I am admitted to practice before this Court and have personal knowledge of the various matters set forth herein based on my day-to-day participation in the prosecution and settlement of this Action.

2.      I submit this Declaration in support of (i) Lead Plaintiff's motion for Final Approval of Class Action Settlement and Plan of Allocation, and (ii) Lead Counsel's motion for an Award of Attorneys' Fees and Expenses and Awards Pursuant to 15 U.S.C. §78u-4(a)(4). Both motions have the full support of Lead Plaintiff as set forth in the accompanying Declaration of Holly Ngo and the full support of additional named plaintiff David Klungle as set forth in his accompanying Declaration. (Ms. Ngo and Mr. Klungle are together referred to as the "**Plaintiffs**" where it is appropriate to do so). A compendium of unreported "slip opinions" cited in these motions is attached hereto in alphabetical order as **Exhibit A**.

3.      Unless otherwise defined, capitalized terms in this Declaration have the meanings in the Stipulation and Agreement of Settlement, dated and filed on August 21, 2020 (ECF 77-1, the "**Stipulation**"). I respectfully refer the Court to my previous Declaration in Support of Lead

Plaintiff's Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement dated and filed on August 21, 2020 (ECF 71), which I affirm and incorporate by reference.

**Preliminary Statement**

4.      The proposed Settlement now before the Court provides for the full resolution of the federal securities fraud claims against Avon Products, Inc. ("**Avon**" or the "**Company**") and Sherilyn S. McCoy, James S. Scully, James S. Wilson, and David Legher (the "**Individual Defendants**," and together with Avon, the "**Defendants**") in exchange for a cash payment of $14,500,000. As detailed herein, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement represents a favorable result for the Settlement Class considering the significant risks of continuing to litigate this Action.

5.      Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and the defenses to the claims. In choosing to settle, Lead Plaintiff and Lead Counsel took into consideration the substantial risks associated with advancing the claims alleged in the Action, as well as the duration and complexity of the legal proceedings that remained ahead. As discussed in detail below, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all.

6.      Had the Action not settled, it would proceed through a contested motion for class certification and contested motions for summary judgment before trial and a likely appeal. All the while, Defendants would have advanced substantial arguments about class certification, liability, and damages. Among other things, Defendants were expected to contest: (1) whether, and the extent to which, various statements and/or omissions alleged by Plaintiffs were materially false or misleading or actionable under the securities laws; (2) whether any of the Defendants intended to mislead investors; (3) whether, and the extent to which, various statements and/or omissions alleged by Plaintiffs influenced the trading price of Avon common stock during the Class Period;

(4) whether the price of Avon common stock was artificially inflated during the Class Period; (5) whether information provided by former Avon employees to Lead Counsel would be admissible at trial; (6) whether testimony from former Avon employees would be suppressed and/or excluded; (7) the method for determining whether and to what extent Avon common stock was artificially inflated during the Class Period including complicated disaggregation issues; and (8) the amount of such inflation, if any.

7.    A particularly complicated challenge was the issue of disaggregation, *i.e.,* determining how much of the decline in the price of Avon's stock was attributable to the alleged fraud and how much was attributable to factors wholly independent of the fraud. This issue would have been the subject of extensive dueling expert testimony. In addition, there was the practical challenge of taking significant discovery in Brazil and London during the COVID-19 Pandemic, with no guarantees that third parties located outside the United States would be willing or allowed to cooperate or travel and few if any means to cost effectively compel their compliance.

8.    Accordingly, in the absence of a settlement, there was a very real risk that the Settlement Class could have recovered nothing or an amount significantly less than the negotiated Settlement of $14.5 million.

9.    In addition to seeking approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation governing the calculation of claims and the distribution of the Settlement proceeds. As discussed below, the proposed Plan of Allocation was developed with the assistance of Lead Counsel's damages expert, and provides for the distribution of the Net Settlement Fund to Settlement Class members who submit Proof of Claim Forms that are approved for payment based on a function of, *inter alia*, (i) when a Settlement Class member purchased or otherwise acquired shares of Avon common stock, and (ii) whether the Settlement Class member

held his, her or its Avon stock through the date of at least one alleged corrective disclosure made by the Company.

