UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

HOLLY NGO and DAVID KLUNGLE,

                    Plaintiffs,

              v.                              19 CV 1420 (MKV)

AVON PRODUCTS, INC., *et al.*,

                    Defendants.          Telephone Conference

------------------------------x

                                         New York, N.Y.
                                         February 3, 2021
                                         11:35 a.m.

Before:

                    HON. MARY KAY VYSKOCIL,

                                         District Judge

                         APPEARANCES

LABATON & SUCHAROW LLP
     Attorneys for Plaintiffs
BY:  CHRISTINE M. FOX
     -and-
LEVI & KORSINSKY, LLP
BY:  DANIEL TEPPER
     GREGORY MARK NESPOLE

CRAVATH SWAINE & MOORE, LLP
     Attorneys for Defendants
BY:  KARIN A. DeMASI

                SOUTHERN DISTRICT REPORTERS, P.C.••••••
                         (212) 805-0300

(Case called)

MR. NESPOLE:  Your Honor, this is Gregory Nespole from Levi & Korsinsky for plaintiff.

THE COURT:  Good morning.

MR. TEPPER:  Your Honor, this is Daniel Tepper from Levi & Korsinsky.  Good morning.

THE COURT:  Good morning.

MS. FOX:  Good morning, this is Christine Fox from Labaton & Sucharow, also on behalf of plaintiffs.

THE COURT:  Good morning, Ms. Fox.

MS. DeMASI:  Good morning, your Honor, for defendants, this is Karin DeMasi at Cravath.

THE COURT:  Good morning, Ms. DeMasi.

Do we have any other appearances?

Then we are here for a hearing on approval of a settlement that the parties have advised the Court they have reached in this matter.

For the record, obviously, we are convened for this hearing telephonically because we remain subject to restrictions from COVID-19.  Having said that, this is a formal court proceeding open to the press and to the public as if we were in open court.  The contact information for today's hearing was posted on ECF, and anyone who wishes to access today's hearing is able to do so.

I would just remind you of a couple of things for the

sake of good order.

First, please mute your lines if you are not addressing the Court so that we don't get the background noise.

Second, when you do address the Court, please identify yourself for the record so that Mr. Greenblum can get an accurate record of who is speaking and that the Court will know who is addressing me.  I would ask you, please, don't interrupt one another.  I will give everyone who wishes to speak an opportunity to be heard.

The final preliminary thing that I wish to say is I want to apologize profusely to counsel and to the parties.  It was necessary to adjourn today's hearing several times due to issues on the Court's end, and I do apologize to you all for that.

As I say, we are here for a motion for a final approval of a settlement of attorneys' fees and of a proposed allocation of the settlement, as I understand it.

Who wishes to be heard?

MR. NESPOLE:  Your Honor, it's Greg Nespole from Levi & Korsinsky.  I hope you can hear me clearly.  I am working from home.

THE COURT:  Not a problem.

MR. NESPOLE:  If you can't, please let me know, and I'm sure the court reporter will as well.

Just for a matter of good order, on each instance

where we had to postpone the hearing, we did in fact update the settlement website, indicating that the hearing had been postponed. So in the event that there was an objector, even though there aren't any objectors, or anyone else from the press or the public who wished to appear today, they would have had the opportunity. We have updated that so the world knows that we are going forward today.

THE COURT: Thank you very much.

MR. NESPOLE: You're welcome. We just thought it was the best way to proceed.

Your Honor, there are a few things that we need to address this morning. I'm sorry. I am not there in person. I look forward to being there in person soon.

THE COURT: I think we all do.

MR. NESPOLE: It's enough already, quite frankly.

This is the time your Honor has kindly scheduled for us to present our application for final approval of the settlement and our plan of allocation. And then, your Honor, with your permission, assuming you find all of that in good order, we will address our firm's respective applications for attorneys' fees and the reimbursement of litigation expenses, as well as two modest service awards for the lead plaintiff and the additional plaintiff, who were extremely helpful in the prosecution of this case.

Your Honor, I respectfully submit this morning that

this settlement warrants final approval under the standards articulated by the Second Circuit and the 2018 amendments to Rule 23 of Federal Rules of Civil Procedure.

