**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re Avon Products Inc. Securities Litigation

Case No.: 19-cv-01420-MKV
CLASS ACTION

**DECLARATION OF JESSIE M. MAHN IN SUPPORT OF LEAD PLAINTIFF'S**
**MOTION FOR ORDER AUTHORIZING DISTRIBUTION**
**OF CLASS ACTION SETTLEMENT PROCEEDS**

I, Jessie Mahn, declare and state as follows:

1.    I am a Project Manager employed by Epiq Class Action & Claims Solutions, Inc. ("Epiq"). Pursuant to the Court's Order Granting Preliminary Approval of Settlement dated August 31, 2020 (Dkt. No. 74) (the "Preliminary Approval Order"), Epiq was authorized to act as the Claims Administrator for the Settlement in the above-captioned action (the "Action").[1]

2.    The following statements are based on my personal knowledge and information provided by Epiq employees working under my supervision, and if called on to do so, I could and would testify competently thereto.

3.    The Court's Final Judgment and Order of Dismissal with Prejudice, dated February 3, 2021, granted final approval of the Stipulation, and adopted its terms (the "Final Approval Order"). The Court's Order Approving Plan of Allocation, dated February 3, 2021, approved the proposed plan for allocating the net settlement proceeds among eligible Settlement Class Members as set forth in the Notice (the "Plan of Allocation"). Epiq has completed processing all Proofs of Claim received through October 31, 2021, in accordance with the Stipulation and the Plan of

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Stipulation and Agreement of Settlement, dated August 21, 2020 (Dkt. No. 71-1, the "Stipulation").

Allocation, and now submits its administrative determinations accepting and rejecting the Proofs of Claim in preparation for a distribution of the Net Settlement Fund to Authorized Claimants.

## I.      DISSEMINATION OF THE NOTICE PACKAGE

4.      As more fully described in my Supplemental Declaration Regarding (I) Mailing of Notice and Proof of Claim Form; (II) Call Center Services; (II) the Settlement Website; and (IV) Requests for Exclusion and Objections Received to Date dated January 11, 2021 (Dkt. No. 87) (the "Supplemental Mailing Declaration"), Epiq had mailed an aggregate of 63,092 Notice Packages to potential Settlement Class members and nominees through January 11, 2021. Since that date, 10 additional Notice Packages have been mailed. In total, Epiq has disseminated 63,102 Notice Packages to potential Settlement Class Members and nominees.

5.      Pursuant to the Preliminary Approval Order, on September 28, 2020, Epiq caused the Summary Notice to be published in *Investor's Business Daily* and over the *PR Newswire*.

## II.      PROCEDURES FOLLOWED IN PROCESSING CLAIM FORMS

6.      Under the terms of the Preliminary Approval Order, and as set forth in the notice, each Settlement Class member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Epiq a properly executed Proof of Claim postmarked no later than December 19, 2020, together with adequate supporting documentation for the transactions and holdings reported therein. Through October 31, 2021, Epiq has received 8,860 Proofs of Claim.

7.      In preparation for receiving and processing Proofs of Claim, Epiq (i) conferred with Lead Counsel regarding the project guidelines for processing Proofs of Claim; (ii) created a unique database to store Proofs of Claim details and images of Proofs of Claim and supporting documentation; (iii) trained staff in the specifics of the project so that Proofs of Claim would be

properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Settlement Class Members' identifying information and transactional information; and (vi) developed a proprietary "calculation module" that would calculate Recognized Loss pursuant to the Court-approved Plan of Allocation set forth in the Notice.

### a. Processing Paper Proofs of Claim

8.  A total of 8,860 Proofs of Claim were received by Epiq through October 31, 2021. Of the 8,860 Proofs of Claim, 889 were paper Proofs of Claim. Once received, these Proofs of Claim were opened and prepared for scanning. This process included unfolding documents, removing staples, copying documents with nonconforming sizes, and sorting documents. This manual task of preparing the paper Proofs of Claim is very laborious and time-intensive. Once prepared, the paper Proofs of Claim were scanned into a database together with all submitted documentation. Each Proof of Claim was assigned a unique Proof of Claim number. Once scanned, the information from each Proof of Claim, including the claimant's name, address, account number/information from the supporting documentation, and purchase/acquisition transactions, sale transactions, and holdings listed on the Proof of Claim, were entered into a database developed by Epiq to process Proofs of Claim. Next, the documentation provided by each claimant in support of his, her, or its Proof of Claim was reviewed to determine: (i) whether the claimant purchased or otherwise acquired publicly traded common stock issued by Avon Products, Inc. from January 21, 2016, through November 1, 2017, inclusive (the "Settlement Class Period"); (ii) whether the transaction information entered on the Proof of Claim was supported by the documentation; (iii) that the claimant did not have any additional trades not reflected on his, her, or its Proof of Claim; (iv) that the name of the claimant matched the information on the trade documentation, or