10.     With respect to the Fee and Expense Application, as discussed in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards Pursuant to 15 U.S.C. §78u-4(a)(4) (the "**Fee Brief**"), the requested fee of 30% of the Settlement Fund would be fair to the Settlement Class as well as to Lead Counsel and additional plaintiffs' counsel Labaton Sucharow LLP (together with The Schall Law Firm, "**Plaintiffs' Counsel**"), and warrants the Court's approval. This fee request is on par with fee percentages frequently awarded in this type of action and, under the facts of this case, is justified in light of the benefits that Lead Counsel and Plaintiffs' Counsel conferred on the Settlement Class, the risks they undertook, the quality of the representation, the nature and extent of the legal services provided, and the fact that Lead Counsel and Plaintiffs' Counsel pursued the case at their sole financial risk. Lead Counsel also seeks $157,000 in litigation expenses incurred by Lead Counsel and Plaintiffs' Counsel in connection with their work, as well as awards pursuant to 15 U.S.C. §78u-4(a)(4) in the amount of $7,500 to Lead Plaintiff and $1,220 to additional named plaintiff David Klungle in recognition of their significant assistance in prosecuting the Action.

### History of the Action

11.     On February 14, 2019, plaintiff Manzoor Bevinal filed a class action complaint in the United States District Court for the Southern District of New York against Defendants on behalf of himself and all persons or entities who purchased or otherwise acquired the publicly traded common stock of Avon between January 21, 2016 and November 1, 2017 inclusive (the "**Class Period**"), alleging violations of 15 U.S.C. §§ 78j(b) and 78t(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. (ECF 1).

12.     Pursuant to the PSLRA, on February 14, 2019, counsel for plaintiff Bevinal published notice informing other potential class members of their right to move for appointment as lead plaintiff for the putative class.

13.     On April 15, 2019, Holly Ngo moved to be appointed lead plaintiff and for her attorneys, Levi & Korsinsky, to be appointed Lead Counsel. On June 3, 2019, the Court appointed Lead Plaintiff as such, and appointed Levi & Korsinsky as Lead Counsel. (ECF 16).

14.     Lead Plaintiff, through counsel, diligently investigated the claims, defenses, and underlying events and transactions that are the subject of the Action. This process has included analyzing, among other things, publicly filed documents and records, investigative reports, and news stories; and reviewing and corroborating the allegations and developments in the case. Lead Plaintiff, through counsel, also contacted more than 60 potential witnesses, who were former employees, independent contractors, and outside sales representatives (“**Representatives**”) of Avon and interviewed 40 of them. Seven Representatives became cooperating witnesses, who provided additional information supporting the allegations. In addition, Lead Counsel consulted with certain experts regarding issues of market efficiency and damages suffered by Lead Plaintiff and the class resulting from the claims in the Action.

15.     On July 24, 2019, based on an extensive investigation, Lead Counsel, with the assistance of Plaintiffs’ Counsel, filed the operative Corrected Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws (the “**Amended Complaint**”) on behalf of Lead Plaintiff Holly Ngo and additional named plaintiff David Klungle. (ECF 32).

16.     The Amended Complaint alleges that during the Class Period, Avon and the Individual Defendants tried to create the illusion that Brazil was still a growth center by (along with other practices) dramatically lowering credit standards for their Representatives in Brazil.

Thus, during the Class Period, Defendants allegedly concealed that they dramatically loosened credit standards for Brazilian Representatives to mask declining performance. Defendants also stopped training Avon's Brazilian sales Representatives during the Class Period, another critical fact that Defendants allegedly affirmatively misrepresented.

17.    The Amended Complaint further alleged that Defendants violated GAAP by improperly recognizing revenue and failing to properly account for doubtful accounts. The Amended Complaint details Defendants' issuance of false and misleading statements during the Class Period through SEC filings, earnings announcements, conference calls with analysts and during industry conferences. Each of the false statements was alleged with particularity concerning why they were untrue and how they were made with scienter or otherwise actionable.

18.    The allegations in the Amended Complaint were buttressed by information provided to Plaintiffs' Counsel by numerous cooperating witnesses who are former employees, most of whom are located in Brazil with Portuguese as their native language. These witnesses confirmed that Defendants lowered credit standards applicable to new sales recruits. Plaintiffs allege that this materially increased the risk of default. The witnesses confirmed that the new sales recruits suffered under the weight of poor credit, rendering them more likely to default on the payment of the merchandise they ordered from the Company. The witnesses further confirmed that revenue figures were inflated through the "sale" of product to these new recruits even though they ultimately defaulted on the payments owed to Avon. Finally, the witnesses confirmed that Defendants received reports and other materials and participated in meetings acknowledging the increasingly dire situation among newly recruited Representatives, particularly in Brazil.

19.    The Amended Complaint alleges that the truth began to emerge though three disclosures made by the Company beginning on February 16, 2017, and that the entirety of the

malfeasance was disclosed in the fourth disclosure on August 2, 2017. On that day, before the market opened for trading, investors learned that bad debt figures had materially increased, driven by relaxed credit standards among newly recruited Representatives, especially in Brazil. Investors were finally told that the push to hire more Representatives to boost revenue came at the risk of exposing the Company to uncollectable debts because these new Representatives had poor credit ratings well below the minimum level previously required by the Company.