I believe the reasons supporting this position are extensively laid out in our preliminary approval papers and the papers before your Honor now in support of the settlement.

With the Court's indulgence, I would like to summarize what this case is about, unless you would like me to move forward to the more technical issues we have to address today. But I am prepared, for the record, to lay out briefly what the case was about, objectively, for the sake of my friends at Cravath.  And if your Honor is inclined, I will do that.

The case concerns Avon, a company that markets beauty products through direct marketing, meaning the company's representatives sell products through direct marketing, often door to door.  The reps purchase products from Avon on credit and then repay Avon once the product is resold to the customers.  In fact, your Honor, my grandmother was an Avon lady in upstate New York, in a town called Liberty, New York, when I was a kid, so we all know the company.

What was surprising to all of us when the case began is that Avon's largest market over the last few years has become out of Brazil.  With that, certain problems occurred with respect to the company.

Our amended complaint, which the defendants obviously

disagree with, alleges that Avon, from the period of January 21, 2016 to November 1, 2017, the class period for this case, concealed that Avon had dramatically loosened certain credit standings for new reps in Brazil in order to mask representative numbers and waning sales.  That meant, in short, that Avon was treating representatives with weaker credit ratings than they had in the past and were not necessarily in a position to repay Avon for the product that they had purchased on credit for resale.

We also alleged in our complaint, and of course the defendants disagree, that Avon stopped training these Brazilian representatives sufficiently, and that gave rise to even more significant problems with respect to sales and the inability to repay Avon.

We allege in the complaint, instead of disclosing this information to the marketplace, defendants falsely assured the market that both sales and reps and growth were increasing because of the robust recruitment policies and that all was well.  Of course my friends at Cravath and Avon disagree.

When Avon's new Brazilian's representatives, predictably and sadly -- and it was sad -- fell heavily into debt and couldn't pay Avon for merchandise, the company continued to mislead the markets, in our opinion, and, again, used very aggressive collection tactics to get their money back from these reps.

As a result, Avon's numbers earnings were misstated, they had significant bad debt problems on their books, and its financial performance suffered, and their stock declined on several occasions during the class period as a result of this, and we will discuss those respective declines because it is important in this case to understand that there was more than one decline in a case.

Your Honor, following Judge McMahon's appointment of my firm as lead counsel, Ms. Ngo, Holly Ngo, as lead plaintiff, my firm and the Labaton firm, working together, conducted an extensive investigation across the United States and Brazil, which included contacting, I believe, what was 50 witnesses, interviewing at least 40 of them, and securing seven confidential witnesses.  I believe many, if not almost all of these folks, spoke Portuguese as their native language, which is the Brazilian native language.

Based on the information we divined from these witnesses, our own understanding of the financials, our own experience as securities class-action lawyers, we drafted a very detailed pleading supported by these confidential witnesses which Judge McMahon sustained in a written opinion that, I respectfully submit, are very important findings concerning proprietary of using confidential sources in support of a pleading.  And as your Honor may remember, we did have some motion practice with respect to the witnesses later on in

the case, and we will get to that in a moment.

Discovery ensued thereafter but was immediately complicated by several factors.

First, the discovery concerned international issues. Discovery in Brazil is incredibly difficult.  Securing depositions of Brazilians is, frankly, your Honor, nearly impossible.  They speak Portuguese.

Other witnesses were located in the United Kingdom, where Avon's headquarters have now moved.  Documents, thus, were spread all around the world.

We were then, of course, hit with the pandemic, which shut down operations throughout the world, especially, sadly, in Brazil, which was one of the most hard-hit countries in the world.

We noticed 30(b)(6) deps to try to get our arms around these complicated discovery issues, where these documents were, where these people were, how we could do this as effectively as possible.

I can assure you that we met and conferred many times. Ms. DeMasi and I have known each other for many years and have fought hard against each over for many, many years, and we worked very hard in trying to deal with these issues.  We negotiated search terms, custodians, the scope of discovery.

But, again, this was an incredibly complicated case in terms of discovery premised upon the location of materials,

mostly in Brazil, likely more so now in the UK, and the existence of the pandemic.