additional documentation was provided to support any name changes; and (v) that the beneficial owner on the trade documentation, or a valid representative, was the person who signed the Proof of Claim.

9.      In order to process the transactions detailed on the Proofs of Claim, Epiq utilized internal codes to identify and classify any deficiency or ineligibility conditions that existed within those Proofs of Claim. The appropriate codes were assigned to the Proofs of Claim as they were processed. For example, where a Proof of Claim was submitted by a claimant who did not have any eligible transactions in the publicly traded common stock of Avon (the "Securities") during the Class Period, that Proof of Claim would receive a defective code that denoted ineligibility. Similar defective codes were used to denote other ineligible conditions, such as duplicate Proofs of Claim. These codes indicate to Epiq that the claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that Proof of Claim unless the deficiency was cured in its entirety.

10.      Because a Proof of Claim may be deficient only in part, but otherwise acceptable, Epiq utilized codes that are only applied to specific transactions within a Proof of Claim. For example, if a claimant submitted a Proof of Claim with supporting documentation for all but one purchase transaction, that one transaction would receive a transaction-specific defective code. That code indicated that one transaction was deficient, but that the Proof of Claim was otherwise eligible for payment if other transactions in the Proof of Claim calculated to a Recognized Loss according to the Plan of Allocation. Thus, even if the deficiency was never cured, the Proof of Claim could still be partially accepted.

**b.  Processing Web Proofs of Claim**

11.     Of the 8,860 Proofs of Claim received by Epiq through October 31, 2021, 441 were submitted online via the Settlement website. The online claim filing system was accessible through the website home page, where claimants were provided with step-by-step directions for providing their contact information and the relevant shareholding information required to support their claims. Claimants were required to upload their supporting documentation through this online system at the time of filing their proof of claim.

12.     Claimants received a confirmation number advising them that their claim was successfully uploaded and submitted. All Proofs of Claim that were successfully uploaded and submitted through the online filing system are all imported into the case database on a nightly basis and assigned a claim number. Online claims are subject to the same review and process as a paper claim, as explained above.

**c.  <u>Processing Proofs of Claim Submitted Electronically Via Spreadsheet</u>**

13.     Of the 8,860 Proofs of Claim received through October 31, 2021, 7,530 were filed electronically. Electronic Claims are typically submitted by institutional investors who may have hundreds, thousands, or even millions of transactions during the Class Period. Rather than provide reams of paper requiring data entry, the institutional investors filing electronic Claims either mail a computer disc or electronically submit a file to Epiq so that Epiq may electronically upload all transactions to its proprietary database developed for the Settlement.

14.     Epiq's Securities Team coordinates and supervises the receipt and handling of all electronic Claims. In this case, the Securities Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format, and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, Epiq

notified the sender. If the electronic file was deemed to be in an acceptable format, it was then loaded to Epiq's database.

15. Once the file was loaded, the electronic Claims were coded to identify them as electronic Claims and codes were applied to denote any deficiencies or ineligible conditions that existed within them. These codes are similar to those applied to paper Proofs of Claim. In lieu of manually applying codes, the Securities Team performed programmatic reviews on electronic Claims to identify deficient and ineligible conditions including, but not limited to, price per share/net amount validation issues, out of balance conditions, and transactions outside the Class Period. The output was thoroughly verified and confirmed as accurate.

16. The review process also included flagging any electronic Claims that were not accompanied by a signed Proof of Claim, which serves as a "Master Proof of Claim" for all accounts referenced on the electronic file submitted. This process was reviewed by Epiq's Securities Team and, where appropriate, Epiq contacted the institutional filers whose electronic files were missing information. This process ensured that all claims were submitted by properly authorized representatives of the claimants.