20. On November 18, 2019, following full briefing by the parties, Judge Colleen McMahon entered her Decision and Order Denying Defendants' Motion to Dismiss. (ECF 46). (The Action was reassigned from Judge McMahon to Judge Vyskocil upon her appointment to the bench from the United States Bankruptcy Court). Judge McMahon's decision held that the Amended Complaint credibly pled that, throughout the Class Period, Defendants issued false and misleading statements concerning: (i) Avon's recruitment practices, the ongoing credit crisis, and the resulting increase in bad debt; (ii) Avon's accounting practices, including the Company's failure to increase its allowance for bad debts to account for the changes to its credit terms; and (iii) Avon's training and support systems for new Representatives. *Id*.

21. Discovery began upon the Court's denial of Defendants' motion to dismiss. In addition to the type of discovery generally undertaken in a complex litigation, discovery here involved issues surrounding cooperating witnesses located in Brazil who mostly spoke Portuguese.

22. Plaintiffs drafted and served Defendants with demand for documents and requests for admissions. Plaintiffs also served Avon with a Rule 30(b)(6) deposition notice, seeking testimony about the following topics (among others): (i) the preservation, search, and production of responsive documents and electronically stored information; (ii) Defendants' document retention policies and practices; (iii) the software, programs, systems or documents used to track

Avon's Representatives including their sales and delinquencies and Avon's revenues, earnings, and profitability; (iv) Avon's policies and practices for recruiting and training Representatives in Brazil and the creditworthiness and delinquency of Avon's Representatives in Brazil; (v) processes for determining and administering Avon's executive compensation and administering the Company's stock trading plan; (vi) Avon's SEC reporting and compliance procedures; and (vii) the identity and frequency of all recurring meetings conducted or attended by any of the Individual Defendants. Plaintiffs also responded to the discovery requests that Defendants served on them.

23.    The Parties engaged in numerous meet and confers concerning discovery. Complicating discovery was Avon's assertion that the requested documents were mostly in Brazil and would have to be translated to English (or possibly in London). There were also serious logistical issues given the Covid-19 Pandemic and how it was expected to affect Avon's ability to collect potentially responsive discovery as well as the general disruption to Avon's business. Nevertheless, Plaintiffs' Counsel pushed for discovery including developing search terms and identifying custodians beyond what Defendants had proposed.

24.    Plaintiffs' use of cooperating witnesses gave rise to notable discovery issues. There was motion practice about the scope of the attorney work product privilege. Plaintiffs opposed a motion to compel, addressing issues concerning whether Defendants were entitled to Lead Counsel's notes and records of meeting with the witnesses and their Brazilian counsel. Another discovery issue was whether the information provided by the witnesses could ultimately be used in the litigation to prove the allegations in the Amended Complaint if they could not travel to the United States to be deposed, or be deposed in Brazil because of restrictions under Brazilian law.

25.    Plaintiffs' Counsel took steps to retain counsel In Brazil for the cooperating witnesses located there. Plaintiffs' Counsel worked with Brazilian counsel to obtain sworn

declarations from the witnesses confirming the information they previously related which had been included in the Amended Complaint.

26.     Plaintiffs' Counsel further moved for class certification, produced the proposed class representatives' documents, and began to prepare the proposed class representatives for their depositions. Plaintiffs' Counsel further spent significant time with its retained damages expert to address the complicated disaggregation issue, how to rebut evidence of confounding events (*i.e.,* events unrelated to the alleged fraud which led to a drop in the stock price), and structure a theory of damages and liability that would support a finding that class certification was appropriate.

27.     Plaintiffs' Counsel further reviewed over 15,000 pages of documents provided by Defendants. This production, though a subset of the full production demanded, consisted of Board minutes and other reports concerning the core allegations in the Amended Complaint.[1]

### The Settlement

28.     Beginning shortly after Judge McMahon issued her decision denying Defendants' motion to dismiss, the Parties began to test whether an early-stage resolution was possible. Lead Counsel and Defendants' Counsel discussed the procedural posture of the Action, forthcoming discovery and motions, and the Parties' initial positions concerning the merits and strength of the allegations and potential defenses. As the case was litigated during the months that followed, counsel for the Parties nevertheless continued to undertake meaningful discussions of their views of the merits, strength, and risks concerning this Action including certain difficulties presented by the pandemic in engaging in discovery in Brazil and London.

---

[1] The production was made pursuant to a confidentiality agreement that remains in effect. Accordingly, Lead Counsel's discussion of the documents is circumscribed. If the Court is so inclined, Lead Counsel is prepared to discuss the documents in detail *in camera*.