Motion practice, your Honor remembers I'm sure, quite heated motion practice, ensued over the issues of cooperating witnesses, the scope of work product privilege with respect to my use of cooperating witnesses, with respect to my having to turn over my investigation notes. There were some rulings your Honor issued that, in fact, we had to turn a great deal of this over, and we were prepared to do so.

We also went out and hired Brazilian counsel across Brazil to obtain sworn declarations from each of these witnesses, generally in Portuguese, that would then have to be translated that substantiated the allegations that were in our complaint in the event these witnesses became unavailable because of the pandemic -- God forbid, death -- or any other reason. It's not an understatement that there was some concern about keeping some of these cooperating witnesses within the case because they were afraid. Some of them got sick. And it was very, very difficult. However, we did get many sworn declarations from these folks, so it substantiated the complaint.

THE COURT: Counsel, can I ask, were those declarations shared with the other side?

MR. NESPOLE: They were going to share them. From what I can remember, they were going to share, but we entered

into discussions to mediate the case, and ultimately I don't think there needed to be the sharing of those declarations.

I would defer to Ms. DeMasi if her memory is better than mine.  Did I in fact give those over to defendants?

MS. DeMASI:  Defendants did secure an order that those declarations would be produced, but the case settled in advance of the date for production, your Honor.

THE COURT:  But you were aware of the existence and the volume of declarations that had been obtained and the general sense of the substance?

MS. DeMASI:  We were aware of the existence.  It was represented to us that the volume was small, and it was represented.  We secured an order to have them to be produced.  We did not have information about the substance.  The only information about the substance we had were the allegations in the complaint.

MR. NESPOLE:  I could represent to your Honor that the declaration substantiated the allegations that these witnesses related to us that we included in the pleading.  There were no inconsistencies.

THE COURT:  I'm sorry.  I didn't hear you.

MR. NESPOLE:  There were no inconsistencies.  The witnesses that we interviewed used that information to help draft the complaint that was sustained.  The declarations we received later.  They substantiated the allegations in the

complaint.  It was nothing that set off alarm bells.  Had there been, we would have turned them over and that would have been there, but there weren't any.

THE COURT:  The point I'm trying to just be certain about is that this case was settled because of the evaluation of the respective merits in addition to all of these difficulties that you are outlining for me about obtaining evidence.  In other words, I don't want a settlement that's motivated solely by concerns about COVID, for example.  That's why I'm asking whether you made the defendant aware of what the declarations were going to go to in terms of substance.

MR. NESPOLE:  Your Honor, I've always told my colleagues at Cravath Swaine that the declarations would substantiate the pleadings.  I firmly believe that they substantiate the pleadings.

And the case, quite frankly, did not only settle because of COVID.  There were other real risks on both sides, which I am going to get to in a moment, that deal with risks that we see in every one of these cases.

And indeed, in a moment, I am going to speak to causation and damages which was the real risk that plaintiffs faced.

THE COURT:  Mr. Nespole, if you could get to that, that would be helpful.  You have laid out a lot of this detail in your papers, and I assure you we have carefully reviewed and

studied all of that. I'll give you the opportunity to speak, but you don't need to walk through at such a slow pace.

MR. NESPOLE: I'm sorry, your Honor. You never know how much detail.

I will say that before we get to that, one of the elements is that your Honor has to approve a class for the purposes of settlement. That is laid out in our papers, and I don't think you need me to go through the steps in Rule 23 for that, do you?

THE COURT: No, I do not.

MR. NESPOLE: Very good.

THE COURT: The Court preliminarily approved both the class and counsel previously, and you are here for final approval of all of that.

In addition, I do note that you have told me that there are no objections and a very limited number of requests for exclusions. I think that was in the affidavit of Mr. Mann.

MR. NESPOLE: Yes. Sorry to interrupt, your Honor.

I checked again last night. There has been nothing new that has come in since the last time we were here, so there are no objections, and there are no additional opt-outs.