17. Finally, at the end of the process, Epiq performed various targeted reviews of electronic Claims. Specifically, Epiq used the calculated Recognized Losses and other identified criteria to flag and reach out to a number of electronic filers and request that various sample exchanges, purchases, sales, and holdings selected by Epiq be documented by providing confirmation slips or other transaction-specific supporting documentation. These targeted reviews

helped to ensure that electronic data supplied by claimants did not contain inaccurate information. Epiq also performed additional targeted reviews in connection with the largest Claims.

### III.    EXCLUDED PERSONS

18.    Epiq reviewed all Proofs of Claims to ensure that they were not submitted by, or on behalf of, excluded persons to the extent that the identities of such persons or entities were known to Epiq through the list of Defendants, and other excluded persons and entities set forth in the Stipulation and the Notice, and through the claimants' certifications on the Proofs of Claim.

### IV.    THE DEFICIENCY PROCESS

19.    Approximately 894 of the 1,330 paper and web Proofs of Claim, or approximately 67% of the paper and web Proofs of Claim submitted, were incomplete or had one or more defects or conditions of ineligibility, such as the Proof of Claim not being signed, not being properly documented, or indicating no eligible transactions of the Securities.

20.    A majority of Epiq's efforts in handling an administration involve claimant communications, so that all claimants have a sufficient opportunity to cure any deficiencies and file a complete Proof of Claim. The "Deficiency Process," which primarily involved mailing letters to claimants and, in response, making and receiving calls and sending and receiving emails to and from claimants, was intended to assist claimants in properly completing their otherwise deficient submissions so that they would be eligible to receive a distribution from the Net Settlement Fund.

21.    If a Proof of Claim was determined to be defective or ineligible, a Notice of Incomplete Proof of Claim Submission ("Deficiency Notice") was sent to the claimant describing the defect(s) or condition(s) of ineligibility in their Proof of Claim and what was necessary to cure any "curable" defect(s) in the Proof of Claim. The Deficiency Notice advised the claimant that the submission of the appropriate information and/or documentary evidence to complete the Proof of

Claim had to be sent within twenty (20) days from the date of the letter, or the Proof of Claim would be recommended for rejection to the extent the deficiency or condition of ineligibility was not cured. The Deficiency Notice also advised claimants that if they desired to contest the administrative determination, they were required to submit a written statement to Epiq requesting Court review of the determination and setting forth the basis for the request. Epiq mailed, by First-Class Mail, a total of 904 Deficiency Notices to claimants. Attached hereto as Exhibit A is an example of the Deficiency Notice.

22.     Claimants' responses to the Deficiency Notices were scanned into Epiq's database and associated with the corresponding Proof of Claim. The responses were then carefully reviewed and evaluated by Epiq's team of processors. If a claimant's response corrected the defect(s), Epiq updated the database manually to reflect the change in status of the Proof of Claim.

## V.    ELECTRONIC CLAIM DEFICIENCY PROCESS

23.     Using the following process, Epiq provided claim submitters who filed electronically via spreadsheet and whose submissions were deficient with an email attaching a Transaction Report, which listed the specific electronic Claims that were incomplete along with a list of the specific portions of the Claims that were incorrect or incomplete. The Transaction Reports:

(a)     were sent electronically to 48 filers who submitted 4,661 deficient or ineligible electronic Claims;

(b)     identified individual transactions and entire electronic Claims that were found to be deficient or ineligible so that the filer on behalf of the claimant had the opportunity to correct the deficient condition or contest the determination of ineligibility;

(c)    stated that any deficient transactions or electronic Claims that remain uncured, as well as any transactions or electronic Claims that were identified as ineligible on the Transaction Report, would be recommended for rejection;

(d)    notified the filer that it could, on behalf of the claimant, request that the Court review Epiq's administrative determination if it wished to contest the rejection of any transactions or electronic Claims; and

(e)    provided Epiq's contact information so that the filer could reach out to Epiq if it had any questions or required assistance.

24.    The responses to the Transaction Reports were reviewed by Epiq's Securities Team, scanned, and/or loaded into Epiq's database, and associated with the corresponding electronic Claim. If the response corrected the defect(s) or affected the electronic Claim's status, Epiq manually and/or programmatically updated the database to reflect the change in status of the electronic Claim.