29.     Defendants' Counsel and Lead Counsel ultimately explored the possibility of resolving the Action through mediation and on June 18, 2020, the Parties participated in a Zoom mediation session held before mediator Robert A. Meyer, Esq. of JAMS (the "**Mediator**"). Following additional discussions occurring over the following days among the Parties with the assistance of the Mediator, the Parties reached an agreement to settle this Action for $14,500,000 in cash and signed a Memorandum of Understanding on July 2, 2020.

30.     Following the parties' entry into the Memorandum of Understanding, the Parties negotiated the Stipulation, which was executed on August 21, 2020. The Stipulation, which sets forth the final terms and conditions of the Settlement, includes, among other things, a release of all claims asserted against Defendants in the Action, and certain related claims, in return for a cash payment by, or on behalf of, the Defendants in the amount of $14,500,000 into a Settlement Fund for the benefit of the Settlement Class.

31.     The only settlement-related agreements between Lead Plaintiff and Lead Counsel, on the one hand, and Defendants or Defendants' Counsel, on the other hand, are the Memorandum of Understanding, the Stipulation, and the confidential Supplemental Agreement, dated August 21, 2020, concerning the circumstances under which Defendants may terminate the Settlement based on the number of requests for exclusion from the Settlement Class. *See* Stipulation ¶ 46. It is standard to keep such agreements confidential so that a large investor, or a group of investors, cannot intentionally try to leverage a better recovery for themselves by threatening to opt out, at the expense of the class. The Supplemental Agreement can be provided to the Court *in camera* or under seal.

32.     In light of the significant risks of proceeding with further litigation, including the risks that Defendants would be successful in defeating a motion for class certification or dismissing

the action at summary judgment, and the challenges with respect to damages and causation issues, Avon's financial position, uncertainty surrounding the collection of a judgment, and issues surrounding discovery to be taken abroad during a pandemic, Lead Plaintiff and Lead Counsel determined that the proposed Settlement represents the best possible result for the Settlement Class.

33.     Accordingly, Lead Plaintiff moved for preliminary approval of the contemplated Settlement on August 21, 2020 (ECF 69-72) and the Court subsequently issued its Order Granting Preliminary Approval of Settlement on August 31, 2020 (ECF 74, the "**Preliminary Approval Order**").

<u>**Risks of Continued Litigation**</u>

34.     Based on their experience and close knowledge of the facts of the case and law governing the claims, Lead Counsel determined that settlement at this juncture is in the best interests of the Settlement Class. As described herein, at the time the Settlement was reached, there were sizable risks facing Lead Plaintiff with respect to class certification, establishing liability, loss causation, market efficiency and damages. Further, there were significant concerns relating to the complexity of the debate inherent in a securities action as described in detail below.

**A.     Risks Related to Liability**

35.     Lead Plaintiff would have faced significant hurdles in proving her case on liability. Litigation of the claims alleged in this case was expected to raise several complex questions concerning scienter, loss causation, and damages that would require substantial efforts by Lead Plaintiff and Lead Counsel. Assuming the claims survived a motion for summary judgment, a jury trial would have required substantial factual and expert testimony, which is always uncertain. Whatever the outcome at trial, it was virtually certain that an appeal would have been taken. All

the foregoing would have posed considerable expense to the Parties and would have delayed any potential recovery for several years.

36.     As noted above, a major challenge to prosecuting this case through motions for summary judgment and then through trial would have been the issue of disaggregation, *i.e.*, determining how much of the decline in the price of Avon's stock was attributable to the alleged fraud and how much was attributable to factors wholly independent of the alleged fraud. There was also the practical challenge of taking significant discovery in Brazil and London during the pandemic, with no guarantees that third parties located there would be willing or allowed to cooperate or travel and few if any means to cost effectively compel their compliance.

**B.     Risks Concerning Loss Causation, Damages, and Market Efficiency**

37.     Lead Plaintiff faced serious risks in ultimately proving loss causation and damages at trial. Indeed, if Lead Plaintiff did not meet her burden to establish causation by a preponderance of evidence, then the class would have recovered nothing.

38.     As to loss causation, Lead Plaintiff anticipates that Defendants would have argued that Lead Plaintiff's event study would be unable to disaggregate for only fraud-related inflation. Defendants would have argued that causation was speculative because Plaintiffs' damages model did not account for the effect of the record macroeconomic downturn in Brazil, or consequential effects such as the tightening of recruiting terms, or other factors such as the announcement of lower-than-expected revenues due to lower sales and higher tax rates.

39.     Lead Plaintiff would have also had to overcome issues surrounding market efficiency, namely that Avon securities suffered at least four declines during the Class Period stemming from several causes, not just Representative retention and debt.