Your Honor, we provided notice pursuant to the preliminary approval under the order. We disseminated over 62,000 copies of notices of proofs of claims. We published in Investors Business Daily, PI Newswire. We used the Epiq

organization for administration, which is, quite frankly, the Cadillac of the business, in my opinion, and they did a marvelous job. They are still working hard because actually claims are still rolling in a bit because we have found that folks in Brazil who had claims, they are slow to arrive, so Epiq is still keeping an eye on things.

We have received a total of 8,500 claims. We have received no objections. We have seen nothing unusual with respect to this administration process whatsoever.

I would submit to your Honor that notice has been effected, as per preliminary approval, and your Honor should be comfortable that we have done so aligned with Rule 23.

With respect to final approval of settlement, I think this case does, in fact, satisfy the city of *Detroit v. Grinnell* factors, which the Second Circuit looks to, its progeny, and, in fact, the new amendments to Rule 23, which frankly overlap with *Grinnell* factors.

To reiterate *Grinnell*, with respect to factor one, complexity and expense and likely duration of the case. The case was very complicated. Obviously, the use of cooperating witnesses, the discoverability of those cooperating witnesses, the ultimate admissibility of that information was a very complicated issue which would have been addressed going forward in this case, had we elected not to mediate, would have been the subject of additional motion practice.

There would have been an argument on behalf of the defendants, and I know there would have been. This was not a case of fraud. It was always, at best, an instance of mismanagement on the part of Avon executives with respect to getting their arms around what was happening in Brazil with respect to the Brazilian economy. Bad debt. There was a bank strike. And, sadly, the Brazilian gross domestic product continues to decline. So they would have argued that this is not an instance of fraud.

There was another issue in this case which made it very complicated which I believe argued in favor of our discussing settlement sooner than later.

Your Honor, there were three drops in this company during the course of the class period followed by an ultimate curative disclosure as information leaked into the marketplace concerning the problems in the Brazilian business.

My friends at Cravath -- and, your Honor, as you know, we moved for class. My friends at Cravath would have argued that the case should have been truncated at the point of the first curative disclosure, that that's when all the information was in the marketplace, and anything thereafter was just more of the same, nothing to see here. And that would have, obviously, cut the case off at its knees with respect to damages. I obviously had argued that, no, more information was coming out that was unknown to the market, so we would have had

a very, very contested issue with respect to causation and disaggregation that would have been a battle of the experts that would have been both at the class certification stage and later in summary judgment, and at trial.

And that issue with respect to four curative disclosures, potential curative disclosures, is unique, frankly very interesting, but presented risks on all side and militated in favor of us entering into a mediation to see if we could resolve this case.  That was a very serious concern on all sides.

I'm trying to move quickly through my outline, your Honor.

We did take some discovery.  We received a set of core documents that Avon was able to pull from locations abroad.  I think they did move heaven and earth to get us the documents that they did, and I appreciate that.  We reviewed those documents.  They, to some degree, were supportive of our case, and in other instances I could see how my friends at Cravath would have used them against us on motion for summary judgment.

Again, with respect to the *Grinnell* factors, the case would have been an extremely expensive endeavor, obviously international discovery, not just because of the pandemic, but because of issues in Brazil, issues in the United Kingdom.

With respect to the company's own financial position under *Grinnell*, the company was not doing well, not that I'm

going -- Ms. DeMasi can clarify this.  The company has since been purchased and is now a subsidiary of another company.  The company in fact -- there was a real chance it did not withstand a greater judgment, should we have been successful at trial.

With respect to damages, again, there were damages issues because of the curative disclosures.  If the case had stopped, your Honor, at the first curative disclosure and your Honor ruled that way on class, damages in this case would have been maybe in the 50 million dollar range.

But our big-picture, soaking-wet plaintiff's number that we believe that we were able to establish all four curative drops was approximately $148 million.  The settlement proposed today is $14.5 million, which is 9.4 percent of aggregate damages.  Under the NERA studies and other cases that I've gone through, 20 some odd years, roughly 9 percent of aggregate damages in a securities class action is on the high end of a recovery.  We always like more.  But, again, 9.5, 9.4 percent is deemed rather high, relative to the total amount of damages that we thought were out there, namely, approximately 148 if in fact your Honor had agreed with me that all four curative disclosures, all of the false statements were part of the case.