## VI.    <u>DISPUTED CLAIMS</u>

25.    As noted above, claimants were advised that they had the right to contest Epiq's administrative determination of deficiencies or ineligibility within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, such persons were advised in the Deficiency Notice and in the Transaction Reports that to dispute Epiq's determinations, they needed to provide a statement of reasons indicating their grounds for contesting the rejection, along with supporting documentation.

26.    A total of 20 Claimants contested Epiq's administrative determinations and requested review by the Court. To resolve the disputes without necessitating the Court's intervention, Epiq contacted all persons requesting Court review, and with respect to those

Claimants who were reached, Epiq answered all their questions, fully explained Epiq's determination of the Claim's status, and facilitated the submission of missing information or documentation where applicable. As a result of these efforts, 16 requests for Court review have either been cured or the request for Court review has been retracted.

27.    Four requests for Court Review have not been resolved or retracted. Epiq has attempted to contact all four claimants by telephone, email, and/or letter. Three of these claimants responded to our efforts to resolve their dispute but have refused to retract their requests. One of the claimants failed to respond to Epiq's attempts to contact them. As described above, the claimants were advised in writing of their rights and the reasons why their claims were denied. Exhibit B attached hereto contains copies of the correspondence relating to the Disputed Claim, including copies of the Proof of Claim and supporting documentation, the Deficiency Notices sent by Epiq with respect to the Disputed Claim and the letters and documentation received by Epiq in response to the Deficiency Notices. The Disputed Claims are labeled as "Disputed Claim No. 1, 2, 3, and 4" and are discussed further below.[2]

28.    **Disputed Claim No. 1:** Epiq recommends the rejection of Disputed Claim No. 1 because the claim did not reflect eligible purchases during the class period. The Proof of Claim Form and documentation submitted reflect that the claimant held 77.756172 shares of Avon common stock as of January 4, 2018 but did not include any purchases or acquisitions of Avon common stock. On March 11, 2021, Epiq sent the claimant a Deficiency Notice indicating that their claim form submission did not contain any eligible purchases/acquisitions of Avon common stock during the Class Period (i.e., from January 21, 2016, through November 1, 2017) and that

---

[2] For privacy reasons, the documents included in Exhibit B have been redacted to remove personal information such as street address, telephone numbers, social security/taxpayer identification numbers and financial account numbers.

unless the claimant had additional purchases/acquisitions of Avon common stock during the Class Period that were not reflected in their original Claim this is not a curable deficiency. The claimant responded on March 19, 2021, with a letter stating that the claimant held 77.756172 shares of Avon common stock during the Class Period. She also included a letter from her broker stating that as of the merger with Natura & Co Holding S.A her 77.756172 shares were converted to 23 shares under the new company. No additional documentation was provided to show that the claimant made any eligible purchases/acquisitions during the Class Period. We attempted to contact the claimant via telephone with no answer or ability to leave a message. As the claimant did not provide an email address, we then mailed a letter to the claimant on June 28, 2021, explaining that the documentation provided was not sufficient to show that the claimant had purchased or acquired her shares during the Class Period. To date we have not received any response to our attempts to reach this claimant. Accordingly, Epiq has maintained the request for Court review. Attached hereto as Exhibit B-1 is Disputed Claim No. 1.

29.    **Disputed Claim No. 2:** Epiq recommends the rejection of Disputed Claim No. 2 because it does not calculate to a Recognized Loss under the Plan of Allocation. The Proof of Claim Form submitted via the online web portal[3] and supporting documentation indicates that the claimant purchased 2,700 shares of Avon common stock at a purchase price of $6.775 per share on October 26, 2017; 3,300 shares at a purchase price of $6.774 per share on October 26, 2017; 1,850 shares at a purchase price of $6.699 per share on October 27, 2016; and sold 7,850 shares of Avon Common Stock at a sale price of $6.6416 per share on October 31, 2016. The Claimant further purchased 50,000 shares of Avon common stock at a purchase price of $2.649 per share on

---

[3] Claim data submitted by Claimants via the online web portal is directly uploaded and imported into Epiq's claim database. Since no paper Proof of Claim Form is generated, Epiq is instead attaching a spreadsheet of the transactions as entered by the Claimant.