40.     Lead Plaintiff's damages expert has estimated that if liability were established with respect to all of the claims, including in connection with the four alleged corrective disclosures, the most reasonable estimate of aggregate damages likely recoverable at trial was $148.7 million, taking into account the exclusion of gains on pre-Class Period purchases and the "parsing out" or disaggregation of the impact of non-fraud related information from the alleged stock price declines in reaction to the corrective disclosures. (Without disaggregation, estimated damages excluding pre-Class Period gains are approximately $309 million). Accordingly, based on the most reasonable estimate by Lead Plaintiffs' damages expert, the Settlement represents approximately 9.4% of aggregate damages likely recoverable at trial. Defendants, however, had argued that the Class Period should end with the first corrective disclosure on February 16, 2017 (before the market opened). Had the Court agreed with Defendants and shortened the Class Period, on class certification or summary judgment, to end on February 15, 2017, estimated damages, including netting and disaggregation would have fallen to as low as $58.7 million.

41.     As the case continued, the Parties' respective damages experts would strongly disagree with each other's assumptions and their respective methodologies. The risk that the Court or a jury would credit Defendants' expert's anticipated damages positions over those of Lead Plaintiff would have considerable consequences in terms of the amount of recovery for the Settlement Class, assuming that liability were proven.

**C.     Risks Related to Class Certification**

42.     Although class certification had not yet been fully briefed in this case, and class certification is sought at this juncture for the purposes of settlement only, Defendants would undoubtedly have raised vigorous challenges to class certification, and such disputes could well devolve into yet another battle of the experts. Additionally, class certification can be reviewed and

modified at any time by the Court before final judgment. Although Lead Counsel believes there are strong grounds for certifying a litigation class, discussed in the Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel (ECF 53) and the Memorandum of Law in Support of Lead Plaintiff's Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement (ECF 72) at Point II, the Settlement avoids any uncertainty with respect to class certification and risks of maintaining certification of the class through trial and on appeal.

43.     Defendants were highly critical of Lead Plaintiffs' class certification motion. Defendants contended that the application was accompanied by an event study that they asserted did not provide insight into how damages were to be measured, the underlying assumptions, or how it would adjust for disaggregation for only fraud-related price inflation. Admittedly, the disaggregation issues presented unique challenges to class certification. Indeed, a four "corrective disclosure" class period is unusual and affords ample fodder to attack the proposed class as being too long or possibly not entitled to the presumption of reliance.

44.     Finally, the protracted litigation necessary to overcome Defendants' arguments on the motion for class certification, summary judgment, and trial would be extremely costly and would have depleted available insurance policy coverage.

**Lead Plaintiff's Compliance with Preliminary Approval Order
and Reaction of the Settlement Class to Date**

45.     Pursuant to the Preliminary Approval Order, the Court approved the appointment of Epiq Global ("**Epiq**") as Claims Administrator in the Action and instructed Epiq to disseminate copies of the Notice and Proof of Claim Form by first class mail; to publish the Summary Notice on a national wire service; and to post the Stipulation, Notice, Summary Notice and Proof of Claim Form on the Claim Administrator's website.

14

46.     The Notice and Summary Notice provide potential Settlement Class members with information about the terms of the Settlement and contain, among other things: (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation for calculating claims; (iii) an explanation of Settlement Class members' right to participate in the Settlement; (iv) an explanation of Settlement Class members' rights to object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class; and (v) the manner for submitting a Proof of Claim Form in order to be eligible for a payment from the net proceeds of the Settlement. The Notice also informs Settlement Class members of Lead Counsel's intention to apply for an award of attorneys' fees on behalf of itself and Plaintiffs' Counsel in an amount not to exceed 30% of the Settlement Fund and for payment of litigation expenses in an amount not to exceed $210,000 for the expenses that Lead Counsel and Plaintiffs' Counsel have incurred in prosecuting the Action. The Notice also informs the Settlement Class that the Fee and Expense Application may include an application pursuant to the PSLRA for the reasonable costs and expenses (including lost wages) of Plaintiffs directly related to their litigation efforts, to be paid from the Settlement Fund. Copies of the Notice and Summary Notice are attached respectively as Exhibit A and Exhibit B to the accompanying Declaration of Jessie Mahn Regarding (I) Mailing of Notice and Proof of Claim Form; (II) Publication of Summary Notice; (III) Call Center Services; (IV) The Settlement Website; and (V) Requests for Exclusion and Objections Received to Date (the "**Mahn Decl.**").