That's ostensibly going through, quite quickly, the *Grinnell* factors as to why we think the case should settle for $14.5 million.

And I would point out that the new factors under federal rule 23(e) also support settlement; namely, that there was no agreement but for the stipulation and the confidential supplemental agreement and the MOU between the parties. Everything was wholly transparent. Everything was arm's length. I can assure you, everything was hotly contested. And I would submit that, premised upon that, we have indeed satisfied the *Grinnell* factors, and this is a case that should be approved.

Assuming your Honor is satisfied with respect to that, our papers do lay out the plan of allocation which was developed with the help of our damages expert. Because while I did study economics and finance in college, putting together plans of allocations in class action settlements do require experts.

Our plan of allocation has not received any objections. It is laid out in the papers. I think it is actually a very well thought-out plan. It takes into account all four drops, issues within the four drops, artificial inflation at different times in the drops, and I submit to your Honor it is fair. I can take you through it, if you wish.

THE COURT:  No.  It is not necessary.

MR. NESPOLE:  Thank you.  I was prepared, however, your Honor.  I studied it last night closely because it is complicated.

Your Honor, if I may take the liberty, if your Honor is comfortable with the settlement, the point of allocation, the certifications of the class for purposes of settlement, I would like to address the attorneys' fees.

THE COURT:  Why don't we pause there and let me address first the settlement itself, and I would like to see, does Ms. DeMasi have anything that you wish to add?

MS. DeMASI:  Thank you, your Honor.

The only thing I would add is, obviously, the defendants, the company and the three executives, do deny any wrongdoing.  The case did settle in advance of that discovery, but we think resolved significant risk on both sides and, I agree, was reached at arm's length through heavily negotiated mediation.

THE COURT:  Thank you.

First, with respect to the settlement itself, the Court does find, first of all, that notice was effectuated pursuant to the Court's order and that notice was fair, reasonable, and effective and consistent with Rule 23.

For all of the reasons set forth on the record and in the moving papers, as I say, the Court finally certifies for settlement purposes only, pursuant to Rule 23(a) and (b)(3), the settlement class as outlined in the papers, which is all persons and entities who purchased or otherwise acquired the publicly traded common stock of Avon during the period from

January 21, 2016 through November 1, 2017, exclusive, and were allegedly damaged thereby, subject to the certain exclusions that are laid out in the proposed order, which I don't need to articulate on the record.

The Court, as I say, has very carefully reviewed all of the submissions made by the parties, as I am required to do under *Wal-Mart*, the Second Circuit case in 2005. I analyzed it both in terms of the process that led to the settlement itself and the substantive terms of the settlement, applying all of the factors in *Grinnell* and the requirements of Federal Rule of Civil Procedure 23.

The Court does find that the settlement is fair, reasonable, appropriate, and the result of arm's length negotiations after some petty litigation and what appears to be some vigorous negotiations, including through a process of mediation.

Applying those *Grinnell* factors and looking at the terms of the settlement itself, as I say, the Court does find that the settlement should be approved under Rule 23 as fair, reasonable, and adequate. I also find that the plan of allocation is reasonable and is approved.

Let me just put a few specifics on the record. I am also noting the lack of any objections, and it's the Court's understanding that there were only six opt-outs from this settlement. Is that correct, or did you tell me additional

ones?

MR. NESPOLE:  There have been no new ones, your Honor.

THE COURT:  The Court does look to that as well as evidence that the market seems to believe that the settlement amount is fair and reasonable.

The Court has also taken into account the litigation risks, including the hurdles in proving liability; not just causation, which counsel seemed to highlight, but also scienter.

There would also be, as counsel outlined extensively, difficulties in procuring witnesses and presenting evidence, although the Court notes that that alone would not be a sufficient reason for the Court to find the settlement amount fair and reasonable.

You are going to address, when you talk about attorneys' fees, appointment of class rep and counsel?

MR. NESPOLE:  Class rep and counsel.