11

August 17, 2017; 700 shares at a purchase price of $2.5774 per share on August 22, 2017; 2,000 shares at a purchase price of $2.5968 per share on September 7, 2017; 34,095 shares at a purchase price of $2.41 per share on September 21, 2017; 45,000 shares at a purchase price of $2.45 per share on September 21, 2017; 2,300 shares at a purchase price of $2.445 per share on September 21, 2017; and sold 2,200 shares of Avon common stock at a sale price of $2.355 per share on October 2, 2017; 6,732 shares at a sale price of $2.35 per share on October 2, 2017; 35,709 shares at a sale price of $2.34 per share on October 2, 2017; 27,872 shares at a sale price of $2.33 per share on October 2, 2017; 300 shares at a sale price of $2.325 per share on October 2, 2017; 15,105 shares at a sale price of $2.32 per share on October 2, 2017; and 46,177 shares at a sale price of $2.31 per share on October 2, 2017. Pursuant to Section A of the Plan of Allocation, for each share purchased or acquired from January 21, 2016, through and including November 1, 2017, and sold before the opening of trading on February 16, 2017, the Recognized Loss Amount will be zero. Accordingly, the Recognized Loss Amount for the claimant's shares purchased on October 26 and 27, 2016 and sold on October 31, 2016, is zero. Pursuant to Section B of the Plan of Allocation, for each share purchased or acquired from January 21, 2016 through and including November 1, 2017 and sold after the opening of trading on February 16, 2017, through the close of trading on November 1, 2017, the Recognized Loss Amount shall be the lesser of (1) the dollar artificial inflation applicable to each such share on the date of purchase/acquisition as set forth in Table 1 (page 7 of the Notice) minus the dollar artificial inflation applicable to each such share on the date of sale as set forth in Table 1 ; or (2) the Out of Pocket Loss. Accordingly, the Recognized Loss Amount for the claimant's shares purchased on August 17, August 22, September 7, and September 21, 2017, and sold on October 2, 2017, is zero. The dollar artificial inflation price applicable to each share purchased on August 3, 2017, through November 1, 2017 ($0.08) minus

the dollar artificial inflation applicable to each share purchased on August 3, 2017, through November 1, 201 ($0.08) is zero. On March 11, 2021, Epiq sent the claimant a Deficiency Notice indicating that in accordance with the Court-approved Plan of Allocation set forth in the Notice, the Claim did not calculate to a Recognized Loss and is not eligible to receive a distribution from the Net Settlement Fund. The claimant responded on April 21, 2021 and requested Court review of Epiq's administrative determination. On May 5, 2021, Epiq sent an email to the claimant advising him that his claim did not calculate to a Recognized Loss and gave a detailed explanation of the calculation. The claimant responded again via email on May 5, 2021 and renewed their request for Court review of Epiq's administrative determination. Attached hereto as Exhibit B-2 is Disputed Claim No. 2.

30.    **Disputed Claim No. 3:** Epiq recommends the rejection of Disputed Claim No. 3 because the claim did not reflect eligible purchases during the class period. The Proof of Claim Form submitted indicates that the claimant purchased 100 shares of Avon common stock at a purchase price of $3.72 per share on January 16, 2016, which is before the beginning of the Class Period. On March 11, 2021, Epiq sent the claimant a Deficiency Notice indicating that their claim form submission did not contain any eligible purchases/acquisitions of Avon common stock during the Class Period (i.e., from January 21, 2016, through November 1, 2017) and that unless the claimant had additional purchases/acquisitions of Avon common stock during the Class Period that were not reflected in their original Claim this is not a curable deficiency. The claimant responded on April 6, 2021, stating that the documentation showing when his stock was bought and sold has been destroyed and that he contacted his brokers but that they did not have documentation for him to submit. On May 5, 2021, Epiq sent an email to the claimant advising that in order to be eligible for recovery from the Settlement, he must have purchased his shares of

Avon common stock during the time period of January 21, 2016, to November 1, 2017, inclusive (the "Class Period"). After receiving no response, Epiq sent another email on May 21, 2021, and then followed up with a telephone call and left a voicemail message. Claimant called back in response to the voicemail message, and we explained Epiq's administrative determination to recommend his claim for rejection. Claimant responded that he wished to maintain his request for court review. We advised that his claim would be submitted for court review. Attached hereto as Exhibit B-3 is Disputed Claim No. 3.