47.     As set forth in the Mahn Decl., Epiq has complied with its obligations pursuant to the Preliminary Approval Order by mailing the Notice and Proof of Claim Form to the Company's stockholders of record as well as persons identified by banks, brokerage firms and other third party nominees as possible Settlement Class members. Mahn Decl. ¶ 4 – 6. As set forth in the Mahn

15

Decl. ¶ 10, in total, Epiq mailed these materials to 63,091 potential Settlement Class members as of December 15, 2020. As set forth in the Mahn Decl. ¶ 12, Epic published the Summary Notice via PR Newswire, a national wire service. Epiq also maintains a toll-free telephone line with pre-recorded information available 24 hours a day, seven days a week. *Id.* ¶¶ 13 – 14. Epiq further maintains and posts information regarding the Settlement on its website, www.AvonSecuritiesLitigation. com, to provide Settlement Class members with information concerning the Settlement, as well as downloadable copies of the Notice, Summary Notice, Proof of Claim Form, the Stipulation, the Preliminary Approval Order, and other important documents related to the Settlement. *Id.* ¶¶ 15-16.

48.    Pursuant to the Preliminary Approval Order ¶¶ 19 and 24, the deadline for Settlement Class members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class, is December 30, 2020. As set forth in the Mahn Decl. ¶¶ 18 and 20, as of December 15, 2020, only five (5) requests for exclusion and no objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application have been received (nor has Lead Counsel received any objections). Epiq will submit a supplemental declaration after the December 30, 2020 deadline addressing any further requests for exclusion received or any objections. *Id.* ¶ 19. Should any objections be received, Lead Counsel will address them in reply papers.

### The Plan of Allocation for Distribution of Settlement Payments

49.    Pursuant to ¶ 17 of the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Proof of Claim Form, including all required information, postmarked no later than December 19, 2020. As provided in the Notice, after deduction of Court-awarded

attorneys' fees and expenses, notice and administration costs, and all applicable taxes, the balance of the Settlement Fund (the "**Net Settlement Fund**") will be distributed according to the plan of allocation approved by the Court (the "**Plan of Allocation**").

50.     The proposed Plan of Allocation, which is set forth in full in the Notice (Exhibit A to the Mahn Decl.), was designed to achieve an equitable and rational distribution of the Net Settlement Fund. Lead Counsel developed the Plan of Allocation with the assistance of its damages expert and believes that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

51.     The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants based on a function of (i) when a Settlement Class member purchased or otherwise acquired shares of Avon common stock, (ii) whether the Settlement Class member held his, her or its Avon stock through the date of at least one corrective disclosure made by the Company; (iii) whether the Settlement Class member held his, her or its Avon stock during the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e) (providing methodology for limiting damages in securities fraud actions), and (iv) the per share amount of artificial inflation in the price of the Company's stock. Purchases of the Company's stock fall into four periods corresponding to the dates of the corrective disclosures. Within each period, Authorized Claimants are treated on a *pro rata* basis based on their Recognized Claim, as such term is defined in the Notice, calculated according to the formulas in the Plan of Allocation, which are consistent with Lead Plaintiff's theory of liability and alleged damages. These formulas consider the amount of alleged artificial inflation in the prices of the Company's stock, as estimated by Lead Counsel's damages expert.

52.     Claimants will be eligible for a payment based on when they purchased or otherwise acquired, held, sold or otherwise disposed of their stock. The Court-approved Claims

Administrator, under Lead Counsel's direction, will calculate claimants' Recognized Claim using the transactional information provided in their Proof of Claim Forms. Claims may be submitted to the Claims Administrator through the mail or online using the settlement website. Neither the Parties nor the Claims Administrator independently have claimants' transactional information. Plaintiffs' losses will be calculated in the same manner.

53.    Once the Claims Administrator has processed all submitted claims and provided claimants with an opportunity to cure deficiencies or challenge rejection determinations, payment distributions will be made to eligible Authorized Claimants using checks. After an initial distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of distribution of the Settlement Fund, the Claims Administrator will, if logistically feasible and economically justifiable, make a further distribution of such balance among Authorized Claimants in an equitable fashion. After any reallocation, or if a reallocation is not undertaken, any balance that remains in the Settlement Fund shall be donated to a non-sectarian §50l(c)(3) non-profit charitable organization.

54.    Lead Counsel has received no objections to the Plan of Allocation to date.

55.    In sum, the proposed Plan of Allocation, developed in consultation with Lead Counsel's damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## Lead Counsel's Application for Attorneys' Fees and Expenses

56.    Consistent with the Notice to the Settlement Class, Lead Counsel, on behalf of itself and Plaintiffs' Counsel, seeks a fee award of 30% of the Settlement Fund, or $4,350,000. No other

attorneys will share the awarded attorneys' fees. Lead Counsel, on behalf of itself and Plaintiffs' Counsel, also requests payment of litigation expenses in connection with the prosecution of the Action from the Settlement Fund in the amount of $157,000. Lead Counsel submits that, for the reasons discussed below and in the accompanying Fee Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

## A.    Plaintiffs Support the Fee and Expense Application

57.    As set forth in the accompanying Declaration of Holly Ngo, Lead Plaintiff has evaluated and fully supports the fee and expense application. In coming to this conclusion, Lead Plaintiff – who was involved throughout the prosecution of the Action and negotiation of the Settlement – considered the recovery obtained as well as the efficient prosecution of the claims to obtain a favorable recovery. *Id*. As set forth in his accompanying declaration, additional named plaintiff David Klungle has likewise evaluated and fully supports the fee and expense application.