The class representative, your Honor, for the purposes of the settlement, was Ms. Ngo, Holly Ngo, and we did in fact move for class certification for Ms. Ngo.  But that got put on the back burner as we began to move into mediation.  But we were preparing her, and I'm going to speak to that a bit when I try to convince your Honor that she is entitled to some form of renumeration for her time.  She would be the class rep for the settlement class, Ms. Holly Ngo.

THE COURT:  As part of the Court approving the settlement I do finally certify Holly Ngo as the class rep, and I appoint the law firm of Levi & Korsinsky as class counsel for the settlement class.  All of the requirements, as I said, of Federal Rule of Civil Procedure 23 have been satisfied.  And pursuant to Rule 23 of the Federal Rules of Civil Procedure, applying all of the *Grinnell* factors, the Court finds the settlement is fair, reasonable, and adequate as to all members of the class and in the best interests of the settlement class and is hereby finally approved.

Counsel, you want to speak to me now about attorneys' fees.

MR. NESPOLE:  I would like to, your Honor, speak to attorneys' fees.

Your Honor, we request 30 percent of the settlement fund, which is $4.35 million, and we request $157,000 in expenses.

First, your Honor, the Second Circuit generally authorizes the percentage of a fund methodology.  As we have discussed at point 2 of our fee brief, which is ECF 85, we cite a number of cases there.

Courts in this district very frequently have awarded 30 percent in similar complex securities class actions.

We have also cited a number of cases in our compendium attached to my declaration in support of final approval.

Accordingly, I believe there is a substantial basis in this district and this circuit to ask for 30 percent under these circumstances.

Regardless of my request, the Second Circuit does in fact assess a number of factors that are outlined in *Goldberger v. Integrated Resources*. That indeed and this case do, in fact, confirm that 30 percent is reasonable. If your Honor wishes, I will carry us through the *Goldberger* factors:

The *Goldberger* factors include the time and labor expended on the case. Collectively we spent approximately 3,800 hours on this case with a lodestar value of $2.6 million. I am sure your Honor is familiar with the lodestar analysis.

The details are set forth in my declaration in support of final approval and the declarations of my colleague and friend, Chris Fox, a partner at the Labaton firm who worked on this case with us. Those time records were kept contemporaneously and carefully, they were checked, and they are accurate.

The second *Goldberger* factor is the magnitude and complexity of litigation, as I have discussed. This case presented certain substantial issues, and thank you for pointing out the scienter issue, which I glossed over. There would have been scienter issues in this case as well as causation issues with respect to whether or not there was, in fact, an intent to deceive with respect to accounting practices

in Brazil among executives in the United States.  There were additional issues that made this case even more complex.  But, again, I still stand on the premise that causation and damages and disaggregation presented for the plaintiffs a steep hill, and we are ready to climb it and we are working on it, but it was a steep hill.

The third *Goldberger* factor is the risks.  Obviously, your Honor, class action law firms take these cases on a contingent basis.  That is our business model.  And we choose to do that.  They are extremely risky and a number of courts have factored in over the years that the cases that are successful justify awards of significant percentages, premised upon the risk that we incur when taking on these cases because it would be practically impossible for individual stockholders to take on these cases one by one.

The fourth *Goldberger* factor is the quality of the representation.  My firm, Levi & Korsinsky, has been in a class action space for many years.  I have been doing this since 1997.  I'm the former managing partner of Wolf Haldenstein.  The Labaton firm is also one of the most sophisticated securities class action law firms in the world and my colleague, Ms. Fox, may be in fact one of the best lawyers in the country.  We are up against -- and I please do not want this to be used in the future against me by my friend Ms. DeMasi, but we were up against probably the best law firm in

New York in Cravath, and so everyone was well represented and everything was hard fought.

The fifth *Goldberger* factor is the relation of the fee of the size of the settlement party.  30 percent is well within the range awarded by courts in similar class actions, again, as noted in our papers and in compendium cases.  There is also public policy consideration in *Goldberger*.  Public policy is that courts should compensate an award to firms that are willing to take on contingent cases that otherwise would not be litigated, given the risks and the fact that an individual did not economically prosecute such a case.