31.    **Disputed Claim No. 4**: Epiq recommends the rejection of Disputed Claim No. 4 because the claim did not reflect eligible purchases during the class period. The Proof of Claim Form submitted via the online web portal and the supporting documentation indicates that the claimant held 264 shares at the beginning of the Class Period and that he received 132 shares of Avon common stock into his account on March 29, 2017, and then held those shares until January 30, 2018. On March 11, 2021, Epiq sent the claimant a Deficiency Notice indicating that their claim form submission did not contain any eligible purchases/acquisitions of Avon common stock during the Class Period (i.e., from January 21, 2016, through November 1, 2017) and that unless the claimant had additional purchases/acquisitions of Avon Common Stock during the Class Period that were not reflected in their original Claim this is not a curable deficiency. The Deficiency Notice explained that received shares or transfers of securities are not open-market transactions and pursuant to the Plan of Allocation, were not considered eligible purchases or acquisitions. On April 6, 2021, the claimant responded and requested Court review of Epiq's administrative determination. On May 6, 2021, Epiq sent an email to the claimant stating that pursuant to the Court-approved Plan of Allocation which is set forth in the Notice at page 8, the receipt or grant by gift, inheritance or operation of law of Avon common stock during the Class

14

Period shall not be deemed a purchase or acquisition of such shares for the calculation of a Claimant's Recognized Claim, nor shall the receipt or grant be deemed an assignment of any claim relating to the purchase/acquisition of such shares unless (i) the donor or decedent purchased or otherwise acquired such shares of Avon common stock during the Class Period; (ii) no Proof of Claim Form was submitted by or on behalf of the donor, on behalf of the decedent, or by anyone else with respect to such shares; and (iii) it is specifically so provided in the instrument of gift or assignment. On May 19, 2021, the claimant responded via email and renewed their request for Court review of Epiq's administrative determination. Epiq responded to the claimant on May 21, 2021, letting them know that their claim would be submitted for court review. Attached hereto as Exhibit B-4 is Disputed Claim No. 4.

## VII.    LATE BUT OTHERWISE ELIGIBLE CLAIMS

32.    Through October 31, 2021, Epiq received 278 Proofs of Claim that were postmarked or received after December 19, 2020, the submission deadline established by the Court. Epiq processed all late Proofs of Claim received through October 31, 2021, and 113 have been found to be otherwise eligible in whole or in part (the "Late But Otherwise Eligible Claims"). Epiq has not rejected any Proofs of Claim received through October 31, 2021, solely based on its late submission, and believes no delay has resulted from the provisional acceptance of these Late But Otherwise Eligible Claims. To the extent they are eligible but for the fact that they were late, Epiq recommends that they be eligible for payment.

33.    However, there must be a final cut-off date after which no more Proofs of Claim will be accepted so that there may be a proportional distribution of the Net Settlement Fund and the distribution may be accomplished. Acceptance of additional Proofs of Claim or responses to Deficiency Notices received during the finalization of the administration and the preparation of

15

this application would necessarily require a delay in the distribution. Accordingly, Epiq intends that no Proofs of Claim or responses received after October 31, 2021, shall be eligible for payment in the initial distribution. After nine months after the initial distribution, if monies remain in the fund and it is cost-effective to do so, Epiq will propose that claims received after October 31, 2021, and are otherwise eligible in whole or in part, be eligible for payment in a re-distribution.

## VIII.    QUALITY ASSURANCE

34.    An integral part of all of Epiq's settlement administration projects is its quality assurance review. Epiq personnel worked throughout the entire administration process to ensure that Proofs of Claim were processed properly; that deficiency and ineligibility message codes were properly applied to Proofs of Claim; that Deficiency Notices were mailed to the appropriate claimants; and that Epiq's computer programs were operating properly.

35.    In support of the work described above, Epiq staff designed, implemented, and tested the following programs for this administration: (i) data entry screens that store Proof of Claim information (including all transactional data included on each Proof of Claim and in any supporting documentation), attach message codes and, where necessary, apply text to denote conditions existing within the Proof of Claim; (ii) screens for the analyst to review images of the Proof of Claim and any supporting documentation provided; (iii) programs to load and analyze transactional data submitted electronically for all electronic Claims (the load program converts the data submitted into the format required by the calculation program, and the analysis program determines if the data is consistent and complete); (iv) a program to compare the claimed transaction prices against the reported market prices to confirm that the claimed transactions were within an acceptable range of the reported market prices; (v) a calculation program to analyze the transactional data for all Proofs of Claim and calculate the Recognized Losses; and (vi) programs

16

to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible Proofs of Claim.