## B.    The Time and Labor of Lead Counsel and Plaintiffs' Counsel

58.    The investigation, prosecution, and settlement of the claims asserted in the Action required diligent efforts by Lead Counsel with the assistance of Plaintiffs' Counsel. The many tasks undertaken by Lead Counsel in this case, assisted by Plaintiffs' Counsel, are detailed above.

59.    Among other efforts, Lead Counsel, assisted by Plaintiffs' Counsel, conducted a comprehensive investigation in connection with the preparation of the Amended Complaint and engaged in a vigorous settlement process with experienced defense counsel. At all times throughout the pendency of the Action, the efforts of Lead Counsel and Plaintiffs' Counsel were driven and focused on advancing the litigation to bring about the most successful outcome for the Settlement Class, whether through settlement or trial.

60.    The following table summarizes Lead Counsel's time records. The table reports the amount of time spent by Lead Plaintiff's attorneys and professional support staff and the "lodestar"

calculations, *i.e.*, their hours multiplied by their current hourly rates. These figures were prepared from daily time records regularly prepared and maintained by Lead Counsel, which are available at the request of the Court, and reflect time from inception of this action through and including briefing the motion for preliminary approval, and <u>excluding</u> time spent on the motion for final approval, the fee application, responding to any objections, preparing for and appearing at the Final Approval Hearing, and other miscellaneous tasks subsequent to the briefing of the motion for preliminary approval:

| Name | Status | Hourly Rate | Hours | Lodestar |
|------|--------|------------|-------|----------|
| Joseph Levi | Partner | $ 1,050.00 | 121.00 | $ 127,050.00 |
| Ed Korsinsky | Partner | $ 1,050.00 | 137.00 | $ 143,850.00 |
| Gregory Nespole | Partner | $ 1,000.00 | 555.00 | $ 555,000.00 |
| Daniel Tepper | Partner | $ 975.00 | 46.50 | $ 45,337.50 |
| Sebastian Tornatore | Counsel | $ 800.00 | 377.50 | $ 302,000.00 |
| Christopher Kupka | Associate | $ 650.00 | 206.75 | $ 134,387.50 |
| Mark Levine | Counsel | $ 450.00 | 56.25 | $ 25,312.50 |
| Zac Gazzard | Paralegal | $ 375.00 | 36.50 | $ 13,687.50 |
| Alexandra Kushnir | Paralegal | $ 350.00 | 19.25 | $ 6,737.50 |
| Mallory Papp | Paralegal | $ 325.00 | 16.50 | $ 5,362.50 |
| Samantha Halliday | Paralegal | $ 325.00 | 23.95 | $ 7,783.75 |
| | | **TOTAL:** | **1,596.20** | **$ 1,366,508.75** |

61.      The hourly rates of Lead Counsel here range from $975 - $1,050 for partners, $450 - $650 for associates and counsel, and $325 - $375 for professional staff. I respectfully submit that the hourly rates for attorneys and professional support staff included in this table are reasonable and customary within the securities class action bar.

62.      As set forth in the accompanying Declaration Of Christine Fox on Behalf of Labaton Sucharow LLP in Support of Application for an Award of Attorneys' Fees and Expenses (the "**Fox Decl.**") ¶ 4, Labaton Sucharow LLP has expended over 2,212 hours prosecuting this action for a lodestar of $1,306,806.

63.     Thus, Lead Counsel and Labaton Sucharow have together spent over 3,808 hours litigating this case for a total lodestar of $2,673,314.75. The requested fee of 30% of the Settlement Fund ($4,350,000) results in a modest 1.63 multiplier.

## C.     The Standing and Expertise of Lead Counsel and Plaintiffs' Counsel

64.     The experience and expertise of Levi & Korsinsky's attorneys is described in the firm resume attached as **Exhibit B** hereto. As set forth therein, the firm has served as lead counsel in a number of high-profile matters and is highly experienced and skilled in securities litigation. The experience and expertise of Labaton Sucharow, LLP is set forth in the Fox Declaration.

## D.     Standing and Caliber of Opposing Counsel

65.     The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel. Here, Defendants were represented by Cravath, Swaine & Moore LLP, a first rate firm with highly skilled and experienced securities attorneys with significant resources. In the face of this knowledgeable and formidable defense, Lead Counsel, assisted by Plaintiffs' Counsel, was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms that are favorable to the Settlement Class.