Finally, although lodestar analysis in the Second Circuit has fallen from favor over the last few years, there still remains a useful lodestar crosscheck under *Goldberger*. And here our lodestar was $2.6 million and, again, that time was, I believe, fairly spent, audited and checked by myself, contemporaneously justified, and premised upon a 4.35 million dollar fee.  That multiple is 1.63.

Courts in this district and across the country, frankly, have found that a multiple of 1.63 is reasonable and that, your Honor, case is cited on page 20 of our fee brief where we cite cases awarding fees with multiples higher than 1.63, thereby justifying, I think, 1.63.

The hourly rates underlying our lodestar are reasonable.  They are based on the rates of New York City's

securities law firms and defense firms.  We are not cheap.  I understand that.  Nobody is cheap anymore.  But I think we are fair, and I think we are in line with the marketplace.

With respect to expenses, we request the reimbursement of $157,000 in litigation expenses.  This is below the 210,000 that we put in the notice.  I'm always inclined to overstate -- wrong word maybe, but always put in the notice the potential that we may have more expenses so that I can always come to the Court and say, look, I actually had less expenses.  I do have less expenses.

Here, we are, in fact, only asking for 157.  The notice had said 210.  Nobody objected to the notice noting 210,000.  58 percent of those expenses were on expert fees, consulting fees, e-discovery.  We also engaged a very sophisticated mediator in Mr. Meyer, who was great.

For the record, by the way, the case did not settle at the mediation.  It continued days after.  And there was a period of time there, your Honor, it looked like it wasn't going to settle.  And we did get together and get it done.  Thanks to cooler heads and Mr. Meyer, we did get it done.

I submit, your Honor, that the fee request and the disbursement requests are reasonable under the controlling case law in the Second Circuit and in this district.  Thank you.

THE COURT:  Anything, Ms. DeMasi?

MS. DeMASI:  No, your Honor.

THE COURT:  The Court has carefully reviewed the application for fees and expenses.  And applying all of the *Goldberger* factors, the Court does approve the application for fees and expenses.  The Court finds that notice of counsel's application for fees and litigation expenses was reasonable and appropriate and given to all members of the settlement class, the form and the method were reasonable and appropriate and satisfied the requirements of Rule 23.  There have been no objections to those fees and expenses, not that that is a dispositive factor.

Those fees and expenses have been approved by lead plaintiff and by the additional named plaintiff, Mr. Klungle, and the Court further finds that counsel, obviously, is competent, diligent, skillful counsel and has led to a settlement that is in the best interests of the settlement class.

So applying all of the *Goldberger* factors, the Court does find that the amount of attorneys' fees sought and the litigation expenses sought are fair and reasonable, and the motion for the award is approved.

You did not speak to me yet about the request for award for the class representative.

MR. NESPOLE:  Yes, ma'am.  I would like to make that presentation because that is actually important to me in this case.  It's always important.  In this instance it's really

quite important to me.

The PSLRA does, in fact, authorize the Court to award lead plaintiff and an initial named plaintiff, like Mr. Klungle, an amount for their service.

Speaking first for my client, who actually has become my friend, frankly, Ms. Ngo, Ms. Ngo lives in California. She spent approximately 70 hours assisting us in this case. She reviewed everything. I traveled to California to meet with her to prepare her for this case. She was prepared to come to New York to be deposed, despite a pandemic, or was prepared for me to come to her to defend her in person if we had to, in fact, do the class depositions. Because once we couldn't settle that evening on the mediation, the class deadline was coming up.

Ms. Ngo and I had set up an entire protocol as to how I was going to come out there, quarantine, we would be together, we were together. We had a weekly meeting. Ms. Ngo actually did a wonderful job assisting us. She was a participant in the mediation on the cell phone next to me here in my home office. She has approved every step of the way. She is a highly educated woman who fled Vietnam as a child, hid in Paris, and then came to the United States and became educated, is a systems analyst, and is now retired.

The way that we came to the conclusion to ask for $7500 is years ago a judge once asked me, well, if she was doing her job, what would you charge? That was the question.

So Ms. Ngo had recently retired and her consulting rate was about $110 an hour consulting. She did spend about 70 hours assisting us. She did prepare for her dep. She provided documents. She had to listen to me once a week during meetings. We think that $7500 is very fair.