36.    Epiq's Securities Team performed a final quality control check once all of the accepted Claims were processed, Deficiency Notices were mailed, and deficiency responses were reviewed and processed, to ensure the correctness and completeness of all of the Proofs of Claim processed, before Epiq prepared its final reports to Lead Counsel. Here, in connection with this quality assurance wrap-up, Epiq: (i) confirmed that Proofs of Claim that are recommended for approval have no messages denoting ineligibility; (ii) confirmed that Proofs of Claim that are recommended for rejection have messages denoting ineligibility; (iii) confirmed that all Proofs of Claim requiring "deficiency" notices were sent such notices; (iv) performed a sample review of deficient Proofs of Claim; (v) reviewed a sampling of Proofs of Claim with high Recognized Losses; (vi) sampled Proofs of Claim that had been determined to be ineligible, including those with no Recognized Losses calculated in accordance with the Plan of Allocation, in order to verify that all transactions had been captured correctly; and (vii) retested the accuracy of the calculation program.

37.    As part of its due diligence in processing the Claims, Epiq conducted a questionable claim filer search of all Proofs of Claim and electronic Claims filed in the Settlement. Epiq maintains a database of known questionable filers. This database contains names, addresses, and aliases of individuals compiled from previous settlements that Epiq has administered and of individuals from whom fraudulent claims were received. Epiq updates this database on a regular basis. The database for the Settlement was searched for all individuals identified in our questionable claim filer database. Epiq performed searches based on name, aliases, address, and city/zip code. In addition, all of Epiq's claim processors are trained to identify any potentially

17

inauthentic documentation when processing claims, including for claims submitted by claimants not previously captured in our database as questionable claim filers. Processors are instructed to flag claims as questionable claims and route them to the project manager and Securities Team for review.

## IX.     DISPOSITION OF PROOFS OF CLAIM

38.     Epiq has completed the processing of the 8,860 Proofs of Claim that were received through October 31, 2021 and has determined that 3,673 are acceptable and 5,187 should be wholly rejected because they are either ineligible, wholly deficient, or have no Recognized Loss when calculated in accordance with the Plan of Allocation.

39.     The 5,187 rejected Proofs of Claim are ineligible for the following reasons:

### Summary of Rejected Proofs of Claim

| Reason for Rejection | Number of Claim Forms |
|---|---|
| No Eligible Purchases/Acquisitions During the Class Period | 2,840 |
| Proof of Claim Did Not Result in a Recognized Loss | 2,009 |
| Deficient Proof of Claim Never Cured | 153 |
| Duplicate Proof of Claim | 39 |
| Withdrawn Proof of Claim | 146 |
| **TOTAL:** | **5,187** |

40.     A list of the Proofs of Claim submitted and Epiq's intended disposition is contained in the Administrator's Report attached hereto as Exhibits C-1 through C-3. Exhibit C-1, entitled "Timely Eligible Claims," lists all timely filed, provisionally accepted Proofs of Claim, and states their Recognized Loss. Exhibit C-2, entitled "Late But Otherwise Eligible Claims," lists all late-filed, provisionally accepted Proofs of Claim and states their Recognized Loss. Exhibit C-3, entitled "Rejected Claims," lists all wholly rejected Proofs of Claim and states the reason for their

rejection. For privacy reasons, Exhibits C-1 through C-3 provide only the claimant's claim number and Recognized Loss or reason for rejection (no names, addresses, taxpayer ID, social security or social insurance numbers are disclosed).

41.     Epiq has determined that 3,673 Proofs of Claim should be accepted. The Proofs of Claim identified for acceptance represent total Recognized Losses of $199,447,178.25. Of that total, $188,348,572.98 is for Timely Eligible Claims and $11,098,605.27 is for Late But Otherwise Eligible Claims. According to the Plan of Allocation, each Authorized Claimant shall be allocated a *pro rata* share of the Net Settlement Fund based on his, her, or its Recognized Loss in comparison to the total Recognized Losses of all Authorized Claimants. Epiq will prepare and mail checks (or wire transfers where applicable) to Authorized Claimants for their payment amount subject to the provisions of the Court-approved distribution plan.