## E.     The Contingency Risk Faced by Lead Counsel

66.     From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires. With an average time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing

basis. Plaintiffs' Counsel received no compensation during the course of the Action, but incurred more than 3,808 hours of time for a total lodestar of over $2.6 million as well as significant out-of-pocket expenses in prosecuting the Action for the benefit of the Settlement Class.

67.     Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Lead Counsel is aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

68.     Surviving a motion to dismiss and achieving favorable discovery rulings is no guarantee of ultimate success on the merits. Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial. While only a few securities class actions have been tried before a jury, several have been lost in their entirety. Even plaintiffs who succeed at trial may find their verdict overturned by a post-trial motion for a directed verdict or on appeal. And the path to maintaining a favorable jury verdict can be arduous and time consuming.

69.     As discussed in greater detail above, Lead Plaintiff's success was by no means assured. Defendants would have disputed whether Lead Plaintiff could establish scienter, damages and loss causation. In addition, Defendants would no doubt have contended, as the case proceeded to summary judgment, that even if liability existed, the amount of damages was substantially lower than Lead Plaintiff alleged; indeed, Lead Plaintiff's damages expert estimated that maximum

damages to the Class could be as low as $58.7 million. Were this Settlement not achieved, Plaintiffs, Lead Counsel and Plaintiffs' Counsel faced potentially years of costly and risky trial and appellate litigation against Defendants, with ultimate success far from certain and the significant prospect of no recovery. Further, prolonged litigation would likely quickly result in the wasting of insurance coverage for the claims.

**F.      Request for Litigation Expenses**

70.      Lead Counsel, on behalf of itself and Plaintiffs' Counsel, seeks payment from the Settlement Fund of litigation expenses reasonably and necessarily incurred in connection with commencing and prosecuting the claims against Defendants.

71.      From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the Action was successfully resolved. Thus, Lead Counsel was motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case.

72.      The following summary table prepared from Lead Counsel's check records and other reliable source materials reflects that Lead Counsel's litigation expenses in connection with the prosecution of the Action totaled $8,092.94, excluding routine overhead expenses such as photocopying and telephone calls:

| Category | Total Amount |
|---|---|
| Research | $    5,025.13 |
| Travel and Meals | $    2,914.24 |
| FedEx and Postage | $      102.80 |
| Misc. Disbursements | $        50.77 |
| **TOTAL:** | **$    8,092.94** |

73.      The foregoing expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in securities class action litigation.

74.       As set forth in the Fox Decl. ¶ 7, Labaton Sucharow LLP incurred $148,907.10 in

expenses, principally expert and consultant fees and electronic discovery. The total expenses of Lead Counsel and Plaintiffs' Counsel all together is thus $157,000.04.

**G.      The Reaction of the Settlement Class to the Fee and Expense Application**

75.      As mentioned above, consistent with the Preliminary Approval Order, a total of 63,091 Notices have been mailed to potential Settlement Class members, in addition to the publication of the Notice on the Claim Administrator's website. Mahn Decl. ¶¶ 7 - 16. Consistent with the Preliminary Approval Order, the Summary Notice has been published on a national news wire. *Id.* ¶ 13-14. These materials inform potential Settlement Class members that Lead Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Fund, and payment of expenses in an amount not to exceed $210,000. These materials also informs the Settlement Class that the Fee and Expense Application may include an application pursuant to the PSLRA for the reasonable costs and expenses (including lost wages) of Plaintiffs directly related to their litigation efforts, to be paid from the Settlement Fund.[2] While the deadline set by the Court for Settlement Class members to object to the requested fees and expenses has not yet passed, to date no objections have been received, and only five (5) prospective class members have opted out. *Id.* ¶¶ 18, 20. Lead Counsel will respond to any objections received in reply papers.

## Conclusion

76.      In view of the favorable recovery for the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved as fair,

---

[2] Lead Plaintiff's motion for approval of the Settlement and Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement website.

reasonable, and adequate. In view of the recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Lead Counsel and Plaintiffs' Counsel, as described above and in the accompanying memorandum of law, Lead Counsel respectfully submits that a fee in the amount of 30% of the Settlement Fund should be awarded and that litigation expenses in the amount of $157,000 be reimbursed in full. In light of their significant assistance in the prosecution of this Action and the reasons set forth in their respective declarations, I respectfully submit that an award of $7,500 for Lead Plaintiff Holly Ngo and an award of $1,220 for additional plaintiff David Klungle should be approved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of December 2020 in New Rochelle, New York.

/s/ Gregory M. Nespole
Gregory M. Nespole

25