Mr. Klungle also provided all of his documents to his counsel for his deposition. He was getting ready for his deposition. He wasn't necessarily the lead plaintiff or wasn't as involved from the outset in all the lead plaintiff process.

But Mr. Klungle, I believe, I'm pretty sure, lived out west. He was a student. He was busy. He had his own family. I think he was a single father, quite frankly. And this took a great deal of time out of his life, too, to help us. And he was prepared to be deposed during this pandemic, and we would have found a way to do it. We think the $1220 is a fair amount of money for him, based upon the calculations in our papers.

But I do really want to say that Ms. Ngo was really what the plaintiffs' lawyers want and need as lead plaintiffs, as class representatives. Not every class action needs to be led by an institutional investor to be well run and the class to be well represented. There are very good, sophisticated individual investors out there who can work with counsel, guide counsel, advise counsel, and Ms. Ngo was the perfect example of that, and I mean that by the bottom of my heart.

THE COURT: Is Ms. Ngo on the line?

MR. NESPOLE: No, she is not on the line today. I have her affidavit. We have gotten your affidavit before your Honor. She is in California. It's 9:30. I guess I could have gotten her on the line. She knows this is happening today.

THE COURT: It's not necessary unless, Ms. DeMasi, do you have anything you wish to add or do you have any interest in cross-examining any of these affiants?

MS. DeMASI: No, your Honor, I have nothing to add, and I take no position on the request.

THE COURT: The Court has received no request or notice from anybody of an interest in cross-examining anybody on the substance of any of the declarations or affidavits submitted in support of the motion today. I simply was inquiring whether she was on the line in order to thank her for her service and hope that she heard what you had to say about her.

Having said that, the Court has carefully, again, reviewed all that you have submitted in connection with this application, and the Court does find that both lead plaintiff, Holly Ngo, and additional plaintiff, David Klungle, have provided a benefit to the class, have adequately represented the class and assisted in securing a settlement which is in the best interest of the class, and so the Court does approve the award of $7,500 to lead plaintiff, Holly Ngo, and $1,220 to additional named plaintiff David Klungle under 15 U.S.C.

Section 78u-4(a)(4).

Is there anything else that we should talk about today?

MR. NESPOLE: Yes. There is one matter of housekeeping which I think would help your Honor. There are three orders before your Honor. If I was there, I would walk them up to you and hand them to you. I will direct you to what they are.

THE COURT: Let me just interrupt you and say, I have the supplemental declaration, Mr. Nespole that you filed. And attached to it as Exhibit A I have your proposed final judgment and order of dismissal with prejudice, which includes the approval of the class action settlement, and it has an exhibit listing the names of the six individuals who have timely and validly requested to be excluded from the settlement. I have your proposed order approving the plan of allocation, and I have your proposed order awarding attorneys fees.

I carefully reviewed each of them, and they all appear to be in order and consistent with the Court's ruling, and we will get them signed and entered at the conclusion of today's hearing.

MR. NESPOLE: Judge, one thing, in Exhibit 81-1, the final judgment, that also contains the bar order at paragraphs 10 and 11. I wanted your Honor to know that we do have a bar order in there as well because that needs to be -- my

experience is, you always need to let the Court know that there is, in fact, a bar order.  That's in there as well.

THE COURT:  Let me just take a quick look at what you are referring me to.

Basically, an injunction against trying to relitigate the released claim.

MR. NESPOLE:  Yes.  Ms. DeMasi's clients are free and clear.

THE COURT:  Yes, correct.  That is appropriately incorporated in the judgment that the Court is prepared to enter, unless anyone wishes to be heard with respect to that.

Anything else?

MR. NESPOLE:  Thank you.

THE COURT:  Ms. DeMasi, anything from you?

MS. DeMASI:  Nothing else.  Thank you, your Honor.

THE COURT:  I congratulate the parties on resolving their dispute and achieving a fair and appropriate settlement of this matter.

I wish everybody well.  Please stay safe and healthy and have a good rest of the day.  We are adjourned.

(Adjourned)