## X.     EPIQ'S REQUESTED FEES AND DISBURSEMENTS

42.     Epiq agreed to be the Claims Administrator in exchange for payment of its fees and expenses, which are paid pursuant to the Stipulation. To date, Epiq has incurred $365,116.83 in fees and expenses for its work performed on behalf of the Class, including its estimate of fees and expenses to complete distribution of the Settlement Fund. Lead Counsel has paid Epiq already a total of $68,225.94 in connection with its fees and expenses. Accordingly, Epiq has $296,890.89 in outstanding fees and expenses. Attached hereto as Exhibit D is a copy of Epiq's invoices. To the extent there are remaining funds and Epiq and Lead Counsel determine its feasible to conduct another distribution, pursuant to paragraph 43(d) below, Epiq's fees and expenses will be paid from the remaining funds at that time.

## XI.     DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

43.     Epiq intends to implement the following distribution plan (the "Distribution Plan"):

(a)      Epiq will distribute 100% of the available balance of the Net Settlement Fund after deducting any Notice and Administration Costs, Taxes, and Tax Expenses to Authorized Claimants who would receive at least $10.00 based on their Recognized Loss in comparison to the total Recognized Losses of all Authorized Claimants.

(b)      In order to encourage Authorized Claimants to promptly deposit their payments, all distribution checks will bear a notation "DEPOSIT PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT NEGOTIATED WITHIN 90 DAYS OF DISTRIBUTION."[4]

(c)      Authorized Claimants who do not negotiate their distribution checks within the time allotted or on the conditions set forth in footnote 4 will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available to be distributed to other Authorized Claimants if Lead Counsel, in consultation with Epiq, determines that it is feasible to conduct a re-distribution. Similarly, Authorized Claimants who do not negotiate their subsequent distributions (should such distributions occur) within the time allotted

---

[4] For Authorized Claimants whose checks are returned as undeliverable, Epiq will attempt to locate new addresses by reasonable methods. Where a new address is located, Epiq will update the database accordingly and re-issue a distribution check to the Authorized Claimant at the new address. In the event an Authorized Claimant loses or damages his, her or its check, or otherwise requires a new check, Epiq will issue replacements. Distribution re-issues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, Epiq will void the initial payment prior to re-issuing a payment. Authorized Claimants will be informed that, if they do not cash their distribution checks within the 90 days from the mail date, or they do not cash check reissues within 30 days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited and the funds will be re-allocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received prior to the next planned distribution. Requests for reissued checks in connection with any re-distribution will be handled in the same manner.

or on the conditions set forth in footnote 4 will irrevocably forfeit any further recovery from the Net Settlement Fund.

(d)     Consistent with the Plan of Allocation, after Epiq has made reasonable and diligent efforts to have Authorized Claimants negotiate their distribution checks, any balance remaining in the Net Settlement Fund at least nine months after the initial distribution of such funds shall be re-distributed on a pro rata basis to Settlement Class Members who have cashed their initial distributions in an equitable and economical manner, after payment of any unpaid costs or fees incurred in administering the Net Settlement Fund for such redistribution. These redistributions shall be repeated until the balance in the Net Settlement Fund is no longer economical to distribute. Any balance that still remains in the Net Settlement Fund after redistribution(s) which not feasible or economical to reallocate, after payment of any unpaid costs or fees incurred in administering the Net Settlement Fund, shall be contributed to the New York Legal Aid Society, a nonprofit legal advocacy organization.

(e)     New Proofs of Claim received after October 31, 2021, responses to deficiencies received after October 31, 2021, and adjustments to Proofs of Claim that would result in an increased Recognized Loss received after October 31, 2021, will not be eligible for the initial distribution. If a re-distribution is necessary, Epiq will propose these claims be eligible for payment in the re-distribution.

(f)     Unless otherwise ordered by the Court, one year after the final distribution, Epiq will destroy the paper copies of the Proofs of Claim and all supporting documentation, and one year after all funds have been distributed, Epiq will destroy electronic copies of the same.

## CONCLUSION

44.    Epiq respectfully requests that the Court enter an Order approving its administrative determinations accepting and rejecting the Proofs of Claim received on or before October 31, 2021 and approving the proposed Distribution Plan. Epiq further respectfully requests that its fees and expenses should be approved for payment from the Net Settlement Fund as reflected on the invoices attached hereto as Exhibit D.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 15, 2021.

_____
Jessie Mahn